HULETT HARPER STEWART, LLP
BLAKE MUIR HARPER, SBN: 115756
225 Broadway, Suite 1350
San Diego, CA  92101
Telephone:    (619) 338-1133
Facsimile:     (619) 338-1139

Attorneys for Plaintiff Michael J. Angley
and Proposed Class Counsel
[Additional Counsel on Signature Page]

# IN THE UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL J. ANGLEY, on behalf of himself and all others similarly situated, | Case No. 5:14-cv-00508 |
| | **CLASS ACTION COMPLAINT** |
| Plaintiff, | |
| v. | |
| UTI WORLDWIDE INC., ERIC W. KIRCHNER, and RICHARD G. RODICK, | |
| Defendants. | **JURY TRIAL DEMANDED** |

Plaintiff Michael J. Angley (hereinafter, "Plaintiff"), by his attorneys, alleges the following upon information and belief, except for those allegations that pertain to Plaintiff, which are based on Plaintiff's personal knowledge:

## NATURE OF THE ACTION

1. Plaintiff brings this action as a class action on behalf of himself and all other persons or entities who purchased shares of UTi Worldwide Inc. ("UTi" or the "Company") common stock on the open market during the period December 5, 2013 through February 25, 2014 to recover damages caused by Defendants' violations of the federal securities laws.

2. On February 26, 2014, UTi disclosed, for the first time, that problems with the rollout of its new freight forwarding operating system dating back to at least September 2013 had so severely depleted UTi's liquidity that it was in breach of covenants relating to one of its financing agreements, forcing its auditor, Deloitte & Touche LLP ("Deloitte") to amend, on February 26, 2014, its last auditor's report on the Company's consolidated financial statements to say that as of February 26, 2014, there was "substantial doubt about the Company's ability to continue as a going concern. In addition, UTi's liquidity problems forced it to announce, the same day, that it was undertaking a highly dilutive offering of, in total, over $500 million worth of convertible notes and preferred shares in order to provide UTi with the emergency financing it badly needed. The disclosures and the news of this offering caused the Company's stock price to fall nearly 30% (or $4.52 per share) on February 26, 2014 (a total decline in market capitalization in excess of $45 million), and to fall even further over the next few trading days as the market and analysts digested the news.

3. UTi failed to disclose in public statements it filed with the SEC prior to February 26, 2014 that the Company had severe problems with its freight forwarding operating system, that it was in the midst of a severe liquidity crunch, and that it was at serious risk of breaching its financing covenants.

1

## JURISDICTION AND VENUE

4.     This action arises under Sections 10(b) (15 U.S.C. § 78j(b)) and 20(a) (15 U.S.C. § 78t(a)) of the Securities Exchange Act of 1934, 15 U.S.C. § 78a, *et seq.* (the "Exchange Act"), and Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated there under by the SEC, and is brought on behalf of investors who purchased publicly traded shares of UTi on the NASDAQ Stock Exchange Global Market ("NASDAQ") in the United States.

5.     In connection with the acts alleged herein, the Defendants directly or indirectly used the means and instrumentalities of interstate commerce, including the United States mails and facilities of a national exchange.

6.     Jurisdiction is conferred upon this Court by Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. §§ 1331 and 1337.  This action arises out of the laws of the United States and the Courts of the United States have exclusive jurisdiction of claims brought under the Exchange Act under 15 U.S.C. § 78aa.

7.     This Court has personal jurisdiction over the Defendants pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) as Defendants have sufficient contacts with the United States through their regular and substantial transaction of business therein and exercising jurisdiction over those Defendants is reasonable.

8.     Venue is proper in this District because UTi maintained offices in this District during the class period and many of the acts and transactions constituting the violations of law herein complained of occurred within this District, including the preparation and dissemination of materially false and misleading financial statements and corporate documents.

9.     In connection with the acts alleged herein, the Defendants directly or indirectly used the means and instrumentalities of interstate commerce, including the United States mails and facilities of a nation securities exchange.

## PARTIES

10.     Plaintiff Michael J. Angley purchased shares of UTi common stock on

2

the open market during the Class Period and was damaged thereby.

11.    Defendant UTi is a British Virgin Islands corporation, with its principal support offices at UTi, Services, Inc., 100 Oceangate, Suite 1500, Long Beach, California 90802, conducting business within California and this Judicial District.  UTi stock trades on the NASDAQ under the symbol UTIW.

12.    UTi is an international, non-asset-based supply chain services and solutions company that provides services through a global network of freight forwarding offices and contract logistics and distribution centers in a total of 59 countries.  The Company also serves its clients in 81 additional countries through independent agent-owned offices.

13.    Defendant Eric W. Kirchner ("Kirchner") is the Chief Executive Officer ("CEO") of UTi, a position he has held since January 2009, and is also a director of the Company.  Kirchner, as UTi's CEO, is a signatory of the Company's financial statements, and had actual knowledge of the undisclosed facts alleged further herein concerning the financial condition of UTi during the Class Period.

