GREEN & NOBLIN, P.C.
James Robert Noblin
700 Larkspur Landing Circle, Suite 275
Larkspur, California 94939
Tel: (415) 477-6700
Fax: (415) 477-6710
-and-
4500 East Pacific Coast Highway
Fourth Floor
Long Beach, California 90804
Tel: (562) 391-2487
jrn@classcounsel.com

*Liaison Counsel for Plaintiffs*

William B. Federman
(admitted *Pro Hac Vice*)
FEDERMAN & SHERWOOD
10205 North Pennsylvania Avenue
Oklahoma City, Oklahoma 73120
Telephone: (405) 235.1560
Facsimile: (405) 239-2112
wbf@federmanlaw.com

*Lead Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| MICHAEL J. ANGLEY, Individually and on Behalf of All Others Similarly Situated, | Case No. 2:14-cv-02066-CBM-E |
| Plaintiff, | **THIRD AMENDED CLASS ACTION COMPLAINT** |
| v. | |
| UTI WORLDWIDE, INC., et al., | **JURY DEMAND** |
| Defendants. | |

# **TABLE OF CONTENTS**

I.     NATURE OF ACTION ................................................................. 1

II.    JURISDICTION AND VENUE .................................................... 4

III.   PARTIES ...................................................................................... 5

IV.    SUBSTANTIVE ALLEGATIONS ............................................... 8

       A.   Background of the Company ............................................. 8

       B.   UTi's Business Transformation Initiative ...................... 10

       C.   UTi Comments on the Progress of the Implementation of Its Business Transformation Initiative and the Effectiveness of its Newly Deployed Oracle Financials and 1View Systems ................................. 11

       D.   Plaintiff's Confidential Witnesses ................................. 16

       E.   Account Reconciliation and Closing the General Ledger ...................... 55

       F.   Materially False and Misleading Statements ................. 57

       G.   The Truth Emerges ........................................................ 121

       H.   Additional Disclosures and Admissions ....................... 130

       I.   Loss Causation .............................................................. 138

       J.   Additional Allegations of Scienter ............................... 142

V.     NO SAFE HARBOR .................................................................. 156

VI.    APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE ................................ 157

VII.   PLAINTIFF'S CLASS ACTION ALLEGATIONS ....................... 158

Lead Plaintiff Stratesis, LLC ("Lead Plaintiff" or "Plaintiff"), by its attorneys, alleges the following upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters, based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the public documents and announcements issued by Uti Worldwide, Inc. ("UTi," "UTIW" or the "Company"), filings by the Company with the Securities and Exchange Commission ("SEC"), wire and press releases published by and regarding the Company, securities analysts' reports and advisories about the Company, other information readily obtainable on the internet, and interviews of confidential witnesses.

## I.   NATURE OF THE ACTION

1.   Plaintiff brings this action as a class action on behalf of itself and all other persons or entities who purchased or otherwise acquired shares of UTi common stock during the period March 28, 2013 through February 25, 2014 (the "Class Period") to recover damages caused by Defendants' violations of the federal securities laws.

2.   Beginning several years ago, UTi initiated a business transformation initiative to establish a single set of global processes for its freight forwarding business and its global financial management.  Among other things, this process involved the centralization of the Company's financial processes.   The capstone of this transformation was the deployment of the Oracle financial system to replace the multiple financial systems the Company had in place as the result of its many

THIRD AMENDED CLASS ACTION COMPLAINT                    MASTER FILE NO. 2:14-cv-02066-CBM-E

acquisitions that had not been fully integrated and the new freight forwarding operating system developed by UTi, called "1View."

3.     On February 26, 2014, UTi disclosed, for the first time, that problems with the rollout of its new freight forwarding operating system had so severely depleted UTi's liquidity that it was in breach of covenants relating to one of its financing agreements, forcing its auditor, Deloitte & Touche LLP ("Deloitte") to amend its last auditor's report on the Company's consolidated financial statements to say that as of February 26, 2014, there was substantial doubt about the Company's ability to continue as a going concern.  In addition, UTi's liquidity problems forced it to announce, that same day, that it was undertaking a highly dilutive offering of, in total, over $500 million worth of convertible notes and preferred shares in order to provide UTi with the emergency financing it badly needed.

4.     More specifically UTi disclosed that its liquidity and capital resources had decreased significantly over the last several fiscal quarters primarily as a result of: (i) the net losses incurred; (ii) capital expenditures associated with its business transformation initiatives; (iii) severance expenses; and (iv) invoicing delays, primarily in the U.S., in connection with implementing its new freight forwarding operating system and global financial system, which led to higher than normal receivables and weaker cash collections.

5.     The Company's disclosures caused the Company's stock price to fall nearly 30% (or $4.52 per share) on February 26, 2014 (a total decline in market

capitalization in excess of $45 million), and to fall even further over the next few trading days as the market and analysts digested the news.

6.     One month later the Company further disclosed that it had identified a material weakness in its internal control over financial reporting related to the fact that the Company had an insufficient number of shared service center financial accounting and reporting resources to allow for timely analysis and recording of financial statement amounts given the Company's migration to its new freight forwarding application.  As a result, the Company said, underlying controls related to account reconciliations and analysis across a number of trade receivable and payable accrual accounts were not operating effectively.

7.     Since then, UTi has announced that the SEC has opened a formal investigation into the matters alleged in this Complaint:

> In July 2014, we received a subpoena from the SEC requesting certain documents related to, among other things, the facts and circumstances surrounding the Fiscal 2015 Refinancing. In September 2014, we received a similar subpoena directed to the members of the Audit Committee of the Board of Directors. In April 2015, we received a subpoena from the SEC requesting certain documents related to the material weakness in internal control over financial reporting and the revisions to prior period financial statements that were disclosed in our Form 10-K for the period ending January 31, 2015. We have been cooperating and intend to continue to cooperate with the SEC's investigation.

8.     *UTi failed to disclose in public statements made in its SEC filings and in earnings and analyst and investor conference calls prior to  February  26,  2014  that the  Company  had  severe  problems  with  its  freight  forwarding  operating  and*

*financial systems, that it had material weaknesses in its internal controls over financial reporting caused by its business transformation initiative, that it was in the midst of a severe liquidity crisis caused in part by invoicing delays resulting from problems connected to the implementation of 1View and Oracle, and that the Company was at serious risk of breaching its financing covenants.*

9.     UTi specifically attributed the liquidity problems to the 1View/Oracle implementation stating: ***"We have experienced some difficulties consolidating our current systems, …. In certain countries, particularly in the U.S., we experienced invoicing delays immediately following the system rollout…. This led to delays in our ability to collect our receivables and significantly impacted our liquidity…." The going concern opinion issued by Deloitte and the dilutive offering were caused by the liquidity crisis.***

10.     When the truth was revealed and/or the undisclosed material risks materialized Plaintiff and Class members who purchased shares of UTi stock at artificially inflated prices during the Class Period were damaged.

## II.     JURISDICTION AND VENUE

11.     This action arises under Sections 10(b) (15 U.S.C. § 78j(b)) and 20(a) (15 U.S.C. § 78t(a)) of the Securities Exchange Act of 1934, 15 U.S.C. § 78a, *et seq.* (the "Exchange Act"), and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5), and is brought on behalf of investors who purchased publicly traded shares of UTi on the NASDAQ Stock Exchange Global Market ("NASDAQ") in the United States.

12.     Jurisdiction is conferred upon this Court by Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. §§ 1331 and 1337. This action arises out of the laws of the United States and the Courts of the United States have exclusive jurisdiction of claims brought under the Exchange Act under 15 U.S.C. § 78aa.

13.     This Court has personal jurisdiction over the Defendants pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) as Defendants have sufficient contacts with the United States through their regular and substantial transaction of business therein and exercising jurisdiction over those Defendants is reasonable.

14.     Venue is proper in this District because UTi maintained offices in this District during the Class Period and many of the acts and transactions constituting the violations of law herein complained of occurred within this District, including the preparation and dissemination of materially false and misleading financial statements and corporate documents.

15.     In connection with the acts alleged herein, the Defendants directly or indirectly used the means and instrumentalities of interstate commerce, including the United States mails and facilities of a nation securities exchange.

## III.   PARTIES

16.     Plaintiff Stratesis, LLC purchased shares of UTi common stock on the open market during the Class Period as set forth in the investor certification attached hereto, which is incorporated by reference herein, and has been damaged thereby.

17.     Defendant UTi is a British Virgin Islands corporation, with its principal support offices at UTi, Services, Inc., 100 Oceangate, Suite 1500, Long Beach, California 90802, conducting business within California and this Judicial District. UTi stock trades on the NASDAQ under the symbol UTIW.  UTi is an international, non-asset-based supply chain services and solutions company.  UTi's primary services include air and ocean freight forwarding, contract logistics, customs brokerage, distribution, inbound logistics and truckload brokerage.

18.     Defendant Eric W. Kirchner ("Kirchner") served as the Chief Executive Officer ("CEO") of UTi, a position he held since January 2009, and a director of the Company, until December 2014.  Kirchner, as UTi's CEO, was a signatory of the Company's annual and quarterly reports filed with the SEC on Forms 10-K and 10-Q, participated in and spoke at the Company's earnings and investor and analysts conference calls, and had actual knowledge of the undisclosed facts alleged further herein concerning the business transformation initiative, business operations and financial condition of UTi during the Class Period.

19.     Defendant Richard G. Rodick ("Rodick") is the Executive Vice President – Finance and Chief Financial Officer ("CFO") of UTi, positions he has held since October 2012.  Prior to his appointment as UTi's CFO, Rodick served as Senior Vice President, Finance, of Broadridge Financial Solutions, an Automatic Data Processing (ADP) spin-off and provider of technology-based outsourcing solutions to the financial services industry, where he led the treasury, risk management, financial planning and

investor relations departments since 2007. Rodick is a Certified Public Accountant and holds a B.S. degree and a Master of Business Administration (M.B.A.) degree from Florida State University.  Rodick, as UTi's CFO, was a signatory of the Company's annual and quarterly reports filed with the SEC on Forms 10-K and 10-Q.  Rodick participated in and spoke at the Company's analysts and investors and earnings conference calls, and had actual knowledge of the undisclosed facts alleged further herein concerning the business transformation initiative, business operations and financial condition of UTi during the Class Period.

20.     Defendant Edward G. Feitzinger ("Feitzinger") served as Executive Vice President, Global Operations from September 2012 to December 2014 when he was named CEO in replacement of Defendant Kirchner.  Feitzinger joined UTi in 2010 and served as Executive Vice President, Global Contract Logistics and Distribution prior to his promotion in September 2012. Feitzinger participated in and spoke at the Company's earnings conference calls, and had actual knowledge of the undisclosed facts alleged further herein concerning the business transformation initiative, business operations and financial condition of UTi during the Class Period.

21.     Defendant Jeffrey D. Misakian ("Misakian") served as Vice President, Investor Relations of UTi from 2007 to October 2014.  According to the Company's November 6, 2007 press release announcing his appointment, Misakian has held senior investor relations and corporate communications roles at several highly regarded public companies, as well as at one of the country's largest strategic communications agencies.

Misakian began his career in the auditing practice of PriceWaterhouseCoopers. Misakian earned his bachelor of science in business administration from the University of Southern California and is a certified public accountant. Misakian participated in the Company's earnings and investor and analysts conference calls and was listed as the contact person on the Company's press releases. Misakian had actual knowledge of the undisclosed facts alleged further herein concerning the business transformation initiative, business operations and financial condition of UTi during the Class Period.

## IV.   SUBSTANTIVE ALLEGATIONS

### A.   Background of the Company

22.   UTi is an international, non-asset-based supply chain services and solutions company that provides services through a global network of freight forwarding offices and contract logistics and distribution centers in a total of 59 countries. In addition, UTi serves its clients in 92 additional countries through independent agent-owned offices. Its business is managed from principal support offices located in Long Beach, California, and several other locations worldwide.

23.   **Freight Forwarding Segment.** Uti operates as both an air and ocean freight forwarder, wherein the Company contracts with commercial carriers to arrange for the shipment of cargo. UTi provides customs brokerage services in connection with a majority of the shipments which it handles and also provides customs brokerage services in connections with shipments forwarded by its competitors. As part of its customs brokerage services, the Company prepares and files formal documentation

required for clearance through customs agencies, obtains customs bonds, facilitates the payment of import duties on behalf of the importer, arranges for payment of collect freight charges, assists with determining and obtaining the best commodity classifications for shipments and performs other related services.

24.     UTi's freight forwarding segment accounts for approximately 68% of the Company's revenues.

25.     **Contract Logistics and Distribution Segment.** UTi's contract logistics services primarily relate to value-added warehousing and the subsequent distribution of goods and materials in order to meet clients' inventory needs and production or distribution schedules. The Company's services include receiving, deconsolidation and decontainerization, sorting, put away, consolidation, assembly, cargo loading and unloading, assembly of freight and protective packaging, warehousing services, order management, and customized distribution and inventory management services. UTi's outsourced services include inspection services, quality centers and manufacturing support. Its inventory management services include materials sourcing services pursuant to contractual, formalized repackaging programs and materials sourcing agreements.   The Company also provides a range of distribution, consultation, outsourced management services, planning and optimization services and other supply chain management services.

### B.    UTi's Business Transformation Initiative

26.    UTi conducts its operations through subsidiaries. The Company grew rapidly over a number of years, primarily through acquisitions that were never fully integrated.

27.    In an attempt to integrate its operating systems, for the last several years UTi underwent a large-scale global business process transformation.   As further explained below, the business transformation attempted by the Company was intended to generate financial and other benefits through efficiency gains. Since at least the early part of 2012, the key components of this transformation were the deployment of the Oracle Financials system and the new freight forwarding operating system developed by UTi, called "1View."   1View was designed to govern the "front-end" of financial data and Oracle Financials the "back-end." In other words, information on transactions would be entered into 1View by UTi branch level employees; Oracle financials would extract financial data from 1View and populate financial data tables for analytical and accounting purposes.

28.    The Company's implementation of Oracle Financials began first, followed by its implementation of 1View.   Both were implemented on a rolling country by country basis.  In conjunction with the implementation of 1View and Oracle Financials, the Company established three shared services centers, one in Portland, a second in Johannesburg, South Africa, and a third in Manila, Philippines.

29.    1View was first implemented in the Netherlands around mid-2012.  By March 2013, the Company had implemented Oracle Financials in 15 countries and 1View in five countries.  The Company implemented both Oracle Financials and 1View in the United States – its largest market – at the beginning of September 2013.  By that time, the Company had implemented Oracle Financials in 29 countries and 1View in 22 countries. By October 1, 2013, the Company had launched 1View in five additional countries, including Belgium, France and Germany – its second largest market – bringing the total number of countries live on the system to 27.  The total number of countries live on Oracle Financials at that time had increased to 30.

**C.    UTi Comments on the Progress of the Implementation of Its Business Transformation Initiative and the Effectiveness of its Newly Deployed Oracle Financials and 1View Systems**

30.    On June 23, 2011, UTi issued a press release commenting on its business transformation efforts.  The press release entitled "UTi Worldwide Provides Long-Term Financial Goals for Transformation Activities" provided as follows:

> UTi Worldwide Inc. (Nasdaq:UTIW) today will provide investors and securities analysts with details of its CLIENTasONE business strategy, operations, transformation activities and financial performance. This discussion will take place at the company's investor day, which begins today at 10:30 a.m. EDT, and which is being hosted at the NASDAQ MarketSite in New York City.
>
> Included in the discussion of UTi's transformation activities will be the following financial goals:
>
> > -- Cost savings of $75-95 million per year, a portion of which begins in fiscal 2013 and increases each successive year until the full annual goal is achieved in fiscal 2016.

-- Capital expenditures of $95-100 million in total.

-- Operating expenses of $25-30 million per year. These expenses include annual depreciation of $20 million over five years and are expected to commence midway through fiscal 2013.

-- Operating margin in the range of 12-13 percent no later than fiscal 2015.

-- Earnings per share growth at a compounded annual rate of 15-20 percent from fiscal 2012 to fiscal 2017.

The transformation is designed to generate significant benefits through efficiency gains, regardless of possible growth in revenue and net revenue. The ranges within the goals above assume no growth to modest above-market growth in net revenue throughout the transformation. Yields were assumed to be constant with those in fiscal 2011. In addition, the goals outlined above do not include costs associated with potential severance obligations that are expected to be incurred throughout the transformation.

Eric W. Kirchner, chief executive officer, said, "Through our CLIENTasONE initiative, we are transforming UTi's business in order to consistently exceed client expectations, while providing a rewarding workplace for our employees and driving increased shareholder value. Our '1 Focus,' '1 Team' and '1 World' objectives are designed to result in a better client experience, more consistent global processes, systems and structure, and predictable and proactive operational excellence on a global basis."

31. In disclosures leading up to the beginning of the Class Period, UTi commented on the progression of its implementation of the Company's business transformation initiative. UTi assured investors that the transformation was proceeding for the most part as planned, that any issues that had arisen during the piecemeal rollout were resolved as they were encountered and would not be problematic when the systems were later deployed in additional regions, and that the systems where deployed were functioning effectively and as expected.

32.    For instance, on March 22, 2012, the Company issued its earnings press release for its fiscal 2012 fourth quarter ended January 31, 2012.  The press release commented on the progress of the Company's transformation initiative:

> "Our transformation is progressing; we deployed our new finance system, we have completed the development of our new freight forwarding operating system, and we continue to test the integration of these systems in the Netherlands. We expect to complete this testing in the near future and begin the rollout of the integrated system throughout the world shortly thereafter. The amount and timing of expected benefits and expenses from the transformation remain consistent with what we communicated at our investor day last June, and we still plan to achieve our operating margin goals no later than fiscal 2015."

33.    On June 7, 2012, the Company issued its earnings press release for its fiscal 2013 first quarter ended April 30, 2012.  The press release announced that "Our new integrated system is now live in the Netherlands, and we are on track to begin deployment in other countries in the second quarter."

34.    On September 6, 2012, the Company issued its earnings press release for its fiscal 2013 second quarter ended July 31, 2012. Defendants commented on UTi's business transformation initiative:

> Kirchner continued, "Our transformation is expected to deliver long-term operating margin expansion, which will position the company well when the economic and freight environment improves. . . . The deployment of our new financial and freight forwarding operating system continues, and we remain on track to achieve our long-term operating margin goals."

35.    On that same date, September 6, 2012, the Company held its earnings conference call for the same period:

> [Kirchner:] Our transformation efforts continue to make progress.  We

launched the pilot in the Netherlands, and key lessons learned there are being integrated into our deployment planning. . . .  We identified the opportunities to advance deployment of the finance system and process changes ahead of next steps in the Freight Forwarding operating system rollout.  We implemented the finance changes in six countries, and the system is up and running. This gives us the option of continuing the finance system and process changes either in conjunction with or independent of the Freight Forwarding operating system.

***

As we put the system in the Netherlands, we've had learnings about how to most effectively deal with subsequent countries in terms of the workflow and the process standardization and the issues that we've been talking about.

If you consider what we did in the run-up to the pilot in the Netherlands, we embarked on a process that was about 18 months long to identify best practice in the field operations across the region. And then adopt one best practice for UTi methods. And then we rolled those out on a process-by-process basis to our field operations. So we deployed those things through a learning management system. We had a training process. **_We audited to make sure that the process changes had occurred._** What you can't do in a remote environment such as I just described is really focus on an industrial engineering sort of approach in terms of workflow within an individual operation. So that's why we had all of the teams on the ground in the Netherlands to learn from the deployment there. And we're now looking at the appropriate next countries to go to, and preparing these teams to get out and move quickly through the deployment process.

The other learning that we had to date is the fact that we could decouple the Oracle and the finance process changes from the Freight Forwarding operating system deployment. And doing so allows us to take advantage of, again, process standardization and shifting more work, as Lawrence mentioned, from country level finance to a shared service environment.

Those shared service environments are up and running in Johannesburg, in Portland and in the Philippines. And we will be able to continue with that Oracle deployment. And then sync back up with the Freight Forwarding operating system deployment, consistent with what we talked about in investor day. And we still are on track to produce the results and the run rate that we talked about by the fourth quarter of this coming year going into 2015.

36.     On December 6, 2012, the Company issued its earnings press release for its fiscal 2013 third quarter ended October 31, 2013. Defendants commented on UTi's business transformation initiative:

[Kirchner:] "Our system rollout is progressing. We have launched our new operating system in five countries and our new financial system in 12 countries. We have plans to deploy both systems in more countries by the end of the fiscal year. We remain focused on achieving our operating ratio targets within fiscal 2015."

37.     That same day, the Company held its earnings conference call for the fiscal 2013 third quarter:

Our transformation is progressing. We launched our new Freight Forwarding operating system in three more countries in the third quarter with another added at the beginning of December. ***The system is now live and processing transactions in five countries***; more are expected by the end of the fiscal year. We still expect to be largely deployed by the end of fiscal 2014.

***Our new financial system is now functioning in 12 countries with more to be added by the end of the year.  This progress is encouraging and we remain focused on achieving our operating margin targets within fiscal 2015.***

38.     Confidential witnesses (former UTi employees) interviewed by Plaintiff, however, painted a different picture.  As set forth below these confidential witnesses described numerous problems with the implementation integration and operation of the Company's new financial operating system Oracle Financials and freight forwarding operating system 1View.  These problems would ultimately lead to a liquidity crisis at the Company.

### D.     Plaintiff's Confidential Witnesses

39.     Confidential Witness 1 ("CW 1") worked at UTi in Long Beach, California from June 2000 through February 2014.  CW 1 held various IT positions with UTi, serving most recently as a Business Analyst from 2009 until his/her departure from the Company.  As a Business Analyst, CW 1 programmed standard operating procedures (SOP) for the Company's central data system, uTrac.  CW 1 knew about 1View's functionality and approximate timeline for implementation as well as 1View's problems. Additionally, CW 1 was trained on 1View functionality and interfaced regularly with employees who worked on the 1View project.

40.     According to CW 1, UTi utilized hundreds of separate shipping and customs brokerage computer systems across the globe.  The systems were developed on an *ad-hoc* basis over time by third parties. Each region, and in many cases each country, employed a separate and distinct system for the placement and tracking of customer shipments. In some areas of the globe, UTi utilized one system for both

shipping and brokerage, but the Company utilized two separate systems in other areas. CW 1 recalled that there were hundreds of different third party shipping systems.

41.     As CW 1 explained, these multiple shipping systems maintained information on materials shipped, along with pick-up and delivery specifications. The brokerage systems served to assist UTi clients with the documentation required for imports in the respective destination country. Whenever a UTi client placed a shipping order, data from the order was put into the relevant shipping and brokerage systems in the country of origin. The respective shipping system in the country of origin sent data on the shipment to UTi's proprietary program uTrac. UTrac in turn forwarded shipment information to the respective third-party shipping system utilized by UTi for each destination country. The destination shipping system then generated brokerage information.

42.     CW 1 explained that 1View was originally intended to replace all of the third party shipping and brokerage systems within one year. However, CW 1 explained that UTrac remained as "the glue" between UTi's multiple third party shipping systems, even after 1View was online.  CW 1, who designed programs for uTrac, said that none of uTrac's functionality was converted to 1View when CW 1 left UTi in February 2014.

43.     CW 1 recalled that the transition to 1View caused invoicing delays and errors in UTI's Accounts Receivable systems. CW 1 said the invoicing delays were caused by 1View.  According to CW 1, the invoicing delays were so pervasive that CW

1 recalled an instance when an Account Manager lost a client because of the invoicing delays.

44.  Confidential Witness 2 ("CW 2") worked for UTi in Portland, Oregon from April 2013 through February 2014. CW 2 worked for the Company on a contractual basis until he/she was employed full-time as a Senior Technical Writer in August 2013. CW 2 reported to Senior Technical Writer Diane Berger until approximately October 2013, when CW 2 began reporting to Director of Global Operating Process David Parker.

45.  As a contractor and then Senior Technical Writer, CW 2 drafted training manuals for the Company's Finance Department.  CW 2 was the only technical writer for the Finance Department. To facilitate the drafting of training materials, CW 2 frequently discussed the Company's accounting practices with employees in the Finance Department, including Senior Vice President of Finance Renee Ronco, Global Director of Finance CW 3, and accountants Donald Acree and Diane Brown.

46.  CW 2 explained that he/she was contracted by UTi to assist the Company in an overhaul of its financial transaction recordkeeping procedures. Specifically, UTi retained CW 2 to scrutinize the existing policies and procedures ("P&P") with the purpose of implementing standard operating procedures ("SOPs") manuals. CW 2 interfaced with accounting staff in the Finance Department on a daily basis to inquire about financial recordkeeping processes. Based on CW 2's conversations with accounting staff, CW 2 drafted training manuals that outlined new SOPs for the

reporting and reconciliation of financial data. The goal of the new SOPs was to streamline and simplify UTi's financial data, which was convoluted and poorly managed, according to CW 2.

47.    As CW 2 explained, UTi did not have any SOPs governing the input and oversight of the financial data generated by its global branches. While the Company had a generalized P&P manual, there was no such manual dedicated exclusively to financial recordkeeping. As a result, each of UTi's branches reported financial information in accordance with its own, unique procedure. CW 2 was therefore tasked with writing an SOP manual governing financial data reporting procedures by UTi's branches. As CW 2 put it, he/she "inherited a mess." CW 2 explained that each branch operated under its own process because many UTi branches were originally separate companies that had been acquired by UTi.

48.    CW 2 explained that the process by which information was entered into UTi's freight forwarding system was both unconventional and exceptionally risky.  As CW 2 recalled, a UTi employee at any one of the Company's branches manually entered financial data (*e.g*., transactions, invoices, revenues, and costs) into spreadsheets. Information on customer shipments was susceptible to human error by branch level employees who manually entered shipments into the system (the "front-end").  The spreadsheets were equipped with macros (*i.e.* instructions for the automatic completion of tasks/mathematical calculations) which calculated different financial metrics for the branch.  Financial data from all of UTi's branches were then extracted and consolidated

into data tables at a UTi entity on the island of Guernsey (the "Guernsey Entity").  CW 2 explained that when shipment information was entered into UTi's system incorrectly, the shipment data resulted in incorrect accounting information at the branches.  CW 2 said this accounting error occurred because the branches utilized the shipment information to create their respective financial statements.  Financial data was never validated by the Company to ensure it was entered and reported correctly, CW 2 said.  CW 2 recalled that erroneous shipment information inevitably resulted in erroneous financial statements.  CW 2 estimated that 5% of UTI's financial data was erroneous based on a sampling of accounting reports he/she reviewed.  "There were errors on every single file I saw," added CW 2, who worked from April 2013 through February 2014.

49.    As CW 2 explained, UTi did not properly reconcile its financial statements between the Guernsey Entity and its branches. Instead, the branches simply overwrote their own financial statements with the financial statements generated by the Guernsey Entity. CW 2 recalled that in many cases the Guernsey Entity's determination of accounts receivable for the branch was different from that of the branch. As CW 2 recalled from conversations with Finance employees and regular reviews of sample accounting reports, branch-level financial statements were determined and finalized by Guernsey – not the branches themselves. When the branch's determination of accounting metrics conflicted with that of the Guernsey Entity's, rather than attempting

to reconcile the differences, the branch always accepted the Guernsey Entity's determination, according to CW 2.

50.     As CW 2 recalled, UTi implemented a new procedure for entering and accessing the financial data described above. Under the new system, customer orders were entered into the Company's new global freight forwarding operating system 1View. 1View was to work with the other new IT system implemented during CW 2's tenure – Oracle Financials. Both 1View and Oracle Financials were implemented on a piecemeal basis with different branches around the world converting to these systems as they became operational in their respective area. Neither 1View nor Oracle Financials was fully implemented across all UTi global branches at the time CW 2 left the Company in February 2014. According to CW 2, 1View governed the "front-end" of financial data and Oracle Financials governed the "back-end." CW 2 explained that UTi branch level employees entered information on transactions into 1View. Oracle Financials extracted financial data from 1View and populated financial data tables for analytical and accounting purposes.

51.     As CW 2 recalled, he/she joined David Parker and Operations Technical Writers on a business trip to UTI's Seattle branch around the end of 2013 or early 2014. The purpose of the trip was to coordinate with branch-level employees in Seattle about the implementation of 1View. The Seattle staff informed CW 2, David Parker, and the Operations Technical Writers of a problem with the terminology of materials ordered by UTi.   As CW 2 recalled, the 1View system defined shipping materials/items

differently than industry standards.  This meant that branch-level employees, who reviewed upwards of 1,000 invoices in a given day, were prone to enter transaction data for the wrong materials shipped. ***The problem was amplified because the terms 1View assigned to shipping items were not just incorrect by industry standards but were oftentimes widely understood to relate to entirely different materials***, according to CW 2.