14.    Defendant Richard G. Rodick ("Rodick") is the Executive Vice President – Finance and Chief Financial Officer ("CFO") of UTi, positions he has held since October 2012.  Rodick, as UTi's CFO, is a signatory of the Company's financial statements, and had actual knowledge of the undisclosed facts alleged further herein concerning the financial condition of UTi during the Class Period.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

15.    Plaintiff brings this action as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."), on behalf of all persons or entities who purchased shares of UTi common stock on the open market during the period from December 5, 2013 through February 25, 2014 (the "Class Period") and were damaged thereby.  Excluded from the Class are the Defendants herein, officers and directors of UTi, members of the immediate family of Defendants Kirchner and Rodick, and affiliates of the corporate Defendant (the

3

1  "Class").

2      16.    The members of the Class are so numerous that joinder of all

3  members is impracticable.  There are, at a minimum, hundreds of members of the

4  Class.  According to UTi's form 10-Q for the period ended October 31, 2013, UTi

5  had a total of 104.8 million common shares outstanding as of December 4, 2013.

6  According to the Company's Form 10-K filed April 1, 2013, as of March 27, 2013

7  there were 193 holders of record of UTi stock, and "a substantially greater number"

8  of beneficial holders.  UTi's common stock was actively traded on the NASDAQ

9  throughout the Class Period.

10      17.    Plaintiff will fairly and adequately protect the interests of the members

11  of the Class.  Plaintiff has retained competent counsel experienced in class action

12  litigation under the federal securities laws to further ensure such protection; he is a

13  member of the Class; his claims are typical of the claims of all Class members; and

14  he does not have interests antagonistic to, or in conflict with, those of the Class.

15      18.    A class action is superior to other available methods for the fair and

16  efficient adjudication of this controversy since a multiplicity of actions could result

17  in an unwarranted burden on the Court system and could create the possibility of

18  inconsistent judgments.  Moreover, a class action will allow redress for many

19  persons whose claims would otherwise be too small to litigate individually.  There

20  will be no difficulty in the management of this action as a class action.

21      19.    There are numerous questions of law and fact which are common to

22  the Class and which predominate over any questions affecting individual members

23  of the Class, including:

24      (i)    whether the federal securities laws were violated by

25  Defendants' acts as alleged herein;

26      (ii)    whether the Defendants omitted material facts concerning,

27  among other things, the Company's liquidity position, its financial condition, its

28  likelihood of breaching certain financing covenants, and its risk of being unable to

4

1 continue as a going concern, necessary to make the public statements Defendants
2 made not misleading; and

3          (iii)   whether members of the Class were damaged by virtue of their
4 investments in UTi common stock during the Class Period, and if so, the
5 appropriate measure of damages.

6                              **SUBSTANTIVE ALLEGATIONS**
7 **Background of the Company**

8          20.     According to UTi's Form 10-K for fiscal year ended January 31, 2013
9 (at 2), UTi is "an international, non-asset-based supply chain services and solutions
10 company that provides services through a global network of freight forwarding
11 offices and contract logistics and distribution centers in a total of 59 countries," and
12 that further "serve[s] our clients in 81 additional countries through independent
13 agent-owned offices."  UTi is structured as a holding company and operates through
14 its subsidiaries.

15         21.     UTi's primary services include air and ocean freight forwarding,
16 contract logistics, customs brokerage, distribution, inbound logistics, truckload
17 brokerage and other supply chain management services, including consulting, the
18 coordination of purchase orders and customized management services.   These
19 businesses are split between two segments, the Freight Forwarding Segment, and
20 the Contract Logistics and Distribution Segment.

21         22.     The Company's Freight Forwarding business does not own or operate
22 aircraft or vessels, and primarily operates by contracting with commercial carriers
23 to arrange for the shipment of cargo, especially through non-committed space
24 allocations with carriers.  The Company arranges for and in many cases provides
25 pick-up and delivery service between the carrier and the shipper and/or recipient.
26 The Freight Forwarding Segment typically makes up a majority of the Company's
27 revenues, with airfreight forwarding services alone accounting for 31%, 35%, and
28 35% of the Company's consolidated revenues for the fiscal years ended January 31,

2013, 2012, and 2011, respectively, and with ocean freight forwarding services accounting for another 28%, 25%, and 26% of the same respective fiscal years.

**UTi Enters the 2013 Note Purchase Agreement**

23.    On January 25, 2013, UTi entered into a note purchase agreement (the "2013 Note Purchase Agreement") pursuant to which it issued $200 million principal of senior unsecured guaranteed notes to The Prudential Insurance Company of America.  The 2013 Note Purchase Agreement included certain restricted provisions including, but not limited to, financial covenants, restrictions on certain types of activities and transactions, restrictions on dividends in certain circumstances, reporting covenants, affirmative and negative covenants and other provisions, some of which could trigger the entire principal amount of the notes to automatically become immediately due and payable.

24.    Included in the "events of default" defined by the 2013 Note Purchase Agreement are certain "Negative Covenants," including the following:

> Section 10.3.  Consolidated Total Debt Coverage.  The Company will ensure that the ratio of Consolidated Total Debt at any time to Consolidated EBITDA for the Measurement Period then or most recently ended, is not greater than 3.25 to 1.00.