52.    ***CW 2 said "everyone" was aware that financial data was recorded incorrectly.  As CW 2 recalled, it was not uncommon for him/her to report incorrect accounts receivable, for example, to a Finance employee who would reply that they were already aware of the error.***

53.    As CW 2 recalled, he/she discussed 1View's terminology issue with David Parker on the drive back from the Seattle meetings.  CW 2 encouraged David Parker to implement changes to 1View to correct shipping item terms.  CW 2 also recalled that he/she informed David Parker of errors in the sample accounting reports he/she reviewed to assist in the design of SOPs.  According to CW 2, David Parker reported to the Company's Chief Executive Officer.  CW 2 believed David Parker and Chief Information Officer/Senior Vice President of Global Operating Processes and Chief Information Officer ("CIO") Ronald Berger (who reported to the CEO) were "on the same level."

54.    According to CW 2, UTi did not comply with Sarbanes-Oxley (SOX) accounting requirements because the Company did not follow SOX's documentation

protocol requirements.  CW 2 sought to implement SOX compliance procedures into the training manuals he/she drafted, but CW 2 was not allowed to do so. As CW 2 recalled, he/she emailed Global Quality Manager Scott Parker in April 2013 to ask Scott Parker if he/she could include SOX procedures in Finance training manuals. Scott Parker denied CW 2's request.

55.    Confidential Witness 3 ("CW 3") began his/her tenure at UTi in 2003 in the Finance department and in March 2010 was promoted to Global Director, Finance. CW 3 held this position until October 2013 when he/she left the Company. As Global Director of Finance, CW 3 reported to Senior Vice President of Finance, Renee Ronco. Ronco reported to Defendant CFO Rodick.

56.    For the last two years of his/her tenure at UTi, CW 3 was substantially involved in the implementation of both Oracle and 1View.  CW 3 worked with a variety of personnel in these efforts including Thurso Barendse (VP of Global Financial Analysis), Clinton Smith (VP of Finance), Stephen Dunn (Global Finance Director), David Parker (Director of Global Operating Process), Neil Pallaudan (Director of Enterprise Architecture), Bob Beck (Director of Software Development), and Chris Sloane (Manager of Activity Based Costing).  CW 3 also interfaced with a variety of Country Managers (*i.e.,* Managing Directors) after the 1View/Oracle rollouts.

57.    As CW 3 explained, because UTi operates through its network of country-specific subsidiaries, in a non-integrated basis, the Company lacked uniform SOPs governing the input and oversight of the financial data that was generated by its global

branches. As a result, each of UTi's branches reported financial information in accordance with its own respective procedures and controls. CW 3 said that UTi's front office and back office processes were woefully lacking in automation. For example, employees at any one of the Company's country branches entered financial data into spreadsheets manually. The spreadsheets were equipped with macros which calculated different financial metrics for the branch. Financial data from all of UTi's branches was then extracted and consolidated into data tables at a UTi entity on the island of Guernsey.

58.     The implementation of 1View/Oracle was a massive undertaking to automate and standardize the Company's business processes, on a global level.

59.     Both 1View and Oracle Financials were implemented on a piecemeal basis, with different branches around the world converting to these systems at different times. CW 3 explained that 1View governed the "front-end" of financial data and Oracle Financials governed the "back-end." UTi branch-level employees entered information on transactions into 1View. Oracle Financials extracted financial data from 1View and populated financial data tables for analytical and accounting purposes. *However, CW 3 explained, there were significant and ongoing challenges in reconciling the financial data between 1View and Oracle.*

60.     *From a User-standpoint, one of the most significant concerns related to system capacity/scalability. CW 3 said that as more branches/countries were brought online to the system, the 1View system became increasingly overwhelmed to the point*

*where the system speed and functionality were compromised.  These capacity issues invariably led to system crashes, which in turn hampered Company productivity and called into question the integrity of the data generated by 1View, and then transferred to Oracle, CW 3 explained.*

61.    Beginning in April/May 2012, CW 3 participated in ongoing meetings/conference calls that included Ronco, David Parker, and Ronald Berger (SVP Global Operating Processes/CIO), among many cross-functional staff/team members, including some of those referenced above. During these meetings, significant problems/issues with regard to the 1View/Oracle system implementations were discussed in detail.  According to CW 3, a "Defects List" was circulated on a recurring basis, to various personnel including Ronco and Berger, which tracked the various "bugs" in the system that needed addressing. Parker and Pallaudin were responsible for the contents and circulation of the Defects List.

62.    Given the variety of problems with implementing the 1View/Oracle system, the implementation teams established short-term "workarounds" for a number of business functions to minimize the disruption of daily business/system use, during the implementation phase.  As CW 3 explained, one of the most significant workarounds was a large-scale effort to manually reconcile the data between the 1View and Oracle systems. Various personnel in accounting and other departments were tasked with conducting these manual reconciliations.

63.     *Due to the capacity issues and system reconciling workarounds, CW 3 recalled that the month-end General Ledger closing process became a protracted and laborious effort each and every month, with many staff and resources devoted to closing.* Similarly, fiscal quarter-end closings were also severely hampered, and required substantial resources to accomplish. *As CW 3 recalled, the fiscal quarter ending in July 2013 was an extremely arduous and painstaking exercise. CW 3 noted that there were "last minute changes" made and "rushed emergency discussions," which involved "disclosure-type items in the balance sheet" and "queries from the Corporate Team" in an effort to understand a variety of trends and metrics relating to shipment revenues, "that weren't making sense."* According to CW 3, these accounting and General Ledger-closing issues caused problems with revenue recognition.

64.     CW 3 recalled certain significant high-level meetings that took place in April and June 2013.  CW 3 was aware of these meetings through CW 3's regular and ongoing communications with his/her supervisor Ronco and because CW 3 was one of several staff members who provided Ronco and Berger with information, documents, and other materials pertaining to the 1View/Oracle implementation and the challenges related thereto, in preparation for these executive meetings.

65.     The first meeting was between Berger and Ronco and took place in April 2013.  According to CW 3, the objective of the meeting in April was for these senior executives to frame and discuss key issues/problems with regard to the 1View/Oracle

implementation and was primarily focused on dealing with financial/accounting issues (as opposed to day-to-day operational issues). CW 3 explained that *the predominant topic was how the implementation problems had given rise to inadequate IT/financial controls, as well as the concomitant effects of these internal control deficiencies. As such, the executives discussed what specific controls needed to be implemented in both IT systems, to increase accuracy of financial data during 1View-to-Oracle data flow process/reconciliation, and ultimately for financial reporting purposes. This meeting and the subsequent executive meeting (discussed below) were characterized by CW 3 as a high-level effort to address financial audit risk/exposure.*

66.    *As CW 3 explained, one significant effect of the inadequate financial controls, and an item that was of great concern, was the Company's inability to properly recognize revenue. Specifically, given the challenges with the system implementations, there were problems in determining which revenue streams (relating to which shipping transactions) needed to be recognized in an earlier versus a later fiscal quarter. CW 3 said that Defendant CFO Rodick was briefed by Renee Ronco and Ronald Berger on these issues around this April 2013 timeframe. CW 3 confirmed that Rodick was briefed in April 2013 by Ronco and Berger about the Company's inability to properly recognize revenue due to the inadequate financial controls.*

67.    A second meeting between Defendant Rodick, Ronco, Berger, and Barendse (VP of Global Financial Analysis) occurred in June 2013, at the Company's

London office. As a result of the June 2013 meeting, these four executives developed specific "multi-work-stream" action items/initiatives relating to financial controls implementation, to be carried out by cross-functional global teams, of which CW 3 was a part.  Additional team members included Barendse, CW 9 (Director, Global Finance and Internal Audit), and a third-party consultant named Cynthia Miller who was based in Portland, Oregon and was responsible for Project Management, and who interfaced primarily with Ronco.  *CW 3 also mentioned that Defendant Rodick was regularly included in bi-weekly email communications along with CW 3, Ronco, and other members of the Finance department. These recurring communications were characterized by CW 3 as "financial information updates" which made reference to the financial control/risk issues discussed herein.*

68.   One key initiative that came about as a result of the above meetings was to develop a standard query language ("SQL") database solution as a workaround, in order to assist in determining when revenue should be properly recognized. Ultimately, the database was structured so as to involve both SQL and Microsoft Access, and was intended to be a temporary fix, until such functionalities could be programmed into the 1View/Oracle systems directly. *However, as CW 3 noted, by the time he/she left the Company in October 2013, the SQL/Access workaround solution "wasn't where it needed to be" in terms of solving the revenue recognition problem.*

69.   *CW 3 said that issues with the system requirements/controls, which were needed to properly assign transaction-related revenue to the correct fiscal quarters,*

*were well known.*   CW 3 explained that this revenue recognition issue arose because of two interrelated reasons: (1) 1View was wholly replacing the prior/legacy billing system(s), with regard to all invoicing functions and (2) there was a "completely different methodology" with regard to how UTis prior/legacy system on the one hand, and how 1View on the other, accounted for certain Transportation Costs.

70.     However, as CW 3 explained the Company had to prioritize: (1) which system requirements were absolutely and immediately necessary to ensure business continuity; (2) which would be preferable for current implementation, and; (3) which could be tabled for implementation at a later time (the latter scenario is where non-automated workarounds were developed).   *According to CW 3, Berger made the decision to "de-scope" the system requirement for proper revenue recognition.*

71.     *Because proper revenue recognition had not been resolved through the 1View/Oracle implementation nor through the SQL/Access workaround, CW 3 explained, these functions were carried out manually, by UTi staff.*   CW 3 and Dunn (who handled the SQL solution) were the principal employees responsible for ensuring proper/timely revenue recognition. CW 3 was more involved in the Import Collect Freight component (detailed below), whereas Dunn, handled the remaining revenue aspects which related primarily to Transportation Costs, reflected as a line item on the Company's Income Statement. CW 3 observed that generally anytime a process is handled manually (as opposed to automated, with proper controls) there is potential for human error, and as such, a higher audit risk.

72.     Because UTi operates through a network of subsidiaries, the Company devised a system to assign net profits for any single freight forwarding transaction between two UTi entities: the Origin (*i.e.,* shipping) branch and the Destination (*i.e.,* receiving) branch.  This practice is referred to as "Spread Share." According to CW 3, the UTi subsidiary in Guernsey played a critical role in Spread Share. As CW 3 explained, Guernsey's role was to receive input from the Origin branch and run a calculation to determine what revenue would be attributed to the Destination branch. The key individual who oversaw this process at Guernsey was VP of Global Finance John Locke, who reported to Defendant Rodick.  Finance Director Richard Collenette was also based in Guernsey and assisted in Spread Share.

73.     According to CW 3, the method by which country branches assigned revenue between Origin and Destination *via* Spread Share was not applied uniformly, and was another source of concern for the Company.  CW 3 said that the Guernsey entity had developed a long-standing IT system created *via* Microsoft Access, which enabled Guernsey to conduct accounts receivable calculations/reconciliations.

74.     In February 2012, CW 3 took the lead role in tracking UTi's inter-company transactions, including Spread Share issues. CW 3 participated in conference calls with Country Managers on a regular basis soon after the initial 1View implementation. CW 3 recalled that the Country Manager for the Netherlands, Dennis Van Aalst, expressed frustrations with regard to the IT system early on.  CW 3 noted that due to the significant

amount of problems with the system (as discussed herein) other Country Managers followed suit.

75.     Deloitte conducted an extensive audit of the Company's accounting procedures beginning in October 2012. CW 3 noted that the audit focused on the revenue recognition challenges, as detailed herein. ***CW 3 explained that the revenue recognition-related challenges were quantitatively significant.***

76.     As CW 3 explained, the 1View rollout in the United States occurred in September 2013. ***Although CW 3 remained with the Company for only a short while thereafter, CW 3 recalled that there were significant invoicing delays which came about after the rollout. <u>CW 3 noted that invoicing delays had also occurred in prior 1View regional rollouts.</u>  The Global Operating Process Team was responsible for training end users as to proper 1View system use, including invoicing. Executives managing this Global Operating Process Team—including David Parker and Ronald Berger – would have discussed these functionality issues (including the invoicing delays), CW 3 said.***

77.     <u>Confidential Witness 4 ("CW 4")</u> began his/her tenure at UTi in 2011 as a Supervisor for Agents Accounts, and in May 2013, CW 4 assumed the position of Credit Analyst and held that role until his/her departure in December 2013. As a Credit Analyst, CW 4 created, reviewed, and distributed Aging/Past Due Accounts Receivables reports, to monitor customer payment status. CW 4 reported to AR Manager Linda Garrison. Garrison reported to VP of Shared Services Clinton Smith.

Smith reported to Senior Vice President of Finance, Renee Ronco, who in turn reported to Defendant CFO Rodick.

78.     CW 4 recalled that there was a large initiative to transfer IT data from UTi's legacy accounting system, AS400, to 1View/Oracle, including past-due receivables.  CW 4 primarily utilized AS400, but explained that the Company was transitioning to the new Oracle Financials system in his/her final months there.  CW 4 explained that while invoicing issues existed before the implementation of 1View due to the Company's decentralized billing method, ***the Company's attempts to centralize billing through the 1View implementation further strained UTi's accounting systems, controls, and procedures***.

79.     Confidential Witness 5 ("CW 5") worked at UTi as an Enterprise Intercompany Accountant from June 2013 to April 2014. CW 5 was based in the Portland, Oregon office, and noted that the accounting department in Portland was part of UTi's Shared Services center. As CW 5 explained, UTi maintained three global Shared Services centers -- one in Portland, another in Johannesburg, South Africa, and a third in Manila, Philippines. CW 5 initially reported to Global Director of Finance CW 3, until CW 3's departure in October 2013, at which point CW 5 reported to an interim Manager named Dan McDonell. In approximately January 2014, CW 5 reported to SVP of Finance Rene Ronco "on paper" for the duration of CW 5's tenure. CW 5 regularly worked with VP Shared Services Clinton Smith.

80.     As CW 5 explained, each of the three Shared Services departments were assigned to three separate geographic regions around the globe. UTi maintained different accounting teams within its three Shared Services departments. The intercompany accounting teams handled all accounting transactions within the Company, between UTi branches/UTi country subsidiaries. These intercompany groups handled transactions specific to the global geo-locales for which their Shared Services centers had been assigned. The Enterprise Intercompany group, of which CW 5 was a part, handled intercompany accounting for U.S.-based transactions (and neighboring countries) similar to their counterparts in Johannesburg and Manila, but also handled intercompany accounting for global (*i.e.*, "Enterprise") transactions; where a branch from one of the three geo-locales transacted with a branch from another of the Company's three global territories.  These intercompany and Enterprise Intercompany accounting personnel were directly involved with UTi's Spread Share accounting method/practice.

81.     *CW 5 described UTi's Spread Share practice (as previously described by CW 3).  CW 5 then described certain problems relating to intercompany transactions and Spread Share, specifically in connection with the implementation of 1View. As CW 5 explained, specific charge codes were used to assign charges to the Origin branch, Destination branch, or to both branches—thereby invoking Spread Share in the latter instance. Charge codes were entered manually into newly launched 1View system by Branch Controllers. As CW 5 explained, on a regular basis, improper*

*charge codes would be entered. The effect of these manual errors was that at times there was no spread/allocation of charges when required for a transaction, and at other times, the spread/allocation was applied for transactions where such charges should not have been shared. CW 5 noted that "destination charges" were by definition only attributable to the destination branch, and thus not shareable. However, the Spread Share charge codes were often incorrectly entered for such charges, thereby improperly assigning the charge to both transacting branches. As noted below, these errors were detected by Country Managers and CW 5 when reviewing the so-called Spread Share reports, and as further noted below, these errors were a contributing factor in UTi being unable to perform its monthly General Ledger closing on a timely basis.*

82.     One of CW 5's primary duties was to reconcile Spread Share transactions and conduct variance analysis, ultimately as part of the Company's month-end General Ledger closing process. *As detailed below, due to various issues, including problems with invoicing, UTi's efforts to timely close the General Ledger became increasingly frustrated and prolonged.*

83.     *CW 5 said that during his/her tenure, there were issues with 1View not generating invoices properly and on a timely basis.*  CW 5 said that in theory an invoice generated by 1View would "trigger" Spread Share accounting, so that the proper accounting treatment could be made for a given transaction. However, according to CW 5, *1View frequently failed to generate invoices, which compromised UTI's ability to*

*carry out proper/timely Spread Share accounting procedures.  CW 5 characterized this problem as "a big issue" and said that it had not been resolved at the time of his/her departure in April 2014.*

84.    According to CW 5, Manager of Activity Based Costing Chris Sloane was responsible for generating Spread Share Reports.  The idea was that Spread Share reports were to be distributed by Sloane to Country Managers/Country Controllers, on a daily basis. Controllers would reply to Sloane and CW 5, with what they assessed to be significant outliers, so that these discrepancies could be evaluated and (in theory) resolved, prior to the month-end closing.  *In practice, however, this initiative was not effective. As CW 5 explained, as more and more countries/subsidiaries went "live" with 1View, the Company experienced increasingly longer delays in performing the monthly General Ledger closing. This was due to invoicing delays and erroneous entry of charge codes, both of which stemmed from challenges with the 1View implementation, CW 5 explained.* With regard to charge codes, CW 5 noted that certain UTi subsidiaries (Controllers) simply did not know what elements of a particular intercompany transaction should be designated as shareable (*i.e.,* invoke Spread Share) and which should be attributed only to the Destination or Origin branch.

85.    CW 5 strongly believed that based on SVP Finance Renee Ronco's role at the Company, Ronco would have been distinctly aware of all 1View-related problems discussed herein.  Accordingly, Ronco would have reported such issues to Defendant Rodick.

86.   Confidential Witness 6 ("CW 6") was employed at UTi as a Senior Program Manager for the Global Oracle Financials Deployment from April 2012 until February 2014. According to CW 6, he/she was responsible for owning and managing the implementation of the Oracle Financials roll-out, globally.  CW 6 directly reported to Senior Vice President of Finance, Renee Ronco, who reported directly to Defendant Rodick (CFO).

87.   In addition to working directly with Ronco, CW 6 also worked with a variety of personnel during his/her tenure, including Finance Department employee Dawn Romaniello, VP of Global Financial Analysis Thurso Barendse, Director of Global Operating Process David Parker, and Director of Enterprise Architecture Neil Pallaudan. CW 6 noted that Ronco interfaced regularly with Ronald Berger who was the CIO and who oversaw the entire transformation of the overall roll-out of the new system at UTi.  CW 6 also managed the Oracle Configuration Team.

88.   ***According to CW 6, UTi faced many implementation challenges from the outset with both 1View and Oracle.  It was CW 6's view that there were three main causes for challenges with the roll-out of Oracle/1View: (1) the unrealistic "go live" dates set by UTi; (2) the amount of users (countries) being added onto the system; and (3) the system was not properly programmed to meet country-specific regulatory requirements.***

89.   CW 6 inherited the Oracle implementation project from a consulting firm out of California. CW 6 recalled that prior to his/her taking over the implementation,

this consulting firm was under pressure to meet implementation deadlines, and the firm improperly configured Oracle for each country, without first addressing the proper country-specific regulatory requirements (as explained below).

90.   *CW 6 stated that 1View similarly faced problems from the very beginning.* CW 6 explained that different branches of UTi were located globally and the individual branches in each country were projected to be converted onto the new system on a piecemeal basis. *However, CW 6 said, from the first implementation beginning in the Netherlands, the system faced setbacks and required "workarounds."*

91.   *CW 6 explained that with the initial implementation of 1View and Oracle in the Netherlands, challenges began immediately after the systems went live, particularly on the 1View side. It took another month before it was ready to go live in another country because of the surmounting issues. Notwithstanding the configuration issues, the Company began adding more users (as the system rolled out to different countries) onto the systems and problems continued to escalate, CW 6 explained.* CW 6 said that for each country, the code was supposed to meet requirements for financial reporting to the respective governments within a country. CW 6 offered Germany as an example. CW 6 said Germany had a law where 1View could not "go live" until the system could properly provide certain informational access to the German government for regulatory purposes. Other countries in the EU maintained similar laws. CW 6 stated that the Company began creating system

"workarounds" in an effort to remediate these problems, and to temporarily resolve these statutory issues in order to continue to meet the "go live" dates set by upper management.

92. *CW 6 stated that in addition to issues associated with the country-specific regulatory requirements, the system coding errors were also causing major problems with invoicing delays on the Accounts Receivable side, which consequently led to problems with the financial General Ledger month-end closings. CW 6 further explained that the two computer systems run in tandem and the insufficient mapping and code in 1View continued to cause delays relating to invoicing and General Ledger month-end closings.*

93. *CW 6 said on the invoicing side, the majority of invoicing functionalities were immediately switched over to Oracle, overwhelming the system. Specifically, CW 6 explained that freight forwarding transactions within UTi were not being properly captured as a result of these ongoing invoicing delays. Further, CW 6 said the 1View code was never sufficient to support the invoicing of some of the branch offices in key countries. Consequently, the problems with 1View directly affected financial reporting at UTi.* CW 6 said he/she had firsthand knowledge of these invoicing issues with 1View due to his/her role in the Company.

94. *In late 2013, when the 1View and Oracle systems were jointly implemented in the U.S., CW 6 explained, there were significant billing and General Ledger closing issues. Even prior to the U.S. roll-out of the new systems, accounting*

1
2
3
4
5

*was experiencing major problems with the month-end General Ledger closings. CW* *6 added that the majority of month-end closing issues (including the spread-share* *database) are inherently billing issues because billing has to be tied out each month* *in order to close.*

6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

95.  *CW 6 said that the 1View code and the Oracle mapping were severely* *lacking.*  It is CW 6's opinion that UTi chose not to avail itself of regression testing (a process of testing changes to new computer programs to ensure that the older programming still works with the new implementations) because it would have taken too much time to apply and would have delayed the Company's firm "go live" dates. *CW 6 believes the decision by UTi not to implement better practices (such as* *regression testing) led to substantial problems across the board, as discussed herein.* *Instead, the Company chose to create a workaround in Microsoft Access and then* *into a SQL.  However, CW 6 said, the workarounds did not work then, and in CW 6's* *opinion, would never work, because the 1View code from the beginning was never* *sufficient to support Spread Share relating to invoicing in some of the key local* *countries.  CW 6 further explained that the training and documentation on how to* *invoice using this workaround was not efficient.*

23
24
25
26
27
28

96.  *CW 6 stated unequivocally that her supervisor Renee Ronco was "aware* *of everything." CW 6 stated that "there is no doubt that [Ronald] Berger and Renee* *knew the details [of all of these issues]. Absolutely, they did." CW 6 said, "at the* *Berger and Renee levels, they knew the details." CW 6 recalled attending meetings,*

*where Ronco was apprised of all of the implementation problems. CW 6 said the meetings were set up by Berger to discuss the current status of the implementation on a country-by-country basis and to raise any critical implementation issues. According to CW 6, status reports were provided at these meetings. The status reports were initially prepared by CW 6, then by CW 6's implementation team.*

97.   ***CW 6 further stated that it was his/her understanding that Ronco communicated directly with Defendant CFO Rodick and possibly Defendant CEO Kirchner regarding these particular invoicing and month-end closing issues on a regular basis. Specifically, CW 6 stated that if it is the Company's assertion that upper executives did not know about these issues, that claim is "absolutely not true."***

98.   <u>Confidential Witness 7 ("CW 7")</u> worked at UTi from March 2005 until April 2014. From July 2012 to April 2014, CW 7 served as Sr. Manager, Enterprise IT Governance. CW 7 was based in Portland, Oregon and reported to VP Global Infrastructure and Operations, Tim Meier, who reported to CIO Ronald Berger. CW 7 was responsible for designing and implementing IT processes and controls for the Company's various IT systems. CW 7's role included his oversight of UTi's SOX Compliance with respect to IT controls. CW 7 worked with personnel across various departments/teams, including Global Director Corporate Systems Suzy Bates and Director of Enterprise Architecture Neil Pallaudan. CW 7 also worked with UTi's internal auditors and occasionally with external auditors from Deloitte, Jim Mills and T'Shaka Lee.

99.     *According to CW 7, the Company experienced major setbacks with its implementation of 1View and Oracle.  CW 7 explained that during the Class Period, the Company was faced with an increasingly difficult and involved effort to properly close its General Ledger every month.  This was due to the problematic 1Veiw/Oracle implementation, and specifically with UTi's inability to reconcile financial information, partly as a result of 1View's inability to properly and timely issue invoices to its customers.  <u>Due to these problems, executive members of UTi's Finance department did not want to "sign-off" on the Company's financial reports because these executives were not confident in the accuracy of the financial information contained therein.</u>  As CW 7 explained, for the last few months of his/her tenure, Rene Ronco and Ronald Berger constantly argued about these issues and concerns.*

100.   *CW 7 said that because 1View/Oracle were not able to adequately capture this critical information, UTi implemented a workaround database solution (Microsoft Access and SQL) to capture financial data (including invoicing, missed shipments, and inter-company transactions).  This database solution was commonly referred to by UTi personnel as "Plan B."   <u>CW 7 said that the manual controls (including the use of Plan B) that were implemented to capture the financial data that was missed by 1View/Oracle were, themselves, also faulty and did not resolve the problems.</u>*

101.   *CW 7 said that at times he/she wondered how UTi considered itself to be SOX compliant, given the various IT/Financial controls issues, many of which arose*

*and/or came to light due to the problematic 1View/Oracle implementation.  As CW 7 explained, in the last fiscal year, Deloitte was concerned about the account reconciliations problems and ensuing inability to timely close the General Ledger, and characterized these issues as significant audit-risk concerns.*

102.   Confidential Witness 8 ("CW 8") worked at UTi from 2000 until January 2014, serving in his/her final role (the last 3 years of CW 8's tenure) as SVP Contract Logistics for the Americas.   CW 8 reported to EVP Global Operations Defendant Feitzinger, who in turn reported to Defendant CEO Kirchner.

103.   CW 8 explained that he/she oversaw the Company's Contract Logistics business segment for the Americas.  Contract Logistics did not utilize the 1View system, according to CW 8. However, ***CW 8 participated in monthly P&L conference calls with Defendant Feitzinger,*** *Thurso Barendse, and CW 8's counterpart for the Freight Forwarding segment which was initially Chris Dale, and as of September 2013 (Dale departed UTi) was Area Vice President of the Americas Isle De Bruin.  As CW 8 explained, at times Defendant Rodick and/or Defendant Kirchner also participated in these calls -- about 50% of the time.   CW 8 said that in his/her final months with the Company (CW 8 left the Company in January 2014), the problems with the 1View implementation (including issues with invoicing, and General Ledger closings) were discussed during these monthly P&L conference calls.*

104.   Confidential Witness 9 ("CW 9") worked at UTi from September 2005 until October 2013 serving throughout his/her tenure as Director, Global Finance and

Internal Audit, based at the Company's Long Beach, California office. CW 9 reported

to VP Global Internal Audit Jim Schulien. Schulien reported to Defendant CFO Rodick.

105. CW 9 worked with a variety of personnel, including Director of Global

Internal Audit Bert Chan, Manager Global Internal Audit Jose Miranda, Sr. Manager

Enterprise IT Governance CW 7, VP of Finance Clinton Smith, Global Finance Director

Stephen Dunn, Global Finance Director CW 3, Director of Global Operating Process

David Parker, VP of Global Financial Analysis Thurso Barendse, CIO Ronald Berger,

and SVP of Finance Rene Ronco. CW 9 also frequently interfaced with external

auditors from Deloitte, specifically Jim Mills and T'Shaka Lee, both of whom CW 9

explained worked at UTI's Long Beach office.

106. CW 9 was responsible for auditing UTi's systems and processes to ensure

the Company was in compliance with a variety of laws and regulations, not the least of

which was Sarbanes-Oxley (SOX). CW 9's role involved the review of UTi's IT

systems, including 1View and Oracle Financials. During the last three years of his/her

tenure at UTi, CW 9 was significantly involved in monitoring the 1View/Oracle

implementation, from an auditing standpoint.

107. On a weekly basis, CW 9 created and disseminated an Auditor's "Issues

Report" which he/she explained related to SOX compliance. The report pulled data from

an internal auditing database operated by third-party vendor Certus Software. The report

contained and tracked a list of ongoing audit-risk issues, each of which was designated

with specific risk ratings, as designated by the Institute of Internal Auditors (IIA). Issues

were rated with characterizations such as "deficient," "significantly deficient," and "material weakness." Recipients of the report included: (1) audit department personnel, including Schulien; (2) several finance personnel, including Renee Ronco, CW 9, Dunn, CW 3, Group Financial Director Rudolph Louw, and EMENA (*i.e.*, Europe, Middle East, and North Africa) CFO Miriam Gagna; (3) Parker and other members of the 1View "Implementation Team" all of whom were based in Portland and (4) CIO Ronald Berger.  CW 9 noted that Parker, Ronald Berger and Renee Ronco, played significant high-level roles in the 1View/Oracle implementation.