> Section 10.4. Priority Debt.  The Obligors will not permit Priority Debt at any time to exceed 15% of Consolidated Net Worth determined as of the end of the then most recently ended fiscal quarter.[1]

The appendix to the 2013 Note Purchase Agreement included the following definitions relevant to the above negative covenants:

> "*Consolidated Total Debt*" means, without duplication,

>> (a)    all Indebtedness of the [the Company] on a consolidated

---

[1]  The covenant described in Section 10.3 will hereinafter be referred to as the "Consolidated Debt Covenant"; The covenant described in Section 10.4 will hereinafter be referred to as the "Priority Debt Covenant."

Case No. 5:14-cv-00508

basis plus;

(b)     any liability arising from any deferred payment agreements arranged primarily as a method of raising finance or financing the acquisition of an asset; and

(c)     any Guaranty of a member of [the Company] with respect to liabilities of the type referred to in clause (b) above.

* * *

"*Consolidated Net Worth*" means at any time the aggregate of:

(a)     the amount paid up or credited as paid up on the issued share capital of the Company; and

(b)     the net amount standing to the credit (or debit) of the consolidated reserves of the [Company], based on the latest published consolidated balance sheet of the Company (the "*latest balance sheet*") but adjusted by:

(i)     deducting any amount attributable to any mandatorily redeemable preference shares redeemable before the Final Maturity Date;

(ii)     deducting any dividend or other distribution proposed, declared or made by the Company (except to the extent it has been taken into account in the latest balance sheet); and

(iii)     deducting any amount attributable to an upward revaluation of assets after the date of the Original Financial Statements or, in the case of assets of a company which becomes a member of the Group after that date, the date on which that company becomes a member of the Group.

* * *

"*Consolidated EBITDA*" means the consolidated net Pre-taxation

7

Profits of the Group for a Measurement Period:

(a)      including the net Pre-taxation Profits of a member of the Group or business or assets acquired by a member of the Group during that Measurement Period for the part of that Measurement Period when it was not a member of the Group and/or the business or assets were not owned by a member of the Group; but

(b)      excluding the net Pre-taxation Profits attributable to any member of the Group or to any business or assets sold during that Measurement Period, and

(c)      excluding any non-cash impairments or write-ups of intangible assets, and all as adjusted by:

(i)      adding back Consolidated Interest Payable; and

(ii)      adding back depreciation and amortization.

**UTi's New 1View Freight Forwarding System**

25.      For more than five years, UTi has been undergoing a large-scale global business process transformation.  One of the key recent components of this transformation is the implementation of a new freight forwarding operating system, which UTi calls "1View."  The Company first began discussing the planned new system in SEC filings during 2011, and launched the system during the summer of 2013, as announced by Kirchner in the Company's earnings press release filed with the SEC on September 6, 2013:

Since July 1, we have deployed our new freight forwarding operating system in seven countries – including the United States, United Kingdom, and Hong Kong.  There are currently 22 countries on the system to-date.  In particular, the U.S. launch is a notable milestone in our deployment process.  The implementation of our proprietary system in our largest market demonstrates that the platform works and is scalable.  The 22 countries on the new system represent

8

approximately 35 percent of total freight forwarding shipments. We continue to expect that more than 70 percent of shipments will be on the new system by the end of fiscal 2014.

26.     Kirchner also discussed the rollout of 1View in an investor call the same day:

> By necessity, we maintained our focus on executing our comprehensive business process transformation. This involved the continued investments required to improve global processes and to ramp up the deployment of our 1View system.
>
> The results underscore the importance of completing our transformation and on this front, we made significant progress. We are very pleased to report that our new freight forwarding operating system went live in seven additional countries since our last investor call, more than we had projected at that time.
>
> This includes implementation in the major markets of the U.S., and the UK and Hong Kong. With these latest deployments, we now have 22 countries on the new system representing approximately 35% of our freight forwarding volume. . . .
>
> The U.S. launce is a notable milestone for UTi. The U.S. is our largest market by shipment. It's also more complex than the countries implemented so far because of the interaction with ancillary systems such as customs brokerage. We've demonstrated that our proprietary system works. The deployment in the recently added large countries shows that it's scalable.
>
> The progress since our last earnings call is also important because we now have sufficient volume on the new system to begin more aggressively to remove costs. . . .

* * *

1      The transformation costs include duplicative expenses that are

2      expected to ease as the rollout progresses through the third quarters

3      and fourth quarters of fiscal 2014 . . . .

4  **The December 5, 2013 Press Release**

5      27.   On December 5, 2013, prior to the opening of the U.S. securities

6  markets, UTi issued a press release announcing its Fiscal 2014 Third Quarter

7  financial results (the "December 5, 2013 Release"), and making specific positive

8  statements with respect to the 1View freight forwarding operating system.  The

9  December 5, 2013 press release stated, in material part:

10        *UTi Worldwide Reports Fiscal 2014 Third Quarter Results*

11        Freight Forwarding Operating System Launched in Germany

12        LONG BEACH, Calif., Dec. 5, 2013 (GLOBE NEWSWIRE) – UTi

13        Worldwide Inc. (Nasdaq:UTIW) today reported financial results for its

14        fiscal 2014 third quarter ended October 31, 2013.