108.  *As CW 9 explained, the most prominent issues that were raised and documented in the Issues Report during the fiscal year 2013 ended January 31, 2013, related to problems arising from the 1View/Oracle implementation. Specifically, 1View was unable to properly/timely issue invoices. Additionally, financial data (including invoicing data) was not flowing properly from 1View to Oracle and vice versa, as was required. As CW 9 put it, the systems "weren't talking to each other."*

109.  This problem required UTi to devise a database solution (Microsoft Access/ SQL) where this database served as an intermediary between the 1View and Oracle systems. In theory, billing data from 1View was to be captured in the "workaround" database solution, and would then travel into Oracle Financials. Information from Oracle would also be transported to 1View, *via* the intermediary database. *This effort however, also proved to be challenging and insufficient, due to a variety of technological complications.*

110.   ***The invoicing problem, and the larger challenge of not having financial data flow from 1View to Oracle, had the effect of creating significant accounting discrepancies for the Company. These problems, in turn stifled UTi's ability to properly reconcile accounts, and close its General Ledger every month. CW 9 said that UTi struggled every month to tie-out all accounts and close its GL.  As CW 9 explained, the Company's inability to properly close its General Ledger represented significant internal financial control deficiencies.***  The 1View implementation was a "mess," CW 9 explained, in that it lacked the functionality to capture the information that was needed to reconcile the GL.

111.   ***Another risk identified in the above reports was UTi's potential inability to meet its debt covenants as required through certain "bank loans" issued to the Company, CW 9 explained. As CW 9 recalled, the above debt covenants as well as the GL-closing issues, had both been characterized as "significant deficiencies" in the reports CW 9 prepared beginning in early 2013, and remained "significant deficiencies" in the monthly Issues Reports that CW 9 prepared, for the duration of his/her tenure. He/she emphasized that the GL-closing issues "had been ongoing" and were "pervasive."***  CW 9 explained that any and all of the recipients of the Issues Reports, including Schulien, had knowledge of the aforementioned "significant deficiencies," as so reported.

112.   According to CW 9, Deloitte partners Mills and T'Shaka Lee were also well aware of the above issues. ***In fact, these external auditors had expressed concerns***

*about these problems to Schulien early on during the 1View/Oracle international implementation (prior to the systems going live in the U.S. September 1, 2013). As CW 9 explained, 1View/Oracle had been rolled out in Europe and Asia prior to being launched in the U.S. The Company maintained a Shared Services center in Manila, Philippines, which handled (among other things) accounting functions across a substantial international territory - but not including the U.S. CW 9 recalled that around 2012 there were significant problems in reconciling accounts and closing the General Ledger for all financial accounts (i.e., arising from activity in various UTi country subsidiaries) that filtered up to the Manila Shared Services department, which had been detected by the Deloitte team. During this timeframe, there were "ongoing communications" between Deloitte partners Mills and Lee on the one hand, and Schulien on the other, about these problems and their implications. CW 9 believed that the Deloitte partners also communicated the above issues to members of the Implementation Steering Committee (headed by Parker), and to CFO Defendant Rodick, by mid-2013 if not earlier. CW 9 said such issues were "common knowledge" and were widely discussed during regular meetings held by the Implementation Steering Committee. CW 9 was knowledgeable about the Implementation Steering Committee meetings because CW 9 reviewed the minutes from such meetings.*

113.   CW 9 was also aware of high-level meetings as early as mid-2012 in which Ronco, Berger, and Barendse discussed the above issues and evaluated the potential audit risks of same. CW 9 said that Schulien was also involved in meetings with the

above executives to discuss these issues. ***CW 9 and the Deloitte partners Mills and Lee had brought these issues to the attention of Schulien in 2012 and continued to raise these issues with Schulien for the duration of CW 9's tenure.*** Based on CW 9's ongoing communications with UTi colleagues, CW 9 came to learn that in approximately December 2013 (two months after CW 9's departure from the Company) Ronco successfully lobbied to have Lee removed from the UTi external audit team.

114. Moreover, according to CW 9, from August 2012 through March 31, 2013, SOX compliance conference calls for the Americas region were held once every three weeks, in preparation for the Company's April 1, 2013 filing deadline for fiscal year ended 2013. CW 9 attended every one of these calls. ***Regular attendees of these conference calls also included Defendant CFO Rodick, VP Global Internal Audit Jim Schulien, Global VP and Corporate Controller Matthew Tachouet, Director of Global Internal Audit Bert Chan, and Deloitte partners Lee and Mills, as well as other Deloitte personnel. CW 9 said that Rodick attended approximately 90% of the calls.*** SVP of Finance Renee Ronco also participated in these calls, though not as regularly as Rodick.

115. According to CW 9, during these calls CW 9, as well as Deloitte partners Lee and Mills, frequently discussed the following issues: UTi's inability to properly reconcile accounts, and to close its General Ledger, and UTi's potential inability to meet its debt covenants as required through certain "bank loans" issued to the Company. CW 9 confirmed that these issues were discussed during every SOX compliance conference

call in the aforementioned time period, including the calls that Rodick participated in. Thus, CW 9 insisted Rodick was aware of these issues. CW 9 further stated that Corporate Controller Tachouet and Defendant CFO Rodick acknowledged the existence of these issues as they were presented during the calls, generally by responding with statements such as "we'll follow up with these issues."

116.   CW 9 further said that Defendant Rodick was aware of UTi's potential inability to meet its debt covenants because in early 2013, Rodick as well as Tachouet were in discussions with banks in order to minimize the impact of this issue. CW 9 knew this because Manager Global Finance, Hugo Silva, told him. Silva reported to Tachouet.

117.   Confidential Witness No. 10 ("CW 10") worked as a Global VP for UTi from 2010 until February 2013, reporting to EVP and President Client Growth, Gene Ochi, who, in turn, reported to Defendant Kirchner.  CW 10 provided presentations about UTi's supply chain solutions to new client prospects, and worked with existing clients to ensure UTi was delivering them appropriate products and services. Given this role, CW 10 was well aware of UTi's 1View implementation and the various problems associated with its deployment, acknowledging that *from the outset* 1View implementation suffered and caused problems, including capacity and scalability issues, invoicing delays, inability to properly/timely close out the general ledger, internal control deficiencies, and the need to employ multiple temporary "work-arounds."

118.    CW 10 said that UTi began holding monthly senior-level conference calls in early 2012 where executives discussed and tracked the challenges associated with the 1View implementation and developed initiatives to address such problems. These calls were chaired by CIO Berger and *occasionally attended by Kirchner*, CW 10 said. Other regular attendees, who CW 10 characterized as "stakeholders" in the 1View implementation, included David Parker, Director of Enterprise Architecture Neil Pallaudan, SVP Leslie Frank, Finance, IT Development and Project Implementation personnel, Global Project Managers, and UTi's four Regional Presidents. From approximately March 2012 until October 2012, CW 10 attended approximately five of these meetings as a fill in for Gene Ochi.  After each call, CW 10 said, a report relating to the 1View Project Plan, which contained a "Defects List" tracking the various bugs in the system, was prepared and disseminated among attendees.  *CW 10 recalled attending at least one meeting in which Kirchner was present.*  CW 10 said at each of the meetings and in each of the ensuing reports, the various implementation problems, were widely discussed and *that would have been true for the call(s) that Kirchner had attended*.

119.    Confidential Witness No. 11 ("CW 11") served as an Area Sales Manager during the Class Period, specifically from April 2013 through the end of the Class Period. CW 11 held other positions with UTi from November 2011 through April 2013. CW 11 reported to Regional Sales Director North, John O' Connor who in turn reported to VP of Area Sales, North America, Michael Andersen.

120.  CW 11 explained that subsequent to the rollout of 1View, invoices requesting payment from clients were regularly 3-4 months behind. Additionally, relationships with clients became tainted when the latter received several delayed invoices simultaneously, with a demand for payment within 30 days. CW 11 regularly brought his/her concerns regarding this issue up the chain to O'Connor and Andersen. Client issues were so prevalent that an internal conference call, entitled "Clients Under Threat," took place approximately once a month to discuss the Company's large clients, that were at risk of ending relations with UTi due to the latter's problematic practices. According to CW 11, the highest ranking member on these calls was Ilse De Bruin, currently the Global Senior VP of Network Operations.

121.  CW 11 explained that after 1View's rollout, he/she was unable to access the sales numbers in CW 11's area and was thus operating blind with regards to what his/her sales goals should be.  This lack of financial data was so widespread in CW 11's area that he/she had to estimate the commission checks for the sales representatives that reported to CW 11.  CW 11 expressed his/her frustration to his/her managers, O'Connor and Andersen, on a regular basis and explained to them that he/she could not meet sales goals and increase sales if he/she was not privy to the current sales numbers. They continuously replied that access to this information was "coming."

122.  Confidential Witness No. 12 ("CW 12") served as Quality Process Manager, Global Operating Processes of Freight Forwarding at UTi, where he/she worked from well before the Class Period through February 2015.  CW 12 reported to

current Global Director, Operating Processes for the Americas, Mike Hartel, who in turn reported to CIO Ronald Berger.

123.    CW 12 led a team of six that was responsible for deploying 1View in nine countries, including the U.S., Mexico and Canada.  CW 12 and CW 12's team were responsible for providing operational knowledge and support to business analysts and programmers, and for developing and training local branch staff on desk level operational procedures for the 1View rollout. The team also provided ongoing support related to the system, following its implementation in various locales.

124.    CW 12 confirmed that he/she knew firsthand that the Company experienced invoicing delays as a result of the 1View deployment. As CW 12 explained, there were several different causes of the delays. For example, 1View frequently applied, incorrectly, a standard freight charge code for clients whose rates and terms were specific to them. When this happened, however, personnel had to override the charges and calculate them manually.

125.    CW 12 worked regularly to solve the items on the "Defects List," or the list of bugs and issues with 1View. CW 12 explained that this list was generated based on employee submissions to IT Support. CW 12 interfaced directly with CIO Ronald Berger on a couple of occasions, and Berger was copied on almost all of CW 12's email communications with his/her team and direct supervisor, Hartel, CW 12 said. Berger regularly, though not always, called in to Hartel's conference calls with CW 12's team, in which they discussed the status of 1View implementation and any related issues.

126.   CW 12 explained that the rollout of 1View in the U.S. was continuously delayed; initial plans to deploy the system in the U.S. for a March 2013 "go-live date" did not realize until September of that year.

127.   Confidential Witness No. 13 ("CW 13") worked at UTi from February 2013 through April 2015. CW 13 reported to Manager of Activity-based Costing, Chris Sloan who reported to former Global Vice President of Financial Analysis Thurso Barendse until February 2014. Barendse, in turn, reported to SVP Finance, Renee Ronco. Ronco reported to Defendant, CFO Rodick. After Barendse left UTi in February 2014, Sloan reported directly to Ronco. CW 13 explained that the use of 1View led to errors in the way transactions were coded and charged, and then categorized. When a transaction was given the wrong code it was in turn billed to the wrong categories. CW 13 explained that when transactions over a certain monetary threshold were erroneously placed into a wrong category, he needed to move them and place them into a "catch all bucket." CW 13 explained that this threshold depended on a number of factors, including the region, as well as other factors determined by upper management. Ronco was one of those in charge of viewing these incorrectly billed transactions, and for correcting the error, CW 13 said.

128.   Confidential Witness No. 14 ("CW 14") served as a Senior Business Analyst and Scrum Master for UTi from July 2012 through April 2013.  CW 14 reported to "Raju," who reported to Global Director of Development Neil Palludin, who, in turn, reported to CIO Ronald Berger.  CW 14 explained that there were approximately six to

eight teams working on 1View at different times. CW 14 was a member of one of those teams. CW 14's team was headed by IT Development Manager Jay Newey. Generally, 1View was a confusing program, CW 14 said. The part of 1View CW 14 worked on, the "auto-rating" portion, was confusing as well, CW 14 said. Business Analysts and architects of 1View were consistently at odds regarding the software. CW 14 explained that arguments regularly ensued regarding 1View. Additionally, every time 1View was rolled out in a new city, new requirements and methodologies were requested from the IT teams. CW 14 explained that these requests came from upper management and were relayed via Palludin in "bits and pieces." It was difficult to understand what the goals of management were.

129.   <u>Confidential Witness No. 15 ("CW 15")</u> was employed at UTi in Long Beach, California from March 2004 through September 2013. CW 15 most recently served as President of the Americas, reporting directly to the CEO, Defendant Kirchner and Defendant Feitzinger, who served in a COO capacity at the time. CW 15 had full P&L responsibility over the Company's freight forwarding and customs brokering services in the Americas region that he managed.

130.   CW 15 attended regular meetings during which the status of the business transformation initiative involving 1View and Oracle, including significant issues relating thereto, were discussed.  CW 15 was one of twelve individuals that participated in quarterly International Executive Board Meetings. Among attendees of these quarterly meetings were CFO Defendant Rodick, CIO Ron Berger, Defendant Kirchner,

Defendant Feitzinger, CCO "Gino," as well as CW 15's regional counterparts.   In addition to these attendees, a junior-level employee whose name CW 15 did not remember, was responsible for coordinating the meetings and taking minutes during them. CW 15 confirmed that Berger provided attendees with status updates for the 1View/Oracle implementation, at every executive board meeting.

131.   Additionally, CW 15 participated in regular, hour-long meetings with certain executives, to discuss his regional operations. CW 15's counterparts in other regions participated in similar meetings of their own.  On a monthly basis, CW 15 and UTi executives, including Defendants Kirchner, Rodick and Feitzinger and Berger, discussed CW 15's region's performance, including relevant news and issues that affected operations.

132.   CW 15 confirmed that Holland served as the Company's first "Guerrilla Test" for the 1View implementation, in 2012. According to CW 15, this usability testing was originally scheduled to last a few months, but in reality took over a year because it revealed a greater volume of bugs and issues than the Company could address within the initial timeframe. CW 15 confirmed that executives in CW 15's monthly and quarterly meetings were concerned, prior to 1View's "go-live" date in the U.S. in September 2013, that the implementation issues experienced in other countries, like Holland, would pose potential problems in the U.S. if left unfixed. CW 15 characterized these 1View problems, and their presumed negative implications for the U.S., as a

"general topic" that everybody, including the defendant executives, were regularly concerned about.

133.   As CW 15 explained, the deployment of 1View presented too many issues and bugs for CW 15 to list exhaustively. However, CW 15 characterized the following as the Company's two major issues with the 1View / Oracle implementation: (1) Oracle and 1View failed to communicate properly due to "linkage issues," resulting in a lack of visibility into the financial data that was supposed to be communicated between the two systems, and (2) 1View experienced a system slowdown, as additional users engaged in the onboarding process. CW 15 said these issues were the subject of general conversations among the executives at their various regular meetings, in which CW 15 took part. CW 15 confirmed that Defendants Kirchner, Rodick, and Feitzinger were aware of the issues outlined above, "without question," as "it [1View issues] was discussed at every executive board meeting, on many conference calls, and other meetings." CW 15 recalled that Berger communicated these issues to the executives at their quarterly meetings, in the context of providing them with his status update.

## E.   Account Reconciliation and Closing the General Ledger

134.   As described by the confidential witnesses, many of UTi's problems concerning the deployment and functionality of Oracle Financials and 1View pertained to delayed billings and closing the general ledger at months' and accounting periods' ends.  The process of closing the general ledger, in general, is briefly described below:

135.   The ***general ledger*** (or simply "ledger" or "GL") is a collection of all balance sheet and income statement accounts.   A sub-ledger is a detailed record of transactions for an individual account.   It is important to ***reconcile*** the general ledger balances to the sub-ledger balances on a periodic basis.

136.   Two important accounts that should be reconciled on a periodic basis are accounts receivable and accounts payable.   Management of accounts receivable is important because the timing of receivables is a major factor in a company's cash flow. Reconciling the individual customer account balances with the general ledger balance establishes the accuracy of the balance sheet asset. The reconciliation is usually done at least monthly as part of the month-end closing procedures so any adjustments needed can be included in the correct period.

137.   Once the activities of one specific period are complete and the financial statements have been prepared for that period, those accounts related to that specific period have that period's effects eliminated from them. The process of eliminating the results of a period's activity from general ledger accounts is called the ***closing process.*** Unlike permanent accounts (*i.e.,* items located on a balance sheet, such as assets, shareholders' equity and liability accounts), temporary accounts (*i.e.,* items found on an income statement, such as revenues and expenses) must be closed at the end of a company's accounting period to begin the new accounting cycle with zero balances.

138. ***CW 6 said the majority of month-end closing issues (including the spread-share database) were inherently billing issues because billing has to be tied out each month in order to close.***

**F.    Materially False and Misleading Statements**

139.    Defendants knowingly or recklessly issued materially false or misleading statements regarding UTi's implementation of its new Oracle (financial) and 1View (freight forwarding) systems.  Throughout the Class Period (March 28, 2013 through February. 25, 2014), Defendants touted how these key initiatives were working to integrate the Company's dispersed financial and freight forwarding systems into one efficient process and were bringing value to UTi.  However, according to multiple confidential witnesses, many of whom held high level positions at UTi, the implementation of Oracle/1View caused continual severe and persistent problems that ultimately crippled the Company's liquidity.  Such problems included:

- Severe problems with system capacity/scalability, which caused frequent system crashes;

- significant invoicing problems and delays;

- ongoing problems with UTi's revenue recognition and general ledger closings;

- the recording of incomplete and inaccurate financial data; and

- pervasive deficiencies in the Company's control over financial reporting.

140.    According to multiple confidential witnesses, these problems began with the first implementations of 1View/Oracle and continued throughout the Class Period

as more countries were brought onto the new 1View/Oracle systems.  These problems were extremely significant to UTi because they prevented UTi from issuing invoices and collecting receivables and from maintaining accurate financial records.

141.   The Class Period begins on March 28, 2013.  On that date the Company issued its earnings press release for the fiscal 2013 fourth quarter and fiscal year 2013 ended January 31, 2013.[1]  The release provided in part:

> **Kirchner continued, "Our comprehensive business process transformation is gathering pace. We accomplished a great deal in fiscal 2013, and we plan to achieve even more this year.** We expect to deploy our new freight forwarding operating system in 35 additional countries in fiscal 2014, with more than 70 percent of shipments on the new system by the end of this fiscal year. We believe that progress under our transformation activities should drive annualized gross cost savings of approximately $30-35 million in fiscal 2014 (including expense reductions that were previously announced) and approximately $45-50 million in fiscal 2015…."

(emphasis added).

142.   On that same date, March 28, 2013, the Company held its earnings conference call for its 2013 fiscal fourth quarter ended January 31, 2013.  Defendants Kirchner, Rodick, Feitzinger and Misakian participated in the call:

> [Kirchner:] Expenses increased in the fiscal 2013 fourth quarter compared to the same period last year, while net revenue declined. This was primarily due to investments in Contract Logistics to improve efficiency and prepare for newly won business; some duplicative costs in our shared service centers, as we wrap up our system rollout; and the local sales initiatives in North America. We expect the duplicative shared service center cost pressures to ease later this year, as the Freight Forwarding and finance systems are implemented more broadly and various local costs shift to the

---

[1] UTi operated on a fiscal quarter ending January 31 of each year.

shared service center environment. …

***Our transformation efforts continue to gain traction and our system rollout is picking up speed.*** We've launched our new Freight Forwarding operating system in six countries and our new financial system in 15 countries. I'll share more with you on our plans this year after Rick's remarks. I'll now ask Rick to walk through the financial results. Rick?

*** 

[Rodick:] As Eric mentioned, we continue to move forward aggressively with the rollout of our new systems. He will share our deployment schedule and cost savings goals for this year and the next year in a moment. Based on the current schedule, we expect to begin amortizing the new system this summer. This is expected to result in an increase in amortization of approximately $10 million this year. Using a seven-year life, we expect depreciation to be approximately $20 million annually. This is in line with our previous guidance. With that, I'll turn the call back to Eric for his closing remarks. Eric?

ERIC KIRCHNER: Thank you, Rick. We accomplished a great deal in fiscal 2013 that's not reflected in our financial results. ***We launched our Freight Forwarding system in six countries and deployed Oracle financials in 15 countries. We've made further improvements to our operating processes***, launched new products in air, ocean and customs brokerage, and deployed our new human resources information system globally among other activities. The year ahead is very important with much work to be done.

***

Our comprehensive business process transformation continues to move forward. We plan to launch our Freight Forwarding system in 35 additional countries this year, including eight to 10 countries before the next earnings call. We estimate that at least 70% of shipments will be on the new system by the end of fiscal 2014. This is about six months behind the pace that we originally targeted, but that's not surprising for a system this large and complex.

***At our investor day in June 2011, we told you that we expect to achieve $75 million to $95 million in cost savings on a gross basis due to the transformation in fiscal 2016. At that time we were less definitive about the years in between because we'd not yet deployed our new systems. At***

*this point in the process, we believe we have enough information to provide you with more details on our expectations. <u>Because we're confident in our progress, we are turning our attention to maximizing the client facing capabilities of the new system in ways that will help accelerate growth.</u> We expect to generate cost savings of approximately $30 million to $35 million in fiscal 2014. This includes the expense reductions that we announced in December. Cost savings in fiscal 2015 are estimated to be in the range of $45 million to $50 million, positioning us to achieve our goal of $75 million to $95 million by fiscal 2016.* Again, all these savings are on a gross basis and do not factor in severance or amortization of the new systems.

\*\*\*

SCOTT GROUP: **Can you just maybe give us some thoughts on -- you've implemented the forwarding system with, I think you said, six countries -- what you're hearing from customers and service levels in those countries and if there's any benefit that you're seeing yet?** And then with that, do you think that's having any impact on the market share in those countries. So, as you roll out another 35 countries this year, do you think that's a risk to your plan to start taking market share again?

ED FEITZINGER: Scott, this is Ed. I'll try to unpack that question. There's a bunch of different questions inside that. Maybe I'll just talk a little bit about how I view these system rollouts. We've been through this before. The first country that you put on is really a test of whether your bits and bytes work. Does the system work? You have the theory and then you're applying the theory in your country.

Certainly -- and because this is a network where you have one country interfacing with another, we have one country on the new system and then every other country in the world on the old system and the Netherlands is our first country to go live on that. So, you're certainly not going to see a lot of benefits there other than cost or in market share and if anything you get a couple bumps along the way as it goes in.

*As you get to the five or six country phase, that would really what I would see -- you start to see more issues about the productivity of the system, you start to see the lights go off, go on at least between the two countries that are on the new system now instead of being on disparate systems before. We started to see that already. People get pretty excited about that,* but it's a small percentage of overall shipments, as the team has

discussed.

*And that's where you test the system to see whether it scales. That's where you see how the change management's working, as people adopt their processes to the system and the different countries. And that's kind of what's behind us now at this point.*

*So, as we roll on and we get a significant portion of our business on, that's where you're going to start to see some of the savings start to materialize. That's where we start to see some of the efficiencies and visibility for customers, better service for us and the benefits that we expect from the market side.*

So, there are benefits out there from a customer growth perspective. Certainly we think it's going to improve our service, but we have to get to a critical mass of number of countries on it, so that the customers are going to be able to see that and see the material difference, so that the average transaction that would pop up between branch A and branch Z that might come in the next transaction in the system would be on the new system instead of maybe A is on the new system and Z is still on a local system. I don't know if that helps answer that question for you, Scott.

\*\*\*

SCOTT GROUP: **Eric, that actually makes a lot of sense and is really helpful. And it sound[s] like maybe the timing is a little bit delayed, but overall you still are just as confident in the ultimate savings from this rollout. Is that right? Is that fair?**

ERIC KIRCHNER: *No. I'm more confident than before, because we're at the point where we're getting ready to ramp and we've really taken some steps forward since the last call.*

We just got done with a global roadshow. So, the senior management team, the executive board in our vernacular, went out and met with our people around the world and hit the top 300 leaders and we've come to hear this phrase several times about transformation fatigue or things associated with UTi, so I've looked back at an old quote from Vince Lombardi, which was fatigue makes cowards of us all.

I didn't see any cowards out there when we went through this process. We've got people out there that are resilient, they have got a lot of resolve to make this thing happen and they're actually waiting and ready to go to

get this system stood up, ***so I'm more bullish on where we are than I've been in this process.***

SCOTT GROUP: Okay. Good to hear. I've taken up a lot of time. Thanks a lot. I appreciate it.

***

PETER NESVOLD: And then as my follow-up question, you've [rolled] out the Freight Forwarding system in six countries so far. You've mentioned that you're looking to deploy them in 35 additional countries this summer. What's the risk that we get a repeat of what happened in the first six rollout? Obviously, you got through it. It took a little longer, cost a little bit more money, but it was in six countries. You're going now into 35. How can you get as comfortable that we don't get a much bigger push out and a much bigger run-up in the costs?

RICK RODICK: Most of the costs are already behind us in terms of the capital for building the system. ***So, from a cost perspective regarding the deployment or the system itself, that should be relatively stable. The only area that costs could have impact otherwise is if we don't start to achieve the productivity improvements that we expect as we implement the system.***

***We took great care in the pilot phase and as Ed walked through the first country and the learnings from a first country pilot to then this current model where we have six countries, then we're building on that, both in the performance in terms of speed and the functionality of the system, the system is now ready to scale. So, the system itself will be able to handle the additional transactions as we add the volume into it.***

***And then we've developed the right processes around the transfer of information from the Freight Forwarding operating system into Oracle to help smooth out some process changes there.*** The Company, quite frankly, had a fairly complex inter-company billing process that we learned in this deployment in the Netherlands. We learned a lot about things that we could do to improve there.

And that also helps build toward the efficiency improvements over time because as that work shifts to the shared service environment and actually gets done in the background, where the country level people don't have to get involved in that. It's going to really help accelerate the productivity improvements going forward. So, we've got a very methodical plan to

move through it.

*We're not going to put the business at risk. I think the fact that we rollout on a country by country basis gives us the right calibration in the event that we do need to look at different aspects of the system in terms of performance,* but it's pretty much how these things go, having gone through it three times.

PETER NESVOLD: **I guess, I understand. If there's one fear in the back of my mind it's that you don't know what the systems going to do until you turn it on. But if I understand what you're saying correctly it sounds like by deploying it in a half-dozen markets initially you figured out where the inefficiencies are in the system and the processes that you've developed to address those are repeatable through the, to the other markets and that it's more or less just repeating the same process over and over again in the deployment. Is that fair?**

RICK RODICK: ***I'd say so, yes.***

PETER NESVOLD: Okay.

RICK RODICK: It's not like National Lampoon's Christmas vacation where Chevy Chase plugs the lights in and the whole place lights up at once. ***It kind of comes on incrementally and builds over time and we are going to make sure that we're doing it in that way.***

PETER NESVOLD: Okay. Thank you.

143.   The Defendants' March 28, 2013 statements, summarized above, were materially false or misleading.  In particular, the following statements by Defendants were materially false or misleading:

- "[Feitzinger:] As you get to the five or six country phase, that would really what I would see -- you start to see more issues about the productivity of the system, you start to see the lights go off, go on at least between the two countries that are on the new system now instead of being on disparate systems before. We started to see that already. People get pretty excited about that …

  ***And that's where you test the system to see whether it scales.***

*That's where you see how the change management's working, as people adopt their processes to the system and the different countries. And that's kind of what's behind us now at this point.*

- "[Rodick:] So, from a cost perspective regarding the deployment or the system itself, that should be relatively stable. The only area that costs could have impact otherwise is if we don't start to achieve the productivity improvements that we expect as we implement the system.

  *We took great care in the pilot phase and as Ed walked through the first country and the learnings from a first country pilot to then this current model where we have six countries, then we're building on that, both in the performance in terms of speed and the functionality of the system, the system is now ready to scale. So, the system itself will be able to handle the additional transactions as we add the volume into it.*

  *And then we've developed the right processes around the transfer of information from the Freight Forwarding operating system into Oracle to help smooth out some process changes there.* The Company, quite frankly, had a fairly complex inter-company billing process that we learned in this deployment in the Netherlands. We learned a lot about things that we could do to improve there."

- (Rodick:) In response to the question, *"I understand what you're saying correctly it sounds like by deploying it in a half-dozen markets initially you figured out where the inefficiencies are in the system and the processes that you've developed to address those are repeatable through the, to the other markets and that it's more or less just repeating the same process over and over again in the deployment. Is that fair?"* Rodick: ***"I'd say so, yes."***

144.    Contrary to the statements by Feitzinger and Rodick, the "right processes around the transfer of information from the Freight Forwarding operating system [1View] into Oracle" were not "developed" or in place, the difficulties of implementation were not "behind" UTi at that point, nor did the evidence indicate that

the system was "ready to scale" such that the system would "be able to handle the additional transactions."  In fact both Oracle and 1View were experiencing significant capacity and scalability problems and difficulties with communications between the two systems, resulting in: (1) internal control deficiencies; (2) system crashes; (3) the delayed issuance of invoices; (4) difficulties in closing the general ledger at months' end and the end of reporting periods; (5) inaccurate financial data; and (6) the need to employ multiple temporary "work-arounds."