15        Fiscal Third Quarter 2014 vs. 2013 Results:

16        Revenues were $1,154.4 million, a decrease of 0.2 percent from

17        $1,156.7 million.

18        Net revenues (revenues minus purchased transportation costs) were

19        $393.5 million, a decrease of 2.5 percent from $403.6 million.

20        On an organic basis, revenues increased 3.1 percent and net revenues

21        increased 1.6 percent versus the comparable prior year period.

22        Net loss attributable to UTi Worldwide Inc. was $9.1 million, or $0.09

23        per diluted share, compared to net income of $10.5 million, or $0.10

24        per diluted share.

25        The GAAP net loss in the fiscal 2014 third quarter includes after-tax

26        severance costs of $12.0 million, or $0.12 per diluted share.  In

27        addition, the company recorded additional tax expense exceeding its

28        normalized tax rate by $5.2 million, or $0.05 per diluted share.

Excluding the after-tax severance costs and the additional tax expense described above, non-GAAP net income attributable to UTi Worldwide Inc. was $8.1 million, or $0.08 per diluted share.

\* \* \*

Eric W. Kirchner, chief executive officer, said, "Our fiscal 2014 third quarter results reflect increased activity in both our freight forwarding and contract logistics and distribution segments, offset by transformation-related costs.   Our sales efforts drove freight forwarding volume growth that was ahead of the market, particularly in airfreight. Rates were under pressure in the third quarter and this led to a decline in net revenue per unit of cargo that partially offset the higher volumes.  We anticipate this rate pressure to continue for the foreseeable future.  Improved trading conditions and our ongoing sales activities in contract logistics and distribution led to new business and increases in existing accounts.  Year over year comparisons in contract logistics and distribution were negatively impacted by the conclusion in October 2012 of a high-margin account in the Americas and the impact of currency exchange rates on our global results."

*Kirchner continued, "Since October 1, we have launched our 1View freight forwarding operating system in five countries, including Belgium, France and Germany.  There are now 27 countries that are live on the system, representing approximately 50 percent of total freight forwarding shipments.  We continue to expect approximately 70 percent of shipments to be on the new system at the end of our 2014 fiscal year.  In addition, we expect to be substantially complete with the system rollout by the middle of fiscal 2015. Because of the progress made in our transformation activities, we removed approximately $30 million in pre-tax operating expenses on an annualized basis at the*

11

*end of the third quarter.  None of these cost reductions are reflected in our third quarter results.  We anticipate an additional $10-12 million of annualized pre-tax operating expenses to be removed by the end of our 2014 fiscal year.  We expect to realize cumulative gross pre-tax cost savings of approximately $75-95 million on an annualized go-forward basis by the end of fiscal 2015, beginning with the cost actions taken during the third quarter."*

Operating expenses less purchased transportation costs were $386.2 million in the third quarter of fiscal 2014. Severance costs in the fiscal 2014 third quarter were $13.2 million on a pre-tax basis, compared to $3.9 million in the same period last year.  In addition, the company accrued $5.2 million in the fiscal 2013 third quarter for other costs as a result of a legal judgment relating to a 2006 warehouse fire which was not covered by insurance.  Excluding these items, adjusted operating expenses less purchased transportation costs were $373.1 million, compared to $371.8 million in the same period last year.   On an organic basis, adjusted operating expenses less purchased transportation costs increased 4.2 percent, compared to the same period last year.  The increase primarily reflects costs associated with transformation related activities.

The company recorded a tax provision of $9.3 million in the fiscal 2014 third quarter on pretax income of $2.0 million, due to valuation allowances and the mix of taxable income across the company's tax jurisdictions. . . .

28.     Both Defendants Kirchner and Rodick previewed the contents of the press release and authorized its dissemination.  The December 5, 2013 Release omitted any mention of any problem with the rollout of the new freight forwarding system, or of any invoicing or collection delays.  The December 5, 2013 Release

12

1  also did not disclose any increased liquidity problems in the Company or elevated

2  risk of breaching covenants related to the 2013 Note Purchase Agreement.

3  **The FY2014 Third Quarter Earnings Call**

4      29.    Also on December 5, 2013, UTi held an earnings call for the third

5  quarter of the fiscal year ended January 31, 2014 (the "FY2014 Third Quarter

6  Earnings Call").  During the call, Kirchner addressed the 1View system multiple

7  times:

8          We continue to make significant progress in our system deployment.

9          It's exciting to report that our freight forwarding operating system

10         went live in five additional countries since our last investor call,

11         including Germany, which is our second largest market by shipment.

12         We're live in 27 countries, representing approximately 50% of our

13         freight forwarding volume.  We've also completed the implementation

14         of Oracle Financials for freight forwarding operations in 30 countries.