145.   According to CW 6, the Senior Program Manager for the Global Oracle Financials Deployment, UTi faced many implementation challenges *from the outset with both 1View and Oracle*.  It was CW 6's view that there were three main causes for the challenges with the roll-out of Oracle/1View: (1) the unrealistic "go live" dates set by UTi; (2) the amount of users (countries) being added onto the system; and (3) the system was not properly programmed to meet country-specific regulatory requirements. According to CW 6, with the initial implementation of 1View and Oracle in the Netherlands, *challenges began immediately after the systems went live*.  CW 6 explained that from the first implementation beginning in the Netherlands, the system faced setbacks and required "workarounds."  Notwithstanding the configuration issues, the Company began adding more users (as the system rolled out to different countries) onto the systems and problems continued to escalate, CW 6 explained.  Among other things, CW 6 described that the substantial invoicing functionalities that were switched

over to Oracle **overwhelmed the system** and explained that freight forwarding transactions were not being properly captured as a result of those invoicing delays.

146.   Similarly, CW 3, the Global Director of Finance, who participated in conference calls with Country Managers on a regular basis soon after the initial 1View implementation, recalled that the Country Manager for the Netherlands (the first company in which 1View was deployed), Dennis Van Aalst, expressed frustrations with regard to the IT system early on. CW 3 noted that due to the significant amount of problems with the system other Country Managers followed suit.  According to CW 3, *there were significant and ongoing challenges in reconciling the financial data between 1View and Oracle.  From a User-standpoint, CW 3 explained, one of <u>the most significant concerns related to system capacity/scalability.</u>  Specifically, as more branches/countries were coming online to the system, the 1View system became increasingly overwhelmed to the point where the system speed and functionality were compromised, CW 3 said.  These capacity issues invariably led to system crashes, which in turn hampered Company productivity and called into question the integrity of the data generated by 1View, and then transferred to Oracle, CW 3 explained.*

147.   CW 9 (the Director, Global Finance and Internal Audit until October 2013 and who was tasked with preparing and disseminating on a weekly basis an Auditor's "Issue Report") explained that ***<u>the most prominent issues that were raised and documented in the Auditor's Issues Reports during fiscal year 2013 (ended January 31, 2013), were problems arising from 1View/Oracle implementation. Specifically,</u>***

*1View was unable to properly/timely issue invoices.  CW 9 additionally explained that financial data (including invoicing data) was not flowing properly from 1View to Oracle and vice versa, as was required. As CW 9 put it, the systems "weren't talking to each other."*

148.  *CW 7 similarly said that the Company experienced major setbacks with its implementation of 1View and Oracle.  CW 7 explained that during the Class Period, the Company was faced with an increasingly difficult and involved effort to properly close its General Ledger every month.  This was due to the problematic 1Veiw/Oracle implementation, and specifically with UTi's inability to reconcile financial information, partly as a result of 1View's inability to properly and timely issue invoices to its customers.  CW 7 said that because 1View/Oracle were not able to adequately capture this critical information, UTi implemented a workaround database solution (Microsoft Access and SQL) to capture financial data (including invoicing, missed shipments, and inter-company transactions).  This database solution was commonly referred to by UTi personnel as "Plan B."  However, CW 7 said that the manual controls (including the use of Plan B) that were implemented to capture the financial data that was missed by 1View/Oracle were, themselves, also faulty and did not resolve the problems.*

149.  CW 10 (the Global VP of UTi who left the Company in February 2013) acknowledged that *from the outset* 1View implementation suffered and caused problems, including capacity and scalability issues, invoicing delays, inability to

properly/timely close out the general ledger, internal control deficiencies, and the need to employ multiple temporary "work-arounds."

150.   CW 10 said that UTi began holding monthly senior-level conference calls in early 2012 where executives discussed and tracked the challenges associated with the 1View implementation and developed initiatives to address such problems. These calls were chaired by CIO Berger and many other high-ranking UTi executives and managers, and *occasionally attended by Kirchner*, CW 10 said.  From approximately March 2012 until October 2012, CW 10 attended approximately five of these meetings as a fill in for Gene Ochi (EVP and President of Client Growth).  After each call, CW 10 said, a report relating to the 1View Project Plan, which contained a "Defects List" tracking the various bugs in the system, was prepared and disseminated among attendees.  *CW 10 recalled attending at least one meeting in which Kirchner was present.*  CW 10 said at each of the meetings and in each of the ensuing reports, the various implementation problems, were widely discussed and *that would have been true for the call(s) that Kirchner had attended*.

151.   CW 3 confirmed a "Defects List" was circulated on a recurring basis, to various personnel including Ronco and Berger, which tracked the various "bugs" in the system that needed addressing.

152.   Similarly, CW 12 said he/she worked regularly to solve the items on the "Defects List," or the list of bugs and issues with 1View.  CW 12 interfaced directly with CIO Ronald Berger on a couple of occasions, CW 12 said, and Berger was copied

on almost all of CW 12's email communications with CW 12's team. Berger regularly, though not always, called in to conference calls with CW 12's team, in which they discussed the status of 1View implementation and any related issues.

153.   CW 15, the former President of the Americas who reported directly to Defendants Kirchner and Feitzinger, was one of twelve individuals that participated in quarterly International Executive Board Meetings with Defendants Rodick, CIO Ron Berger, Defendant Kirchner and Defendant Feitzinger. CW 15 confirmed that Berger provided attendees with status updates for the 1View/Oracle implementation, at every executive board meeting.  On a monthly basis, CW 15 and UTi executives, including Defendants Kirchner, Rodick and Feitzinger and Berger, discussed CW 15's region's performance, including relevant news and issues that affected operations.

154.   CW 15 characterized the 1View problems, and their presumed negative implications for the U.S., as a "general topic" that everybody, including the defendant executives, were regularly concerned about.

155.   As CW 15 explained, the deployment of 1View presented too many issues and bugs for CW 15 to list exhaustively. However, CW 15 characterized the following as the Company's two major issues with the 1View / Oracle implementation: (1) Oracle and 1View failed to communicate properly due to "linkage issues," resulting in a lack of visibility into the financial data that was supposed to be communicated between the two systems, and (2) 1View experienced a system slowdown, as additional users engaged in the onboarding process. CW 15 said these issues were the subject of general

conversations among the executives at their various regular meetings, in which CW 15 took part. CW 15 confirmed that Defendants Kirchner, Rodick, and Feitzinger were aware of the issues outlined above, "without question," as "it [1View issues] was discussed at every executive board meeting, on many conference calls, and other meetings." CW 15 recalled that Berger communicated these issues to the executives at their quarterly meetings, in the context of providing them with his status update.

156.   The above summarized testimony of former UTi employees is directly at odds with Defendants' statements that the implementation challenges were largely behind the Company and statements that the system was ready to scale.

157.   On April 1, 2013, the Company filed with the SEC on Form 10-K its annual report for fiscal year 2013 ended January 31, 2013.  The report which was signed by Defendants Kirchner and Rodick, among others, provided in part:

> **ITEM 1A.   Risk Factors**
>
> In addition to the risks and uncertainties discussed elsewhere in this Annual Report, the following risks and uncertainties should be carefully considered when evaluating our company. ***Our business, financial condition and financial results could be materially and adversely affected by any of these risks and uncertainties.***
>
> ***We are currently engaged in a multi-year business transformation initiative that involves risks, could result in higher than expected costs and/or could otherwise adversely impact our operations, profitability and/or retention rates for clients and employees.*** [emphasis except underlining in original]
>
> We have undertaken a multi-year business transformation initiative to establish a single set of global processes for our freight forwarding business and our global financial management. As part of this initiative, we are developing our next generation freight forwarding operating system

and rationalizing our business segments to a more common organizational structure on a worldwide basis. The scale and anticipated future costs associated with the business transformation initiative are significant and we could incur costs substantially in excess of what we are anticipating spending. Any technical or other difficulties in developing or implementing this project may result in delays, which in turn, may increase the costs of the initiative. Currently, we operate numerous systems with varying degrees of integration, which can lead to inefficiencies, workarounds and rework. As such, delays in the business transformation initiative will also delay cost savings and efficiencies expected to result from the initiative. ***We may*** *also experience difficulties consolidating our current systems, moving to a common set of operational processes, implementing shared services and implementing a successful change management process. These difficulties **may** impact our clients and our ability to efficiently meet their needs.* This internal initiative may also reduce our external focus on clients and growth, thereby negatively impacting our growth rates and client relationships. …

***

***If we are not reimbursed for amounts that we advance for our clients, our expenses may increase, our profitability **may** decrease, and our results of operations **may** be adversely impacted.*** [emphasis in original]

We make significant advances and disbursements on behalf of our clients for transportation costs concerning collect freight and customs duties and taxes and in connection with our performance of other contract logistics services. These advances and disbursements temporarily consume cash as they are typically paid to third parties in advance of reimbursement from clients. The billings to our clients for these disbursements may be several times larger than the amount of revenue and fees we derive from these transactions. ***If we are unable to recover a significant portion of these disbursements or if our clients do not reimburse us for these disbursements in a timely manner, we may experience losses and our cash flows and results of operations would be negatively impacted.***

**ITEM 7.   Management's Discussion and Analysis of Financial Condition and Results of Operations.**

***

*Multi-year Business Transformation Initiative.*    We have undertaken a multi-year business transformation initiative to establish a single set of

global processes for our freight forwarding business and our global financial management. We anticipate total capital expenditures related to the development of software of approximately $135.0 million to $145.0 million, in connection with these initiatives, the majority of which is nearing completion. We currently expect to incur an aggregate of approximately $20.0 million to $30.0 million during fiscal 2014 related to our business transformation initiatives. ***We expect our global operating system to be ready for its intended use during our fiscal 2014.*** Although the deployment of our operating system has begun, we will consider it ready for its intended use based upon a variety of factors, including but not limited to operational acceptance testing and other operational milestones having been achieved. We expect to incur depreciation expense and amortization expense over a seven-year useful life, beginning once the applications are considered ready for their intended use.

\*\*\*

## ITEM 9A.    Controls and Procedures.

Management's Evaluation of Disclosure Controls and Procedures

\*\*\*

Our management, under the direction and with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated our disclosure controls and procedures as of January 31, 2013. ***Based upon this evaluation, management, including our Chief Executive Officer and Chief Financial Officer, has concluded that <u>our disclosure controls and procedures were effective as of January 31, 2013</u>.***

Management's Report on Internal Controls Over Financial Reporting (as defined in Rules 13a-15(f) and 15d-15(f) of the Exchange Act) and the related Report of Independent Registered Public Accounting Firm are included herewith on pages F-2 and F-3 respectively, and are incorporated herein by reference.

***We have initiated a multi-year effort to upgrade the technology supporting our financial systems. As part of this effort, we have licensed enterprise resource planning software and have begun a process to expand and upgrade our financial systems. <u>There were no changes in our internal control over financial reporting during the most recently completed fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.</u>***

(emphasis in bold and italics added unless otherwise indicated).

158.   Defendants' April 1, 2013 statements, summarized above, were materially false or misleading.  In particular, the following statements were materially false or misleading because they warned of risks that had already materialized or represented UTi's control over financial reporting was effective, when it was not:

- We are currently ***engaged in a multi-year business transformation initiative that involves risks,*** could result in higher than expected costs and/or ***could otherwise adversely impact our operations, profitability….***

- ***We may also experience difficulties consolidating our current systems, moving to a common set of operational processes, implementing shared services and implementing a successful change management process.*** These difficulties ***may*** impact our clients and our ability to efficiently meet their needs.

- ***If*** we are unable to recover a significant portion of these disbursements or if our clients do not reimburse us for these disbursements ***in a timely manner***, we ***may*** experience losses and our cash flows and results of operations would be negatively impacted.

- [O]ur disclosure controls and procedures were effective as of January 31, 2013.

- There were no changes in our internal control over financial reporting during the most recently completed fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

(emphasis added).

159.   Contrary to the Defendants' generalized risk disclosures, including statements that the Company "***may*** experience difficulties consolidating [its] current

systems," Defendants were already aware of numerous implementation, capacity, and scalability problems summarized in ¶¶145-155, which resulted in: (1) internal control deficiencies; (2) system crashes; (3) the delayed issuance of invoices; (4) difficulties in closing the general ledger at months' end and the end of reporting periods; (5) inaccurate financial data; and (6) the need to employ multiple temporary "work-arounds."   These problems constituted then-existing materialized risks, which had affected and were reasonably likely to adversely affect operations.   Moreover, the known problems with delayed invoices and inaccurate financial data were known risks that undermined the Company's ability to timely recover a significant portion of its disbursements on behalf of clients.

160.   In addition, Defendants' statements that UTi's control over financial reporting were effective were false and misleading because when those statements were made such controls were severely deficient.

161.   For example, CW 4 (Credit Analyst) described that while invoicing issues existed before the implementation of 1View due to the Company's decentralized billing method, *the Company's attempts to centralize billing through the 1View implementation further strained UTi's accounting systems, controls, and procedures*.

162.   CW 9 related that the invoicing problems, and the larger challenge of not having financial data flow from 1View to Oracle, had the effect of creating significant accounting discrepancies for the Company. These problems, in turn stifled UTi's ability to properly reconcile accounts, and close its General Ledger every month. CW 9 said

that UTi struggled every month to tie-out all accounts and close its General Ledger.  As CW 9 explained, ***the Company's inability to properly close its General Ledger represented significant internal financial control deficiencies.***

163.   CW 9 further explained that ***a risk identified in the Audit Issue Reports was UTi's potential inability to meet its debt covenants as required through certain "bank loans" issued to the Company.  As CW 9 recalled, control issues involving the debt covenants as well as the GL-closing issues, had both been characterized as "significant deficiencies" in the reports CW 9 prepared beginning in early 2013, and remained "significant deficiencies" in the monthly Issues Reports that CW 9 prepared, for the duration of his/her tenure (which ended in October 2013). He/she emphasized that the General Ledger-closing issues "had been ongoing" and were "pervasive."***

164.   CW 9 further said that from August 2012 to March 2013, SOX compliance conference calls for the Americas were held once every three weeks, in preparation for the Company's April 1, 2013 filing deadline for fiscal year 2013. CW 9 attended every one of these calls. ***Regular attendees of these conference calls also included Defendant CFO Rodick, VP Global Internal Audit Schulien, Global VP and Corporate Controller Matthew Tachouet, Director of Global Internal Audit Bert Chan, and Deloitte partners T'Shaka Lee and Jim Mills. Rodick attended approximately 90% of the calls, CW 9 said.***

165.   According to CW 9, during these calls CW 9, as well as Deloitte partners Lee and Mills, frequently discussed the following issues: UTi's inability to properly reconcile accounts, and to close its General Ledger, and UTi's potential inability to meet its debt covenants as required through certain "bank loans" issued to the Company. CW 9 confirmed that these issues were discussed during every SOX compliance conference call in the aforementioned time period, including the calls that Rodick participated in.

166.   According to CW 2, the Senior Technical Writer, UTi did not comply with Sarbanes-Oxley (SOX) accounting requirements because the Company did not follow SOX's documentation protocol requirements.   CW 2 sought to implement SOX compliance procedures into the training manuals he/she drafted, but he/she was not allowed to do so. As CW 2 recalled, he/she emailed Global Quality Manager Scott Parker in April 2013 to ask Scott Parker if he/she could include SOX procedures in Finance training manuals.  CW 2's request was denied.

167.   CW 10 acknowledged that *from the outset* 1View implementation suffered and caused problems, including invoicing delays, inability to properly/timely close out the general ledger, internal control deficiencies, and the need to employ multiple temporary "work-arounds."

168.   Since the close of the Class Period UTi has disclosed that the Company has "received a subpoena from the SEC requesting certain documents related to the material weakness in internal control over financial reporting and the revisions to prior

period financial statements that were disclosed in our Form 10-K for the period ending January 31, 2015."

169.   In addition, Defendants' failure to disclose in UTi's 2013 Form 10-K the adverse circumstances summarized in ¶¶145-155 and 161-168 violated Items 303(a)(1) and (3) of SEC Regulation S-K, as these circumstances constituted material known events, trends or uncertainties that "are reasonably likely to result in the registrant's liquidity . . . decreasing in any material way" and/or that "the registrant reasonably expects will have a material . . . unfavorable impact on . . . revenues or income from continuing operations."[2] 17 C.F.R. § 229.303(a)(1) and (3) and (b).

170.   As Defendants admitted at or after the close of the Class Period: (1) ***"[i]n certain countries, particularly in the United States, we experienced invoicing delays immediately following the system rollout in those countries;" (2) "[t]he increase***

_____

[2] SEC Regulation S-K (and SEC Forms 10-K and 10-Q) requires disclosure of certain information, including information required to be disclosed under Item 303(a) and (b) of Regulation S-K (17 C.F.R. §229.303), in the non-financial-statement portions of annual reports filed on SEC Form 10-K and quarterly reports filed on SEC Form 10-Q under the Exchange Act. 17 C.F.R. § 229.10.

Instruction 3 to paragraph 303(a) provides that "[t]he discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition." 17 C.F.R. § 229.303(a), Instruction 3.  The SEC's interpretive release regarding Item 303 clarifies that the Regulation imposes a disclosure duty "where a trend, demand, commitment, event or uncertainty is both [1] presently known to management and [2] reasonably likely to have material effects on the registrant's financial condition or results of operations." Management's Discussion and Analysis of Financial Condition and Results of Operations, Securities Act Release No. 6835, Exchange Act Release No. 26,831, Investment Company Act Release No. 16,961, 43 SEC Docket 1330 (May 18, 1989).

Instruction 5 to Item 303(a) defines "liquidity" for purposes of Item 303(a) as "the ability of an enterprise to generate adequate amounts of cash to meet the enterprise's needs for cash."

*occurred primarily in the United States, and receivables, <u>as expected</u>, rose in almost every country where 1View has been implemented;" (3) "WIP [work in progress] <u>generally rises in every country</u> that goes live on 1View;" (4) "[t]hese balances begin to decline as the learning curve improves;" (5) "[i]n our experience, this improvement takes about three to six months;" (6) "the <u>overall trend of increases</u> followed by decreases <u>continues</u>;" and (7) "this has led to delays in our ability to collect our receivables and has significantly impacted our liquidity (leading to weak or possibly negative operating cash flows in our fourth fiscal quarter, which is usually a strong working capital quarter).*

171.   On June 6, 2013, the Company issued its earnings press release for the fiscal 2014 first quarter ended April 30, 2013.  The release provided in part:

> Eric W. Kirchner, chief executive officer, said, "Revenues and net revenues in the first quarter of fiscal 2014 were lower than the same period last year, impacted by many of the same issues that we saw in the final quarter of fiscal 2013. However, we saw steady improvement each month during the quarter, and in April net revenue increased on a year-on-year basis for the first time in 13 months. Airfreight volumes were slightly lower during the quarter, but ocean freight volumes were higher than the comparable prior year period. Net revenue per unit in freight forwarding was lower than the first quarter of last year in both airfreight and ocean freight. Contract logistics and distribution continued to be impacted by lower volumes from existing business and the previously reported loss of certain high-margin accounts. Although we are not satisfied with the full quarter results, recent volume improvements in April lead us to be slightly more optimistic about the remainder of fiscal 2014."

> Kirchner continued, "Our freight forwarding operating system deployment continues to advance. We have launched the new system in nine countries since April 1, bringing the total to 15 countries on the system to-date. We continue to expect that more than 70 percent of shipments will be on the

new system by the end of fiscal 2014. We also remain on schedule to meet our cost savings goals and operating margin targets."

172.   On that same date, June 6, 2013, the Company held its earnings conference call for the 2014 fiscal first quarter ended April 30, 2013.  Defendants Kirchner, Rodick, Feitzinger, and Misakian participated in the call:

> [Kirchner:] We launched our freight forwarding system in nine additional countries, as we projected on our last investor call. That brings to 15 the total number of countries on the system, including Thailand, Malaysia and Canada, our largest countries to date, in terms of shipments.
>
> ***The operating system is performing well.*** We plan to deploy the new system in three to five additional countries before our next earnings call. However, most of our time will be spent on pre-implementation activities for larger countries we expect to add in the third quarter. We also plan to refine the linkage between our freight forwarding operating system and Oracle financials. We estimate that at least 70% of shipments will be on the new system by the end of fiscal 2014.
>
> Our new cost savings target of approximately $30 million to $35 million in fiscal 2014 remains on track. Cost savings in fiscal 2015 are still estimated to be in the range of $45 million to $50 million, and we remain on track to achieve our goal of $75 million to $95 million by 2016. We're also on schedule to reach our targeted operating margin run rate of 20% in freight forwarding, and 10% in contract logistics and distribution in late fiscal 2015. With that, I'll turn the call back to Jeff to direct the Q&A period. Jeff?
>
> ***
>
> ELIZABETH TYSON, ANALYST, MORGAN STANLEY: This is [Elizabeth Tyson] for Bill. I wanted to follow-up on the transformation. What are the key milestones we should be watching for over the next quarter, and are there any lessons that you learned so far with the numbers, with the countries that you rolled out, that you can update us on?
>
> ERIC KIRCHNER: Sure. It's a challenge to try to peg specific milestones by quarter, because there are movements within the deployment schedule based on specific conditions. But our expectation, as we've said, is to be

over 70% of our transactions on the system by the end of this fiscal year [ending January 30, 2014] and some of that just has, the quarterly view just has to do with the timing of which countries go on when we have probably eight or nine countries that are already in queue to go, based on the pre-implementation work. But we're doing a deeper dive on the larger countries that would come on line, because they are just bigger, there are more locations to deal with, and it is a slightly larger endeavor to bring the US on to the system, versus a much smaller country.

But as we said, we remain on track for that 70% of transactions metric by the end of this fiscal year [ending January 30, 2014]. We anticipate three to five more countries coming on the system in this coming quarter. That would take our transaction volume somewhere in the neighborhood of 25% of our total transactions, depending again on which countries. So we have specific nuances within the system deployment, so we might have a different proposition in a country that has more complexity around linkage of the customs systems and automated customs system and our system. Or depending on the existing functionality that resides in a country on its legacy system, and how that compares to our new system deployment.

*** 

ELIZABETH TYSON: Sure, that makes sense, and one quick follow-up. Is there any service updates in terms of feedback from customers? Has that been coming in, is that changing your timeline at all?

ERIC KIRCHNER: No. ***We had some learnings in the pilot phase that we went through in the Netherlands, and we implemented that, or I'm sorry, incorporated that in the subsequent rollouts. And actually, this last round of countries that came online in the last two or three months have had very positive feedback, and have been our smoothest implementations to date. So it's positive reflection that we are integrating learnings into the go-forward deployments. With respect to any issues with customers, there's not been any service deterioration associated with the systems,*** and the thing that we're mindful of and continuing to work on, as it relates to our customers, is the visibility from a reporting standpoint, because often customers rely on us to provide them detailed reports about their transportation and logistics activities, ***and we do have some refinement to do with that going forward, but it has not impacted our ability to service those customers.***

ELIZABETH TYSON: Thank you.

\*\*\*

NATE BROCHMANN: [W]e talk a lot about the transformation in terms of the systems, but you mentioned a couple times, like particularly still kind of combing through some of the underperforming contracts or areas in CL & D, and then also in terms of continuing to focus on improving your buy rates and leveraging that. Obviously, those have been ongoing-type projects for a long time. Just wondering, in terms of how far through all those you feel that we are, how much more is there really to go, in terms of once we even get this whole system up and running on the freight forwarding side. How much more process improvement or combing through underperforming type things do you feel that you still need to go through?

ERIC KIRCHNER: There are, I guess, a couple different questions within your question, Nate….

***We have an initiative that spans both forwarding and logistics, which is five-star quality so we have a very prescribed approach to insure that we're improving operations, and it involves an audit process. It's I think very detailed and it's helping us get better in terms of our performance.*** With regard to forwarding, we have now built out product leadership, which the Company didn't have before. So we have an air leader, an ocean leader and a customs brokerage and compliance leader. And we are seeing better collaboration and cooperation across the geographic execution, and then this higher level product function, to just help us iterate and get better and better.

\*\*\*

NATE BROCHMANN: **Okay, that's great. But it sounds like generally, the platforms and process improvement on both sides are definitely in place, and in freight forwarding, it's about leveraging what you have in place, and then even be able to leverage that even further once the system is in place.**

ERIC KIRCHNER: ***Yes, that's fair.***

(emphasis added).

173.   On June 7, 2013, the Company filed with the SEC on Form 10-Q its quarterly report for the fiscal 2014 first quarter ended April 30, 2014.  The Form 10-Q which was signed by Defendants Kirchner and Rodick, among others, provided in part:

> *Multi-year Business Transformation Initiative.* We have undertaken a multi-year business transformation initiative to establish a single set of global processes for our freight forwarding business and our global financial management. We anticipate total capital expenditures related to the development of software of approximately $135.0 million to $145.0 million in connection with these initiatives, the majority of which is nearing completion. We currently expect to incur an aggregate of approximately $20.0 million to $30.0 million during fiscal 2014 related to our business transformation initiatives. We expect our global operating system to be ready for its intended use during fiscal 2014. Although the deployment of our operating system has begun, we will consider it ready for its intended use depending upon a variety of factors, including but not limited to operational acceptance testing and other operational milestones having been achieved. We expect to incur depreciation expense and amortization expense over a seven-year useful life, beginning once the applications are considered ready for their intended use.

> ***

> **Item 4. Controls and Procedures.**

> ***

> "Disclosure controls and procedures" (as defined in Rules 13a-15(e) Our management, under the direction and with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated our disclosure controls and procedures as of April 30, 2013. ***Based upon this evaluation, management, including our Chief Executive Officer and Chief Financial Officer, has concluded that <u>our disclosure controls and procedures were effective as of April 30, 2013</u>.***

> ***

> <u>***There were no changes in our internal control over financial reporting during the most recently completed quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.***</u> ***We have initiated a multi-year effort to upgrade the***

*technology supporting our financial systems. As part of this effort, we have licensed enterprise resource planning (ERP) software and have begun a process to expand and upgrade our financial systems. Additionally, we are in the process of migrating certain financial processes to centralized locations. The planned implementation of these processes will affect the processes that constitute our internal control over financial reporting* <u>*in the future*</u> *and will require testing for effectiveness prior to and concurrently with the implementation.*

\*\*\*

**Item 1A. Risk Factors**

Our business, financial condition and results of operations are subject to a number of factors, risks and uncertainties. ***There have been no material changes to the risk factors as disclosed under Part I, Item 1A "Risk Factors" in our Annual Report on Form 10-K for the fiscal year ended January 31, 2013 filed with the SEC.*** …

(emphasis in italics added).

174.   The Defendants' June 6 and June 7, 2013 statements were materially false and misleading.   In particular, the following statements made by Defendants were materially false or misleading:

- [Kirchner:] ***The operating system is performing well.***

- [Kircner:] ***So it's positive reflection that we are integrating learnings into the go-forward deployments. With respect to any issues with customers, there's not been any service deterioration associated with the systems,*** … and we do have some refinement to do with that going forward, ***but it has not impacted our ability to service those customers.***

- [Kirchner:] In response to the question, ***"But it sounds like generally, the platforms and process improvement on both sides are definitely in place***, and in freight forwarding, it's about leveraging what you have in place, and then even be able to leverage that even further once the system is in place," Kirchner: ***"Yes, that's fair."***

83

- [O]ur disclosure controls and procedures were effective as of April 30, 2013.

- The planned implementation of [technology upgrades to financial] processes will affect the processes that constitute our internal control over financial reporting *in the future* and will require testing for effectiveness prior to and concurrently with the implementation.

- There have been no material changes to the risk factors as disclosed under Part I, Item 1A "Risk Factors" in our Annual Report on Form 10-K for the fiscal year ended January 31, 2013 filed with the SEC.

175. These statements were materially false or misleading because the statements omitted that both Oracle Financials and 1View were experiencing significant implementation, capacity, and scalability problems, summarized in ¶¶145-14855, 161-1668, and 170, which resulted in: (1) internal control deficiencies; (2) system crashes; (3) the delayed issuance of invoices; (4) difficulties in closing the general ledger at months' end and the end of reporting periods; (5) inaccurate financial data; (6) the need to employ multiple temporary "work-arounds;" and (7) deteriorated customer service.