15                              * * *

16         [. . .] [E]xpenses remain inflated due to the ongoing investment in our

17         transformation.    We   incurred   approximately   $4   million   of

18         implementation and duplicative costs related to the rollout of our new

19         freight  forwarding  system  during  the  third  quarter  and  we  began

20         amortizing previously capitalized expenses in September.  However,

21         because of the progress we've made in our system deployment, we've

22         begun  to  remove  costs  from  the  organization.    We  removed

23         approximately  $30  million  in  pre-tax  operating  expenses  on  an

24         annualized basis at the end of the third quarter.  None of these cost

25         reductions are reflected in our third quarter results.  We anticipate an

26         additional $10 million to $12 million of annualized pre-tax operating

27         expenses to be removed by the end of our 2014 fiscal year.

28         30.    At no time during the FY2014 Third Quarter Earnings Call did

13

Kirchner or Rodick (who was on the call) or any other representative of UTi
mention invoicing delays or cash problems resulting from the rollout of 1View.
Kirchner even answered an analyst's question specifically relating to the rollout of
1View, addressing the speed of the rollout and making generally positive statements
about its progress, but saying nothing about the problems that were already ongoing
at that time:

> <Q – Kelly A. Dougherty>: [. . .]. And then just quick on the $23
> million [in amortization expense], I think you had previously been
> talking about $20 million in amortization, and I think on the last call
> you had said we want to get 8 to 10 additional countries on [the 1View
> system], by this call it looked like there was five. Is there anything we
> should think about with things getting a little bit slower during this
> past quarter or cost increasing, that increased that amortization number
> at all a bit? How you think about catching up to get to that 70% [of
> freight forwarding volume on the 1View system] by the end of the
> year?
>
> <A – Eric W. Kirchner>: Sure.  To go back, let me add something also
> to the – to your earlier question.  The way we need to think about these
> costs is run rate by the end of.  So, as an example, when you look at
> the cost actions that we showed for the third quarter, a lot of them
> came – became effective at the very end of the third quarter, therefore
> they are not reflected in the numbers.  And we would anticipate some
> cost actions that would run close to the end of next year to get to that
> $85 million number.  So it's not as if those things start or front load,
> and when you consider what our OpEx or our basic cost run rates will
> be. [. . . .]
>
> * * *
>
> So when you talk about the deployment schedule and where we are

14

1    with the rollout, the number of countries is important, because all the

2    countries have to get on the system, obviously, but the percentage of

3    transactions in the system is a bigger driver of how we're viewing the

4    progress of the rollout.  So, we did go into fewer countries than we had

5    initially anticipated in this quarter, but the U.S. implementation was

6    the most complex and we wanted to make sure that we had everything

7    right before we went into additional countries.

8    So if you look at the U.S., that involved our largest number of

9    branches.  It involved a new freight forwarding operating system, a

10   new finance system with Oracle Financials, a new customs brokerage

11   system and all the associated linkages of those systems and business

12   process changes.  So, it was the most challenging and complex rollout

13   that we had and we wanted to make sure we had that right before we

14   went into a lot of additional countries.

15   I wouldn't characterize that we fell behind or that that was a big miss

16   that we went to five versus 8 to 10 countries because we now have our

17   two largest countries on the system and we expect to get the next two

18   largest countries on the system at the end of the fiscal year.  So we're

19   about 50% today, just the addition of China and South Africa get us

20   well on the way to that 70% number and we'll add some other

21   countries to get there.  *So, I think that we've made excellent progress.*

22   *The fact that we've got more than or half of our transactions in the*

23   *system today and it's functioning and working and we're seeing the*

24   *benefits that we expected in terms of how that system performed, I*

25   *think we're doing a great job with that.*

26   **The FY2014 Third Quarter 10-Q**

27        31.    On December 10, 2013, UTi filed with the SEC its Quarterly Report

28   for the third quarter of the fiscal year ending January 31, 2014 (the "FY2014 Third

15

1    Quarter 10-Q").   The FY2014 Third Quarter 10-Q discussed the rollout of the
2    1View system, stating:

3       *Multi-year Business Transformation Initiative*.  We have undertaken a
4       multi-year business transformation initiative to establish a single set of
5       global processes for our freight forwarding business and our global
6       financial management.   We anticipate current and future capital
7       expenditures related to the development of software in the aggregate of
8       approximately $135.0 million to $145.0 million, in connection with
9       these initiatives, the majority of which is nearing completion.  *We*
10      *expect our global operating system to be substantially ready for its*
11      *intended use during the first half of our fiscal 2014.  Although the*
12      *deployment of our operating system has begun, we will consider it*
13      *ready for its intended use depending upon a variety of factors,*
14      *including but not limited to operational acceptance testing and other*
15      *operational milestones having been achieved.*  We expect to incur
16      depreciation expense and amortization expense over a five-year to
17      seven-year useful life, beginning once the applications are considered
18      substantially ready for their intended use.

19          32.    The FY2014 Third Quarter 10-Q, which was signed by both Kirchner
20   and Rodick, contained no disclosures regarding the problems the Company was
21   already experiencing with the 1View system, about any invoicing delays or
22   collections problems, or about any liquidity problems or elevated risk of the
23   Company breaching its covenants on the 2013 Note Purchase Agreement.