176. In fact, according to CW 9, Deloitte partners Mills and Lee *had expressed concerns about problems with account reconciliation to VP Global Internal Audit Jim Schulien in 2012 and continued to raise these issues for the duration of CW 9's tenure (CW 9's tenure ended in October 2014).* As CW 9 explained, 1View/Oracle had been rolled out in Europe and Asia prior to being launched in the U.S. The Company maintained a Shared Services center in Manila, Philippines, which handled (among other things) accounting functions across a substantial international

*territory- but not including the U.S.  CW 9 recalled that around 2012 there were*

*significant problems in reconciling accounts and closing the General Ledger for all*

*financial accounts (i.e., arising from activity in various UTi country subsidiaries) that*

*filtered up to the Manila Shared Services department, which had been detected by the*

*Deloitte team.  During this timeframe, there were "ongoing communications"*

*between Deloitte partners Mills and Lee on the one hand, and Schulien on the other,*

*about these problems and their implications.  <u>CW 9 believed that the Deloitte partners</u>*

*<u>also communicated the above issues to members of the Implementation Steering</u>*

*<u>Committee (headed by Director of Global Operating Process David Parker), and to</u>*

*<u>CFO Defendant Rodick, by mid-2013 if not earlier.  CW 9 said such issues were</u>*

*<u>"common knowledge" and were widely discussed during regular meetings held by the</u>*

*<u>Implementation Steering Committee.</u>*

177.   Similarly, CW 3 recalled certain significant high-level meetings that took

place in April and June 2013.  *The predominant topic at the April 2013 meeting was*

*how <u>the implementation problems had given rise to inadequate IT/financial controls,</u>*

*<u>as well as the concomitant effects of these internal control deficiencies</u>.  This April*

*2013 meeting and the subsequent executive meeting in June 2013 (which included*

*Defendant Rodick, Ronco, Berger, and Barendse) were characterized by CW 3 as a*

*high-level effort to address financial audit risk/exposure.  As CW 3 explained, <u>one</u>*

*<u>significant effect of the inadequate financial controls, and an item that was of great</u>*

*<u>concern, was the Company's inability to properly recognize revenue.</u>  Specifically,*

*given the challenges with the system implementations, there were problems in determining which revenue streams (relating to which shipping transactions) needed to be recognized in an earlier versus a later fiscal quarter.*

178.   CW 3 said that Defendant CFO Rodick was briefed by Ronco and Berger on these issues around the April 2013 timeframe.  In addition, CW 3 explained that Rodick participated in the June 2013 executive meeting.  CW 3 further stated that Defendant Rodick was regularly included in bi-weekly email communications along with CW 3, Ronco, and other members of the Finance Department. These recurring communications characterized by CW 3 as "financial information updates" made reference to the financial control/risk issues discussed herein.

179.   Moreover, contrary to Defendant Kirchner's statements to the opposite CW 11 reported that UTi's problems with the systems implementation and integration had seriously strained customer relationships. CW 11 explained that subsequent to the rollout of 1View, invoices requesting payment from clients were regularly 3-4 months behind. Additionally, relationships with clients became tainted when the latter received several delayed invoices simultaneously, with a demand for payment within 30 days. CW 11 regularly brought his/her concerns regarding this issue up the chain to O'Connor and Andersen. Client issues were so prevalent that an internal conference call, entitled "Clients Under Threat," took place approximately once a month to discuss the Company's large clients, that were at risk of ending relations with UTi due to the latter's problematic practices, CW 11 said.  And Defendants admitted at the close of the Class

Period, the difficulties encountered during the implementation and integration of the systems had *"impacted certain of our clients and our ability to efficiently meet their needs."*

180.   CW 11 also said sales were threatened in that the new systems would not allow CW 11 to access the current sales numbers and he/she expressed his/her frustration to his/her managers, O'Connor and Andersen, on a regular basis and explained to them that he/she could not meet sales goals and increase sales if he/she was not privy to the current sales numbers.

181.   In addition, Defendants' failure to disclose in the Form 10-Q the circumstances described in paragraphs ¶¶145-155, 161-168, 170, and 176-80 violated Items 303(a)(1) and (3) of SEC Regulation S-K, as these circumstances constituted material known events, trends or uncertainties that "are reasonably likely to result in the registrant's liquidity . . . decreasing in any material way" and/or that "the registrant reasonably expects will have a material . . . unfavorable impact on . . . revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(1) and (3) and (b).  *See also* ¶267 (itemizing Defendants' admissions)

182.   On September 6, 2013, the Company issued its earnings press release for the fiscal 2014 second quarter ended July 31, 2013.  The release, partially entitled "New Freight Forwarding Operating System Launched in the United States," stated in part:

> Long Beach, Calif., September 6, 2013 – UTi Worldwide Inc. (NASDAQ: UTIW) today reported financial results for its fiscal 2014 second quarter ended July 31, 2013.

Eric W. Kirchner, chief executive officer, said, "Our results in the fiscal 2014 second quarter continue to reflect a lackluster global economy, challenging trading conditions and costs associated with our comprehensive business process transformation. ***The results underscore the importance of completing our transformation, and we have continued to make significant progress in that area. Since July 1, we have deployed our new freight forwarding operating system in seven countries – including the United States, United Kingdom and Hong Kong. There are currently 22 countries on the system to-date.***

***<u>In particular, the U.S. launch is a notable milestone in our deployment process. The implementation of our proprietary system in our largest market demonstrates that the platform works and is scalable.</u>*** The 22 countries on the new system represent approximately 35 percent of total freight forwarding shipments. We continue to expect that more than 70 percent of shipments will be on the new system by the end of fiscal 2014."

(emphasis added).

183.   On September 6, 2013, the Company held its earnings conference call for its fiscal 2014 second quarter ended July 31, 2013.  Defendant Misakian participated during the call and Defendants Kirchner, Rodick, and Feitzinger participated and took questions during the call:

ERIC KIRCHNER, CEO, UTI WORLDWIDE INC.: Thank you, Jeff, and good morning, everyone. Our second-quarter results were disappointing. The industry faced a generally lackluster environment and challenging trading conditions. We cut costs in some areas and would have removed more in a steady state operational environment. Several competitors were more aggressive with their costs during the quarter. By necessity, we maintained our focus on executing our comprehensive business process transformation. This involved the continued investments required to improve global processes and to ramp up the deployment of our [one view] system.

***The results underscore the importance of completing our transformation, and on this front we made significant progress.*** We are very pleased to report that our new Freight Forwarding operating system went live in seven additional countries since our last investor call, more

than we had projected at that time. This includes implementation in the major markets of the US, the UK and Hong Kong. With these latest deployments, we now have 22 countries on the new system, representing approximately 35% of our Freight Forwarding volume. We've also completed the implementation of Oracle financials in 29 countries.

***The US launch is a notable milestone for UTi. The US is our largest market by shipment. It's also more complex than the countries implemented so far because of the interaction with ancillary systems [such as] customs brokerage. <u>We've demonstrated that our proprietary system works, the deployment in the recently added large countries shows that it's scalable.</u> The progress since our last earnings call is also important because we now have sufficient volume on the new system to begin more aggressively to remove costs.***

\*\*\*

[RICK RODICK, CFO, UTI WORLDWIDE INC.:] Adjusted operating expenses in second quarter were higher than the same period last year. On an organic basis, adjusted operating expenses increased 3.6%, primarily due to transformation costs in the previously disclosed investments in local sales initiatives and Contract Logistics facilities that Eric mentioned earlier. We're currently incurring approximately $7 million in implementation in duplicative costs per quarter. These costs are expected to go away once the transformation is complete. In the third quarter, we plan to begin amortizing costs that have been capitalized under the new system. As a result, amortization expense in fiscal 2014 is anticipated to increase by approximately $7 million to $8 million. We still expect the system amortization to be approximately $20 million annually.

\*\*\*

Cash flow from operations was an outflow of $47 million in the first six months of fiscal 2014 compared to last years' outflow of $14 million. Working capital deteriorated $80 million compared to a deterioration of $90 million in the first six months of last year. In the fiscal 2014 second quarter, working capital deteriorated $12 million compared to the deterioration of $44 million in same period last year. While this was also an improvement over the first quarter, we still have more work to do on the free cash flow side. ***<u>I anticipate a significant improvement in cash collections during the second half of the year, as we enhance our focus on collecting receivables.</u>*** With that, I'll turn the call back to Eric for

closing remarks. Eric?

\*\*\*

ERIC KIRCHNER: Thank you, Rick. The industry faces ongoing headwinds and our results in the first six months of fiscal 2014 reflect this. … But our long-term outlook remains upbeat. We remain focused on the completion of our transformation, which is expected to drive significant improvement in operating income and margin.

***We're very encouraged by the progress we made in our transformation during the quarter. The launch of our new Freight Forwarding operating system in major markets like the US, UK and Hong Kong is a significant achievement.*** Our teams are working diligently on the rollout, and I want to personally recognize their efforts and congratulate them for this accomplishment. We certainly still have more work to do. We plan to deploy the new system in 8 to 10 additional countries before our next earnings call in early December, including a launch in one or more of our largest remaining countries. We still estimate that at least 70% of shipments will be on the new system by the end of fiscal 2014. Our focus remains squarely on completing our transformation, while operating in an environment that's not expected to provide relief in the short term.

***Over the next two to three quarters, the balance will begin to shift from carrying costs related to the transformation to seeing benefits associated with improved operational efficiency and finance processes.*** We still expect to execute significant cost savings this year. Savings have already been realized in some areas, but the majority are expected to begin late in the third quarter and carry into the fourth quarter. We anticipate an increase in severance costs in the second half of the year as a result. With that, I'll turn the call back to Jeff to direct the Q&A period. Jeff?

\*\*\*

DAVID ROSS [ANALYST, STIFEL NICOLAUS]: Then last question related to the sales initiatives, I know you talked previously about the North American sales initiatives. Where are we in that cycle, bringing new people on and training them, and then when should we expect to see that increased volume as a result of the sales initiatives?

ERIC KIRCHNER: We're well down the track with regard to people becoming productive….

***This launch of the system in the US is a significant enabler for that process to improve, because we now have an environment with standard processes and standard product offerings that will allow us to sell more effectively because we can onboard those small to medium-sized customers much more rapidly than we could before. So I'm encouraged about where we're situated. …***

\*\*\*

So I think if we look at our new business wins, they are encouraging. They've been offset somewhat, though, by the retention actions, and that does take both time and effort from the sales force to retain our existing accounts and that does put pressure on the margins. So at some point, that's going to flip over and we'll see the influx of new business start to outpace any negative impact from the margin pressure and the rebid situation. ***And I also believe that with the increasing standard, standardization of the processes and rollout of the system, we'll provide a better service experience for the customers which will, again, help us win and retain more business.***

\*\*\*

BEN HARTFORD, ANALYST, ROBERT W. BAIRD & COMPANY, INC.: This question is for both Eric and Ed. We focused a lot on the system and the productivity gains that it's expected to drive, but I'm curious about your point of view as it relates to data analytics and the capabilities from the system. Maybe, Ed, if you could provide some perspective in terms of where you think the market is in terms of data analytic capabilities and how the system that you guys have rolled out can provide a niche or an opportunity from a sales standpoint that would be above and beyond what we've looked at just from a tactical Freight Forwarding perspective. And then if the capabilities from the system exist, when should we begin to see some of the benefits from data analytic capabilities that the system would provide? I would assume it wouldn't be until it's fully rolled out, but I'm interested in your perspective on this topic.

\*\*\*

ERIC KIRCHNER: The -- additionally, Ben, I think we've talked in the past, when this thing's completely deployed across our Company, it will be one of a mere handful of global systems that can produce reliable and consistent information. So I would say we're at a tactical phase right now and we're very focused on data quality, because again, you can build the

best system in the world but if it's not utilized effectively, it doesn't produce the outcome that it should. …

***But the good news is, the way the system has been assembled gives us a lot of flexibility to respond to those requests and requirements and I think from an industry perspective, one element is it's the ante. It's the cost of being in this business. <u>If you don't have the ability to produce reliable and robust information, I think a company's going to fall further behind the market</u>. And then secondly, if we can -- we're not going to spend $1 billion a year on IT like a UPS might, right? But we have to spend our money effectively and then engineer competitive -- <u>you have intellectual property within the system that helps set us apart</u>.***

(emphasis added).

184.   On September 9, 2013, the Company filed its Form 10-Q for the second fiscal quarter ended July 31, 2013.  The Form 10-Q was signed by Defendants Kirchner and Rodick and made the following disclosures:

Our primary sources of liquidity include cash generated from operating activities, which is subject to seasonal fluctuations, particularly in our Freight Forwarding segment, and available funds under our various credit facilities. We typically experience increased activity associated with our peak season, generally during the second and third fiscal quarters, requiring significant disbursements on behalf of clients. During the second quarter and the first half of the third quarter, this seasonal growth in client receivables tends to consume available cash. ***Historically, the latter portion of the third quarter and the fourth quarter tend to generate cash recovery as cash collections usually exceed client cash disbursements.*** Cash disbursements in the first quarter of the fiscal year typically exceed cash collections and, as a result, our first fiscal quarter historically results in the usage of available cash.

\*\*\*

**Item 4. Controls and Procedures**

\*\*\*

Our management, under the direction and with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated our

disclosure controls and procedures as of July 31, 2013. ***Based upon this evaluation, management, including our Chief Executive Officer and Chief Financial Officer, has concluded that our disclosure controls and procedures were effective as of July 31, 2013.***

\*\*\*

***<u>There were no changes in our internal control over financial reporting during the most recently completed second quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.</u> We have initiated a multi-year effort to upgrade the technology supporting our financial systems. As part of this effort, we have licensed enterprise resource planning (ERP) software and have begun a process to expand and upgrade our financial systems. Additionally, we have begun the process to migrate certain financial processes to centralized locations. It is anticipated that during the third quarter for our fiscal 2014, the planned implementation of these processes <u>will begin</u> to affect the processes that constitute our internal control over financial reporting <u>in the future</u> and require testing for effectiveness prior to and concurrently with the implementation.***

\*\*\*

**Risk Factors**

Our business, financial condition and results of operations are subject to a number of factors, risks and uncertainties. ***There have been no material changes to the risk factors as disclosed under Part I, Item 1A "Risk Factors" in our Annual Report on Form 10-K for the fiscal year ended January 31, 2013 filed with the SEC.*** The disclosures in our Annual Report on Form 10-K and in other reports and filings are not necessarily a definitive list of all factors that may affect our business, financial condition and future results of operations.

(emphasis added).

185.   The Defendants' September 6 and September 9, 2013 statements were materially false and misleading.   In particular, the following statements made by Defendants were materially false or misleading:

- [Kirchner]: ***We've demonstrated that our proprietary system works, the deployment in the recently added large countries shows that it's scalable.*** The progress since our last earnings call is also important because we now have sufficient volume on the new system to begin more aggressively to remove costs.

- [Rodick]: I anticipate a significant improvement in cash collections during the second half of the year, as we enhance our focus on collecting receivables.

- [Kirchner]: This launch of the system in the US is a significant enabler for that process to improve, ***because we now have an environment with standard processes and standard product offerings*** that will allow us to sell more effectively because we can onboard those small to medium-sized customers much more rapidly than we could before. So I'm encouraged about where we're situated.…

- [O]ur disclosure controls and procedures were effective as of July 31, 2013.

- There were no changes in our internal control over financial reporting during the most recently completed second quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

- [T]he planned implementation of these processes ***will begin*** to affect the processes that constitute our internal control over financial reporting ***in the future*** and require testing for effectiveness prior to and concurrently with the implementation.

- There have been no material changes to the risk factors as disclosed under Part I, Item 1A "Risk Factors" in our Annual Report on Form 10-K for the fiscal year ended January 31, 2013 filed with the SEC.

(emphasis added).

186. These statements were materially false or misleading because the statements omitted that both Oracle Financials and 1View were experiencing significant

implementation, capacity, and scalability problems, summarized in ¶¶145-155, 161-167, 170, and 175-80, which resulted in: (1) internal control deficiencies; (2) system crashes; (3) the delayed issuance of invoices; (4) difficulties in closing the general ledger at months' end and the end of reporting periods; (5) inaccurate financial data; and (6) the need to employ multiple temporary "work-arounds."

187.   CW 15 confirmed that executives in CW 15's monthly and quarterly meetings, which included Defendants Kirchner, Rodick and Feitzinger, were concerned, prior to 1View's "go-live" date in the U.S. in September 2013, that the implementation issues experienced in other countries, like Holland, would pose potential problems in the U.S. if left unfixed.  CW 15 characterized these 1View problems, and their presumed negative implications for the U.S., as a "general topic" that everybody, including the defendant executives, were regularly concerned about.

188.   CW 1 (Business Analyst in UTi's IT department) recalled that the transition to 1View caused invoicing delays and errors in UTI's Accounts Receivable systems. According to CW 1, the delays caused by 1View were so pervasive that CW 1 recalled an instance when an Account Manager lost a client because of the invoicing delays.  CW 1 additionally explained that even after 1View was online, UTrac remained "the glue" between UTi's multiple third party shipping systems. CW 1, who designed programs for uTrac, said that none of uTrac's functionality was converted to 1View when CW 1 left UTi in February 2014.  According to CW 1, UTrac continued to allow erroneous data entries even after 1View was implemented.

189.   *According to CW 5 (Enterprise Intercompany Accountant), as more and more countries/subsidiaries went "live" with 1View, the Company experienced increasingly longer delays in performing the monthly General Ledger closing. This was due to invoicing delays and erroneous entry of charge codes, both of which stemmed from challenges with the 1View implementation.* With regard to charge codes, CW 5 noted that certain UTi subsidiaries (Controllers) simply did not know what elements of a particular intercompany transaction should be designated as shareable (*i.e.,* invoke Spread Share) and which should be attributed only to the Destination or Origin branch.  CW 5 strongly believed that based on SVP Finance Renee Ronco's role at the Company, Ronco would have been distinctly aware of all 1View-related problems discussed herein.

190.   Given the variety of problems with the 1View/Oracle implementation, CW 3 explained, "workarounds" were established for a number of business functions, to minimize the disruption of daily business/system use, during the implementation phase. As CW 3 explained, one of the most significant workarounds was a large-scale effort to manually reconcile the data between the 1View and Oracle systems. Various personnel in Accounting and other departments were tasked with conducting these manual reconciliations. *Due to the ongoing issues and system reconciling workarounds, CW 3 recalled, the month-end General Ledger closing process became a protracted and laborious effort each and every month, with many staff and resources devoted to ensuring proper and accurate closing. Similarly, fiscal quarter-end closings were also*

*severely hampered, and required substantial resources to accomplish.  As CW 3 recalled, <u>the fiscal quarter ending in July 2013 (the quarter addressed here)</u> was an extremely arduous and painstaking exercise. CW 3 noted that there were "last minute changes" made, and "rushed emergency discussions" which involved "disclosure-type items in the balance sheet" and "queries from the Corporate Team" in an effort to understand a variety of trends and metrics relating to shipment revenues, "that weren't making sense."* According to CW 3, the above accounting/General Ledger-closing issues related to challenges with regard to revenue recognition.

191.   As set forth above, CW 3 also recalled certain significant high-level meetings that took place in April and June 2013 during which ***the predominant topic at the April 2013 meeting was how <u>the implementation problems had given rise to inadequate IT/financial controls, as well as the concomitant effects of these internal control deficiencies</u>.  This April 2013 meeting and the subsequent executive meeting in June 2013 (which included Defendant Rodick, Ronco, Berger, and Barendse) were characterized by CW 3 as a high-level effort to address financial audit risk/exposure. As CW 3 explained, <u>one significant effect of the inadequate financial controls, and an item that was of great concern, was the Company's inability to properly recognize revenue.</u>*** CW 3 said that Defendant CFO Rodick was briefed by Ronco and Berger on these issues around the April 2013 timeframe.  In addition, CW 3 explained that Rodick participated in the June 2013 executive meeting.  CW 3 further stated that Defendant Rodick was regularly included in bi-weekly email communications along with CW 3,

Ronco, and other members of the Finance Department. These recurring communications characterized by CW 3 as "financial information updates" made reference to the financial control/risk issues discussed herein.

192.   In addition Defendants failure to disclose in the September 9, 2013 Form 10-Q the circumstances described in paragraphs ¶¶145-155, 161-167, 165, 176-180, and 188 violated Items 303(a)(1) and (3) of SEC Regulation S-K, as these circumstances constituted material known events, trends or uncertainties that "are reasonably likely to result in the registrant's liquidity . . . decreasing in any material way" and/or that "the registrant reasonably expects will have a material . . . unfavorable impact on . . . revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(1) and (3) and (b).  *See also* ¶267 (itemizing Defendants' admissions).

193.   On September 10, 2013 Defendant Rodick presented on behalf of the Company at the RBC Capital Markets Global Industrials Conference:

UNIDENTIFIED PARTICIPANT RBC CAPITAL MARKETS: How quickly do you think those things ramp up, as you draw the other things to a close? I mean, do you have the infrastructure in place from a personnel perspective to start looking at M&A immediately, or is that something you're going to have to layer in?

RICK RODICK: Well, we've been continually building a pipeline, and we've got the people we need to, if and when we're ready to get back in that. So it wouldn't be like we need to ramp people up. ***It would really be get the transformation done, what we hadn't done in the past was integrate the acquisitions we had gotten, which I think a lot in our industry hadn't done. We built a platform that we can integrate things quickly and really not only get the revenue, but take the cost out. So I think we can do these things pretty quick.***

The main thing is get the transformation where (inaudible) complete. We

said by the end of the year it would be 70-plus percent complete, continue to build the pipeline. But also, as I said, focus on the sales in order to get that growth back.

\*\*\*

UNIDENTIFIED PARTICIPANT: You've talked about the IT personnel you've had to have in place and things like that. What's the margin ramifications from that effort, kind of beginning to come to a close?

RICK RODICK: Sure. So once the IT, the transformation's complete, we're going to take $75 million to $95 million out of run rate in people, all people. About 25% of finance people, I'd really call them administrative people that are in the field today that help bill, help collect, [code] payables, we're putting all those people into shared service centers in lower cost countries.

***But the really big savings are that the people will be so much more efficient, because you're not managing -- we have 4 or 5 major platforms, but there's actually 9 in total - so we go to one. It's very inefficient when you're shipping, when you're in LA and something comes in from China, they enter all the information in China, you've got to re-enter it a couple times in LA on the multiple platform. So it's really going to free up the people that we'll take out a lot of people. It's all salary dollars that come out in that $75 million to $95 million. We become a lot more efficient.***

\*\*\*

UNIDENTIFIED PARTICIPANT RBC CAPITAL MARKETS: Sure. As you've gone through the process with the IT system and that kind of thing, I'm sure you've uncovered other nuggets within the company. I mean, the whole, who knows where the bodies are buried kind of mentality. Any time you have a rollup company, and that's what [this was], what else have you found, either good or bad, that you kind of looked at and said, well, I didn't know that, hey, that's an expertise we didn't know we really had, or the other side, god, that's actually a little bit worse than we thought it was?

RICK RODICK: ***I'd say the biggest item has been that we weren't as standardized as we thought. So as you roll out each country, we learn something new, because we were 4 regions that ran kind of independent. And they got together and agreed which way to go, and then they kind of went off their own way, until like Eric Kirchner came along, and we're***

*more of a global entity now.*

Those, even within the countries within those regions, we found as we rolled out these countries, that, while they did some things non-standard, some cases, they're a better way to go. So as we're building a system, we're kind of tweaking it to say, either we tweak the system or now this country has to do what everybody else is doing.

*So I think we're going to see a lot more standardized processes, a much better consistent client experience than we've had in the past,* and we're learning that now that I think the surprise was, wow, there's a lot more non-standard things going on than we thought. And it's things clients want us to do, so in some ways it's things that, boy, that'd be good, something to do worldwide, and sometimes you just say, there was no value in that, we're just not going to do that anymore.

*So a lot of learning, and that's why we're rolling out each -- of these early countries we found some things, and it's going to be a lot more standardized and for the better, and we'll be a lot more efficient.* We were doing a lot of things that maybe didn't add a lot of value and really weren't the best way to do things. So I think there's been good learning. That'd be the good learning is, here's a way to make us more efficient, and also do things more standard worldwide.

UNIDENTIFIED PARTICIPANT RBC CAPITAL MARKETS: Yes. You used the term, kind of transformation fatigue. And I know you guys, as a management team, feel it. I'm curious, you've only been there a year, so this question probably doesn't apply to you as much. But you've got some guys that have been there since the beginning of this, had laid out the strategy for this. What's the confidence that they can just flip the switch and go from this transformation-detailed management team, to all of a sudden becoming this vibrant sales organization? What's the switch there that gives you confidence that that's something that that's a skill set they still possess after 3 or 4 years of this transformation process?

RICK RODICK: *Well, I think they're all excited about, as I said, to get that behind us. So really, the transformation, I think that everybody believes we've proven, especially with US going live, we got that, so now let's focus on sales*….

*There won't be as much focus on getting the transformation done as there has been, so now they can focus on sales, even senior management, because now we've proven it works, so now Eric, Ed, and those guys can*

*say, we know it works, IT and finance, you guys get that done, operations, now let's go out and sell.*

(emphasis added).

194.   On September 17, 2013, Defendant Misakian presented on behalf of the Company at the Morgan Stanley Industrials & Autos Conference:

We just recently, early this month, launched in our largest market, the United States. And that took us up rather quickly to the 35% level.

Our goal from this point is to launch eight to ten additional markets by early December, our next earnings call. And that by the end of this fiscal year, we will have sufficient volumes on the transaction that would account for 70%.

On the Oracle side, we have launched in 29 markets. Oracle is running a little ahead of the freight forward operating system, and that will be the case as well as we continue. I would say by second quarter of next year we should be fully deployed on both -- with both systems.

BILL GREENE: As these will out, how do the savings roll in? You presumably don't get all of the $95 million or so right away.

JEFF MISAKIAN: Correct.

BILL GREENE: So how does that work?

JEFF MISAKIAN: So the plan is to have $30 million to $35 million or to realize $30 million to $35 million of those cost savings this year.

BILL GREENE: Okay.

JEFF MISAKIAN: And we're on track for that. And then that increases an incremental $15 million or so next year. So the cumulatively we will be at $45 million to $50 million in operating savings, expense savings next year. And then the full $75 million to $95 million, run rating at the end of next year, fully realized in FY 2016.

BILL GREENE: And where are the savings coming from? What is it? Is it just redundant inputs or how do you -- how do you actually get those savings?

**JEFF MISAKIAN: *It is primarily staff costs through the freight forwarding operating system as well as on the finance side. If you can imagine different systems that have been put in place over the years and you saw how shipments are processed, you'd see it's very clearly. So if you -- for example, if you ship something from Shanghai to Los Angeles, the folks in Shanghai would enter the information for that shipment on their system, the Asia-Pacific system. It would be received in Los Angeles and the folks there would input exactly the same information on the Americas system plus maybe a few other things.***

***With the new system, the folks in Los Angeles simply pull up a screen. That's it.***

BILL GREENE: One set of input.

**JEFF MISAKIAN: *One set of input. And on the finance side we've got multiple systems there. The move to shared service centers allows us to effectively consolidate staff and remove some of the staff from the field.***

BILL GREENE: Okay. Now, those savings numbers when we look at -- you said I think 35% of the shipments are now in the system.

JEFF MISAKIAN: Correct.

*** 

BILL GREENE: Okay. And as you've rolled this out now at 35%, are there any lessons learned or any sort of surprises or anything that's we need to think about as we consider the ultimate outcome here?

**JEFF MISAKIAN: *<u>I would say on balance things are -- the system is performing as we would expect it to right now</u>. But we have had some issues as we've gone through. We have found that when we launch the system and specific markets that some of the standardized processes and procedures we put in place were not being followed entirely. So each market was not as standard as we thought it would be. And that caused things to slow down a little bit.***

***In addition, the interface or the link between [One View Art], which is what we call our freight forwarding operating system and Oracle Financials is not as fully automated as it needed to be. <u>We have fixed that situation with the launch in the US market.</u>*** So I think we have learned quite a bit through these. Each market you deploy in, especially as

you start deploying in the larger markets, you start to learn more and more things. ***The fact that we launched in the US early this month and it has been two weeks and things are proceeding along as planned, I think is a good sign.***

\*\*\*

BILL GREENE: Maybe you can touch a little bit on balance sheet and cash flow. You've made some significant investments in IT. Did that pullback such that we get a kick on cash flow? Are you comfortable with the leverage that you are at now? So maybe talk a little bit about capital structure and cash flow.

JEFF MISAKIAN: Yes, unquestionably we have spent $150 million nearly to date from inception to date on the transformation; so that obviously is a drain on cash flow. That effectively comes to a close very soon when we start amortizing the system. The fact that we launched in the US puts us essentially at the point where the system is deemed pretty close to being available or being ready for its intended use. Amortization is going to start fairly quickly so there will be less -- there will still be capitalized costs associated with the transformation but they won't be nearly -- with the system, but I won't be nearly as much is that was historically.

So that will start to sunset and I think you'll see increased cash flow coming from there. I think --.

BILL GREENE: Just for clarification, what is the amortization expense you will record?

JEFF MISAKIAN: It will be $20 million a year over a seven-year of life. For the balance of this fiscal year, it will be $7 million or $8 million because we will be starting sometime relatively soon. But you won't see a full, obviously, a full run rate yet. It will be $20 million starting next year.