24   **The February 26, 2014 Results 8-K Reveals the True Facts of UTi's Dire**
25   **Financial Condition for the First Time**

26          33.    The true facts concerning UTi's financial condition were first revealed
27   before the opening of the NASDAQ on February 26, 2014, when the Company filed
28   a Form 8-K with the SEC (the "February 26, 2014 Results 8-K"), announcing the

Case No. 5:14-cv-00508

1    Company's preliminary financial results for the fourth quarter and full fiscal year
2    2014.   The February 26, 2014 Results 8-K revealed that the UTi was not in
3    compliance with financial covenants associated with certain of its notes and credit
4    facilities, and further, that its auditor had expressed doubts about its ability to
5    continue as a going concern:

6        As disclosed below under "Recent Developments," the Company
7        experienced several adverse developments during its 2014 fiscal fourth
8        quarter [the fourth quarter of the fiscal year ended January 31, 2014].
9        As a result, as of January 31, 2014, the Company was not in
10       compliance with certain financial covenants associated with its $200.0
11       million of senior unsecured guaranteed notes (the "2013 Senior
12       Notes") and its global credit facilities.   In addition, the Company's
13       South African facilities agreement and other letters of credit and
14       guarantee facilities have cross-default provisions that could be
15       triggered by covenant violations of the 2013 Senior Notes and global
16       credit facilities.   The Company has obtained waivers with respect to
17       the 2013 Senior Notes and its global credit facilities, which each waive
18       any failure of the Company to be in compliance with such financial
19       covenants from January 31, 2014 through April 15, 2014.   Following
20       the expiration of such waivers on April 15, 2014, the Company will
21       again not be in compliance with such covenants, in which case debt of
22       approximately $400.0 million would become due and immediately
23       payable (absent additional waivers), for which sufficient cash would
24       not be available (absent a new financing).   This could result in events
25       of default under all of the Company's outstanding indebtedness and
26       the lenders under those facilities would be able to accelerate the
27       indebtedness, which would have adverse consequences that may
28       include insolvency of the Company, raising substantial doubt about the

1     Company's ability to continue as a going concern.

2     The Company is updating its Financial Statements to update (i) "Note
3     1 – Summary of Significant Accounting Policies and Other" to the
4     Company's Financial Statements, which contains information related
5     to uncertainty regarding the Company's ability to continue as a going
6     concern and (ii) Deloitte & Touche LLP ("Deloitte"), the Company's
7     independent registered public accounting firm, reissued its report with
8     respect to the Company's Financial Statements, and included an
9     explanatory paragraph related to the Company's ability to continue as
10    a going concern.

11    34.    The February 26, 2014 8-K placed primary blame for UTi's liquidity
12    problems on the Company's ongoing "business transformation initiative" and
13    problems due to the rollout of the Company's 1View system:

14    Although we made substantial progress executing our business
15    transformation initiative during fiscal 2014 and we remain on track to
16    complete the implementation by August 31, 2014, *our liquidity and*
17    *capital resources have decreased significantly over the last several*
18    *quarters.*  This decrease is primarily the result of (i) the net losses we
19    have incurred, (ii) capital expenditures associated with our business
20    transformation initiatives, (iii) severance expenses and (iv) recent
21    invoicing delays, primarily in the U.S., in connection with
22    implementing our new freight forwarding operating system and global
23    financial system, which have led to higher than normal receivables and
24    weaker cash collections.  Although our invoicing processes have been
25    improved, particularly in the United States, we cannot ensure that we
26    will not face similar issues as we implement the system in additional
27    countries.

28    As of January 31, 2014, we estimate that a significant amount of our

18

cash was in jurisdictions that impose legal limitations on repatriation and we had drawn down substantially all of our existing credit facilities.  In addition, due to our financial results for fiscal 2014, we expect not to be in compliance with the maintenance covenants in our debt agreements and obtained the waivers described herein.  We also have approximately $171 million of debt with maturities in the next nine months.  As a result of these factors, in connection with this offering, the Company is updating Note 1 to the Consolidated Financial Statements for the fiscal year ended January 31, 2013 to include disclosure regarding uncertainty about the ability to continue as a going concern, and Deloitte & Touche LLP, independent registered public accountants, reissued their audit opinion on our financial statements for the fiscal year ended January 31, 2013, to include a qualification stating that they believe there is substantial doubt about our ability to continue as a "going concern".

35.    The February 26, 2014 8-K further states, repeatedly, that the Company began experiencing problems with the 1View system *immediately* after it was rolled out in September 2013, for example:

We have experienced some difficulties consolidating our current systems, moving to a common set of operational processes, implementing shared services and implementing a successful change management process and these difficulties may continue.  These difficulties have impacted certain of our clients and our ability to efficiently meet their needs.  In certain countries, particularly in the United States, *we experienced invoicing delays immediately following the system rollout in those countries*.  This has led to delays in our ability to collect our receivables and has significantly impacted our liquidity (leading to weak or possibly negative operating cash flows in

19

1    our fourth fiscal quarter, which is usually a strong working capital

2    quarter).