BILL GREENE: And just for clarification, the $35 million, $45 million, $75 million to $95 million that we talked about in terms of operating savings, that is net of amortization or –

JEFF MISAKIAN: It is gross. That's gross.

BILL GREENE: That is gross. Okay, fair enough. **Okay, sorry, just in terms of the leverage and the cash position, what do you do with the cash that gets freed up by not spending on the IT?**

JEFF MISAKIAN: *I think from a leverage perspective we're about probably where we need to be. I don't think we need to do a whole lot. Eventually we might -- the senior notes that we have on the books will eventually get paid off at some point in the future. But I think where we are today is probably fine.* And as far as use of cash, we intend to employ a balanced approach. Our first priority will be invest in the business either organically or post-transformation in M&A-type activity. And then secondly, look at returning cash to shareholders.

195.   Defendants' statements on September 10 and September 17, 2013 were materially false and misleading.   In particular, the following statements made by Defendants were materially false or misleading:

- [Rodick]: We built a platform that we can integrate things quickly and really not only get the revenue, but take the cost out. So I think we can do these things pretty quick.

- [Rodick]: Well, I think they're all excited about, as I said, to get that behind us. *So really, the transformation, I think that everybody believes we've proven, especially with US going live, we got that, so now let's focus on sales.*

- [Rodick]: *There won't be as much focus on getting the transformation done as there has been,* so now they can focus on sales, even senior management, *because now we've proven it works, so now Eric, Ed, and those guys can say, we know it works, IT and finance, you guys get that done, operations, now let's go out and sell.*

- [Misakian]: I would say on balance things are -- *the system is performing as we would expect it to right now.*

- [Misakian]: In addition, the interface or the link between [One View Art], which is what we call *our freight forwarding operating system and Oracle Financials is not as fully automated as it needed to be. We have fixed that situation with the launch in the US market.*

- [Misakian]: I think from a leverage perspective we're about probably where we need to be. I don't think we need to do a whole lot. Eventually we might -- the senior notes that we have on the books will eventually get paid off at some point in the future. But I think where we are today is probably fine.

(emphasis added).

196.   These statements were materially false or misleading because the statements omitted that both Oracle Financials and 1View were experiencing significant implementation, capacity, and scalability problems, summarized in ¶¶145-155, 161-167, 170, 176-180, and 188-191, which resulted in: (1) internal control deficiencies; (2) system crashes; (3) the delayed issuance of invoices; (4) difficulties in closing the general ledger at months' end and the end of reporting periods; (5) inaccurate financial data; and (6) the need to employ multiple temporary "work-arounds."

197.   At the close of the Class Period the Company admitted:

*In certain countries, particularly in the United States, we experienced invoicing delays immediately following the implementation of our freight forwarding operating system and global financial system in those countries.*

\*\*\*

*When we launched 1View in the United States, our largest and most complex market, our working capital issues reached tipping point. You may recall we also launched Oracle Financials and a new customs brokerage system at the same time in all 28 branches in the United States. The learning curve was steep, and our associates fell behind on certain tasks, and by necessity, they focused on servicing our clients and we fell behind in our billings.*

*We immediately focused our attention on additional training for billing personnel and correcting the issues.*

198.   The Company has also acknowledged that that "at the end of the last fiscal year, January 31[,] [2014],[the Company was] still struggling with billing quality."

199.   <u>The systems did not "work," at least not in the way investors were led to believe, nor had the problems with the two operating systems been "fixed" with "the launch in the U.S. market."</u>

200.   As CW 3 explained, the 1View rollout in the United States occurred in September 2013. ***Although CW 3 remained with the Company for only a short while thereafter, CW 3 recalled that there were significant invoicing delays which came about after the rollout. <u>CW 3 noted that invoicing delays had also occurred in prior 1View regional rollouts.</u> The Global Operating Process Team was responsible for training end users as to proper 1View system use, including invoicing. Executives managing this Global Operating Process Team—including Director of Global Operating Process David Parker and CIO Ronald Berger – would have discussed these functionality issues (including the invoicing delays), CW 3 said.***

201.   CW 6 explained, that in late 2013, when the 1View and Oracle systems were jointly implemented in the U.S., there were significant billing and General Ledger closing issues. Even prior to the U.S. roll-out of the new systems, the accounting was experiencing major problems with the month-end General Ledger closings, CW 6 said. CW 6 added that the majority of month-end closing issues (including the spread-share database) are inherently billing issues because billing has to be tied out each month in order to close.

202.   According to CW 6, *the 1View code and the Oracle mapping was severely lacking.*   It is CW 6's opinion that UTi chose not to avail itself of regression testing (a process of testing changes to new computer programs to ensure that the older programming still works with the new implementations) because it would have taken too much time to apply and would have delayed the Company's firm "go live" dates. *Instead, the Company chose to create a workaround that did not work then, and in CW 6's opinion, would never work, because the 1View code from the beginning was never sufficient to support Spread Share relating to invoicing in some of the key local countries.  CW 6 further explained that the training and documentation on how to invoice using this workaround was not efficient.*

203.   *CW 6 stated unequivocally that her supervisor Renee Ronco, who reported directly to Defendant Rodick, was "aware of everything." CW 6 stated that "there is no doubt that Berger and Renee knew the details [of all of these issues]. Absolutely, they did." CW 6 said, "at the Berger and Renee levels, they knew the details." CW 6 recalled attending meetings, where Ronco was apprised of all of the implementation problems. CW 6 said the meetings were set up by CIO Ronald Berger (who reported directly to Defendant Kirchner) to discuss the current status of the implementation on a country-by-country basis and to raise any critical implementation issues. According to CW 6, status reports were provided at these meetings.   CW 6 further stated that it was her understanding that Ronco communicated directly with Defendant CFO Rodick and possibly the Defendant CEO*

*Kirchner regarding these particular invoicing and month-end closing issues on a regular basis.*

204. *CW 9, the Director, Global Finance and Internal Audit, said that the GL-closing issues, and issues related debt covenants, had been characterized as "significant deficiencies" in reports CW 9 prepared and disseminated beginning in early 2013, and continued to be reported as "significant deficiencies" in such reports at the time he/she left UTi in October 2013.*

205. On December 5, 2013, UTi issued a press release announcing its fiscal 2014 third quarter financial results. The December 5, 2013 press release stated, in material part:

> LONG BEACH, Calif., Dec. 5, 2013 (GLOBE NEWSWIRE) – UTi Worldwide Inc. (Nasdaq:UTIW) today reported financial results for its fiscal 2014 third quarter ended October 31, 2013.
>
> ***
>
> Eric W. Kirchner, chief executive officer, said, "Our fiscal 2014 third quarter results reflect increased activity in both our freight forwarding and contract logistics and distribution segments, offset by transformation-related costs. Our sales efforts drove freight forwarding volume growth that was ahead of the market, particularly in airfreight. Rates were under pressure in the third quarter and this led to a decline in net revenue per unit of cargo that partially offset the higher volumes. We anticipate this rate pressure to continue for the foreseeable future. Improved trading conditions and our ongoing sales activities in contract logistics and distribution led to new business and increases in existing accounts. Year over year comparisons in contract logistics and distribution were negatively impacted by the conclusion in October 2012 of a high-margin account in the Americas and the impact of currency exchange rates on our global results."

*Kirchner continued, "Since October 1, we have launched our 1View freight forwarding operating system in five countries, including Belgium, France and Germany.  There are now 27 countries that are live on the system, representing approximately 50 percent of total freight forwarding shipments. We continue to expect approximately 70 percent of shipments to be on the new system at the end of our 2014 fiscal year. In addition, we expect to be substantially complete with the system rollout by the middle of fiscal 2015. Because of the progress made in our transformation activities, we removed approximately $30 million in pre-tax operating expenses on an annualized basis at the end of the third quarter.  None of these cost reductions are reflected in our third quarter results.  We anticipate an additional $10-12 million of annualized pre-tax operating expenses to be removed by the end of our 2014 fiscal year. We expect to realize cumulative gross pre-tax cost savings of approximately $75-95 million on an annualized go-forward basis by the end of fiscal 2015, beginning with the cost actions taken during the third quarter."*

(emphasis added).

206.   On December 5, 2013, UTI held its earnings conference call for the fiscal third quarter ending October 31, 2013.   Defendants Kirchner, Rodick, Feitzinger and Misakian were present and participated during the call:

[Kirchner:] **We continue to make significant progress on our systems deployment.** It's exciting to report that our freight-forwarding operating system went live in five additional countries since our last investor call, including Germany, which is our second-largest market by shipment. We're live in 27 countries, representing approximately 50% of our freight-forwarding volume. We've also completed the implementation of Oracle Financials for freight forwarding operations in 30 countries.

***

Turning to slide 5, expenses remain insulated [sic] [inflated] due to the ongoing investment in our transformation. We incurred approximately $4 million of implementation and duplicative costs related to the rollout of our new freight-forwarding system during the third quarter, and we began

amortizing previously capitalized expenses in September.

However, because of the progress we've made in our system deployment, we've begun to remove costs from the Organization. We removed approximately $30 million in pre-tax operating expenses on an annualized basis at the end of the third quarter. None of these cost reductions are reflected in our third-quarter results. We anticipate an additional $10 million to $12 million of annualized pre-tax operating expenses to be removed by the end of our 2014 fiscal year. The remainder of our cost actions and efficiency improvements are expected to be substantially complete by the end of fiscal 2015. These actions position us well to achieve our $75-million to $95-million cumulative pre-tax annualized savings target.

\*\*\*

[Rodick:] Cash flow from operations was an outflow of $68 million in the first nine months of fiscal 2014, compared to last year's outflow of $57 million. Working capital decreased $143 million, compared to a decline of $160 million in the first nine months of last year. In the fiscal-2014 third quarter, working capital decreased $62 million compared to a decline of $70 million in the same period last year. ***Our fourth quarter is historically our strongest free-cash-flow quarter, and I anticipate improvement in cash collections in the fourth quarter.***

\*\*\*

[Kirchner:] ***We're very pleased with the progress made under our transformation initiative. As I said earlier, we've launched our OneView system in 27 countries, representing about 50% of shipments, including the US and Germany, which are our two largest markets. These are major milestones in our comprehensive business process transformation, and it's notable that the US represented the largest and most complex deployment challenge of our entire project.***

\*\*\*

KELLY DOUGHERTY [ANALYST, MACQUARIE CAPITAL SECURITIES]: Okay. Thanks. And then quick on the $23 million, I think you'd previously been talking about $20 million in amortization. And I think on the last call you had said we want to get 8 to 10 additional countries on by on this call. It looked like there was 5. Is there anything we should think about with things getting a little bit slower during this past quarter or costs increasing that increased that amortization number at all a bit and how you think about catching up to get to that 70% by the end of the year?

ERIC KIRCHNER: Sure. To go back, let me add something also to your earlier question. The way we need to think about these costs is run rate by the end of. So as an example, when you look at the cost actions that we showed for the third quarter, a lot of them became effective at the very end of the third quarter, therefore, they're not reflected in the numbers. And we would anticipate some cost actions that would run close to the end of next year to get to that $85 million number. So it's not as if those things start or are front loaded, when you consider what our OpEx or our basic cost run rates will be.

KELLY DOUGHERTY: Sure. That would be a number we should think about for fiscal '16, right?

ERIC KIRCHNER: Yes. So when you talk about the deployment schedule and where we are with the rollout, the number of countries is important, because all the countries have to get on the system, obviously. But the percentage of transactions in the system is a bigger driver of how we're viewing the progress of the rollout. ***So we did go into fewer countries than we had initially anticipated in this quarter, but the US implementation was the most complex. And we wanted to make sure that we had everything right before we went into additional countries. So if you look at the US, that involved our largest number of branches. It involved a new Freight Forwarding operating system, a new finance system with the local financials, a new customs brokerage system, and all the associated linkages of those systems and business process changes. So it***

*was the most challenging and complex rollout that we had, and we wanted to make sure we had that right before we went into a lot of additional countries.*

I wouldn't characterize it that we fell behind or that that was a miss that we went to 5 versus 8 to 10 countries, because we now have our two largest countries on the system and we expect to get the next two largest countries on the system at the end of the fiscal year. So we're about 50% today. Just the addition of China and South Africa get us well on the way to that 70% number, and we'll add some other countries to get there. *So I think that we've made excellent progress. The fact that we've got more than -- or half of our transactions in the system today, and it's functioning and working and we're seeing the benefits that we expected in terms of how that system performs, I think we're doing a great job with that.*

\*\*\*

KENTON MOORHEAD, ANALYST, ROBERT W. BAIRD & CO.: This is Kenton on for Ben. **I wanted to maybe talk a little bit about some of your efforts in terms of managing the net working capital.** And then maybe as a follow-up to that, as you're basically two to three quarters away from finishing the rollout, how do you guys start to prioritize some of this free cash flow that you guys are going to be generating?

RICK RODICK: **Okay. So you mentioned net working capital. Talking about where we are now and what we see in the upcoming?**

KENTON MOORHEAD **In terms of managing just the amount of net working capital that you guys are laying out? Because it looks like -- obviously, this is a higher net working capital quarter, but it looks like -- I remember a few quarters ago, you talk about when you came in that this was something that you were going to focus in on.**

RICK RODICK: *Yes. Definitely. We've increased focus.* A couple of things. Number one, this is always our weakest cash flow quarter, because it's normally our highest revenue. We actually had record -- our highest revenues, I shouldn't say record -- highest revenues of the year this quarter. So with that, there's increased demands, higher volumes, higher payments -- higher charges with carriers and things. And so what we normally see is it ramps up a bit. *There's a use of working capital in third quarter, and*

*then fourth quarter improves dramatically. There has been an excellent focus on it. I will tell you in the last few quarters in each of our regions, we've seen the older debts be paid down and we're seeing as higher current billings. So while it doesn't show up in improved working capital, our aging's improving, so I think you'll see that improve in the fourth quarter, continue to improve. And we've been investing in the business with the system and such.*

KENTON MOORHEAD: Yes. And then the other part of that was as you get through that system, and you've got basically two to three quarters more in terms of the rollout if you're getting towards mid-fiscal '15, where's the focus turn in terms of uses for free cash flow?

RICK RODICK: We'll reevaluate at that time. But number one, we want to pay down debt. We'll look at investing in the business. Because our investment in the business the last couple years has been in the transformation, and those costs wind down, so we can look at invest in the business. And then we'll consider other options returning dollars, cash to the shareholders and such. But right now it would be pay down debt, invest in the business, and then consider other options.

207.   On December 10, 2013, UTi filed with the SEC its quarterly report for its fiscal 2014 third quarter ended October 31, 2013.  The Form 10-Q was signed by Defendants Kirchner and Rodick.  The Form 10-Q disclosed in part:

*Freight Forwarding Operating System.* On September 1, 2013, we deployed our global freight forwarding operating system in the United States. As of that date, based on a variety of factors, including but not limited to operational acceptance testing and other operational milestones having been achieved, we considered it ready for its intended use. Amortization expense with respect to the system began effective September 2013, and accordingly, we recorded amortization expense related to the new application of approximately $3.3 million during the third quarter ended October 31, 2013. Going forward, we expect that we will incur additional amortization expense over a seven-year useful life for

our global freight forwarding operating system, which we expect will be approximately $23.0 million per year, or $5.8 million per fiscal quarter.

\*\*\*

**Liquidity and Capital Resources**

\*\*\*

Our primary sources of liquidity include cash generated from operating activities, which is subject to seasonal fluctuations, particularly in our Freight Forwarding segment, and available funds under our various credit facilities. We typically experience increased activity associated with our peak season, generally during the second and third fiscal quarters, requiring significant disbursements on behalf of clients. During the second quarter and the first half of the third quarter, this seasonal growth in client receivables tends to consume available cash. ***Historically, the latter portion of the third quarter and the fourth quarter tend to generate cash recovery as cash collections usually exceed client cash disbursements.*** Cash disbursements in the first quarter of the fiscal year typically exceed cash collections and, as a result, our first fiscal quarter historically results in the usage of available cash.

\*\*\*

**Item 4. Controls and Procedures**

\*\*\*

Our management, under the direction and with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated our disclosure controls and procedures as of October 31, 2013. ***Based upon this evaluation, management, including our Chief Executive Officer and Chief Financial Officer, has concluded that our disclosure controls and procedures were effective as of October 31, 2013.***

\*\*\*

> *Our management, including our Chief Executive Officer and Chief Financial Officer, believes that our disclosure controls and procedures and internal control over financial reporting are designed to provide reasonable assurance of achieving their objectives and are effective at the reasonable assurance level.* …
>
> \*\*\*
>
> **Item 1A. Risk Factors**
>
> Our business, financial condition and results of operations are subject to a number of factors, risks and uncertainties. ***There have been no material changes to the risk factors as disclosed under Part I, Item 1A "Risk Factors" in our Annual Report on Form 10-K for the fiscal year ended January 31, 2013 filed with the SEC.*** The disclosures in our Annual Report on Form 10-K and in other reports and filings are not necessarily a definitive list of all factors that may affect our business, financial condition and future results of operations.

(emphasis added).

208.   The Form 10-Q contained no disclosures regarding the problems the Company was already experiencing with the 1View system, about any invoicing delays or collections problems, or about any liquidity problems or elevated risk of the Company breaching its covenants on the 2013 Note Purchase Agreement resulting from same.

209.   Defendants' statements on December 5 and December 10, 2013 were materially false and misleading.   In particular, the following statements made by Defendants were materially false or misleading:

- [Rodick:] Our fourth quarter is historically our strongest free-cash-flow quarter, and I anticipate improvement in cash collections in the fourth quarter.

- [Kirchner:] [T]he US implementation was the most complex. ***And we wanted to make sure that we had everything right before we went into additional countries.*** So if you look at the US, that involved our largest number of branches. It involved a new Freight Forwarding operating system, a new finance system with the local financials, a new customs brokerage system, and all the associated linkages of those systems and business process changes. ***So it was the most challenging and complex rollout that we had, and we wanted to make sure we had that right before we went into a lot of additional countries.***

- [Kirchner:] ***So I think that we've made excellent progress. The fact that we've got more than -- or half of our transactions in the system today,*** <u>***and it's functioning and working and we're seeing the benefits that we expected in terms of how that system performs, I think we're doing a great job with that.***</u>

- [Rodick:] There's a use of working capital in third quarter, ***and then fourth quarter improves dramatically. There has been an excellent focus on it. I will tell you in the last few quarters in each of our regions, we've seen the older debts be paid down and we're seeing as higher current billings. So while it doesn't show up in improved working capital, our aging's improving, so I think you'll see that improve in the fourth quarter, continue to improve.***

- Historically, the latter portion of the third quarter and the fourth quarter tend to generate cash recovery as cash collections usually exceed client cash disbursements.

- Based upon this evaluation, management, including our Chief Executive Officer and Chief Financial Officer, has concluded that our disclosure controls and procedures were effective as of October 31, 2013.

- Our management, including our Chief Executive Officer and Chief Financial Officer, believes that our disclosure controls and procedures and internal control over financial reporting are designed to provide reasonable assurance of achieving their objectives and are effective at the reasonable assurance level.

- There have been no material changes to the risk factors as disclosed under Part I, Item 1A "Risk Factors" in our Annual Report on Form 10-K for the fiscal year ended January 31, 2013 filed with the SEC.

(emphasis added).

210.   These statements were materially false or misleading because the statements omitted that both Oracle Financials and 1View were experiencing significant implementation, capacity, and scalability problems, summarized in ¶¶145-155, 161-167, 170, 175-180, 1887-191, and 197-204, which resulted in: (1) internal control deficiencies; (2) system crashes; (3) the delayed issuance of invoices; (4) difficulties in closing the general ledger at months' end and the end of reporting periods; (5) inaccurate financial data; and (6) the need to employ multiple temporary "work-arounds."

211.   As CW 2, the Senior Technical Writer for the Finance department recalled, he/she joined Director of Global Process David Parker and Operations Technical Writers on a business trip to UTI's Seattle branch around the end of 2013 or early 2014. The purpose of the trip was to inquire with branch-level employees about the implementation of 1View. The Seattle staff informed them of a problem with the terminology of materials ordered by UTi. As CW 2 recalled, the 1View system defined shipping materials/items differently than its clients. This meant that branch-level employees, who reviewed upwards of 1,000 invoices in a given day, were prone to enter transaction data for the wrong materials shipped. The problem was amplified because the terms 1View assigned to shipping items were not just incorrect by industry

standards, but oftentimes widely understood to relate to entirely different materials, according to CW 2.

212.   As CW 2 recalled, he/she discussed 1View's terminology issue with David Parker on the drive back from the Seattle meetings. CW 2 encouraged David Parker to implement changes to 1View to correct shipping item terms.  CW 2 also recalled that he/she informed David Parker of errors in the sample accounting reports he/she reviewed to assist in the design of SOPs.  According to CW 2, David Parker reported to the Company's CEO, Defendant Kirchner.

213.   *CW 8 participated in monthly Profit & Loss (P&L) conference calls with Defendant Feitzinger, Thurso Barendse, and CW 8's counterpart for the Freight Forwarding segment which was initially Chris Dale, and as of September 2013 Area Vice President of the Americas Isle De Bruin.  As CW 8 explained, at times Defendant Rodick and/or Defendant Kirchner also participated in these calls -- about 50% of the time.  CW 8 said that in his/her final months with the Company (CW 8 left UTi in January 2014), the problems with the 1View implementation (including issues with invoicing, and General Ledger closings) were discussed at times during these monthly P&L conference calls.*

214.   *CW 7 explained that during the Class Period, the Company was faced with an increasingly difficult and involved effort to properly close its General Ledger every month.  This was due to the problematic 1Veiw/Oracle implementation, and specifically with UTi's inability to reconcile financial information, partly as a result*

*of 1View's inability to properly and timely issue invoices to its customers. Due to the above, executive members of UTi's Finance department did not want to "sign-off" on the Company's financial reports because these executives were not confident in the accuracy of the financial information contained therein. As CW 7 explained, for the last few months of his/her tenure, Rene Ronco and Ronald Berger constantly argued about these issues and concerns.*

215. *CW 7 said that at times he/she wondered how UTi considered itself to be SOX compliant, given the various IT/Financial controls issues, many of which arose and/or came to light due to the problematic 1View/Oracle implementation.* As CW 7 explained in September 2014, in the most recent fiscal year, Deloitte characterized the problems with account reconciliations and ensuing inability to timely close the General Ledger, as UTi's primary audit-risk concern.

216. *CW 9 said the Company's inability to properly close its General Ledger represented significant internal financial control deficiencies that were reported every week in the Audit Issue report issued from early 2013 until CW 9 left the Company in October 2013. Another risk identified in the above reports was UTi's potential inability to meet its debt covenants as required through certain "bank loans" issued to the Company, CW 9 explained.* CW 9 explained that any and all of the recipients of the Issues Reports, including VP Global Internal Audit Jim Schulien, had knowledge of the aforementioned "significant deficiencies," as so reported. Also, according to CW 9 the auditors Deloitte repeatedly raised these issues, expressing

concern.  Based on CW 9's ongoing communications with UTi colleagues, CW 9 came to learn that in approximately December 2013 (two months after CW 9's departure from the Company) that SVP Finance Renee Ronco successfully lobbied to have Deloitte auditor Lee removed from the UTi external audit team.

217.   Moreover, Defendant Rodick was the CFO of the Company and, as he admitted, "focused" on UTi's working capital situation.  Defendants' failure to disclose UTi's significant billing issues and related liquidity crisis rendered Rodick's statements that "in the last few quarters in each of our regions, we've seen the older debts be paid down" and "our aging is improving" materially misleading.

218.   In addition Defendants failure to disclose in the December 10, 2013 Form 10-Q the circumstances described in paragraphs ¶¶145-155, 161-167, 170, 175-180, 1887-191, 197-204, and 211-217 violated Items 303(a)(1) and (3) of SEC Regulation S-K, as these circumstances constituted material known events, trends or uncertainties that "are reasonably likely to result in the registrant's liquidity . . . decreasing in any material way" and/or that "the registrant reasonably expects will have a material . . . unfavorable impact on . . . revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(1) and (3) and (b).

219.   As Defendants admitted at or after the close of the Class Period: (1) *"[i]n certain countries, particularly in the United States, we experienced invoicing delays immediately following the system rollout in those countries;" (2) "[t]he increase occurred primarily in the United States, and receivables, as expected, rose in almost*

*every country where 1View has been implemented;" (3) "WIP [work in progress] generally rises in every country that goes live on 1View;" (4) "[t]hese balances begin to decline as the learning curve improves;" (5) "[i]n our experience, this improvement takes about three to six months;" (6) "the <u>overall trend of increases</u> followed by decreases <u>continues</u>;" (7) "this has led to delays in our ability to collect our receivables and has significantly impacted our liquidity (leading to weak or possibly negative operating cash flows in our fourth fiscal quarter, which is usually a strong working capital quarter); and (8) "at the end of the last fiscal year, January 31[,] [2014],[the Company was] still struggling with billing quality."*

## G.    The Truth Emerges

220.   The true facts concerning  UTi's financial condition and the fact that the concealed risks associated with the implementation and integration of the systems had materialized were first revealed before the opening of the NASDAQ on February 26, 2014, when the Company filed a Form 8-K with the SEC (the "February 26, 2014 Results 8-K"), announcing the Company's preliminary financial results for the fourth quarter and full fiscal year 2014 ended January 31, 2014:

> As disclosed below under "Recent Developments", the Company experienced several adverse developments during its 2014 fiscal fourth quarter. ***As a result, as of January 31, 2014, the Company was not in compliance with certain financial covenants associated with its $200.0 million of senior unsecured guaranteed notes (the "2013 Senior Notes") and its global credit facilities.*** In addition, the Company's South African facilities agreement and other letters of credit and guarantee facilities have cross-default provisions that could be triggered by covenant violations of the 2013 Senior Notes and global credit facilities. The Company has

obtained waivers with respect to the 2013 Senior Notes and its global credit facilities, which each waive any failure of the Company to be in compliance with such financial covenants from January 31, 2014 through April 15, 2014. *Following the expiration of such waivers on April 15, 2014, the Company will again not be in compliance with such covenants, in which case debt of approximately $400.0 million would become due and immediately payable (absent additional waivers), for which sufficient cash would not be available (absent a new financing).* This could result in events of default under all of the Company's outstanding indebtedness and the lenders under those facilities would be able to accelerate the indebtedness, which would have adverse consequences that may include insolvency of the Company, raising substantial doubt about the Company's ability to continue as a going concern.

The Company is updating its Financial Statements to update (i) "Note 1 – Summary of Significant Accounting Policies and Other" to the Company's Financial Statements, which contains information related to uncertainty regarding the Company's ability to continue as a going concern and (ii) *Deloitte & Touche LLP ("Deloitte"), the Company's independent registered public accounting firm, reissued its report with respect to the Company's Financial Statements, and included an explanatory paragraph related to the Company's ability to continue as a going concern.*

*** 

Our 1View system is the cornerstone of our transformation efforts and is designed to be a standardized, enterprise-wide IT platform that provides global consistency of service, billing and information. The system is designed to provide a more consistent experience for our global clients (something we believe smaller competitors cannot achieve) and will provide more data analytics, including enhanced visibility into where clients' goods reside in the supply chain. In addition to allowing us to better serve our clients, we believe our transformation will also provide substantial and achievable cost savings and improvements in our working capital as new billing processes are fully implemented. *Although we made substantial progress executing our business transformation initiative during fiscal 2014 and we remain on track to complete the implementation by August 31, 2014, our liquidity and capital resources have decreased significantly over the last several quarters. This decrease is primarily the result of (i) the net losses we have incurred, (ii) capital expenditures associated with our business transformation initiatives, (iii)*

*severance expenses and (iv) recent invoicing delays, primarily in the U.S., in connection with implementing our new freight forwarding operating system and global financial system, which have led to higher than normal receivables and weaker cash collections. Although our invoicing processes have been improved, particularly in the United States, we cannot ensure that we will not face similar issues as we implement the system in additional countries.*

As of January 31, 2014, we estimate that a significant amount of our cash was in jurisdictions that impose legal limitations on repatriation and we had drawn down substantially all of our existing credit facilities. In addition, due to our financial results for fiscal 2014, we expect not to be in compliance with the maintenance covenants in our debt agreements and obtained the waivers described herein. We also have approximately $171 million of debt with maturities in the next nine months. As a result of these factors, in connection with this offering, the Company *is updating Note 1 to the Consolidated Financial Statements for the fiscal year ended January 31, 2013 to include disclosure regarding uncertainty about the ability to continue as a going concern, and Deloitte & Touche LLP, independent registered public accountants, reissued their audit opinion on our financial statements for the fiscal year ended January 31, 2013, to include a qualification stating that they believe there is substantial doubt about our ability to continue as a "going concern".*

To address these liquidity and covenant challenges, we are taking a number of steps, including:

- We are issuing $350 million of Convertible Senior Notes (the "Convertible Notes Offering") due 2019....;

- We are issuing $175 million of 7.00% Convertible Preference Shares to be issued in a private placement to our largest shareholder, P2 Capital, as described below, which will raise its ownership in us to approximately 18.1% on an as-converted, fully diluted basis on the issue date....;

- We have obtained waivers of our covenant defaults from each of our existing credit facilities and private placement notes, which waivers will expire on April 15, 2014;

- We have obtained commitments from affiliates of Citigroup Global Markets Inc. and Morgan Stanley & Co. LLC for a new $150.0 million five-year ABL Facility....