3        36.    In spite of these "immediate" invoicing delays beginning in

4    September 2013 that ultimately led to a liquidity crunch, no such delays were

5    disclosed by UTi until February 26, 2014.  The Company's December 5, 2013

6    Earnings Release and conference call and the Company's FY2014 Third Quarter

7    10-Q, filed December 10, 2013, are conspicuously free of any language giving even

8    an inkling of problems with the system, with the Company's liquidity; nor did UTi

9    disclose, prior to February 26, 2014, that the Company was at an elevated risk of

10   breaching the covenants on the 2013 Note Purchase Agreement.

11   **The February 26, 2014 Press Release Announces a Dilutive Note Offering**

12       37.    As a result of the Company's liquidity problems and resulting breach of

13   its covenants on the 2013 Note Purchase Agreement, the Company was forced to

14   seek additional financing.  The same day the February 26, 2014 Results 8-K was filed

15   with the SEC, the Company also issued a press release (the "February 26, 2014 Press

16   Release") prior to the opening of the NASDAQ, announcing a private offering of

17   convertible notes (the "2014 Note Offering"), which read, in relevant part:

18       UTi Worldwide Announces Pricing of $350 Million Convertible

19       Senior Notes Due 2019

20       LONG BEACH, Calif., Feb. 26, 2014 (GLOBE NEWSWIRE) – UTi

21       Worldwide Inc. (Nasdaq:UTIW) today announced that it has priced its

22       private offering of $350 million aggregate principal amount of 4.50%

23       Convertible Senior Notes due 2019 (the "Notes").  UTi Worldwide

24       Inc. ("UTi") has also granted the initial purchasers in the offering an

25       option to purchase up to an additional $50 million aggregate principal

26       amount of the Notes.  The Notes will mature on March 1, 2019, unless

27       earlier converted, redeemed or purchased by UTi.  UTi intends to use

28       the net proceeds of the offering for general corporate purposes,

1    including repayment of debt.

2    The initial conversion rate for the Notes will be 68.9703 of UTi's

3    ordinary shares per $1,000 principal amount of the Notes, which is

4    equivalent to an initial conversion price of approximately $14.50 per

5    ordinary share and represents a conversion premium of approximately

6    35% over the last reported sale price of UTi's ordinary shares on

7    February 26, 2014, which was $10.74.  Upon conversion of the Notes,

8    UTi will deliver ordinary shares, except that if UTi obtains shareholder

9    approval under certain circumstances, UTi will pay or deliver, as the

10   case may be, cash, ordinary shares or a combination of cash and

11   ordinary shares, at UTi's election.  UTi may not redeem the Notes

12   prior to maturity unless certain tax related events occur.  Holders may

13   cause UTi to repurchase the Notes for cash, at their option, upon the

14   occurrence of specified fundamental changes.

15   Concurrently with the Notes offering, UTi is selling 175,000 of its

16   convertible preference shares to an investor in a private placement

17   exempt from the registration requirements of the Securities Act.  Such

18   convertible preference shares will have an initial conversion price of

19   $13.8671 per ordinary share.  UTi expects to pay dividends in kind on

20   the convertible preference shares.  Based on the initial conversion

21   price and the assumption that all dividends are paid in kind, UTi

22   expects to issue 15,534,575 ordinary shares if the convertible

23   preference shares remain outstanding through March 1, 2017 and the

24   convertible preference shares are converted in full.  Until March 1,

25   2017, the holder of the convertible preference shares will have pre-

26   emptive rights with respect to the Issuer's equity securities for so long

27   as they own a number of convertible preference shares convertible into

28   at least 6,309,896 ordinary shares.  After giving effect to the issuance

21

of the convertible preference shares, P2 Capital, our largest shareholder, will own approximately 20.4% of our ordinary shares on an as-converted basis, without giving effect to any payment in-kind of dividends on such convertible preference shares and any future issuances, including in respect of the Notes.

The closing of the Notes offering is conditioned upon the closing of the convertible preference shares placement and the closing of the convertible preference shares placement is conditioned upon the closing of the Notes offering.   UTi expects that the Notes offering will be completed, subject to customary closing conditions, on March 4, 2014.

The Notes and UTi's ordinary shares issuable upon conversion of the Notes, if any, have not been, and will not be, registered under the United States Securities Act of 1933, as amended (the "Securities Act") or the securities laws of any other jurisdiction and may not be offered or sold in the United States absent registration or an applicable exemption from registration requirements.

UTi plans to sell the Notes only to qualified institutional buyers pursuant to Rule 144A under the Securities Act. . . .

38.    Because the notes and preferred shares are convertible into ordinary common shares of UTi stock, the 2014 Note Offering has a large potential dilutive effect on UTi stock, particularly given the large size of the offering (over $500 million including the $175 million private placement) in relation to the total market capitalization of UTi.