\*\*\*

As described above, we are in the midst of a multi-year business transformation initiative intended to establish a single set of global processes and systems for our freight forwarding business and our global financial management. ***In certain countries, particularly in the United States, we experienced billing delays immediately following the system implementation in such countries.*** *This has led to delays in our ability to collect our receivables, which has negatively impacted the cash generated by our operating activities. Although our invoicing processes have been improved, particularly in the United States, we cannot ensure that we will not face similar issues as we implement the system in additional countries.* ***Accordingly, while our fourth quarter is usually a strong quarter for cash flows, we expect that our net cash provided from operating activities will be substantially lower for the quarter than we originally anticipated and could be negative.*** *We estimate that at January 31, 2014, a significant amount of our cash was in jurisdictions that impose legal limitations on repatriation, and that we had drawn down substantially all of our existing credit facilities.*

\*\*\*

**Matters Impacting First Fiscal Quarter 2015 and Full Fiscal Year 2015**

Seasonally the first fiscal quarter is typically our weakest financial quarter. *In addition to normal seasonality issues, we believe our operating results for the first fiscal quarter of 2015 will be negatively impacted by the continued effect of a number of factors that affected our fiscal 2014 results, including* pricing pressures, severance costs associated with our ongoing business transformation initiative, *increase in receivables,* amortization associated with our 1View system, which began in September 2013, and our higher than historically normalized tax rate. Certain of these items will continue to compress our margins and lead to cash usage in our operations through at least the first quarter of this fiscal year. …

\*\*\*

**Risks Related to the Business**

***There is substantial doubt about our ability to continue as a going concern, and if we are unable to secure financing, we may be required***

*to cease or curtail our operations.*

Although we made substantial progress executing our business transformation initiative during fiscal 2014 and we are on track to complete the implementation by August 31, 2014, our liquidity and capital resources have decreased significantly over the last several quarters. This decrease is primarily the result of (i) the net losses we have incurred, (ii) capital expenditures associated with our business transformation initiatives, (iii) severance expenses and (iv) recent invoicing delays, primarily in the U.S., in connection with implementing our new freight forwarding operating system and global financial system, which have led to higher than normal receivables and weaker cash collections. We have also been out of compliance with certain financial covenants contained in our debt agreements. Although we have obtained waivers with respect to those defaults, they expire in April 2014. As a result, our independent registered public accounting firm has reissued its report with respect to our consolidated financial statements for the fiscal year ended January 31, 2013 to include an explanatory paragraph expressing substantial doubt about our ability to continue as a going concern. We have undertaken the financing plan described under "Recent Developments" to address our liquidity and covenant situation. If we are unable to complete each aspect of the plan in the amount and on the terms we anticipate (including full availability of the asset-based revolving credit facility we expect to enter into after closing), or if our estimates are wrong and we need more cash we may be required to cease or curtail our operations or otherwise seek protection from creditors and you may lose your investment.

\*\*\*

***Our liquidity has decreased significantly over the last several quarters. While we believe this offering and the related transactions (including our anticipated entry into our new committed secured asset-based revolving credit facility) will provide us sufficient liquidity in the near term, we cannot assure you that we will have sufficient liquidity if our assumptions prove incorrect.*** [Emphasis in original].

Our liquidity and capital resources have decreased significantly over the last several quarters primarily as a result of (i) the net losses we have incurred, (ii) capital expenditures associated with our business transformation initiatives, (iii) severance expenses and (iv) recent invoicing delays, primarily in the U.S., in connection with implementing our next generation freight forwarding operating system and our global

financial system, which have led to higher than normal receivables and weaker cash collections. This has required us to draw a substantial portion of our credit facilities and led to significant loss of working capital.

*\*\**

**We are currently engaged in a multi-year business transformation initiative that involves risks, could result in higher than expected costs and/or could otherwise adversely impact our operations, profitability and retention rates for clients and employees.**  [Emphasis in original].

We are in the midst of a multi-year business transformation initiative intended to establish a single set of global processes for our freight forwarding business and our global financial management. As part of this initiative, we are developing and implementing our next generation freight forwarding operating system and rationalizing our business segments to a more common organizational structure on a worldwide basis. Currently, we operate numerous systems with varying degrees of integration, which can lead to inefficiencies, workarounds and rework…. _**We have experienced some difficulties consolidating our current systems, moving to a common set of operational processes, implementing shared services and implementing a successful change management process and these difficulties may continue. These difficulties have impacted certain of our clients and our ability to efficiently meet their needs. In certain countries, particularly in the United States, we experienced invoicing delays immediately following the system rollout in those countries. This has led to delays in our ability to collect our receivables and has significantly impacted our liquidity (leading to weak or possibly negative operating cash flows in our fourth fiscal quarter, which is usually a strong working capital quarter)**_. . . .

If our customers delay paying or fail to pay a significant amount of our outstanding receivables, it could have a material adverse effect on our liquidity, consolidated results of operations, and consolidated financial condition.

**We rely on cash from operations to fund our business. In order to generate such cash, we need to invoice accurately and collect our receivables. _In certain countries, particularly in the United States, we experienced invoicing delays immediately following the implementation of our freight forwarding operating system and global financial system in those countries._ As we implement our system in additional countries,**

*we may experience similar disruptions in our invoicing processes…. In the past, we have experienced collection delays from certain customers, and we cannot predict whether we will continue to experience similar or more severe delays in the future. Although we have established reserves to cover losses due to delays or inability to pay, there can be no assurance that such reserves will be sufficient to cover our losses. If losses due to delays or inability to pay are greater than our reserves, it could have a material adverse effect on our liquidity, results of operations, and financial condition.*

(Emphasis added unless otherwise indicated).

221.   The Company further updated investors and analysts in a conference call that same day, February 26, 2014:

[Kirchner:] … Please turn to slide 6. Our comprehensive business process transformation accomplishes many objectives. First, we will move from nine separate freight forwarding operating systems to one global, fully integrated system. It will be one of only a handful of systems in the world that will be truly integrated. A common global operating system is critical in this industry in order to drive efficiency in a lower growth environment and to deliver a consistent experience for global clients.

We are changing from a company with regional processes, systems, and structures that were suboptimal and inefficient, to an enterprise-led business model that is far more efficient, and will provide greater consistency around the world, both in our operations and for our clients. Because of our inefficiencies, operating expenses have been growing faster than net revenues. Our transformation is expected to turn this around, and leads to stronger sustainable operating margins in the future.

***

Please turn to slide 8. We started our comprehensive business process transformation about four years ago, and are now only about six months away from completion.

***

While we face some challenges in the US, we believe the issues have been fixed. The 1View system is doing what we thought it would. It works and

it's scalable.

***

Total CapEx for our transformation from inception to date has been $160 million to $170 million, and this is nearly all behind us. After the transformation, we expect CapEx to decline significantly to about $55 million on a run rate basis for all normal requirements.

***We also expect substantial improvement in working capital, as we fully implement our new billing processes and resolve the temporary issues we experienced from our initial transition into 1View. …***

***

RICK RODICK, CFO, UTI WORLDWIDE INC.: Thanks, Eric. Please turn to slide number 9.

As you know, we also announced this morning our preliminary financial results for the fourth quarter of the fiscal year ended January 31, 2014. We're not satisfied with our results, but there are several factors that have impacted our performance.

One of the main reasons is that there has been a softness in the air freight, a factor that has impacted the entire industry. Since air freight is more expensive, the decline in this higher-margin business has had a disproportionate impact on our bottom line.

Given that we've been in the midst of the transformation, we have not had the operational flexibility to manage our cost structure during this difficult freight environment. This is expected to change with the completion of the transformation. In addition, we expect that opportunity costs in terms of management bandwidth will reverse, as we target stronger net revenue growth.

As Eric mentioned, we have incurred increased costs, due to the rollout of our new system. Some of these are implementation expenses that have arisen from delays in deployment. Others are duplicative costs in nature, as we have ramped up our shared service centers before removing personnel from the field. These are all temporary costs that will roll off, once we complete our system deployment.

***<u>We have also experienced working capital pressures due to the steeper</u>***

*__than expected learning curve associated with our new operational processes. This led to recent but temporary invoicing delays, higher than normal receivables, and weaker cash collection.__*

*__These issues were primarily centered in the United States, where we launched 1View, Oracle and a new customs brokerage system simultaneously in 28 branches in September….__*

(emphasis added).

222.   The February 26, 2014 results 8-K and the February 26, 2014 Press Release and conference call caused UTi's stock price to fall from a close of $15.26 per share on February 25, 2014 to an open of $12.07 on February 26, 2014.  UTi stock then slid further during the trading day on February 26, 2014, to a close of $10.74 per share – a decline of $4.52, or 29.6%.  In contrast, the S&P 500 Index was down less than 1%.

223.   Total reported volume trading of UTi stock on February 26, 2014 was approximately 10.7 million shares, compared to average volume of approximately 360,000 shares over the prior 30-day trading period.

224.   As a result of the disclosures, the investment bank Avondale Partners downgraded UTi stock from Outperform to Market Perform on February 27, 2014, and UTi's stock price continued to fall, closing at $9.84 on February 28, 2014, and at $9.76 on March 3, 2014.

225.   The February 26, 2014 corrective disclosures revealed the materialization of the material risks known but concealed by Defendants.  Thus, as a result of the February 26, 2014 corrective disclosure, the artificial inflation in the price of UTi stock

caused by Defendants' false and misleading statements was removed and Plaintiff and class members were damaged.

### H.    Additional Disclosures and Admissions

226.   During UTI's March 31, 2014 earnings call for the fiscal 2014 fourth quarter and year ended January 31, 2014, the Company further explained the issues that led to the Company's liquidity crisis and refinancing:

> [Rodick:] Please turn to slide number 11. I'd like to conclude my remarks by addressing some of the issues that culminated in the recent refinancing. ***Our liquidity and capital resources have decreased over the last several fiscal quarters, primarily*** as a result of weak financial performance due to poor macroeconomic conditions, capital expenditures associated with the end of our spending on the transformation, severance expenses, ***and recent invoicing delays, primarily in the US, in connection with the rollout of our 1View freight-forwarding system. Ultimately, we had a suboptimal capital structure with financial covenants that did not provide us with the operating flexibility we needed.***
>
> ***
>
> In addition, we had to seek amendments to our financial covenants for each of the previous three quarters, which put a significant strain on our relationship with our lenders. However, we had finished the third quarter on a strong note financially, and we expected a strong cash collection in the fourth quarter, which is historically our strongest cash flow period of the year. Accordingly, based on historical performance, at the end of the third quarter we expected to be in compliance with our financial debt covenants at year end. Our fourth-quarter operating performance turned out to be weaker than expected, as a result of the factors we discussed earlier on this call.
>
> ***Concurrent with poor operating results, we were implementing our 1View freight-forwarding system in numerous countries and transitioning to new processes. <u>Each new country deployment led to a temporary deterioration in liquidity due to the learning curve associated with implementing new operating and financial systems.</u> This primarily stemmed from employees learning to use the new system.***

So, prior to launch in the United States, as our teams adapted to the new systems, we would normally see working capital normalize in each country. ***When we launched 1View in the United States, our largest and most complex market, our working capital issues reached tipping point. You may recall we also launched Oracle Financials and a new customs brokerage system at the same time in all 28 branches in the United States. The learning curve was steep, and our associates fell behind on certain tasks, and by necessity, they focused on servicing our clients and we fell behind in our billings.***

***We immediately focused our attention on additional training for billing personnel and correcting the issues. We believe we have substantially resolved our billing issues in the US, but it was not until very late in the fiscal year. Consequently, we've experienced a year-over-year increase in accounts receivable at January 31, 2014. We estimate that these issues created an accounts receivable bubble for approximately $40 million in the US,*** and we expect to collect these amounts during the first and second quarters of FY15.

***

The confluence of our sustained weak operating results, our need to obtain repeated waivers from our lenders, and the short-term billing challenges in the US led to the refinance transaction that we previously disclosed….

***

As I had previously described, we believe the problems that precipitated the billing issues in the United States are largely behind us. We have a more aggressive focus on collections, and a higher degree of accountability on credit terms. ***We are experiencing improved collections in the United States, but have not yet made significant headway in reducing the US accounts receivable balance.*** However, we expect to reduce that balance in the next few months due to this increased focus.

(emphasis added).

227.   The Company's Annual Report for the fiscal year 2014 ended January 31, 2014 filed with the SEC on Form 10-K further disclosed:

***We are currently engaged in a multi-year business transformation initiative that involves risks, has resulted in and could continue to result***

*in higher than expected costs and/or could otherwise adversely impact our operations, profitability and retention rates for clients and employees.* … *We have experienced some difficulties consolidating our current systems, moving to a common set of operational processes, implementing shared services and implementing a successful change management process and these difficulties may continue. These difficulties have impacted certain of our clients and our ability to efficiently meet their needs. In certain countries, particularly in the United States, we experienced invoicing delays immediately following the system rollout in those countries. This led to delays in our ability to collect our receivables and significantly impacted our liquidity (which led to negative operating cash flows in our fourth fiscal quarter, which is usually a strong working capital quarter). The negative impact on our liquidity was among the factors that caused us to undertake a refinancing in March 2014 which involved issuing $400.0 million principal amount of convertible notes and $175.0 million in Convertible Preference shares as well as entering into a new senior secured asset-based revolving credit facility.* We may experience additional invoicing delays as we implement our system in additional countries. In March 2014, we implemented our 1View system in China, South Africa, Peru and Uruguay and the percentage of freight forwarding transactions on the system increased to approximately 72%. This internal initiative may also reduce our external focus on clients and growth, thereby negatively impacting our future potential growth and client relationships. …

***

*If we are not reimbursed for amounts that we advance or disburse for our customers or if our customers delay paying or fail to pay a significant amount of our outstanding receivables, it could have a material adverse effect on our liquidity, consolidated results of operations, and consolidated financial condition.* [emphasis in original]. We rely on cash from operations to fund our business. In order to generate such cash, we need to invoice accurately and collect our receivables. In certain countries, particularly in the United States, we experienced invoicing delays immediately following the implementation of our freight forwarding operating system and global financial system in those countries. As we implement our system in additional countries, we may experience similar disruptions in our invoicing processes….

We make significant advances and disbursements on behalf of our clients for transportation costs concerning collect freight and customs duties and

taxes and in connection with our performance of other contract logistics services. These advances and disbursements temporarily consume cash as they are typically paid to third parties in advance of reimbursement from clients. The billings to our clients for these disbursements may be several times larger than the amount of revenue and fees we derive from these transactions.

Although we have established provisions to cover losses due to delays or inability to pay, there can be no assurance that such provisions will be sufficient to cover our losses. If losses due to delays or inability to pay are greater than our provisions, it could have a material adverse effect on our liquidity, results of operations, and financial condition.

\*\*\*

## Item 9A. Controls and Procedures.

Management's Evaluation of Disclosure Controls and Procedures

\*\*\*

Our management, under the direction and with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated our disclosure controls and procedures as of January 31, 2014. ***During this evaluation, a material weakness in internal control over financial reporting was identified. This material weakness relates to the fact that there are currently an insufficient number of shared service center financial accounting and reporting resources to allow for timely analysis and recording of financial statement amounts given the Company's current migration to its new freight forwarding application. As a result, underlying controls related to account reconciliations and analysis across a number of trade receivable and payable accrual accounts were not operating effectively. As a result of this material weakness, which is described more fully in Management's Report on Internal Controls Over Financial Reporting (as defined in Rules 13a-15(f) and 15d-15(f) of the Exchange Act) and the related Report of Independent Registered Public Accounting Firm, which are contained in Item 15 of Part IV of this Annual Report, "Exhibits and Financial Statement Schedules" and which are incorporated herein by reference, management, including our Chief Executive Officer and Chief Financial Officer, has concluded that our disclosure controls and procedures were ineffective as of January 31, 2014***, solely due to the material weakness in internal control over financial reporting described above.

228.   On June 5, 2014, the Company held its earnings conference call for its fiscal 2015 first quarter ended April 30, 2014.   Defendant Rodick commented on the higher accounts receivable balance that still existed at the end of fiscal first quarter 2015, which he attributed in large part to problems encountered with the rollout of 1View, acknowledging that this trend began during the early phases of the 1View rollout and had continued unabated:

> [Rodick:] Turn to slide 17. As noted on the previous slide, the $139 million growth in receivables is primarily related to normal seasonal factors which contributed approximately 60% of the increase. We also experienced a rise in past due billings in Contract Logistics and Distribution which accounted for about 15% of the higher receivable balance.
>
> ***The final component of the increase, approximately 25%, is attributable to the temporarily higher balances resulting from the 1View implementations. The increase occurred primarily in the United States, and receivables, <u>as expected</u>, rose in almost every country where 1View has been implemented.***
>
> Trade receivables are comprised of two components, billed accounts receivables and work in process, which is more commonly referred to in the industry as WIP. WIP balance requires additional information to conclude the billing process and subsequently become billed as accounts receivables.
>
> ***
>
> ***To provide greater context, <u>WIP generally rises in every country that goes live on 1View</u>. These balances begin to decline as the learning curve improves. In our experience, <u>this improvement takes about three to six months</u>. In the US, this improvement took longer, but WIP has now stabilized and begun to decline.***
>
> ***While WIP has grown less in countries that went live after the United States, the <u>overall trend of increases</u> followed by decreases <u>continues</u>….***
>
> ***

ART HATFIELD, ANALYST, RAYMOND JAMES: Thanks for taking my question. You've had a lot of questions on working capital. If you could help me, just one last clarification. **In the quarter, the 25% of the increase in trade receivables related to the 1View implementation. Was that just related to the countries that were rolled out in the quarter, or is there some lingering effect from prior quarter rollouts?**

RICK RODICK: *There's a little of both, there's, definitely, the new countries, some lingering effects is we're in that three- to six-month time frame that we talked about. Most of the countries that's been on longer than that, or all of the countries longer than that have seen a decline, but there's -- we have some peaks and valleys. Even countries that have been on for a while might have a blip and then they come back down, and we're seeing that consistently. So that's what we talked about the three- to six-month time frame to get over that learning curve.*

(emphasis added).

229.   In July 2014 the SEC began a formal investigation of UTi and the matters alleged herein.

230.   On September 4, 2014, the Company held its earnings conference call for its fiscal 2015 second quarter ended July 31, 2014.  Defendant Rodick reiterated that accounts receivable aging had increased in every country in which 1View goes live:

Please turn to slide 15. As noted on the previous slide, trade receivables declined to $38 million. As a reminder, trade receivables are comprised of two components, billed accounts receivables and work in process, more commonly referred to in the industry as WIP. WIP balances require additional information to conclude the billing process and subsequently become billed accounts receivables.

As I mentioned on our last call, WIP generally rises in every country as it goes live on 1View. These balances begin to decline as the learning curve improves. In our experience, this improvement takes about three to six months to occur. In the United States, this improvement took longer. While WIP has grown less in countries that went live after the US, the overall trend of increases followed by decreases continues.

231.   On September 15, 2014, Defendant Rodick spoke at the Morgan Stanley Laguan Conference.   Rodick acknowledged that "at the end of the last fiscal year, January 31[,] [2014],[the Company was] still struggling with billing quality."

232.   On December 8, 2014, UTi announced that Defendant Kirchner had resigned his positions of CEO and a director of the Company and that he was being replaced by Defendant Feitzinger.   No explanation was given for Kirchner's resignation.

233.   On December 9, 2014, the Company held its earnings conference call for its fiscal 2015 third quarter ended October 30, 2014.   Defendant Feitzinger admitted that UTi's freight forwarding business suffered as a result of the implementation of 1View and Oracle:

> Second, we must restore growth and margin in our forwarding business. We have lagged forwarding industry growth, particularly in the last two quarters.
>
> Our focus on growth is a midterm story; it takes at least several quarters for positive or negative actions to impact volumes and margins, in most cases. We have seen the negative effects of this in the second and third quarter of this year, given our earlier issues related to the implementation of the system.
>
> ***
>
> Our corporate costs grew as we invested in enterprise capabilities, consistent with a company twice our size. We centralized some tasks with the expectation of creating cost efficiencies and more consistent service, but neither of the two cost buckets has yet to deliver all the expected savings.

*\*\**

We have a good foundation. The transformation, as I mentioned in my prepared remarks, was we were looking under the hood instead of out the window a lot of the times. As with any Company, we've talked about this prior, that goes through a major ERP type of transformation, they can be disruptive and certainly for us, it was.

234.   On March 31, 2015, the Company held its earnings conference call for its fiscal 2015 fourth quarter ended January 31, 2015.   Defendant Feitzinger explained some of the problems UTi had encountered in connection with its implementation of 1View:

During the year, many of you asked for an assessment of what happened in our forwarding business in the past year. Most of these experiences relay back to either a lack of focus on basics caused by the distraction of our large-scale transformation or aspects of the transformation design that upon implementation caused unexpected issues.

In hindsight, we made far too many process changes at once. Most of the changes were a textbook correct decision, but the collection of them together altered almost every variable on our forwarding business.

Some of our issues can be attributed to the sheer magnitude of everything changing at once in a specific country and working through that, while others attributed to implement a design that seemed to make sense, but took away years of tried-and-true process for managing margin and working capital. The good news is that we've already fixed many of these issues.

We spoke earlier in FY15 about invoicing and billing issues as we rolled out the new freight forwarding system. The issues increased our receivables in the first half of FY15.

235.   Finally, in its Form 10-Q filed with the SEC on June 8, 2015, UTi announced that the SEC had expanded its formal investigation into the matters alleged in this Complaint:

> In July 2014, we received a subpoena from the SEC requesting certain documents related to, among other things, the facts and circumstances surrounding the Fiscal 2015 Refinancing. In September 2014, we received a similar subpoena directed to the members of the Audit Committee of the Board of Directors. In April 2015, we received a subpoena from the SEC requesting certain documents related to the material weakness in internal control over financial reporting and the revisions to prior period financial statements that were disclosed in our Form 10-K for the period ending January 31, 2015. We have been cooperating and intend to continue to cooperate with the SEC's investigation.

## I.   Loss Causation

236.   Defendants made materially false and misleading statements and omitted, among other things, that both Oracle and 1View were experiencing significant implementation, integration, capacity, and scalability problems, which importantly caused, *inter alia*, the delayed issuance of invoices, inaccurate financial data, and difficulties in recognizing revenue and collecting receivables.  Plaintiff also alleges that Defendants represented that UTi's controls over financial reporting were effective, when they were not, as the result of the invoicing delays and other problems, which resulted in the Company's inability to capture and record accurate financial data.

237.   On February 25, 2014, after the market closed, UTi announced the results of the undisclosed problems with its "transformation" which it had previously assured investors was on track to deliver the expected cost savings and improvements in UTi's

operations and financial condition.   Thus, prior to this announcement, investors expected far better financial performance and liquidity than UTi announced on February 25, 2014. The announced financial results and severe liquidity problems were the direct manifestation of the new systems' failures to generate invoices.  This failure resulted in diminished cash flows.[3]   The inability to generate timely invoices, perform account reconciliations and capture revenue for reporting purposes represented material weaknesses in UTi's control over financial reporting.  *See* ¶227 (March 31, 2014 statements) ("As a result [of a material weakness], underlying controls related to account reconciliations and analysis across a number of trade receivable and payable accrual accounts were not operating effectively."), ("This material weakness relates to the fact that there are currently an insufficient number of shared service center financial accounting and reporting resources to allow for timely analysis and recording of financial statement amounts given the Company's current migration to its new freight forwarding application.").

238.   The failure of the invoicing system and the financial consequences, so severely depleted UTi's liquidity that it was in breach of covenants relating to one of its financing agreements, forcing its auditor, Deloitte to amend its last auditor's report on

---

[3]  Moreover, without invoices, receivables were not recorded (a receivable is a function of an invoice being issued) and customers did not pay invoices they had not yet received. Consequently, without receivables being recorded and revenues being recognized and payments contributing to income (on the income statement) and cash (on the balance sheet) and without receivables on the balance sheet, the Company reported lower current income and lower expected income in the next quarter and a grossly depleted balance sheet.

the Company's consolidated financial statements to say that as of February 26, 2014, there was "substantial doubt about the Company's ability to continue as a going concern.  In addition, UTi's liquidity problems forced it to announce, that same day, that it was undertaking a highly dilutive offering of, in total, over $500 million worth of convertible notes and preferred shares in order to provide UTi with the emergency financing it badly needed.  The Company's liquidity problems and the resulting refinancing were caused directly by the invoicing failures and delays resulting from the difficulties in implementing and integrating the new systems. *See* ¶220 (We have experienced some difficulties consolidating our current systems, …. This led to delays in our ability to collect our receivables and <u>significantly impacted our liquidity</u>….), 227 (March 31, 2014 statements) ("We have experienced some difficulties consolidating our current systems, …. This led to delays in our ability to collect our receivables and significantly impacted our liquidity…. The negative impact on our liquidity was among the factors that caused us to undertake a refinancing….").

239.   In direct response to the Company's disclosures on February 25, 2014 (all direct consequences of the inability to issue invoices) of UTi's financial results, the Company's reduced expectations regarding the next quarter's financial results, UTi's liquidity crisis, the change in Deloitte's opinion and the Company's necessity to issue dilutive convertible notes and preferred shares, UTi's stock price dropped precipitously. Having closed at $15.26 on February 25, 2014 it dropped to a close of $10.74 on February 26, 2014, a decline of $4.52 or 30%. Volume on February 26, 2014 was 10.7

million shares, or almost 30 times the previous 30-day average of 360,000 shares. This was not a one day aberration. To this day, even though the stock market as measured by standard broad market indexes, has increased dramatically, UTi's stock has not recovered. From February 26, 2014 through June 26, 2014, UTi stock closed between $9.07 and $13.63, nowhere near the close of $15.26 on February 25, 2014 before the announcement of the manifestations of the concealed risks after the market closed on that date. On June 26, 2015 UTi stock closed at $9.82, a decline of 35.6% from its close on February 25, 2014 before its disclosures of the disastrous results which were a direct manifestation of its inability to invoice customers and even an 8.6% decline from its close on February 26, 2014, after the disclosures of the disastrous results of not being able to invoice customers. From February 26, 2014 through June 25 and through June 26, 2015 the Dow Jones Industrial Average increased 10.9% and 10.8% respectively. From February 26, 2014 through June 25 and through June 26, 2015 the NASDAQ Composite Index increased 18.5% and 18.4% respectively. Thus the announcement of the manifestations of these undisclosed risks regarding the inability to issue invoices caused a decline in the price of UTi stock that was unrelated to general market movements and was uniquely catastrophic for UTi stock. These announcements of the manifestations of the undisclosed risks were the direct cause of damages suffered by investors.

240. The February 25-26, 2014 corrective disclosures revealed the materialization of the material risks known but concealed by Defendants. As a result,

the artificial inflation in the price of UTi stock caused by Defendants' false and misleading statements was removed and Plaintiff and class members were damaged. *Id.* Indeed, the liquidity crisis, violation of debt covenants, and highly dilutive equity offering — all disclosed on February 25, 2014 — constituted materialized risks of UTi's inability to accurately recognize revenue and collect receivables, which were the result of alleged implementation and integration problems with 1View/Oracle and alleged deficiencies in UTi's financial controls. *See* ¶220 (Feb. 26, 2014 statements), 227 (March 31, 2014 statements) ("As a result [of a material weakness], underlying controls related to account reconciliations and analysis across a number of trade receivable and payable accrual accounts were not operating effectively.").

## J.   Additional Allegations of Scienter

241.   The progress and effectiveness of UTi's business transformation initiative (*e.g.,* the deployment of Oracle Financials and 1View) was extremely important to the Company, Defendants, analysts, and investors.   As Peter Nesvold, an analyst for Jefferies & Company, stated during the June 3, 2013 earnings conference call, "assuming you are successful at the IT deployment, the stock's going to be a lot higher than $15…."   According to CW 3, the implementation of 1View/Oracle was a massive undertaking to automate and standardize the Company's business processes, on a global level.   The $100+ million capital expenditure project was estimated by the Company – when fully implemented – to save UTi $75-90 million (less amortization costs) per year and increase operating margins and earnings per share substantially. ***Defendants had***

***been engaged in and hyping the attempted transformation for many years, and it was
the signature initiative of UTi's CEO, Defendant Kirchner.***

242.   The UTi executive officer charged with overseeing the transformation
initiative was UTi Senior Vice President – Global Operating Processes and CIO Ronald
Berger (Berger left the Company in February 2015), ***who reported directly to
Defendant Kirchner.*** The September 18, 2012 press release announcing Berger's
appointment discloses that Berger's "role aligns information technology and the
company's transformation initiative under a single leader."  Berger is one of six named
executive officers in the Company's Form 10-K for the fiscal year 2014.