**UTi Shareholders Suffer Large Losses Due to the Disclosures of the Previously Hidden Financial Problems**

39.    The February 26, 2014 Results 8-K and the February 26, 2014 Press Release caused UTi's stock price to fall from a close of $15.26 per share on February 25, 2014 to an open of $12.07 on February 26, 2014.  UTi stock then slid

further during the trading day on February 26, 2014, to a close of $10.74 per share – a decline of $4.52, or 29.6%. In contrast, the S&P 500 Index was effectively flat that day, down less than 1%.

40. Total reported volume trading of UTi stock on February 26, 2014 was approximately 10.7 million shares, compared to average volume of approximately 360,000 shares over the prior 30-day trading period.

41. As a result of the disclosures, the investment bank Avondale Partners downgraded UTi stock from Outperform to Market Perform on February 27, 2014. UTi's stock price continued to fall, closing at $9.84 on February 28, 2014, and at $9.76 on March 3, 2014.

## COUNT I

### Against Defendants for Violation of Sections 10(b) of
### The Exchange Act and Rule 10b-5 Thereunder [15 U.S.C.A. § 78j]

42. Plaintiff incorporates each of the foregoing paragraphs as if fully set forth herein.

43. Defendant Kirchner participated in a course of conduct of improperly concealing adverse material information by signing the FY2014 Third Quarter 10-Q, and by omitting statements in the FY2014 Third Quarter Earnings Call and the December 5, 2013 Press Release required in order to make the statements he did make not materially misleading. Defendant Rodick also participated in the improper course of conduct by signing the FY2014 Third Quarter 10-Q, and by participating and speaking in the FY2014 Third Quarter Earnings Call without disclosing the information needed to make Kirchner's and the Company's statements not materially misleading.

44. Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of fraudulent conduct as alleged herein in an effort to prop up UTi's stock price. This conduct of omitting to state material facts necessary in

23

1  order to make the statement made about UTi and its business, in light of the

2  circumstances under which they were made, not misleading, operated as a fraud and

3  deceit upon the purchasers of UTi securities during the Class Period.  Defendants

4  knew of the omitted material facts or acted with reckless disregard to their existence

5  and truth.

6      45.    Had Plaintiff and the other members of the Class known of the

7  material adverse information not disclosed by Defendants, they would not have

8  purchased UTi's securities at artificially inflated prices.

9      46.    The price of UTi securities declined materially upon public disclosure

10  of the true facts which had been concealed, as alleged in this complaint.  Plaintiff

11  and other members of the Class have suffered substantial damages as a result of the

12  wrongs alleged herein.

13      47.    By reason of the foregoing, Defendants violated Section 10(b) of the

14  Exchange Act and Rule 10b-5 promulgated thereunder.

15  ## COUNT II

16  **Against Defendants Kirchner and Rodick Pursuant to Section 20(a) of**

17  **the Exchange Act [15 U.S.C.A. § 78t]**

18      48.    Plaintiff incorporates by reference and realleges each of the foregoing

19  allegations.

20      49.    Defendants Kirchner and Rodick, by virtue of their positions with UTi

21  and their specific acts, were controlling persons of UTi within the meaning of

22  Section 20(a) of the Exchange Act.

23      50.    Defendants Kirchner and Rodick had the power and influence and

24  exercised same to cause UTi to make the material omissions in public statements

25  complained of herein.  Defendants were thereby and otherwise active and culpable

26  participants in the fraud perpetrated by Defendants.

27      51.    Defendants Kirchner and Rodick are liable for the aforesaid wrongful

28  conduct of UTi and liable to Plaintiff and the Class for the substantial damages

which they suffered in connection with their purchases or acquisitions of shares as a result of UTi's violations of the Exchange Act.

52.    By reason of such conduct, the Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and the other members of the Class, prays for judgment as follows:

A.    Declaring this action to be a proper class action maintainable pursuant to Rule 23(b)(3) of the Fed. R. Civ. P. and declaring Plaintiff to be a proper Class representative;

B.    Awarding Plaintiff and the other members of the Class damages suffered as a result of the wrongs complained of herein, together with appropriate interest;

C.    Awarding Plaintiff and the other members of the Class their costs and expenses of this litigation, including reasonable attorneys' fees and experts' fees and other costs and disbursements; and

D.    Awarding Plaintiff and the other members of the Class such other and further relief as may be just and proper under the circumstances.

## JURY DEMAND

Plaintiff demands a trial by jury for all claims so triable.

DATED: March 17, 2014           HULETT HARPER STEWART, LLP
                                BLAKE MUIR HARPER


                                 _/s/ Blake Muir Harper_____
                                BLAKE MUIR HARPER

                                225 Broadway, Suite 1350
                                San Diego, CA  92101
                                Telephone:  (619) 338-1133
                                Facsimile:   (619) 338-1139

25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

WOLF POPPER LLP
LESTER L. LEVY
ROBERT C. FINKEL
JOSHUA H. SALTZMAN
845 Third Avenue, 12th Floor
New York, NY  10022
Telephone:   (212) 759-4600
Facsimile:    (212) 486-2093

Attorneys for Plaintiff Michael J. Angley
and Proposed Class Counsel

Case No. 5:14-cv-00508