243.   CW 10 (the former Global VP who reported directly to EVP and President
of Client Growth, who in turn reported to Defendant Kirchner) said that UTi began
holding monthly senior-level conference calls in early 2012 where executives discussed
and tracked the challenges associated with the 1View implementation and developed
initiatives to address such problems. These calls were chaired by CIO Berger and
***occasionally attended by Kirchner***, CW 10 said. Other regular attendees, who CW 10
characterized as "stakeholders" in the 1View implementation, included David Parker,
Director of Enterprise Architecture Neil Pallaudan, SVP Leslie Frank, Finance, IT
Development and Project Implementation personnel, Global Project Managers, and
UTi's four Regional Presidents. From approximately March 2012 until October 2012,
CW 10 attended approximately five of these meetings as a fill in for Gene Ochi.  After
each call, CW 10 said, a report relating to the 1View Project Plan, which contained a

"Defects List" tracking the various bugs in the system, was prepared and disseminated among attendees. ***CW 10 recalled attending at least one meeting in which Kirchner was present.*** CW 10 said at each of the meetings and in each of the ensuing reports, the various implementation problems, were widely discussed and ***that would have been true for the call(s) that Kirchner had attended***.

244.   Beginning in approximately mid-2012 and for the duration of CW 3's tenure, CW 3, the Global Director – Finance, reported to Senior Vice President of Finance, ***Renee Ronco who in turn reported to Defendant CFO Rodick.*** CW 3 was substantially involved in the implementation of both Oracle Financials and 1View and worked with a variety of personnel in these efforts, including Director of Global Operating Process ***David Parker, who reported to Defendant CEO Kirchner Rodick.*** CW 3 also interfaced with a variety of Country Managers (*i.e.,* Managing Directors) after the 1View/Oracle rollouts.

245.   Significant high-level meetings were held in April and June of 2013, CW 3 said.  Both meetings were described by CW 3 as high-level efforts to address audit risk/exposure.

246.   The April meetings involved Ronald Berger and Ronco. ***The predominant topic at the April meeting was how the implementation problems had given rise to inadequate IT/financial controls, as well as the concomitant effects of these internal control deficiencies.  Defendant CFO Rodick was briefed on these issues on or about April 2013, according to CW 3.***

247.   *The June meetings involved Ronco, Vice President of Global Financial Analysis Thurso Barendse, CIO Ronald Berger and Defendant CFO Rodick.  As a result of the June meeting the four executives, including Ronco and Defendant CFO Rodick, developed specific "multi-work-stream" action items/initiatives relating to financial controls implementation to be carried out by cross-functional teams of which CW 3 was a part.  According to CW 3, Defendant Rodick was regularly included in bi-weekly email communications along with CW 3, Ronco, and other members of the Finance department.  These recurring communications, characterized by CW 3 as "financial information updates," made reference to the financial control/risk issues discussed herein.*

248.   CW 3 recalled that there were significant invoicing delays which came about after the September 2013 rollout of 1View in the United States; invoicing delays had also occurred in prior 1View regional rollouts, CW 3 said.  Executives, including David Parker and Ronald Berger, managing the Global Operating Process Team that was responsible for training end users as to proper 1View system use, including invoicing, would have discussed these functionality issues (including the invoicing delays), CW 3 said.

249.   CW 5, the Enterprise Intercompany Accountant, said that due to various issues, including problems with invoicing, UTi's efforts to timely close the GL became increasingly frustrated and prolonged.  CW 5 said that during his/her tenure, there were issues with 1View not generating invoices properly and on a timely basis. CW 5 said

that 1View's failure to generate invoices compromised UTI's ability to carry out proper/timely Spread Share accounting procedures.  ***CW 5 characterized the above problems as "a big issue" and said that it had not been resolved at the time of his/her departure in April 2014.  CW 5 strongly believed that based on Renee Ronco's role at the Company, Ronco would have been distinctly aware of all 1View-related problems discussed herein.***

250.  CW 6, the Senior Program Manager for the Global Oracle Financials Deployment, said he/she was responsible for owning and managing the implementation of the Oracle Financials roll-out globally.  CW 6 directly reported to Senior Vice President of Finance, Renee Ronco, who reported to Defendant CFO Rodick.  Ronco also interfaced regularly with CIO Ronald Berger who oversaw the entire transformation of the overall roll-out of the new systems at UTi.

251.  CW 6 described a host of problems with the implementation and function of both Oracle Financials and 1View.  *See* ¶¶86-97.  CW 6 said both Oracle and 1View faced many implementation problems from the beginning, including, the unrealistic "go live" dates, the number of countries being added to the system, and the fact that the system was not properly programmed to meet country specific requirements.

252.  CW 6 stated that in addition to issues associated with the country-specific regulatory requirements, the system coding errors were also causing major problems with invoicing delays on the Accounts Receivable side which consequently led to problems with the financial General Ledger month-end closings.  CW 6 explained that

the problems with the month-end (GL) closings, were inherently billing issues because billing has to be tied out each month in order to close. CW 6 said that the majority of invoicing functionalities were immediately switched over to Oracle, overwhelming the system. Additionally, CW 6 explained that freight forwarding transactions within UTi were not being properly captured as a result of these invoicing delays. Further, CW 6 said the 1View code and the Oracle mapping were severely lacking and were never sufficient to support the invoicing of some of the branch offices in key countries. Consequently, the problems with 1View directly affected financial reporting at UTi. CW 6 said he/she had firsthand knowledge of these invoicing issues with 1View due to his/her role in the Company. Notwithstanding the configuration issues, the Company began adding more users (as the system rolled out to different countries) onto the systems and problems continued to escalate, CW 6 said.

253. *CW 6 stated unequivocally that his/her supervisor Renee Ronco was "aware of everything." CW 6 stated that "there is no doubt that [CIO Ronald] Berger and Renee knew the details [of all of these issues]. Absolutely, they did." CW 6 said, "at the Berger and Renee levels, they knew the details." CW 6 recalled attending meetings, where Ronco was apprised of all of the implementation problems. CW 6 said the meetings were set up by Ronald Berger to discuss the current status of the implementation on a country-by-country basis and to raise any critical implementation issues. According to CW 6, status reports were provided at these meetings. The status reports were initially prepared by CW 6, then by CW 6's*

*implementation team and eventually a "PMO" team established by Ronco.  Again CIO Berger reported to Defendant Kirchner and Ronco reported to Defendant Rodick.*

254. **_CW 6 further stated that it was her understanding that Ronco communicated directly with Defendant CFO Rodick and possibly Defendant CEO Kirchner regarding these particular invoicing and month-end closing issues on a regular basis._**

255. Moreover, in the Company's December 2012 earnings call Defendant Rodick said, "*I'm going to be very focused on working capital for the remainder of this fiscal year, but also next year*. So I'm not really sure what it will look like yet, *but I can tell you we'll be very focused on improving net free cash flow and driving it in the positive area*."  Thus, Defendant Rodick acknowledged that he would be paying very close attention to the cash flows and the receivables throughout the calendar year 2013.

256. CW 7, the Sr. Manager, Enterprise IT Governance, reported to VP Global Infrastructure and Operations Tim Meier who reported to CIO Ronald Berger. CW 7 also worked with UTi's internal auditors and occasionally interfaced with external auditors Deloitte.  CW 7's role included oversight of UTi's SOX Compliance with respect to IT controls.  CW 7 said the Company experienced major setbacks with its implementation of 1View and Oracle. According to CW 7 during the Class Period, the Company faced an increasingly difficult and involved effort to properly close its

General Ledger every month due to the problematic 1Veiw/Oracle implementation, and specifically with UTi's inability to reconcile financial information, partly as a result of 1View's inability to properly and timely issue invoices to its customers. *CW 7 explained that due to these reconciliation problems, executive members of UTi's Finance department did not want to "sign-off" on the Company's financial reports because these executives were not confident in the accuracy of the financial information contained therein. As CW 7 explained, by late 2013, Rene Ronco and Ronald Berger – each of whom reported to Defendant CFO Rodick – constantly argued about these issues and concerns.*

257.  CW 8 (who oversaw UTi's Contract Logistics business segment for the Americas and *reported to EVP Global Operations Defendant Feitzinger*, *who in turn reported to Defendant CEO Kirchner*) *participated in monthly P&L conference calls with Defendant Feitzinger and CW 8's counterparts for the Freight Forwarding segment. At times Defendant Rodick and/or Defendant Kirchner also participated in these calls -- about 50% of the time – CW 8 said.   CW 8 said that in his/her final months (with January 2014 being the last month) with the Company, the problems with the 1View implementation (including issues with invoicing, and GL closings) were discussed at times during these monthly calls.*

258.  CW 9, the Director, Global Finance and Internal Audit, reported to VP Global Internal Audit Jim Schulien who *reported to Defendant CFO Rodick.* CW 9 worked with a variety of personnel, including Director of Global Operating Process

David Parker, CIO Ronald Berger, and SVP of Finance Rene Ronco.  Ronco reported to Defendant CFO Rodick.  Berger and Parker reported to Defendant CEO Kirchner. CW 9 also frequently interfaced with external auditors from Deloitte.

259.   CW 9 created and disseminated an Auditor's "Issues Report" which he/she explained related to SOX compliance. The report contained and tracked a list of ongoing audit-risk issues, which were rated with characterizations such as "deficient," "significantly deficient," and "material weakness."  Recipients of the report included: (1) audit department personnel, including Schulien; (2) several finance personnel including Renee Ronco; (3) David Parker and other members of the 1View "Implementation Team," and CIO Ronald Berger. ***CW 9 noted that David Parker, Ronald Berger and Renee Ronco, played significant high-level roles in the 1View/Oracle implementation.  Again Ronco reported to Defendant CFO Rodick; Berger and Parker reported to Defendant CEO Kirchner.***  As CW 9 explained, the most prominent issues that were raised and documented in the Issues Report during the fiscal year 2013 ended January 31, 2013, related to problems arising from the 1View/Oracle implementation; specifically, 1View was unable to properly/timely issue invoices. Additionally, financial data (including invoicing data) was not flowing properly from 1View to Oracle and vice versa, as was required, or as CW 9 put it, the systems "weren't talking to each other."

260.   The invoicing problem, and the larger challenge of not having financial data flow from 1View to Oracle, had the effect of creating significant accounting

discrepancies for the Company. These problems, in turn stifled UTi's ability to properly reconcile accounts. CW 9 explained that UTi struggled every month to tie-out all accounts and close its General Ledger. *CW 9 emphasized that the General Ledger-closing issues "had been ongoing" and were "pervasive."* As CW 9 explained, the Company's inability to properly close its General Ledger represented significant internal financial control deficiencies. *CW 9 was aware of high-level meetings as early as mid-2012 in which Renee Ronco and Ronald Berger discussed the above issues and evaluated the potential audit risks of same.*

261. *CW 9 recalled the General Ledger-closing issues, and issues related to debt covenants, had both been characterized as "significant deficiencies" in the reports CW 9 prepared beginning in early 2013, and remained "significant deficiencies" in the monthly Issues Reports that CW 9 prepared for the duration of his/her tenure (which ended in October 2013). According to CW 9, the Deloitte partners were well aware of these issues and had expressed concerns about the 1View/Oracle implementation problems to Schulien in 2012 and continued to raise these issues with Schulien for the duration of CW 9's tenure (which ended in October 2013). CW 9 said there were "ongoing communications" between the Deloitte auditors and Schulien about these problems and their implications, and believed that the Deloitte partners also communicated the above issues to members of the Implementation Steering Committee (headed by David Parker), and to the CFO, by mid-2013 if not earlier. CW 9 said such issues were "common knowledge" and were*

*widely discussed during regular meetings held by the Implementation Steering Committee of which CW 9 reviewed the minutes.*

262.   CW 9 further said that from August 2012 to March 2013, SOX compliance conference calls for the Americas were held once every three weeks, in preparation for the Company's April 1, 2013 filing deadline for fiscal year 2013. CW 9 attended every one of these calls. *Regular attendees of these conference calls also included Defendant CFO Rodick, VP Global Internal Audit Schulien, Global VP and Corporate Controller Matthew Tachouet, Director of Global Internal Audit Bert Chan, and Deloitte Partners T'Shaka Lee and Jim Mills. Rodick attended approximately 90% of the calls, CW 9 said.*

263.   According to CW 9, during these calls CW 9, as well as Deloitte partners Lee and Mills, frequently discussed the following issues: UTi's inability to properly reconcile accounts, and to close its General Ledger, and UTi's potential inability to meet its debt covenants as required through certain "bank loans" issued to the Company. CW 9 confirmed that these issues were discussed during every SOX compliance conference call in the aforementioned time period, including the calls that Rodick participated in.

264.   CW 15, the former President of the Americas who reported directly to Defendants Kirchner and Feitzinger, was one of twelve individuals that participated in quarterly International Executive Board Meetings. Among attendees of these quarterly meetings were CFO Defendant Rodick, CIO Ronald Berger, Defendant Kirchner and Defendant Feitzinger. CW 15 confirmed that Berger provided attendees with status

updates for the 1View/Oracle implementation, at every executive board meeting.  On a monthly basis, CW 15 and UTi executives, including Defendants Kirchner, Rodick, Feitzinger and Berger, discussed CW 15's region's performance, including relevant news and issues that affected operations.

265.   CW 15 confirmed that executives in CW 15's monthly and quarterly meetings were concerned, prior to 1View's "go-live" date in the U.S. in September 2013, that the implementation issues experienced in other countries, like Holland, would pose potential problems in the U.S. if left unfixed.  CW 15 characterized these 1View problems, and their presumed negative implications for the U.S., as a "general topic" that everybody, including the defendant executives, were regularly concerned about.

266.   As CW 15 explained, the deployment of 1View presented too many issues and bugs for CW 15 to list exhaustively. However, CW 15 characterized the following as the Company's two major issues with the 1View / Oracle implementation: (1) Oracle and 1View failed to communicate properly due to "linkage issues," resulting in a lack of visibility into the financial data that was supposed to be communicated between the two systems, and (2) 1View experienced a system slowdown, as additional users engaged in the onboarding process. CW 15 said these issues were the subject of general conversations among the executives at their various regular meetings, in which CW 15 took part. CW 15 confirmed that Defendants Kirchner, Rodick, and Feitzinger were aware of the issues outlined above, "without question," as "it [1View issues] was discussed at every executive board meeting, on many conference calls, and other

meetings." CW 15 recalled that Berger communicated these issues to the executives at their quarterly meetings, in the context of providing them with his status update.

267.   Finally, at the end or after the closing of the Class Period, Defendants belatedly admitted for the first time that during the Class Period they were aware of many of the adverse facts alleged herein which were at odds with their Class Period statements:

- "We have experienced some difficulties consolidating our current systems, moving to a common set of operational processes, implementing shared services and implementing a successful change management process and these difficulties may continue." (February 26, 2014);

- "These difficulties have impacted certain of our clients and our ability to efficiently meet their needs. In certain countries, particularly in the United States, we experienced invoicing delays *immediately* following the system rollout in those countries." (February 26, 2014);

- "This has led to delays in our ability to collect our receivables and has significantly impacted our liquidity (leading to weak or possibly negative operating cash flows in our fourth fiscal quarter, which is usually a strong working capital quarter)." (February 26, 2014);

- ***"Our liquidity and capital resources have decreased over the last several fiscal quarters, primarily*** as a result of weak financial performance due to poor macroeconomic conditions, capital expenditures associated with the end of our spending on the transformation, severance expenses, ***and recent invoicing delays, primarily in the US, in connection with the rollout of our 1View freight-forwarding system."*** (March 31, 2014);

- "In certain countries, particularly in the United States, we experienced invoicing delays *immediately* following the implementation of our freight forwarding operating system [1View] and global financial system [Oracle Financials] in those countries." (February 26, 2014);

- "[R]eceivables, ***as expected,*** rose in almost every country where 1View has been implemented." (June 5, 2014);

- ***"WIP [work in progress] generally rises in every country that goes live on 1View. These balances begin to decline as the learning curve improves. In our experience, <u>this improvement takes about three to six months.</u>*** In the US, this improvement took longer...." (June 5, 2014);

- ***"While WIP has grown less in countries that went live after the United States, the <u>overall trend of increases</u> followed by decreases <u>continues."</u>*** (June 6, 2014);

- ***"<u>Each new country deployment [of "1View" and "new processes"] led to a temporary deterioration in liquidity due to the learning curve associated with implementing new operating and financial systems."</u>*** (March 31, 2014);

- ***"<u>When we launched 1View in the United States, our largest and most complex market, our working capital issues reached tipping point.</u>*** You may recall we also launched Oracle Financials and a new customs brokerage system at the same time in all 28 branches in the United States. ***<u>The learning curve was steep, and our associates fell behind on certain tasks, and by necessity, they focused on servicing our clients and we fell behind in our billings."</u>*** (Rodick, March 31, 2014);

- "We have...experienced working capital pressures due to the steeper than expected learning curve associated with our new operational processes. This led to recent but temporary invoicing delays, higher than normal receivables, and weaker cash collection." (February 26, 2014);

- "These issues were primarily centered in the United States, where we launched 1View, Oracle and a new customs brokerage system simultaneously in 28 branches in September." (February 26, 2014);

- *"*We ***immediately*** focused our attention on additional training for billing personnel and correcting the issues." (March 31, 2014);

- ***"In the past, we have experienced collection delays from certain customers...."*** (February 26, 2014);

- "There is substantial doubt about our ability to continue as a going concern, and if we are unable to secure financing, we may be required to cease or curtail our operations." (February 26, 2014);

- "Ultimately, we had a suboptimal capital structure with financial covenants that did not provide us with the operating flexibility we needed." (March 31, 2014);

- The Company has "identified" a "material weakness [in its 'disclosure controls and procedures' that] relates to the fact that there are currently an insufficient number of shared service center financial accounting and reporting resources to allow for timely analysis and recording of financial statement amounts given the Company's current migration to its new freight forwarding application. *As a result, underlying controls related to account reconciliations and analysis across a number of trade receivable and payable accrual accounts <u>were not</u> operating effectively.*" (March 31, 2014);

- ***"These difficulties have impacted certain of our clients and our ability to efficiently meet their needs."*** (Feb. 26, 2014).

(emphasis added).

## V.   <u>NO SAFE HARBOR</u>

268.   UTi's "Safe Harbor" warnings accompanying its reportedly forward-looking statements issued during the Class Period were ineffective to shield Defendants' false or misleading statements from liability. Because most of the false and misleading statements related to existing facts or conditions, the Safe Harbor has no applicability.

269.   Defendants are also liable for any false or misleading forward-looking statements pleaded because, at the time each forward-looking statement was made, the speaker knew the forward-looking statement was false or misleading and the forward-looking statement was authorized and/or approved by an executive officer and/or director of UTi who knew that the forward-looking statement was false.  In addition,

the forward-looking statements were contradicted by existing, undisclosed material facts that were required to be disclosed so that the forward-looking statement would not be misleading.  Finally most of the purported "Safe Harbor" warnings were themselves misleading because they warned of "risks" that had already materialized or failed to provide meaningful disclosures of the relevant risks.

## VI.   APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

270.   At all relevant times, the markets for Exide common stock and notes were efficient markets for the following reasons, among others:

a)      Exide stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

b)      according to the Company's Form 10-K for fiscal year ended January 31, 2013, the Company had 103,961,646 shares outstanding.  During the Class Period, there existed an active and broad market for UTi permitting a very strong presumption of an efficient market;

c)      as a regulated issuer, UTi filed periodic public reports with the SEC;

d)      UTi regularly communicated with public investors *via* established market communication mechanisms, including regular disseminations of press releases on the national circuits of major news wire services, the Internet and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

e)      UTi was followed by many securities analysts who wrote reports that were distributed to the sales forces and certain customers of their respective firms during the Class Period. Each of these reports was publicly available and entered the public marketplace;

f)      numerous National Association of Securities Dealers' member firms were active market-makers in UTi stock at all times during the Class Period; and

g)      unexpected material news about UTi was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

271.   As a result of the foregoing, the markets for UTi common stock promptly digested current information regarding UTi from publicly available sources and reflected such information in UTi's stock and note prices. Under these circumstances, all purchasers of UTi common stock during the Class Period suffered similar injury through their purchase of UTi common stock and notes at artificially inflated prices, and a presumption of reliance applies.

## VII.   PLAINTIFF'S CLASS ACTION ALLEGATIONS

272.   Plaintiff brings this action as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."), on behalf of all persons or entities who purchased shares of UTi common stock on the open market during the period from December 5, 2013 through February 25, 2014 (the "Class Period") and were damaged thereby.  Excluded from the Class are the Defendants

herein, officers and directors of UTi, members of the immediate family of Defendants Kirchner and Rodick, and affiliates of the corporate Defendant (the "Class").

273.   The members of the Class are so numerous that joinder of all members is impracticable.   There are, at a minimum, hundreds of members of the Class. According to UTi's form 10-Q for the period ended October 31, 2013, UTi had a total of 104.8 million common shares outstanding as of December 4, 2013.   According to the Company's Form 10-K filed April 1, 2013, as of March 27, 2013 there were 193 holders of record of UTi stock, and "a substantially greater number" of beneficial holders. UTi's common stock was actively traded on the NASDAQ throughout the Class Period.

274.   Plaintiff will fairly and adequately protect the interests of the members of the Class.   Plaintiff has retained competent counsel experienced in class action litigation under the federal securities laws to further ensure such protection; Plaintiff is a member of the Class; Plaintiff's claims are typical of the claims of all Class members; and Plaintiff does not have interests antagonistic to, or in conflict with, those of the Class.

275.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy since a multiplicity of actions could result in an unwarranted burden on the Court system and could create the possibility of inconsistent judgments.   Moreover, a class action will allow redress for many persons whose claims would otherwise be too small to litigate individually.   There will be no difficulty in the management of this action as a class action.

276.   There are numerous questions of law and fact which are common to the Class and which predominate over any questions affecting individual members of the Class, including:

(i)   Whether the federal securities laws were violated by Defendants' acts as alleged herein;

(ii)   whether the Defendants omitted material facts concerning, among other things, the implementation and effectiveness of UTi's Oracle Financials and 1View systems, the Company's liquidity position, its financial condition, its likelihood of breaching certain financing covenants, and its risk of being unable to continue as a going concern, necessary to make the public statements Defendants made not misleading; and

(iii)   whether members of the Class were damaged by virtue of their investments in UTi common stock during the Class Period, and if so, the appropriate measure of damages.

## COUNT I

### Against Defendants for Violation of Sections 10(b) of
### The Exchange Act and Rule 10b-5 Thereunder (15 U.S.C.A. § 78j)

277.   Plaintiff incorporates each of the foregoing paragraphs as if fully set forth herein.

278.   Defendants made materially false and misleading statements in the Company's quarterly and annual reports filed with the SEC on Forms 10-Q and 10-K, FY2014 Third Quarter 10-Q, and in other documents filed with the SEC in the

Company's press releases and/or in the Company's conference calls. Defendants misrepresented material facts or failed to disclose material facts required in order to make the statements they did make not materially misleading.

279. Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of fraudulent conduct as alleged herein in an effort to prop up UTi's stock price. This conduct of omitting to state material facts necessary in order to make the statements made about UTi and its business, in light of the circumstances under which they were made, not misleading, operated as a fraud and deceit upon the purchasers of UTi securities during the Class Period. Defendants knew of the omitted material facts or acted with reckless disregard to their existence and truth.

280. Had Plaintiff and the other members of the Class known of the material adverse information not disclosed by Defendants, they would not have purchased UTi's securities at artificially inflated prices.

281. The price of UTi securities declined materially upon public disclosure of the true facts which had been concealed, as alleged in this Complaint. Plaintiff and other members of the Class have suffered substantial damages as a result of the wrongs alleged herein.

282. By reason of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### Against Defendants Kirchner, Rodick, Feitzinger and Misakian Pursuant to Section 20(a) of the Exchange Act (15 U.S.C.A. § 78t)

283.   Plaintiff incorporates by reference and realleges each of the foregoing allegations.

284.   Defendants Kirchner, Feitzinger, Rodick and Misakian by virtue of their positions with UTi and their specific acts, were controlling persons of UTi within the meaning of Section 20(a) of the Exchange Act.

285.   Defendants Kirchner and Rodick had the power and influence and exercised same to cause UTi to make the material omissions in public statements complained of herein and/or culpably failed to exercise their power to prevent them. Defendants were thereby and otherwise active and culpable participants in the fraud perpetrated by Defendants.

286.   Defendants Kirchner, Feitzinger, Rodick and Misakian are liable for the aforesaid wrongful conduct of UTi and liable to Plaintiff and the Class for the substantial damages which they suffered in connection with their purchases or acquisitions of shares as a result of UTi's violations of the Exchange Act.

287.   By reason of such conduct, the Defendants are liable pursuant to Section 20(a) of the Exchange Act.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and the other members of the Class, prays for judgment as follows:

A.     Declaring this action to be a proper class action maintainable pursuant to Rule 23(b)(3) of the Fed. R. Civ. P. and declaring Plaintiff to be a proper Class representative;

B.     Awarding Plaintiff and the other members of the Class damages suffered as a result of the wrongs complained of herein, together with appropriate interest;

C.     Awarding Plaintiff and the other members of the Class their costs and expenses of this litigation, including reasonable attorneys' fees and experts' fees and other costs and disbursements; and

D.     Awarding Plaintiff and the other members of the Class such other and further relief as may be just and proper under the circumstances.

## JURY DEMAND

Plaintiff demands a trial by jury for all claims so triable.

Dated: December 29, 2017          /s/ William B. Federman
                                  William B. Federman
                                  (admitted *Pro Hac Vice*)
                                  A. Brooke Murphy
                                  (admitted *pro hac vice*)
                                  **FEDERMAN & SHERWOOD**
                                  10205 North Pennsylvania Avenue
                                  Oklahoma City, Oklahoma 73120
                                  Telephone: (405) 235-1560
                                  Facsimile:  (405) 239-2112
                                  wbf@federmanlaw.com
                                  abm@federmanlaw.com

                                  *Lead Counsel for Plaintiffs*

                                  James Robert Noblin
                                  **GREEN & NOBLIN, P.C.**
                                  700 Larkspur Landing Circle, Suite 275
                                  Larkspur, California 94939
                                  Tel: (415) 477-6700
                                  Fax: (415) 477-6710
                                  -and-

4500 East Pacific Coast Highway
Fourth Floor
Long Beach, CA 90804
Tel: (562) 391-2487
jrn@classcounsel.com

*Liaison Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that this Third Amended Class Action Complaint was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-registered participants on December 29, 2017.


/s/ William B. Federman
William B. Federman

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

Stratesis, LLC ("plaintiff") declares, as to the claims asserted under the Federal Securities Laws, that:

1.      Plaintiff has reviewed the Complaint prepared by counsel and is willing to serve as a lead or named plaintiff in the Action on the basis of the allegations in that complaint or a substantially similar complaint or amended complaint to be filed.  Plaintiff retains the law office of Federman & Sherwood, and any other counsel with whom Federman & Sherwood deems appropriate to associate with, to pursue this action on my behalf on a contingency fee basis.

2.      Plaintiff did not purchase the Security that is the subject of the complaint at the direction of plaintiff's counsel or in order to participate in any private action arising under the Federal Securities Laws.

3.      Plaintiff is willing to serve as a lead or representative party, either individually or as part of a group on behalf of the class, including providing testimony at deposition or trial, if necessary.

4.      Plaintiff has made no transaction(s) during the Class Period in the stock of UTi Worldwide, Inc. (NASDAQ: UTIW) that are the subject of this action except those set forth below:

| DATE | BUY OR SALE | AMOUNT OF SHARES | PRICE PER SHARE |
|------|-------------|------------------|-----------------|
| 2/21/2014 | Buy | 3,200 | $15.479688 |
| 2/24/2014 | Buy | 3,100 | $15.769677 |
| 3/3/2014 | Sell | 3,200 | $9.646875 |
| 3/4/2014 | Sell | 3,100 | $10.502581 |

5.      In the past three years, plaintiff has not sought to serve as a representative party on behalf of a class.

6.      Plaintiff will not accept any payment for serving as a representative party on behalf of a class beyond plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

7.      I declare under penalty of perjury that the foregoing is true and correct.

Executed this 24ᵗʰ day of   November  , 2017, effective as of May 9th, 2014.

Michael   Cutler,   Principal   of   Cutler   Management
Consulting, LLC, Managing Member of Stratesis, LLC