# EXHIBIT 1

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(Western Division)

MICHAEL J. ANGLEY, Individually and
on Behalf of All Others Similarly Situated,

Plaintiff,

**vs.**

UTI WORLDWIDE INC., et al.,

Defendants.

NO. 2:14-cv-02066-CBM-E

EXPERT REPORT OF PAUL A. GOMPERS PH.D.

February 12, 2018

# Table of Contents

I.      Qualifications ................................................................................................. 1

II.     Allegations ..................................................................................................... 2

III.    Assignment .................................................................................................... 2

IV.     Summary of opinions ..................................................................................... 3

V.      Market efficiency in Class Certification ....................................................... 7

        A.      Market efficiency ................................................................................ 7

        B.      Testing market efficiency using an event study .................................. 8

        C.      Tests of market efficiency in the academic literature ........................ 9

VI.     Ms. Jones' analysis of the fifth Cammer factor fails to establish that UTi
        stock traded in an efficient market during the Putative Class Period .......... 12

        A.      The "news days" vs. "no-news days" analysis employed by
                Ms. Jones cannot be used to affirmatively establish market efficiency .................. 13

        B.      Ms. Jones' implementation of the "news days" vs. "no-news days"
                analysis contains errors and inconsistencies that invalidate the results .................... 18

                1.      Ms. Jones' methodology for classification of "news days"
                        is subjective and inconsistent with her description ........................... 19

                2.      Ms. Jones' methodology for classification of "news days" is
                        inconsistent with her past testimony ................................................. 21

                3.      Ms. Jones measures excess returns incorrectly in her event
                        study model ........................................................................................ 26

VII.    Ms. Jones' autocorrelation test fails when applied to excess returns ........... 27

VIII.   Ms. Jones fails to provide any evidence that damages specific to
        Plaintiff's allegations can be calculated on a class-wide basis .................... 28

        A.      Ms. Jones' discussion of a damages methodology .......................... 28

        B.      Ms. Jones does not propose a methodology to isolate the
                stock price decline, if any, due to the corrective disclosure from other
                contemporaneous announcements .................................................... 30

        C.      Ms. Jones fails to propose a methodology for calculating
                inflation consistent with the timing of the rollout of UTi's systems as
                described in the Complaint .............................................................. 33

        D.      Ms. Jones ignores the fact that the corrective disclosure may
                have affected UTi's stock price differently earlier in the Putative Class Period ......... 35

IX.     Conclusion .................................................................................................... 37

## I.      Qualifications

1.      I am the Eugene Holman Professor of Business Administration and Chair of the Elective Curriculum at the Harvard Business School.  I teach courses and conduct research in corporate finance, company structure and governance, company valuation, and institutional investor behavior.  I teach these courses to Ph.D., MBA, undergraduate, and Executive Education students.  In addition to my teaching responsibilities, I am a Research Associate at the National Bureau of Economic Research.  Before joining the Harvard faculty in 1995, I was a member of the faculty at the University of Chicago Graduate School of Business, where I taught entrepreneurial finance from 1993 to 1995. I received an A.B. in Biology from Harvard College in 1987, a M.Sc. in Economics from Oxford University in 1989, and an M.A. and Ph.D. in Business Economics from Harvard University in 1993.

2.      In my career as an academic, I have written numerous case studies and technical notes, and published numerous articles in peer-reviewed finance and economics journals on valuation, corporate governance, the venture capital and private equity industries, and entrepreneurial finance.  Many of these case studies, notes, and research articles have directly examined financial and valuation issues of companies.  In addition, many of these materials have examined market efficiency and the impact of market inefficiency on firms and investors.  I am the co-author of four books: *The Venture Capital Cycle* (editions 1 and 2) published by MIT Press, *The Money of Invention: How Venture Capital Creates New Wealth* published by Harvard Business School Press, and *Entrepreneurial Finance: A Casebook* published by John Wiley.  I am an Associate Editor of *The Journal of Finance*, *Small Business Economics*, and *The Journal of Private Equity*, and a referee for a number of academic journals, including *The Journal of Financial Economics*, *The Journal of Political Economy*, *The Quarterly Journal of Economics*, *The Review of Financial Studies*, and *The Journal of Law and Economics*.

3.      I also have served on the boards of directors of several companies, including the Internet-related firms ZEFER, Mercanteo, and OnTheFrontier.com.  I have also been on the boards of directors or advisory boards of several venture capital and private equity firms, including New Capital Partners, OnPoint Technologies, Khosla Ventures, the Highland Consumer Fund, Knightsbridge Advisors, Spur Capital Partners, Evergreen Capital, and Gemini Capital, where my duties included valuation of companies.  In

addition, I have advised numerous firms (including private equity and venture-capital-financed firms) on fundraising, future projections, and valuation. A copy of my CV is attached as **Appendix A** to this report.

4.      I have served as an expert in numerous legal matters. In these disputes, I have served as an expert on whether securities markets were efficient, the valuation of public and private companies, factors affecting public company securities prices, the customs and practices of venture capital and private equity firms, and the terms and conditions of employment agreements at entrepreneurial firms. I have been qualified to serve as an expert witness in securities and valuation cases in a variety of industries. A list of these matters is presented in **Appendix B** to this report.

## II.      Allegations

5.      It is my understanding that Plaintiff's claims are based on alleged misrepresentations by UTi Worldwide Inc. ("UTi") management between March 28, 2013 and February 25, 2014 ("Putative Class Period") regarding the implementation of a proprietary freight forwarding software system ("1View" or "1View system"), and an accounting software with a customized product from Oracle ("Oracle" or "Oracle system"). I understand that the set of alleged misrepresentations outlined in the Third Amended Complaint ("Complaint") has been narrowed and that the operative set of misrepresentations are outlined in the Ninth Circuit's Memorandum Opinion in this case ("Appeal Ruling").[1] The surviving misrepresentations have been limited to two categories as outlined in the Appeal Ruling: "five risk disclosures made in reports to the SEC signed by CEO Eric Kirchner and CFO Richard Rodick" on April 1, 2013, June 7, 2013, and September 9, 2013 and nine statements "made by individual UTi executives during earnings calls and investor conferences" between March 28, 2013 and December 5, 2013.[2]

## III.      Assignment

6.      I have been retained by counsel for the Defendants to review and respond to the analysis set forth in the Declaration and Expert Report of Cynthia L. Jones, CFA dated

---

[1] *Cutler v. Kirchner*, 696 Fed. App'x 809 (9th Cir. 2017).
[2] *Ibid.* at pp. 812–815.

January 2, 2018 ("Jones Declaration") and to analyze Plaintiff's claim that common stock of UTi traded in an efficient market during the Putative Class Period. I have also been asked to address the Plaintiff's claim regarding whether "a common damage methodology could be applied to compensate purchasers of UTi common stock on a class-wide basis."[3]

7.      I am being compensated at my standard billing rate of $1,100 per hour. I have been assisted in this matter by staff of Cornerstone Research, who worked under my direction. I receive compensation from Cornerstone Research based on its collected staff billings for its support of me in this matter. Neither my compensation in this matter nor my compensation from Cornerstone Research is in any way contingent or based on the content of my opinion or the outcome of this or any other matter.

8.      A list of documents, data, and other information that I have relied upon in forming the opinions in this report is attached as **Appendix C** to this report. I reserve the right to revise my opinions in light of my ongoing review of the materials I have considered, as well as additional materials that may subsequently come to light, or if asked to perform further research or analysis.

## IV.      Summary of opinions

9.      Ms. Jones' analysis fails to demonstrate market efficiency of UTi common stock over the Putative Class Period. While Ms. Jones acknowledges that for a financial economist the fifth Cammer factor is the most important factor for assessing market efficiency, her proposed analysis of the fifth Cammer factor is conceptually flawed, subject to bias, and contains errors and inconsistencies that invalidate her conclusions. Ms. Jones also considers Cammer factors 1-4 and Krogman factors, which are not direct tests of market efficiency. Ms. Jones' analysis of the fifth Cammer factor, the cause-and-effect relationship, fails to demonstrate market efficiency for the reasons described below.

   a.   First, Ms. Jones fails to test her own definition of market efficiency by not identifying new value-relevant information in her analysis. Without identifying *a priori* which news should be value-relevant, a researcher cannot test whether a stock price reacts to value-relevant news. In other

---

[3] Jones Declaration, ¶3.

words, if a price reaction to news is observed, but a researcher has not made a determination of whether the news is value-relevant, the researcher cannot distinguish between the stock reacting to value-relevant news, which supports trading in an efficient market, and the stock reacting to non-value-relevant news, which does not support trading in an efficient market.  Therefore, Ms. Jones' proposed methodology fails to test the fifth Cammer factor.

b.  Second, Ms. Jones ignores the fact that her proposed test fails to assess whether the market reacts consistently to value-relevant news.  By design, the most that Ms. Jones' test can evaluate is whether, on average, there were more frequent statistically significant firm-specific stock price movements on "news days" than on "no-news days."  This is not a test of market efficiency.  It is possible for a stock to only react to *a subset* of value-relevant news and still pass Ms. Jones' test of market efficiency.

c.  This is illustrated by Ms. Jones' finding that UTi stock reacted on "news days" just 11% of the time and failed to react the other 89% of the time.  If Ms. Jones' definition of "news days" includes only days on which new value-relevant information was released, then observing that UTi's stock price fails to react to news 89% of the time is inconsistent with market efficiency.  If Ms. Jones' definition of "news days" is not limited to days with new value-relevant information, then her test fails to assess her own definition of market efficiency that "the price of a security responds rapidly to new, relevant information."[4]

d.  Third, Ms. Jones' proposed test cannot distinguish between market reaction in a direction consistent with the content of particular news and market reaction in the opposite direction.  Ms. Jones considers only whether "news days" had a higher fraction of statistically significant excess returns than "no-news days."  Using this test, if a stock moved in the *opposite* direction to that suggested by the content of news on each day of the Putative Class Period, Ms. Jones could still find that the stock traded in an efficient market.

---

[4] Jones Declaration, ¶60.

e.  Fourth, Ms. Jones' proposed test lacks any scientific basis or support in the event study literature.  The sole article that Ms. Jones cites in support of her methodology, the Ferrillo, Dunbar and Tabak (2004) article in St. John's Law Review, is not from a peer reviewed finance or economics journal.  Furthermore, one of the authors of the article has noted multiple weaknesses of the test, including examples of how a stock that does not trade in an efficient market could still pass the test.

f.  Finally, the specific methodology that Ms. Jones uses in conducting her test is subjective, prone to bias, and unscientific.  The subjectivity is apparent in Ms. Jones' selection of "news days," which is inconsistent with her own stated methodology and with her prior work assessing market efficiency.  Ms. Jones claims to consider all days with releases of analyst reports as "news days."  However, she overlooks a number of analyst reports without providing any explanation in her report.  Her justification in deposition for excluding these reports conflicts with the claim in her report that she includes all news in her definition of "news days."  Ms. Jones also fails to consider other sources of analyst reports when classifying "news days."  When considering sources of public press articles, Ms. Jones chooses Bloomberg as her only source, overlooking other potential sources, most notably Dow Jones Factiva, which she has used in at least one previous matter.  Finally, Ms. Jones fails to provide an explanation for why, in a previous matter, she chose to examine and classify news as "material" or "not economically relevant," while she makes no such assessment here.[5]

g.  In addition to being prone to subjectivity and bias, Ms. Jones' analysis also contains a number of errors, some of which Ms. Jones has identified and corrected.  One notable error is that Ms. Jones estimates her event study model incorrectly by failing to take into account dividends when calculating returns for UTi and the market and industry factors in her regression model.

---

[5] Declaration of Cynthia L. Jones, CFA *In re China Media Express Holdings, Inc. Shareholder Litigation*, filed on August 15, 2013, ("CCME Declaration"), ¶¶49–50.

10.     Ms. Jones claims that finding autocorrelation of stock returns can be inconsistent with market efficiency and determines that UTi's stock returns are not autocorrelated. However, Ms. Jones overlooks that UTi's company-specific returns are autocorrelated after applying her regression model.

11.     Ms. Jones claims to have considered whether she can put forward a class-wide damages methodology consistent with the Plaintiff's theory of liability.  In making her assessment, Ms. Jones ignores the facts as pled by the Plaintiff in the Complaint.  Beyond making generic statements about using an event study and company-specific information to establish inflation, Ms. Jones does not conduct an analysis or offer any discussion regarding damages applicable in this matter.  Therefore, as detailed below, Ms. Jones fails to show that she can put forward a class-wide damages methodology that is consistent with the Plaintiff's allegations.

  a.  First, Ms. Jones does not propose a methodology to parse out value-relevant news unrelated to the allegations from the price impact of the corrective disclosure.

  b.  Second, in her discussion of a damages methodology, Ms. Jones ignores that according to the Plaintiff's theory of liability, the same information that was disclosed on the corrective disclosure date could not have been disclosed on the first day of the Putative Class Period.  For example, since the 1View and Oracle systems were launched in the U.S. in September 2013, UTi management could not have disclosed problems with the implementation of the systems in the U.S. earlier in the Putative Class Period.  More broadly, Ms. Jones has not proposed a damages methodology that could account for information regarding problems with implementation being disclosed throughout the Putative Class Period.

  c.  Finally, Ms. Jones has not proposed a methodology that could take into account the timing of cash flows received by UTi.  Historically, UTi relied on fourth quarter cash collections to replenish its liquidity.  Thus, an announcement of invoicing delays in the fourth quarter may have had an outsized impact on UTi's stock price compared to the same disclosure made earlier in the Putative Class Period.  Since Plaintiff claims that UTi's price decline on the disclosure date was driven by liquidity problems,

these problems may not have been as severe had the disclosure been made earlier in the Putative Class Period.

## V.     Market efficiency in Class Certification

12.     Below I describe tests of market efficiency and event study analysis from the perspective of a financial economist.  Economic literature over the past 40 years has debated whether financial markets are efficient and has found violations of market efficiency even for stocks traded on well-developed exchanges.  I describe examples of these violations as well as their implications for Cammer factor analyses of market efficiency.

### A.     Market efficiency

13.     In an efficient market, security prices always respond rapidly and fully to new value-relevant information when it is publicly announced.  Ms. Jones seems to agree, noting in her report that "Dr. Fama made the argument that, in an active market that includes many well-informed and intelligent investors, *securities prices will reflect all available information*."[6]

14.     There are three well-established forms of market efficiency defined and tested in the financial economics literature:  weak form efficiency, semi-strong form efficiency, and strong form efficiency.  If a market satisfies weak form efficiency, one cannot predict future stock prices based on historical stock prices.  If the market for a security is semi-strong form efficient, all publicly available information is quickly and fully incorporated into the stock price.[7]  A test of semi-strong form market efficiency often discussed in the financial economics literature is "how quickly […] security prices reflect public information."[8]  If the market for a security is strong form efficient, privately available value-relevant information is also incorporated into the stock price.[9]

---

[6] Jones Declaration, ¶12.  Emphasis added.
[7] Fama, E. (1970), "Efficient Capital Markets: A Review of Theory and Empirical Work," *The Journal of Finance*, 25(2), pp. 383–417, ("Fama (1970)"), at p. 388.
[8] Fama, E. (1991), "Efficient Capital Markets: II," *The Journal of Finance*, 46(5), pp. 1575–1617, at p. 1576.
[9] Fama (1970), p. 388.

## B.       Testing market efficiency using an event study

15.       Financial economists have used event studies to assess market efficiency.  An event study measures price reaction around certain events of interest, for example earnings surprises,[10] mergers and acquisitions,[11] or changes in financial regulation.[12] Examples of event studies used to assess market efficiency are described in section C below.

16.       Broadly speaking, an event study includes the following components:  (1) identifying announcements of new information (e.g., earnings releases), (2) formulating a testable hypothesis regarding the expected price reaction to the new information (e.g., based on actual earnings relative to analyst expectations), and (3) comparing the actual stock price reactions with the expected reaction under the hypothesis.

17.       Because the price of an individual security is affected by non-firm specific factors, such as factors that affect the entire economy or the industry, an important component of an event study is isolating price reactions that are specific to the company under examination.[13]  That isolation is typically done using a regression model to measure the typical relationship between the company's returns and control factors such as relevant market and industry index returns.[14]  By comparing a stock's actual price movement to the movement that would be expected based on the typical relationship with the control factors, one can isolate the company-specific portion of its total stock price movement.  The company-specific portion of the return is referred to as the "excess return," because it remains unexplained after accounting for the portion attributable to the control factors.  Using the excess return, a researcher can evaluate the market's reaction to a firm specific, value-relevant event.

---

[10] Hirshleifer, D., S. Lim, and S. Teoh (2009), "Driven to Distraction: Extraneous Events and Underreaction to Earnings News," *The Journal of Finance*, 64(5), pp. 2289–2325; Dellavigna, S., and J. Pollet, (2009), "Investor Inattention and Friday Earnings Announcements," *The Journal of Finance*, 64(2), pp. 709–749.

[11] Moeller, S., F. Schlingemann, and R. Stulz (2005), "Wealth Destruction on a Massive Scale? A Study of Acquiring-Firm Returns in the Recent Merger Wave," *The Journal of Finance*, 60(2), pp. 757–782; Fuller, K., J. Netter, and M. Stegemoller (2002), "What Do Returns to Acquiring Firms Tell Us? Evidence From Firms That Make Many Acquisitions," *The Journal of Finance*, 57(4), pp. 1763–1793.

[12] Chhaochharia, V. and Y. Grinstein (2007), "Corporate Governance and Firm Value: The Impact of the 2002 Governance Rules," *The Journal of Finance*, 62(4), pp. 1789–1825.

[13] MacKinlay, A. (1997), "Event Studies in Economics and Finance," *Journal of Economic Literature*, 35(1), pp. 13–39, ("MacKinlay (1997)"), at pp. 16–20.

[14] MacKinlay (1997), pp. 18–19.

### C.      Tests of market efficiency in the academic literature

18.      Market efficiency has been tested in the academic literature for more than 40 years and the question of whether markets are efficient continues to be studied and contested today.  Over this time, financial economists have found numerous violations of market efficiency across different markets, including markets for stocks traded on major exchanges.  Some of these violations have been found to persist for extended periods of time.  Accordingly, it cannot be taken for granted that a stock, even one traded on a major U.S. exchange like the NASDAQ, trades in an efficient market.  Establishing market efficiency requires a rigorous empirical examination specific to a given security and time period at issue.

19.      One example of market inefficiency documented in the academic literature is security prices reacting to stale information that had previously been disclosed to the public.[15]  For instance, an article in *The Journal of Finance* documented a large and persistent response of biotechnology stocks to stale news.  After a *New York Times* article about a potential new cancer drug was released, the stock price of EntreMed, a biotechnology company, increased significantly.  On the first trading day after the news release, EntreMed stock experienced a return of 330%.  Reaction to the news also positively influenced other biotechnology stocks.  In particular, Bristol-Myers Squibb, which potentially stood to benefit from the breakthrough technology, experienced a 3.12% increase, as compared to a 0.14% return on the NYSE—an appreciation of $3.3 billion in Bristol-Myers' market capitalization.  However, this news had been reported months earlier by the widely-read scientific publication *Nature* and even by the *New York Times* itself.  This substantial and sustained reaction to stale news is one example of failure of market efficiency in a large market capitalization stock traded on the NYSE.  As the authors of the article note, "enthusiastic public attention induced a permanent rise in share prices, even though no genuinely new information had been presented."[16]  Other

---

[15] Huberman, G. and T. Regev (2001), "Contagious Speculation and a Cure for Cancer: A Nonevent that Made Stock Prices Soar," *The Journal of Finance*, 56(1), pp. 387–396, ("Huberman and Regev (2001)"); Tetlock, P. (2011), "All the News That's Fit to Reprint: Do Investors React to Stale Information?," *The Review of Financial Studies*, 24(5), pp. 1481–1512.
[16] Huberman and Regev (2001), pp. 387, 391–392, 394.

similar instances of markets reacting to stale news have also been recorded in the academic literature.[17]

20.    Another set of violations of market efficiency found in the academic literature involves identifying "mispricing" in the market.  The Law of One Price postulates that securities with the same sets of payouts should be priced the same.  Otherwise, arbitrageurs would take advantage of any relative mispricing by buying the relatively cheap security and selling the more expensive one, forcing the prices of securities with identical payoffs to converge.  However, numerous violations of the Law of One Price have been found.

21.    One example described in the academic literature is the case of Royal Dutch/Shell.  Royal Dutch/Shell is a single firm with shares traded on exchanges in Amsterdam (Royal Dutch) and London (Shell).  Cash flows were split according to a fixed formula:  60% for Royal Dutch and 40% for Shell.  With the cash flows of one entity fixed with respect to the other, one would expect their trading prices to reflect the proportional split in their cash flows.  However, over long periods of time, the relative prices of the two entities deviated substantially from their theoretical relationship.  Royal Dutch shares traded at a premium of over 10% with respect to Shell for most of the 1990s.  This serves as an example of a violation of the Law of One Price for large cap stocks trading on highly liquid exchanges.[18]

22.    As potential explanations for these behaviors in the market, the literature has noted that various frictions, restrictions, and cognitive biases may slow or interfere with the arbitrage mechanism that enables a security's price to quickly respond to value-relevant news.[19]  Examples of frictions impeding pricing consistent with market

---

[17] See for example Tetlock, P. (2011), "All the News That's Fit to Reprint: Do Investors React to Stale Information?," *The Review of Financial Studies*, 24(5), pp. 1481–1512.

[18] Lamont, O. and R. Thaler (2003), "Anomalies: The Law of One Price in Financial Markets," *The Journal of Economic Perspectives*, 17(4), pp. 191–202, at pp. 195–196.  Both stocks also had ADRs that traded in the United States.  Prior to 2002, Royal Dutch was part of the S&P 500 Index.

[19] Shleifer, A. and R. Vishny (1997), "The Limits of Arbitrage," *The Journal of Finance*, 52(1), pp. 35–55; Mitchell, M., T. Pulvino, and E. Stafford (2002), "Limited Arbitrage in Equity Markets," *The Journal of Finance*, 57(2), pp. 551–584.

efficiency include illiquidity[20] and capital constraints.[21]  Other noted impediments to market efficiency include constraints on short selling, which can result in prices being driven by the beliefs of optimistic investors, rather than the true market consensus.[22] Furthermore, research has shown that certain mispricing can arise and persist over time due to investments being motivated by factors other than the security's future value.  The presence of certain groups of traders in the market who do not act in a rational manner (frequently termed "noise traders") "[creates] a risk in the price of the asset that deters rational arbitrageurs from aggressively betting against them," which in turn impedes market efficiency.[23]

23.     As discussed above, many violations of market efficiency have been observed in stocks that trade in large, well-developed, and liquid markets.  These markets would have likely met the Cammer 1-4 and Krogman factor requirements as described in Ms. Jones' report.[24]  While Cammer factors 1-4 and the Krogman factors are characteristics often observed in an efficient market, finding that these factors hold does not provide any information regarding the efficiency of the specific stock at issue.[25]

---

[20] Chordia, T., R. Roll, and A. Subrahmanyam (2008), "Liquidity and Market Efficiency," *Journal of Financial Economics*, 87(2), pp. 249–268.  Liquidity can be defined as "the ease and speed with which [a security] can be sold at fair market value."  If a security is illiquid, market participants may incur additional costs when trading. See Bodie, Z., A. Kane, and A. Marcus (2013), *Investments*, McGraw-Hill Irwin, Tenth Edition, p. 310.

[21] Mitchell, M. and T. Pulvino, (2012), "Arbitrage Crashes and the Speed of Capital," *Journal of Financial Economics*, 104(3), pp. 469–490.

[22] D'Avolio, G. (2002), "The Market for Borrowing Stock," *Journal of Financial Economics*, 66, pp. 271–306; Hong, H. and J. Stein (2007), "Disagreement and the Stock Market," *The Journal of Economic Perspectives*, 21(2), pp. 109–128; Cohen, R., P. Gompers, and T. Vuolteenaho (2002), "Who Underreacts to Cash-Flow News? Evidence From Trading Between Individuals and Institutions," *Journal of Financial Economics*, 66, pp. 409–462; Saffi, P. and K. Sigurdsson, (2011) "Price Efficiency and Short Selling," *Review of Financial Studies*, 24(3), pp. 821–852, at p. 824.

[23] De Long, J., A. Shleifer, L. Summers, and R. Waldmann (1990), "Noise Trader Risk in Financial Markets," *Journal of Political Economy*, 98(4), pp. 703–738, at p. 703.  See also Lakonishok, J., A. Shleifer, and R. Vishny (1994), "Contrarian Investment, Extrapolation, and Risk," *The Journal of Finance*, 49(5), pp. 1541–1578; Jegadeesh, N., and S. Titman (1993), "Returns to Buying Winners and Selling Losers: Implications for Stock Market Efficiency," *The Journal of Finance*, 48(1), pp. 65–91.

[24] Jones Declaration, ¶¶26–28.

[25] I note that in discussing Cammer factors 1-4, Ms. Jones' measurement of the average weekly trading volume is inconsistent with her discussion in a prior report examining a NASDAQ traded stock.  In the *Jiangbo Pharmaceuticals* ("JGBO") matter, Ms. Jones examines the trading volume of JGBO common stock, which was also listed on the NASDAQ.  In JGBO, Ms. Jones states that "[i]ndustry data and academic research suggest that trading volume reported by NASDAQ may be overstated."  In order to account for this, she "reduced the reported trading volume for JGBO by 50 percent."  See Report of Cynthia L. Jones, CFA *In re Jiangbo Pharmaceuticals, Inc. Securities Litigation*, filed September 26, 2014, ("JGBO Declaration"), ¶22.  In the case of UTi, Ms. Jones makes no such volume adjustment.  According

24.     Academic literature of the past 40 years has shown that financial markets are complex and market efficiency cannot be presumed without rigorous analysis of the specific underlying security.  The only Cammer factor that directly addresses market efficiency of the specific stock is the fifth Cammer factor, which requires "empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price."[26]  Ms. Jones herself claims that "financial economists generally find the most important [Cammer] factor is the fifth factor, which tests the cause and effect relationship between the dissemination of new, relevant information and changes in the price of the security."[27]  As a financial economist, I agree with this statement.  Accordingly, my discussion of Ms. Jones' analysis of market efficiency focuses on the fifth Cammer factor, as it is the only direct test of market efficiency.

## VI.     Ms. Jones' analysis of the fifth Cammer factor fails to establish that UTi stock traded in an efficient market during the Putative Class Period

25.     Ms. Jones claims to test the fifth Cammer factor by comparing the fraction of days with statistically significant excess returns when news related to UTi was released against the fraction of days with statistically significant excess returns and no such news.  To identify "news days" and "no-news days," Ms. Jones conducts a public press search using the Bloomberg terminal and a search for analyst reports using Thomson Reuters.  She categorizes each day of the Putative Class Period as either a "news day" or a "no-news day" based on these searches.[28]  Ms. Jones then estimates an event study model with industry and market indices over a control period to calculate excess returns of UTi for each day of the Putative Class Period.[29]  She finds statistically significant excess returns on 11.1% of "news days" and 2.6% of "no-news days."[30]  She compares the

---

to Exhibit 6 of Ms. Jones' Declaration, for 17 out of 48 (or 35.4%) of the weeks during the Putative Class Period, the weekly turnover does not meet the 2% threshold to justify a "strong presumption" of market efficiency as set forth in Cammer.  Further, after replicating her suggested methodology in the JGBO Declaration and reducing UTi's trading volume by 50 percent, only 6 out of 48 (or 12.5%) of weeks have turnover above the 2% threshold.

[26] *Cammer v. Bloom*, 711 F. Supp. 1264, 1287 (D.N.J. 1989).
[27] Jones Declaration, ¶27.
[28] Jones Declaration, ¶¶65–69.
[29] Jones Declaration, ¶¶70–72.
[30] Jones Declaration, ¶75.

difference between 11.1% and 2.6% and concludes based on the comparison that UTi stock traded in an efficient market.[31]

26. Below I describe why Ms. Jones' test described above does not support her claim that "the price of UTi's common stock rapidly reflected new, relevant publicly available information concerning the Company" and why Ms. Jones' implementation of the test does not support her conclusion of market efficiency.[32]

### A. The "news days" vs. "no-news days" analysis employed by Ms. Jones cannot be used to affirmatively establish market efficiency

27. Without establishing that a stock reacts quickly to value-relevant news, one cannot determine whether a stock trades in an efficient market. If a stock reacts to value-relevant news during certain times but not during other times or if a stock reacts in a direction that is inconsistent with the informational content of the news, then market efficiency cannot be established. Below, I show that Ms. Jones' proposed approach fails to establish that UTi stock traded in an efficient market because it does not test whether UTi stock reacted quickly to value-relevant information. Furthermore, the test fails to show that UTi stock reacted to *all* value-relevant information and not just a subset of the information, and also fails to show that the stock reacted in a direction that is consistent with the content of the new information.

28. In her report, Ms. Jones claims that "a telling indication of market efficiency is whether the price of a security responds rapidly to new, relevant information."[33] Ms. Jones then goes on to provide examples of what constitutes relevant information: "[f]or common stocks, relevant information may include earnings announcements, changes in dividend policy, merger and acquisition related information, financing strategies, and other information impacting the equity value of the firm."[34] In deposition, she further clarified that to affect the stock price, the relevant information must diverge from the prevailing market expectations.[35] However, in contrast to these examples, when defining "news days," Ms. Jones does not restrict herself to the types of news that would contain

---

[31] Jones Declaration, ¶¶77–79.
[32] Jones Declaration, ¶9.
[33] Jones Declaration, ¶60.
[34] Jones Declaration, ¶60.
[35] Deposition of Cynthia L. Jones, CFA, dated January 31, 2018, ("Jones Deposition"), pp. 42:4–45:23.

"relevant information" to UTi's "equity value." Instead, Ms. Jones claims that "including all UTi news, exclusive of those articles that mentioned UTi's stock price alone, as archived by Bloomberg, and all analyst reports as archived by Thomas [sic] Reuters offers an objective, unbiased methodology for categorizing 'news' and 'no-news' days."[36] By claiming to include "*all* UTi news" instead of only "new, relevant information" in her analysis, Ms. Jones fails to test her own definition of market efficiency.[37]

29.     The problem with Ms. Jones' methodology of including "all UTi news" can be illustrated using the following example. Ms. Jones finds that UTi stock had a statistically significant excess return on April 25, 2013.[38] On that day, Exhibit 12 of Ms. Jones' report shows a single news item stating: "UTi opens state-of-the-art multi-client 3PL logistics center in Taiwan."[39] Ms. Jones does not make an *a priori* assessment regarding whether news about opening of logistics centers is generally value-relevant or whether the news regarding this particular center should be value-relevant. Instead, Ms. Jones assumes that, since there was news about the logistics center on April 25, 2013, and since there was a statistically significant excess return on that date, the stock must have moved due to the news regarding the logistics center. Thus, Ms. Jones concludes that the Taiwan facility opening is value-relevant to UTi's stock price based on observing a statistically significant excess return on the day of its announcement.

30.     In reality, it may be the case that the market does not consider announcements of new facilities to be value-relevant to UTi's stock price. In fact, there were four other days during the Putative Class Period on which news regarding facilities expansions were released and UTi's excess return was not statistically significant on any of these days.[40] If news about facility expansions is categorically not value-relevant to UTi, or if news about the Taiwan facility, in particular, was not value-relevant because it was consistent with market expectations, then observing a statistically significant stock price reaction on April 25, 2013 is *not* supportive of market efficiency. This highlights a general problem with Ms. Jones approach. Since Ms. Jones does not identify which news is likely to be value-relevant, she cannot differentiate between a stock reacting to value-relevant news,

---

[36] Jones Declaration, ¶68.
[37] Emphasis added.
[38] Jones Declaration, Exhibit 13.
[39] Jones Declaration, Exhibit 12.
[40] See Section VI.B.2 for examples of such articles.

which is supportive of market efficiency, and a stock reacting in the absence of value-relevant news, which is not supportive of market efficiency.

31.     The example above illustrates why an important step in testing informational efficiency is an *a priori* assessment of what information the market is likely to find new and value-relevant, which includes assessing the content of the information relative to prior expectations.  In deposition, Ms. Jones acknowledged that some news is not expected to move the stock price because it is consistent with prior expectations:  "[m]ore often than not, when information enters the market about a company, it is consistent with what the investment community expects, and therefore, it doesn't change the stock price."[41]  Accordingly, any test for "whether the price of a security responds rapidly to new, relevant information," as Ms. Jones claims to have performed, should identify information that is in fact new and value-relevant, and not consistent with prior expectations.[42]

32.     Despite articulating the conceptual importance of identifying new and value-relevant information when testing market efficiency, Ms. Jones makes no effort to identify such information in this matter.  This failure to identify new and value-relevant information contrasts with Ms. Jones' "news days" vs. "no-news days" analysis in a previous matter, where she attempted to identify categories of news that would potentially be value-relevant.[43]  In the *In re China Media Express* ("CCME") matter, Ms. Jones screened the universe of news, limiting her definition of "news days" to days when the news released was "potentially likely to have been viewed as material news at the time it was announced."[44]  She defined these "potentially [...] material news" announcements as including "disclosures made directly by CCME, such as earnings announcements and information related to the company's capital structure, as well as other Company-specific events including analyst commentary and changes in investment recommendations."[45]  By contrast, in this matter, she has not performed any analysis to identify such "potentially [...] material news."

---

[41] Jones Deposition, pp. 42:4–45:23.
[42] Jones Declaration, ¶60.
[43] As discussed above, to test whether potentially value-relevant news is expected to affect the stock returns, one must also compare the news against market expectations.
[44] CCME Declaration, ¶49.
[45] CCME Declaration, ¶49.  Ms. Jones contrasts "material" news with other news that, "in [her] opinion, was not 'economically relevant.'"  CCME Declaration, ¶50.

33.     Furthermore, Ms. Jones' proposed "news days" vs. "no-news days" analysis does not test whether market efficiency holds for the *entire* Putative Class Period.  For example, a stock could pass Ms. Jones' "news days" vs. "no-news days" test for market efficiency if it reacts to new value-relevant information on half of the days on which such information is released and fails to react during the other half.  This is because the test, as designed, shows only whether the price reacts more often on "news days" than on "no-news days."  Thus, at most, the test can show only that, *on average,* "news days" are relatively more likely to have statistically significant excess returns than "no-news days."

34.     Since the test can only assess whether "news days" are *relatively more likely* to have statistically significant excess returns than "no-news days," the test does not require the market to react to value-relevant news *on all days*.  If one takes Ms. Jones' definition of "news days" as given, her test can show, at most, that a statistically significant price reaction on 11.1% of "news days" is higher than on 2.6% of "no-news days."  The test cannot assess whether a statistically significant price reaction on 11.1% of "news days" and a lack of a statistically significant price reaction on the other 88.9% of "news days" is consistent with trading in an efficient market.  Ms. Jones acknowledged this point in deposition with the following statement:

> "there's a sample of days when news enters the market, there's a sample of days when there's no news.  And the methodology is to compare the likelihood of a statistically significant price change in the sample with news versus no news.  And you make that statistical comparison and you test the difference.  **So, in isolation, you wouldn't form a conclusion about a certain percentage of days being -- you know, resulting in a price change.**"[46]

Thus, Ms. Jones' test is not in line with her own proposed definition of market efficiency, which is that "the price of a security responds rapidly to new, relevant information," not that the price of a security responds *more often* to information than to a lack of information.[47]  Therefore, observing a higher fraction of statistically significant excess returns on "news days" than "no-news days" is not sufficient to establish market efficiency.

35.     Furthermore, if all news identified by Ms. Jones on "news days" is value-relevant, then observing a statistically significant price reaction on just 11.1% of "news days" contradicts the finding of market efficiency, regardless of whether the stock experiences

---

[46] Jones Deposition, p. 45:12–23.  Emphasis added.
[47] Jones Declaration, ¶60.

statistically significant returns more often on "news days" than on "no-news days."  As
discussed above, in an efficient market, prices should *always* react to new, value relevant
information.  Finding that the market fails to react to new, value-relevant information
88.9% of the time is inconsistent with market efficiency.  If, on the other hand, Ms.
Jones' definition of "news days" is not limited to new and value-relevant information,
then she is not testing her own definition of market efficiency, that "the price of a
security responds rapidly to new, relevant information."[48]

36.     Ms. Jones' "news days" vs. "no-news days" analysis also does not assess whether
a stock reacted in a direction consistent with what would be expected in an efficient
market.  For example, if UTi stock exhibited a statistically significant negative excess
return on a day when news was released that was value-relevant and positive compared to
prior expectations, Ms. Jones' analysis would consider the negative reaction as
supportive of market efficiency.  In deposition, Ms. Jones acknowledged that observing a
price reaction in a direction inconsistent with the "news" is puzzling:

> "So, hypothetically, there is some information that hits the market and,
> you know, three analysts say, oh, my gosh, this is terrible for the stock, we
> can't believe this, you know, negative news, came out of nowhere, we're
> shocked, and the price goes up by 20 percent, I would think that was
> odd."[49]

However, her test does not do anything to address her own hypothetical example above.
Because her "news days" vs. "no-news days" test fails to test the direction of stock price
movement against the direction of the news, Ms. Jones would find her example above as
evidence of market efficiency.  Therefore, it is not merely "odd," but a fundamental flaw
in her analysis to ignore the direction of the news and market reaction when assessing
market efficiency.

37.     Finally, Ms. Jones claims that the "news days" vs. "no-news days" analysis is "set
forth in a peer reviewed academic article" and cites to the Ferrillo, Dunbar and Tabak
(2004) article in St. John's Law Review.[50]  The St. John's Law Review article is not in a
peer reviewed finance journal and I am not familiar with any peer reviewed finance
articles that utilize the "news" vs. "no-news" methodology in assessing market
efficiency.  Furthermore, a 2010 online publication by one of the authors of the Ferrillo et
al. article, David Tabak, articulates the problems of the "news" vs. "no-news" ("FDT")

---

[48] Jones Declaration, ¶60.
[49] Jones Deposition, p. 52:4–13.
[50] Jones Declaration, ¶65.

test described above.  In particular, David Tabak notes that "there are several ways that versions of the FDT methodology may not be able to fully distinguish an efficient market from an inefficient one […] There are also conceptual questions relating to whether a market can exhibit some form of inefficiency but still pass the FDT test."[51]  The paper notes examples of such inefficiencies that would pass the "news" vs. "no-news" test.  In particular, the paper provides an example of the market reacting to some news and not others and still passing the "news" vs. "no-news" test:

> "[…] what if only some news items are incorporated into the price of a security? […] For example, suppose that on non-news days a stock moves by 2% in absolute value and on news days it moves by 8%.  If the stock fails to respond to half of the news, we would observe average movements of 2% in absolute value in the non-news sample and of 5% in the news sample (the 5% being the average of the half of the news days when the stock moves by 8% because it responds to news and the half of the news days when it moves by the 2% typical of the movement on a non-news day).  The price movements in the two samples look different.  This does show that the stock sometimes does respond to news, but not that there was a 'reliable relationship between changes in [the company's] stock price and news events.'  Consequently, we cannot be sure that the market would incorporate any misrepresentation, meaning that investors should not rely on market prices."[52]

### B.    Ms. Jones' implementation of the "news days" vs. "no-news days" analysis contains errors and inconsistencies that invalidate the results

38.    Setting aside the conceptual problems with Ms. Jones' "news days" vs. "no-news days" test, her implementation of the test does not come close to meeting the standards for publication in a peer reviewed finance journal.  An important part of any academic article in a peer reviewed journal is its replicability.  In other words, a third party should be able to reproduce the results of an analysis by reviewing the methodology put forward by the author.  Otherwise, the study is susceptible to manipulation in favor of proving the desired outcome.  The analysis put forward by Ms. Jones does not meet these criteria.  As described below, Ms. Jones' test is not reproducible using her description of her own

---

[51] Tabak, D., "Use and Misuse of Event Studies to Examine Market Efficiency, *Nera Economic Consulting*, April 30, 2010, Retrieved from http://www.nera.com/content/dam/nera/publications/archive2/PUB_Use_Misuse_of_Event_Studies_0410_final.pdf, ("Tabak (2010)"), p. 7.
[52] Tabak (2010), pp. 7–8.

methodology, inconsistent with her application of the same test in prior matters, and implemented with errors.

### 1. Ms. Jones' methodology for classification of "news days" is subjective and inconsistent with her description

39.     Ms. Jones claims to have classified all days in the Putative Class Period as either "news days" or "no-news days" based on two sources, a public press search using Bloomberg and an analyst report search using Thomson Reuters.  Setting aside the conceptual problems of her test as described above, Ms. Jones' identification of "news days" is subjective and not in line with her stated methodology.  Since her test hinges on classifying each day of the Putative Class Period as either a "news day" or a "no-news day," incorrect classification renders the results of Ms. Jones' test inaccurate and any conclusions drawn from the test unreliable.

40.     In her report, Ms. Jones claims that she has included as news "all analyst reports as archived by Thomas [sic] Reuters."[53]  However, comparing the list of analyst reports in Exhibits 8 of her report to the event chronology in Exhibit 12 of her report shows that Ms. Jones fails to include some of the analyst reports listed in Exhibit 8 as news in her event chronology.  In particular, Ms. Jones fails to categorize as "news days" 13 days that include analyst reports that she identifies in her Exhibit 8 (see Exhibit 1 for a list of these analyst reports).[54]  In her report, Ms. Jones fails to include any reasons for not considering as news certain analyst reports that she cited in Exhibit 8.  In fact, excluding analyst reports contradicts her stated methodology of including "all analyst reports."[55]  In deposition, Ms. Jones acknowledged that "[n]ot each of these reports [listed in Exhibit 8] appears in the event chronology [Exhibit 12]."  Her reason for excluding some of the analyst reports from the event chronology is that she labeled them as "more of an informational report rather than an analyst report."[56]

41.     Moreover, when questioned about her methodology for classifying reports as "informational," Ms. Jones acknowledged that she used her own judgement.  She

---

[53] Jones Declaration, ¶68.
[54] See Exhibit 1 for a list of analyst reports identified in the Jones' Declaration Exhibit 8 that fall on "no-news" days.
[55] Jones Declaration, ¶68.
[56] Jones Deposition, p. 61:3–22.

explained her methodology for excluding some reports while including other as follows: "as a normal part of what I do, I review analyst reports all the time […] So, based on my experience and my review of millions of analyst reports, I have […] selected the analyst reports […] that were following the company actively […] and making investment recommendations."[57]  Because Ms. Jones claims to use her judgement in selecting which analyst reports to include as news in her analysis, her criteria for excluding some reports while including others is not objective or replicable by a third party.  In fact, some of the analyst reports she chose to exclude appear to contradict her stated justification for excluding analyst reports.[58]  For instance, CFRA Research, one of the firms Ms. Jones has excluded, has published reports more frequently during the Putative Class Period than analysts such as Jeffries and J.P. Morgan, which she included, and has offered investment recommendations.  Excluding CFRA reports from the event chronology further underscores the subjectivity in Ms. Jones' methodology in classifying analyst reports as news.

42.     In addition to arbitrarily classifying some reports as "informational,"[59] Ms. Jones has also failed to capture all of the analyst reports archived by Thomson Reuters.  Performing the search on Thomson Reuters that Ms. Jones describes in her report yields additional analyst reports that are not included anywhere in her results.  12 of these analyst reports fall on days she considers "no-news days."  Exhibit 1 lists these analyst reports.  In her report, Ms. Jones does not mention these 12 analyst reports or provide any reason why they were excluded.  A third party attempting to replicate Ms. Jones' analysis would be unable to understand, based on her stated methodology, why these analyst reports archived by Thomson Reuters were absent from Ms. Jones' analysis.

43.     Moreover, the analyst reports listed in Thomson Reuters do not provide a comprehensive list of all UTi analyst reports published during the Putative Class Period.  For example, in her event chronology, Ms. Jones identifies a public press article published during the Putative Class Period mentioning ratings changes by Avondale Partners.[60]  This report does not appear in Thomson Reuters.[61]  Despite noting this report

---

[57] Jones Deposition, p. 62:3–19.
[58] "[M]y criteria here was to focus on the analyst reports that were published by companies actively following the company during this time period and publishing reports including earnings estimates and investment recommendations." Jones Deposition, p. 63:11–16.
[59] Jones Deposition, p. 61:3–22.
[60] Jones Declaration, Exhibit 12.  See press article on 8/26/13.
[61] Jones Declaration, Exhibits 8, 12.

by Avondale Partners in her event chronology, Ms. Jones makes no effort to investigate
whether there were any other analyst reports by Avondale Partners released during the
Putative Class Period.  Nor does she inquire more broadly regarding whether there were
additional analyst reports released during the Putative Class Period but not covered by
Thomson Reuters.  To illustrate this shortcoming, I searched for all analyst reports issued
by Avondale Partners covering UTi using the Capital IQ database.  My search yielded
five analyst reports during the Putative Class Period, including the one that Ms. Jones
identifies in her event chronology.  Of these five reports, two fall on days classified by
Ms. Jones as "no-news" days.[62]

44.     Finally, Ms. Jones is inconsistent in her categorization of "news days" and "no-
news days" based on her treatment of analyst reports from Thomson Reuters and press
articles from Bloomberg.  When selecting which analyst reports to include in her
analysis, Ms. Jones claimed in deposition to use her judgement to exclude certain analyst
reports from her definition of "news days," as discussed above.  However, she claims that
she does not make any such judgement calls regarding inclusion of press articles from
Bloomberg and that selecting press articles based on content constitutes "cherry picking."
Specifically, when asked about her methodology for including public press articles from
Bloomberg as news in her analysis she responded: "I did not cherry-pick or select out
news that I thought was of the type that would necessarily change the price. […] Had I
selected news that I thought was of enough import that it would have moved to the price,
I would bias my sample."[63]  Thus, by making choices about whether an analyst report is
news but not about whether a press article is news, Ms. Jones is applying an inconsistent
methodology that is subject to bias.

## 2.     Ms. Jones' methodology for classification of "news days" is inconsistent with her past testimony

45.     Ms. Jones claims that "including all UTi news, exclusive of those articles that
mentioned UTi's stock price alone, as archived by Bloomberg, and all analyst reports as
archived by Thomas [sic] Reuters offers an objective, unbiased methodology for
categorizing 'news' and 'no-news' days."[64]  However, Ms. Jones' selection of news

---

[62] The two reports were published on 4/17/13 (during market hours per Capital IQ) and 6/13/13 (after
market close per Capital IQ).  Ms. Jones classifies both 4/17/13 and 6/14/13 as "no-news" days.
[63] Jones Deposition, p. 58:11–19.
[64] Jones Declaration, ¶68.

sources is very different in this matter compared to her prior report in the CCME matter, where she also analyzed market efficiency of a NASDAQ traded stock.  In the CCME matter, Ms. Jones used Dow Jones Factiva ("Factiva") in conjunction with Bloomberg to search for public press articles when determining which days are "news days."  She also did not include analyst reports as potential news sources in the CCME matter.  She described the sources she used for classifying news in the CCME matter is as follows:

> "I first conducted a search of the news archives for CCME, by ticker, on the Bloomberg L.P. terminal during the period October 1, 2009 through May 31, 2011.  **I also conducted a search of Dow Jones Factiva for articles where CCME, either by name or ticker, appeared in the headline, the article, or both**.  These searches produced more than 2000 pages of articles during the Class Period where CCME was the subject of the article or mentioned in the article.  I entered the articles chronologically in a spreadsheet next to the stock price, noting the time of the release if provided, and I also entered the dates upon which CCME made filings with the SEC."[65]

46.     In contrast to the CCME matter, here, Ms. Jones relies on Bloomberg as her only source for public press articles.  She does not claim that Bloomberg captures UTi related news comprehensively, nor does she provide any justification for the inconsistency introduced by not using Factiva in conjunction with Bloomberg, as she has done in the CCME matter.  In deposition, the justification that Ms. Jones provided for using Bloomberg was "[b]ecause I have access to it on my desktop" and that she could not use other sources "without paying a fee."[66]  She also asserted, without any evidence, that her method comprised an "objective way to identify news days" that produced a "robust sample" of news.[67]  In fact, her rationale is not robust and indicates she has either not tested the completeness of using Bloomberg as a source or chosen to exclude other sources without providing adequate justification.  She even stated in deposition that it "would not surprise [her] if at this point in time there may have been news items that were not archived by Bloomberg."[68]  The unexplained inconsistency in news sources between the report in this matter and the CCME matter is subject to potential bias if certain public press articles are excluded by not using Factiva.

---

[65] CCME Declaration, ¶48.  Emphasis added.
[66] Jones Deposition, p. 59:1–5.
[67] Jones Deposition, p. 68:3, 16–17.
[68] Jones Deposition, pp. 67:24–68:1.

47.     To illustrate this potential for bias, I conducted a public press search for UTi on Factiva.[69]  My search yielded 1,313 headlines, and only a portion of these headlines overlap with the news Ms. Jones identifies using Bloomberg.  Moreover, some of the additional public press articles identified using Factiva appear to correspond to the types of news identified by Ms. Jones on "news days" by using Bloomberg.

48.     For instance, as discussed above, the only piece of news Ms. Jones identifies on April 25, 2013 is that "UTi opens state-of-the-art multi-client 3PL logistics center in Taiwan."[70]  Using Factiva, I identified four additional examples of days labeled by Ms. Jones as "no-news days," which contain news of opening or expanding UTi facilities. These examples include the following:

- On August 8, 2013, Reno Gazette reported the following headline: "UTi/Starbucks triples distribution facility in Sparks"[71];

- On August 14, 2013, Journal of Commerce reported the following headline: "UTi Worldwide Opens Expanded London Air Cargo Hub"[72];

- On September 30, 2013, Journal of Commerce reported the following headline "UTi Worldwide Enhances Warehousing Services in Chicago Area"[73]; and

- On February 11, 2014 American Shipper reported that "UTi Worldwide consolidates in new facility."[74]

49.     Similarly, Ms. Jones identifies two instances of announcements of appointments of company officials as the only news on two separate "news days":  on April 18, 2013 her Exhibit 12 cites that "Pat Cooney joins UTi as new regional vice president for sales

---

[69] The Factiva search was conducted across all available publications from 3/28/13 to 2/25/14, searching for the following terms in headlines: "UTi" or "UTIW" or "UTi Worldwide."  The search excluded republished news, recurring pricing and market data, obituaries, sports, and calendars.
[70] Jones Declaration, Exhibit 12.
[71] An earlier mention of this public press article was made on 7/15/13.  See Miller, T., "UTi/Starbucks Leases Major Distribution Facility in Sparks, Nevada," *Miller Industrial Properties,* July 15, 2013, http://www.millerindustrialblog.com/utistarbucks-leases-major-distribution-facility-in-sparks-nevada/. Both mentions of this news (in the Reno Gazette and Miller Industrial Properties) are not included in Ms. Jones' event chronology in Exhibit 12.
[72] An earlier mention of this public press article was made on 8/12/13.  See "UTi Worldwide Opens New Expanded London Facility," *PRWeb*, August 12, 2013, http://www.prweb.com/releases/2013/8/prweb11018804.htm.  Both mentions of this news (in the Journal of Commerce and in PRWeb) are not included in Ms. Jones' event chronology in Exhibit 12.
[73] An earlier mention of this public press article was made on 9/26/13.  See "UTi Worldwide Expands Multi-Client Warehousing in Chicago Area," *PRWeb*, September 26, 2013, http://www.prweb.com/releases/2013/9/prweb11164172.htm.  Both mentions of this news (in the Journal of Commerce and in PRWeb) are not included in Ms. Jones' event chronology in Exhibit 12.
[74] The article in the American Shipper was not included in Ms. Jones' event chronology in Exhibit 12.

and marketing Asia-Pacific" and on July 2, 2013 that "UTi Worldwide Names Ditlev Blicher APAC President." Using Factiva, I identified two additional examples of days labeled by Ms. Jones as "no-news days," which contain news about the announcement of new company officials. These examples include the following:

- On July 26, 2013, Journal of Commerce reported the following headline: "UTi Worldwide Names Bruce Hulings New Global Lead for Projects, Mining and Energy"[75];

- On July 30, 2013, Journal of Commerce reported the following headline: "UTi Worldwide Announces Mike Valentine New Americas Region Sales Vice President."[76]

50.     Similarly, Ms. Jones identifies the following as the only news on August 21, 2013: "UTi Worldwide to host Fiscal 2014 Second Quarter Conference Call on Friday September 6."[77] Using Factiva, I identified an additional example of a day labeled by Ms. Jones as "no-news day," which announces an upcoming earnings conference call:

- On May 23, 2013, Globe Newswire reported the following headline: "UTi Worldwide to Host Fiscal 2014 First Quarter Conference Call on Thursday, June 6, 2013"[78]

51.     Finally, Ms. Jones reports on February 14, 2014 that "Tiger Global Management exited UTIW stake in Q4; sold 2,205,000."[79] However, she does not include in her analysis announcements of Tiger Global Management entering the position. These were disclosed in institutional holdings and reported on August 23, 2013 and November 23, 2013 by Dow Jones Institutional News, when Tiger Global Management acquired 1,530,000 and 675,000 shares, respectively. Ms. Jones has not explained why Tiger exiting a position should be considered news, while the same firm entering into this position should not be considered as news.

---

[75] An earlier mention of this public press article was made on 7/24/13. See "UTi Worldwide Names Bruce Hulings New Global Lead for Projects, Mining and Energy," *PRWeb*, July 24, 2013, http://www.prweb.com/releases/2013/7/prweb10961973.htm. Both mentions of this news (in the Journal of Commerce and in PRWeb) are not included in Ms. Jones' event chronology in Exhibit 12.
[76] An earlier mention of this public press article was made on 7/29/13. See "UTi Worldwide Announces Mike Valentine New Americas Region Sales Vice President," *PRWeb*, July 29, 2013, http://www.prweb.com/releases/2013/7/prweb10972329.htm. Both mentions of this news (in the Journal of Commerce and in PRWeb) are not included in Ms. Jones' event chronology in Exhibit 12.
[77] Jones Declaration, Exhibit 12.
[78] The article in the Globe Newswire was not included in Ms. Jones' event chronology in Exhibit 12.
[79] Jones Declaration, Exhibit 12.

52.     The examples above show days labeled as "no-news days" by Ms. Jones, which
appear to contain similar types of information as "news days" identified by Ms. Jones.
Ms. Jones has not explained why searching for news using Bloomberg[80] is appropriate in
this matter while searching for news using Bloomberg *and* Factiva was appropriate in the
CCME matter.  The lack of consistent methodology for identification of news introduces
the potential for bias in Ms. Jones' methodology.

53.     Another key difference in Ms. Jones' methodology in the CCME matter and here
is Ms. Jones' definition of what constitutes a "news day."  As explained in the previous
section, in contrast to this matter where Ms. Jones makes no attempt to identify news
important to investors because she thought it "would bias [her] sample,"[81] in the CCME
matter Ms. Jones stated that she used her judgement to classify information that was
"potentially likely to have been viewed as material news at the time it was announced."[82]
In addition to examining days with information "potentially likely to have been viewed as
material," Ms. Jones also examines days with misrepresentations and curative disclosures
in the CCME matter.  When questioned about the differences in her examination of
"news days" between the two reports,  Ms. Jones provided the following response:

> "event studies are not one size fits all.  And you've got to adopt your
> application criteria to, you know, a certain time period that you are
> constrained by, and the facts and circumstances, the available data.  There
> are a number of factors that you would look at in developing a model that
> assists you in answering the questions that you're seeking answers for."[83]

54.     Ms. Jones' response underscores the subjectivity of her methodology.  It is
unclear why Ms. Jones chooses to classify "news days" based on "potentially […]
material news" in her previous report, while claiming to have categorized "news days"
based on "*all* UTi news, exclusive of those articles that mentioned UTi's stock price
alone, as archived by Bloomberg […]" in this matter. [84]  It is further unclear why she
chose to examine misrepresentation and disclosure days in the CCME matter, while she
has not conducted the same analysis in this matter.  Without a clear explanation of why
different definitions are used in the two reports and which definition is appropriate in this
matter, Ms. Jones' methodology is not replicable and subject to bias.

---

[80] I discuss Ms. Jones' stated reasons for using Bloomberg in this matter in ¶46 above.
[81] Jones Deposition, p. 58:18–19.
[82] CCME Declaration, ¶49.
[83] Jones Deposition, p. 74:3–11.
[84] CCME Declaration, ¶49; Jones Declaration, ¶68.

### 3.      Ms. Jones measures excess returns incorrectly in her event study model

55.      In addition to the methodological weaknesses identified above, Ms. Jones also makes an error in her calculation of excess returns.  To measure excess returns for each day of the Putative Class Period, Ms. Jones estimates a market model over a one year control period prior to the Putative Class Period.  The market model measures the typical relationship between UTi's stock returns and the returns of the NASDAQ Composite and the NASDAQ Transportation indices ("market and industry indices").[85]

56.      In conducting this calculation, Ms. Jones has made an error by failing to account for dividends as a part of the returns of UTi and constituent stocks of the NASDAQ Composite and the NASDAQ Transportation indices.[86]  In deposition, Ms. Jones stated that she defined daily returns as "the percentage change in the price from close to close," which would exclude dividend payments from the calculation.[87]  When asked whether dividend adjusted returns are needed in event study analyses, Ms. Jones incorrectly replied: "Not if you are trying to ascertain the change in the price of the stock."[88]  This statement is not accurate and contradicts event study tests of market efficiency that Ms. Jones cites in her report.

57.      By excluding dividends in her return series for UTi stock[89] and market and industry indices, Ms. Jones' analysis will have days with stock price drops due to dividend payouts and not due to any new value-relevant information released in the market.  Investors know in advance the date dividends will be paid.  Any stock purchased before a certain date, called the *ex-dividend* date, will receive a dividend payment while a stock purchased on or after the *ex-dividend* date will not.  If the market takes into account the difference in cash flows from buying before and after the *ex-dividend* date, all else equal, there will be a stock price drop, or a negative return, on the *ex-dividend* date.  However, the drop does not reflect an informational event because the dividend was announced earlier.  The drop reflects the fact that a buyer on or after the *ex-dividend* date will not be getting the dividend.  Thus, failing to add back the dividend amount to the

---

[85] Jones Declaration, ¶¶70–72.
[86] For a description of her event study model, see Jones Declaration, ¶¶70–74.
[87] Jones Deposition, p. 77:22–23.
[88] Jones Deposition, p. 78:2–3.
[89] The *ex-dividend* date for UTi during the Putative Class Period was 6/26/13.

stock price on the *ex-dividend* date, as Ms. Jones has done, results in stock price declines
on the *ex-dividend* dates that are due to mechanics of dividend payment and not due to
informational events.

58.     Calculating returns without accounting for dividends is inconsistent with the
academic literature on event study analysis that Ms. Jones herself cites.[90]  For example,
Fama, Fisher, Jensen and Roll (1969), which Ms. Jones cites in her report, includes
dividends in the definition of returns: "In answer to the first question we shall show that
stock splits are usually preceded by a period during which **the rates of return (including
dividends and capital appreciation)** on the securities to be split are unusually high."[91]
Ms. Jones does not provide any explanation for why she deviates from the accepted
methodology in calculating stock and index returns in her event study model.

59.     A comparison of Ms. Jones' excess returns and statistically significant days with
the corrected excess returns and statistically significant days can be found in Exhibit 2.
All results discussed in this report use the corrected, dividend-adjusted return series.[92]

## VII.   Ms. Jones' autocorrelation test fails when applied to excess returns

60.     Ms. Jones claims to test weak form market efficiency by showing that UTi's stock
returns are not autocorrelated.  According to Ms. Jones, "[i]f a security is weak-form
efficient, there should be no statistically significant relationship between today's price
change and yesterday's.  If a statistically significant relationship does exist, it's a
condition known as 'autocorrelation,' and may be a sign of inefficiency."[93]  Ms. Jones
tests the presence of autocorrelation in raw returns of UTi stock but does not test whether
there is autocorrelation in returns once industry and market factors are taken into account.

61.     Performing Ms. Jones' test with UTi's excess returns in place of raw stock returns
yields a statistically significant autocorrelation coefficient, meaning that excess returns of
UTi are autocorrelated.  In other words, an investor would be able to predict future excess

---

[90] For a definition of dividend-adjusted returns see, Campbell, J., A. Lo, A. MacKinlay, *The Econometrics
of Financial Markets*, Princeton University Press, p. 12.
[91] Fama, E., L. Fisher, M. Jensen, and R. Roll (1969), "The Adjustment of Stock Prices to New
Information," *International Economic Review*, 10(1), pp. 1–21, at pp. 2–3.  Emphasis added.
[92] Ms. Jones has also made a number of errors by misclassifying news days based on information released
after market close.  She has submitted a revised Exhibit 13 on January 30, 2018 correcting these errors.
[93] Jones Declaration, ¶14.

returns of UTi, in statistical terms, simply by analyzing past returns of UTi, the industry index, and the market index.  This evidence does not corroborate Ms. Jones' opinion that the market for UTi stock is efficient.  This result holds regardless of whether it is applied using the incorrect excess return series in Ms. Jones' report or correcting for dividends, per my discussion in the previous section.[94]  Ms. Jones fails to take this result into account in her discussion of market efficiency.

## VIII.   Ms. Jones fails to provide any evidence that damages specific to Plaintiff's allegations can be calculated on a class-wide basis

62.      It is my understanding that at Class Certification, in addition to showing that the securities at issue traded in an efficient market, Plaintiff must also demonstrate that they can provide a methodology for calculating damages on a class-wide basis that is consistent with their theory of liability.  In other words, Plaintiff must show that they can provide a methodology that will calculate the harm due to the alleged fraud for all investors that are members of the putative class.  Ms. Jones has not demonstrated that such a methodology can be provided beyond asserting that an event study methodology can be used.  As discussed below, in the case of UTi and the alleged corrective disclosure on February 26, 2014,[95] an event study alone is not enough to measure inflation on a class-wide basis in a manner consistent with the Plaintiff's theory of liability.

### A.      Ms. Jones' discussion of a damages methodology

63.      In her report, Ms. Jones does not provide any evidence that damages can be calculated on a class-wide basis in this matter.  Instead, Ms. Jones puts forward a generic discussion about inflation without taking into account the specific allegations in this matter and their implications for a damages methodology.

64.      Ms. Jones assumes that the amount of inflation can be calculated "using the results of an Event Study, along with company-specific information that is relevant to the

---

[94] The autocorrelation coefficient has a t-statistic of 2.71 without correcting for dividends and 2.73 when correcting for dividends, both of which are statistically significant at the 5% level.

[95] I understand the Form 8-K alleged to contain the corrective disclosure was filed before market open on February 26, 2014 (Complaint, ¶220).  The Date of Report (date of earliest event reported) on the Form 8-K is February 25, 2014.

allegations."[96]  This overly general statement does not explain which information Ms. Jones views to be allegation specific or how she intends to use "company-specific information that is relevant to the allegations" to calculate inflation.  When discussing her damages approach in deposition, Ms. Jones repeatedly referred to this sentence in her report without providing any clarification on how she could use company-specific information to calculate inflation.[97]  As discussed in section VIII.B below, specific challenges to parsing allegation-related information need to be addressed in the case of UTi.

65.     In her report, when discussing the calculation of the artificial inflation throughout the Putative Class Period, Ms. Jones provides a Crew et al. (2012) quote that describes what appears to be a constant dollar or constant percentage inflation approach:

> "The share price declines on these curative disclosure dates serve as a basis for measuring the inflation earlier in the class period. The logic of the argument is that when the company disclosed the corrective information on the curative disclosure dates, the share price declined by an amount of X dollars or Y percent, which indicates the decline that would have occurred had the market known the information earlier in the class period."[98]

66.     Constant dollar inflation takes the amount of the share price decline on the disclosure date, denoted by X dollars ($X) in the quote above, and assumes that the same decline would have occurred in the market had the same disclosure been made at any time earlier in the class period.  In other words, the misrepresentations inflated the stock price by a constant amount of $X throughout the entire class period.  In order to make this assumption, one would need to show that the same information could have been disclosed earlier in the class period and also, had the information been disclosed earlier, it would have had the same $X impact on the stock price.  Ms. Jones has not made any attempt to show that the same information could have been disclosed earlier or that it would have had the same impact on the stock price.  As I discuss below, the specific facts of this matter do not support the assumptions required for constant dollar inflation.

---

[96] Jones Declaration, ¶84.
[97] Jones Deposition, pp. 89:14–25, 100:6–101:1.
[98] Jones Declaration, ¶83 citing "Federal Securities Acts and Areas of Expert Analysis," by Nicholas I. Crew, et al., in Chapter 24 of the *Litigation Services Handbook*; *The Role of the Financial Expert*, 5th ed., edited by Roman L. Weil, Daniel G. Lentz, and David P. Hoffman, John Wiley & Sons, Inc., 2012, p. 24.11.

67.     Constant percentage inflation takes the percent share price decline on the disclosure date, denoted by Y percent (Y%) in the quote above, and assumes that the same percentage decline would have occurred in the market had the same disclosure been made at any time earlier in the class period.  This assumption means that the alleged misrepresentations inflated the stock price by a constant Y%.  Again, Ms. Jones does not provide any evidence to show why constant percentage inflation could be appropriate in this matter.  As I discuss below, the specific facts in this matter are inconsistent with constant percentage inflation during the Putative Class Period.

68.     In deposition, Ms. Jones indicated that she has not yet decided whether the inflation is constant and that it will depend on the theory of liability:

> "Q. Does the methodology you describe in your opinion explain how you could calculate artificial inflation that changed over the course of the class period?
> A. Not specifically.  However, it does say along with company-specific information that is relevant to the allegations in the instance case.  It does not elaborate and say this potentially includes, you know, changing inflation throughout the class period depending upon, you know, what the trier of fact finds as the liability.
> Q. Does your opinion explain methodologies that might be used to determine artificial inflation that changes throughout the class period?
> A. It explains the standard methodology.  It doesn't detail the application of that methodology to a number of different potential scenarios on liability."[99]

69.     Beyond indicating that inflation could potentially be constant dollar or constant percentage throughout the Putative Class Period, Ms. Jones has not shown any evidence that a common damages methodology that is consistent with the Plaintiff's theory of liability could be applied to shareholders transacting in the stock of UTi during the Putative Class Period.

**B.      Ms. Jones does not propose a methodology to isolate the stock price decline, if any, due to the corrective disclosure from other contemporaneous announcements**

70.     As discussed in Section V.B above, an event study can isolate the stock price impact of all company-specific information from broader market factors, such as factors that impact the economy or the industry.  However, an event study alone cannot disentangle the impact on the stock price of multiple pieces of company-specific information released on a given day.  This limitation is particularly important on the

---

[99] Jones Deposition, pp. 100:6–101:1.

alleged corrective disclosure date of February 26, 2014 because the disclosure was accompanied by other confounding news.  Ms. Jones' discussion of a damages methodology does not mention any confounding news nor does she propose a methodology to parse out the impact of the confounding news on the stock price of UTi. In fact, Ms. Jones stated in deposition that she did not consider UTi's Form 8-K dated February 25, 2014 in determining whether class-wide damages are subject to a common methodology in this matter.[100]

71.     In deposition, although Ms. Jones conceded that company-specific information may have to be used to isolate the impact of the allegation-related disclosure, she did not discuss how she could parse out the confounding news in this matter.  In deposition she stated that "[t]he event study is not the penultimate methodology for coming up with the per share damages" and that "there are ways to isolate the portion [of per share damage] that's related to the allegations."[101]  When questioned about whether she described any such methodology, her response provides nothing specific to the facts of this matter:

> "So I believe the sentence is the level of inflation in the price of UTi common stock can be calculated using the results of an event study along with company-specific information that is relevant to the allegations in the instant case.  So it's not just the event study, but there would be an additional part of the analysis that would look at company-specific information that's relevant to the allegation."[102]

72.     Before market open on February 26, 2014, UTi Worldwide announced it expected 4Q 2014 results that were below consensus estimates.[103]  The announcement included a number of items unrelated to the allegations.  For example, UTi linked its performance to difficulties in the macroeconomic environment and pricing pressures:

> "Revenues and net revenues for the fourth quarter and fiscal year 2014 reflect a lackluster global economy and difficult operating conditions […]. In addition, pricing remains under pressure, and we expect this to be the case for the foreseeable future. We believe the macroeconomic and freight environments will continue to be challenging […]"[104]

---

[100] Jones Deposition, p. 91:5–19.
[101] Jones Deposition, p. 90:1–6.
[102] Jones Deposition, p. 89:14–25.
[103] Complaint, ¶220.
[104] UTi Worldwide, Inc. Form 8-K filed February 25, 2014, p. 5.

73.     These conclusions were shared by analysts.  For example, a BB&T Capital Markets report published February 26, 2014 that Ms. Jones includes in her event chronology in her Exhibit 12 stated that "[s]everal factors [are] impacting results. 1) An airfreight market that remains soft, impacting the company's bottom line as this is a higher margin business.  Management noted increased volumes in air and ocean freight, but net revenue/unit continues to decline on pricing pressure."[105]  Similarly, a Baird Equity Research report on February 27, 2014 stated that "UTIW's liquidity position deteriorated during F2H14 given […] continued challenges to forwarding industry yield environment."[106]

74.     Analyst reports that Ms. Jones includes in her event chronology also identified unfavorable changes in foreign exchange rates as a contributing factor to UTi's liquidity problems.  In particular, on February 26, 2014, BB&T Capital Markets included the decline of South African rand vs. the U.S. dollar as one of the factors that impacted UTi's results.[107]  Similarly, RBC Capital Markets commented on February 27, 2014, that "[w]e get the sense that overall volume levels were inline with our expectations, but that weaker yields and foreign exchange headwinds drove the shortfall [in earnings]."[108]

75.     Ms. Jones stated in her deposition that the alleged corrective disclosure contains relevant information that may be unrelated to Plaintiff's allegations.  In particular, she agreed that information regarding UTi's low revenues due to the macroeconomic environment and difficult operating conditions would be relevant to investors and that such information could potentially be confounding, depending on whether "analysts would have taken those conditions into account in forming their earnings estimates."[109]  However she has not articulated a method to analyze whether this information is confounding or how to exclude the effect of this potentially confounding information in a class-wide damages model:

---

[105] BB&T Capital Markets, "UTIW: Q4'14 Impacted by Higher Costs and Margin Pressure; Breaches Covenants."  February 26, 2014, p. 1.
[106] Baird Equity Research, "UTI Worldwide Inc. (UTIW) Recap a Seemingly Expensive Solution to a Short-Term Liquidity Need." February 27, 2014, p. 1.
[107] BB&T Capital Markets, "UTIW: Q4'14 Impacted by Higher Costs and Margin Pressure; Breaches Covenants."  February 26, 2014, p. 1.
[108] RBC Capital Markets, "UTi Worldwide, Inc. A wild day, we view risk/reward as favorable." February 27, 2014, p. 3.
[109] Jones Deposition, pp. 92:7–94:11.

"Q. Have you determined that analysts did take those conditions into
account in forming their earnings estimates for UTi in the fourth quarter of
fiscal year 2014?
A.  I have not yet done any such damages analysis."[110]

76.     UTi's financial statements and related market commentary cited by Ms. Jones in

her event chronology point to problems in UTi's financial condition separate from the

allegations related to the implementation of the new financial and invoicing systems.  Ms.

Jones has provided no guidance on how she would be able to disentangle the effect of the

confounding information from the price drop caused by the alleged corrective disclosure.

Her generic statement that she would use "the results of an Event Study, along with

company-specific information that is relevant to the allegations" does not explain how

she would measure the inflation in the presence of the confounding information specific

to this matter.[111]

### C.     Ms. Jones fails to propose a methodology for calculating inflation consistent with the timing of the rollout of UTi's systems as described in the Complaint

77.     As discussed above, Ms. Jones proposes a generic methodology for applying

inflation on the disclosure day to the rest of the Putative Class Period.  In deposition, Ms.

Jones indicated that she "ha[s] no idea" whether the information that that was conveyed

on the alleged corrective disclosure date could have been conveyed on the first day of the

Putative Class Period.[112]  As I discuss below, consistent with the Plaintiff's Complaint,

the same information that was announced on the alleged corrective disclosure date could

not have been disclosed on the first date of the Putative Class Period.  Ms. Jones' generic

discussion of inflation ignores the timeline of the implementation of the systems as

discussed in the Complaint and she does not show that a class-wide damages

methodology could be provided that would be consistent with the Plaintiff's theory of

liability.

78.     It is my understanding that the Plaintiff's theory of liability is based on UTi

management's alleged failure to adequately disclose implementation problems of the

invoicing and financial systems as the systems were being rolled out worldwide.  As

described in the Complaint, UTi's rollout of the 1View and Oracle systems expanded

---

[110] Jones Deposition, p. 94:6–11.
[111] Jones Declaration, ¶84.
[112] Jones Deposition, p. 102:7–14.

during the Putative Class Period.  By March 2013, according to the Plaintiff's pleadings, the Oracle system was live in 15 countries and the 1View system was live in five of the countries where UTi conducted business.  By September 2013, UTi implemented the Oracle and 1View systems in 14 and 17 additional countries, respectively.  By October 1, 2013, five additional countries had launched the 1View system and an additional country transitioned to the Oracle system.[113]  According to the Complaint, over the Putative Class Period, the number of countries where the freight forwarding system was implemented more than quadrupled and the number of countries where the new financial system was implemented doubled.

79.    Given that the systems were being rolled out during the Putative Class Period, UTi management could not have disclosed difficulties in the implementation of these systems prior to the implementation occurring.  Furthermore, UTi's understanding of the possible execution issues related to the transformation of the invoicing and financial systems likely evolved over the Putative Class Period because the systems were deployed in multiple countries over the course of that period.

80.    Ms. Jones ignores the fact that some of the information that was disclosed on February 26, 2014 could only have been disclosed later in the Putative Class Period, after the two systems had been implemented in additional countries.  Even though Ms. Jones stated in deposition that "the damage[s] model would have to be structured in lockstep with liability," she does not provide any evidence that a class-wide damages model could be put forward that would be able to account for factors related to the staged rollout of the new systems worldwide, as described in the Complaint.[114]

81.    Not only did the number of countries where the systems were launched increase over the Putative Class Period, but the rollouts were not uniform in complexity.  As highlighted in the Complaint, when UTi rolled out the systems in the U.S. at the beginning of September 2013, UTi noted that the U.S. was their "largest market by shipment"[115] and that it was "more complex than the countries" where these systems had been implemented before due to "the interaction with ancillary systems [such as] customs

---

[113] Complaint, ¶29.
[114] Jones Deposition, p. 100:4–5.
[115] UTi Worldwide, Inc. Conference Call on September 6, 2013; see Complaint, ¶183.

brokerage."[116]  Further, UTi had "launched 1View, Oracle and a new customs brokerage system simultaneously in 28 branches" in the U.S.[117]  In fact, UTi CFO Richard Rodick commented that "[t]he U.S. was a larger implementation than all of the implementations live to date."[118]

82.     Indeed, Plaintiff identifies several alleged misstatements specific to the implementation of the 1View system and Oracle system in the U.S.[119]  Furthermore, as highlighted in the Complaint, UTi singled out the problems with the rollout in the U.S. as a contributing factor to the firm's liquidity crisis.  Specifically, UTi cited the "recent invoicing delays, primarily in the U.S., in connection with implementing our new freight forwarding operating system and global financial system" as one of the reasons behind the firm's decrease in liquidity and capital resources.[120]  Since the U.S. rollout took place in the middle of the Putative Class Period, on September 1, 2013, any misrepresentations related to the U.S. rollout could not have been corrected prior to the rollout itself.[121]  Therefore, under the Plaintiff's theory of liability, misstatements related to the U.S. implementation could not be a part of the inflation before September 2013, at the earliest.  Ms. Jones' generic discussion of inflation does not provide any class-wide damages methodology that can account for this inability to make the alleged corrective disclosure at the beginning of the Putative Class Period.

### D.     Ms. Jones ignores the fact that the corrective disclosure may have affected UTi's stock price differently earlier in the Putative Class Period

83.     Ms. Jones' generic damages discussion also fails to take into account the timing of cash flows received by UTi.  Specifically, as discussed below, the majority of UTi's cash collections are typically received in the fiscal fourth quarter ending in January.  Therefore, any delays in invoicing in the fourth quarter would have an outsized impact on the liquidity of the firm.  Since Plaintiff claims that UTi's price decline on the disclosure

---

[116] UTi Worldwide, Inc. Conference Call on September 6, 2013; see Complaint, ¶183.  Complaint contains the inserted language.
[117] UTi Worldwide, Inc. Conference Call on February 26, 2014; see Complaint, ¶221.
[118] Deposition of Richard Glen Rodick, Jr., dated January 23, 2015, ("Rodick Deposition"), p. 72:17–22.
[119] Complaint, ¶¶185, 194.
[120] UTi Worldwide, Inc. Form 8-K filed February 25, 2014, p. 3; see Complaint, ¶220.
[121] Complaint, ¶112.

date was driven by liquidity problems, these problems may not have been as severe or may not have been realized at all had the disclosure been made in an earlier quarter of the Putative Class Period.[122]

84.     UTi's primary source of liquidity was cash flow generated from operating activities.[123]  UTi historically experienced higher shipping volumes in the second and the third quarters of the fiscal year.[124]  During these quarters, the company needed to pay third parties such as air and ocean carriers to transport goods before UTi's customers paid it back.[125]  UTi also prepaid customs duties for its customers and only later recouped these expenses from customers.[126]  The high shipping volumes in the second and third quarters typically led to net cash outflows for UTi which were followed by net cash inflows in fourth quarter as UTi collected from its customers.[127]

85.     The timing of cash flows described above made the company more vulnerable to invoicing delays in the fourth quarter since the company received the highest portion of its cash payments from customers at that time.  Exhibit 3 shows that cash flow from operations was the highest in the fourth quarter for all years prior to the Putative Class Period.  The same cash flow patterns were also described by UTi's CFO Richard Rodick:

> "The – our peak season is – the holiday season worldwide occurred in September-October-November time frame.  The bills all get paid in January.  So actually our fourth quarter is our best quarter.  It's actually the month of January is when it all comes in and our clients kind of catch up.  And it's always our strongest cash flow quarter and month of every fiscal year.  It's just the nature of the business – the seasonality."[128]

86.     Therefore, any invoicing problems earlier in the Putative Class Period would lead to delays that affect smaller amounts of cash inflows.  As a result, the financial impact of a corrective disclosure of invoicing delays would likely be smaller earlier in the Putative Class Period.

---

[122] Complaint, ¶¶238–239.
[123] UTi Worldwide, Inc. Form 10-K for FY2013 filed April 1, 2013, p. 46.
[124] UTi Worldwide, Inc. Form 10-K for FY2013 filed April 1, 2013, p. 46.
[125] UTi Worldwide, Inc. Form 10-K for FY2013 filed April 1, 2013, p. 19.
[126] UTi Worldwide, Inc. Form 10-K for FY2013 filed April 1, 2013, p. 46.
[127] Rodick Deposition, pp. 46:7–19, 77:17–78:11.
[128] Rodick Deposition, pp. 77:20–78:2.

## IX.    Conclusion

87.    Ms. Jones provides an opinion about market efficiency of UTi stock based on an analysis that is conceptually flawed, subject to bias, and contains errors that render the analysis unreliable.  Her analysis of the fifth Cammer factor, which Ms. Jones acknowledges is, for an economist, the most important factor in assessing market efficiency, amounts to nothing more than testing whether there is a higher fraction of statistically significant excess returns on days with "news" than days with "no-news."  By design, her test cannot demonstrate that UTi's stock price reacted to value-relevant news on all days of the Putative Class Period or that the stock reacted in a direction consistent with the news.  Therefore, the test is not sufficient to demonstrate market efficiency. Furthermore, Ms. Jones' methodology for defining "news days" and "no-news days" is inconsistent with her definition of market efficiency, inconsistent with her own description of her methodology, and subject to bias.  In addition, although Ms. Jones claims that finding autocorrelation of stock returns can be inconsistent with finding market efficiency, she overlooks that UTI's excess returns are, in fact, autocorrelated.

88.    Finally, Ms. Jones fails to show that she can put forward a class-wide damages methodology that is consistent with the Plaintiff's theory of liability.  By making generic statements about using an event study and company-specific information in establishing inflation, Ms. Jones ignores the facts as pled by the Plaintiff in the Complaint. Specifically, Ms. Jones does not show that she can propose a methodology to parse out value-relevant information unrelated to the allegations from the price impact of the corrective disclosure.  She also ignores that according to the Plaintiff's theory of liability, at least some of the information that was disclosed on the corrective disclosure date could not have been disclosed on the first day of the Putative Class Period.  Finally, Ms. Jones has not proposed a methodology that could take into account the timing of cash flows received by UTi.  Since the Plaintiff claims that UTi's price decline was driven by liquidity problems, these problems may not have been as severe had the disclosure been made earlier in the Putative Class Period when less cash was collected.  Instead of considering the allegations as pled by the Plaintiff, Ms. Jones makes generic statements about applying a damages methodology without showing how these statements would be applicable in this matter.

.

Executed this 12th of February, 2018

 

Paul A. Gompers

**Appendix A**

# Paul A. Gompers CV

Baker Library 263
Graduate School of Business Administration
Harvard University
Boston, MA 02163

(617) 495-6297 (ph)
(617) 496-8443 (fax)
pgompers@hbs.edu
http://www.people.hbs.edu/pgompers

## ACADEMIC POSITIONS

2000–present   HARVARD BUSINESS SCHOOL                           BOSTON, MA
Eugene Holman Professor of Business Administration. Research interests include venture capital, private equity, entrepreneurial finance, institutional investors, corporate governance, optimal security design, dynamic capital structure, long-run performance of firms, and sources of financing for start-up businesses.

1998–2000   HARVARD BUSINESS SCHOOL                           BOSTON, MA
Associate Professor of Business  Administration.

1995–1998   HARVARD BUSINESS SCHOOL                           BOSTON, MA
Assistant Professor of Business  Administration.

1993–1995   UNIVERSITY OF CHICAGO                           CHICAGO, IL
Assistant Professor of Finance and Policy at the Graduate School of Business. Created new course on the financing of start-up companies.

1995–present   NATIONAL BUREAU OF ECONOMIC RESEARCH          CAMBRIDGE, MA
Research Associate.  Appointed as an NBER affiliate in corporate finance.

## EDUCATION

1989–1993   HARVARD UNIVERSITY                           CAMBRIDGE, MA
Received Ph.D. in Business Economics, June 1993.

1987–1989   OXFORD UNIVERSITY                           OXFORD, UK
Graduated *summa cum laude* with a M.Sc. in economics, July 1989.

1982–1987   HARVARD COLLEGE                           CAMBRIDGE, MA
Graduated *summa cum laude* with an A.B. in biology.

**Appendix A**

## PUBLICATIONS

### Books

The Venture Capital Cycle, (MIT Press, Cambridge) October 1999. (Joint with Josh Lerner.)  First Edition.

The Money of Invention, (Harvard Business School Press, Boston) November 2001. (Joint with Josh Lerner.)

Entrepreneurial Finance: A Casebook, (John Wiley, New York) December 2001. (Joint with William Sahlman.)

The Venture Capital Cycle, (MIT Press, Cambridge) October 1999. (Joint with Josh Lerner.)  Second Edition.  2004.

### Articles in Refereed Journals

"Optimal Investment, Monitoring, and the Staging of Venture Capital," *Journal of Finance* 50, 1461–1489. December 1995. Reprinted in Michael Wright and Ken Robbie, editors, Venture Capital (International Library of Management) (Aldershot:  Dartmouth Publishing, 1997.)

"Grandstanding in the Venture Capital Industry," *Journal of Financial Economics* 42, 133–156.  July 1996.

"The Rise and Fall of Venture Capital," Business and Economic History 23, 1–24.  Winter 1994. Awarded Newcomen Prize essay for best paper in business history.

"The Use of Covenants: An Empirical Analysis of Venture Partnership Agreements," *Journal of Law and Economics* 39, 463–498.  October 1996.  (with Josh Lerner.)

"Myth or Reality? The Long-Run Underperformance of Initial Public Offerings: Evidence from Venture and Nonventure Capital-backed Companies." *Journal of Finance* 52, 1791–1821.  December 1997.  (with Alon Brav.)  Awarded the Smith-Breeden Distinguished Paper Award.

"Venture Capital Growing Pains: Should the Market Diet?" *Journal of Banking and Finance* 22, 1089–1104.  August 1998.

"An Analysis of Compensation in the US Venture Capital Partnership," *Journal of Financial Economics* 51, 3–44.  January 1999.  (with Josh Lerner.)

"Venture Capital Distributions: Short-Run and Long-Run Reactions," *Journal of Finance* 53, 2161–2184. December 1998.  (with Josh Lerner.)

"Conflict of Interest in the Issuance of Public Securities: Evidence from Venture Capital," *Journal of Law and Economics* 42, 1-28.  April 1999.  (with Josh Lerner.)

"What Drives Venture Capital Fundraising?"  *Brookings Proceedings on Microeconomic Activity*, 149-192.  August 1998.  (with Josh Lerner.)

"Money Chasing Deals? The Impact of Fund Inflows on Private Equity Valuations," *Journal of Financial Economics* 55, 281-325.  February 2000.  (with Josh Lerner.)

"Is the Abnormal Return Following Equity Issuances Anomalous?" *Journal of Financial Economics* 56, 209–250.  May 2000.  (with Alon Brav and Chris Geczy.)

"Institutional Investors and Equity Prices," *Quarterly Journal of Economics* 114, 229–260. 2001.  (with Andrew Metrick.)

"The Venture Capital Revolution," *Journal of Economic Perspectives* 15, 145–168. Spring 2001.  (with Josh Lerner.)

"Who Underreacts to Cash Flow News?" *Journal of Financial Economics* 66, 409–462. 2002.  (with Randy Cohen and Tuomo Vuolteenaho.)

 "The Role of Lock-ups in Initial Public Offerings Provisions," *Review of Financial Studies* 16, 1–29.  Spring 2003.  (with Alon Brav.)

"Corporate Governance and Equity Prices," *Quarterly Journal of Economics* 118, 107-156.  February 2003.  (with Joy Ishii and Andrew Metrick.)

"The Really Long-Run Performance of Initial Public Offerings: Evidence from the Pre-Nasdaq Period, 1933–1972," *Journal of Finance* 56, 1355–1392.  August 2003.  (with Josh Lerner.)

"The Determinants of Board Structure and Function in Entrepreneurial Firms," *Journal of Law and Economics* 46, 569–598.  October 2003.  (with Malcolm Baker.)

"Entrepreneurial Spawning: Corporations and the Genesis of New Ventures, 1986–1999," *Journal of Finance* 60, 577-614.  April 2005.  (with Josh Lerner and David Scharfstein.)

"Large Blocks of Stock: Prevalence, Size, and Measurement," *Journal of Corporate Finance* 12, 594-618.  June 2006.  (with Rudiger Fahlenbrach, Jennifer Dlugosz, and Andrew Metrick.)

"Venture Capital Investment Cycles: The Impact of Public Markets," *Journal of Financial Economics*, 1–23.  2008.  (with Anna Kovner, Josh Lerner, and David Scharfstein.)

"Specialization and Success: Evidence from Venture Capital," *Journal of Economic and Management Strategy* 18, 817–845.  2009.  (with Anna Kovner, Josh Lerner, and David Scharfstein.)

"Extreme Governance: An Analysis of Dual-Class Firms in the United States," *Review of Financial Studies* 23, 1051–1088.  2010. (with Joy Ishii and Andrew Metrick.)

"Performance Persistence in Entrepreneurship and Venture Capital," *Journal of Financial Economics* 96, 18–32.  2010.  (with Anna Kovner, Josh Lerner, and David Scharfstein.)

"Buy Local?  The Geography of Successful Venture Capital Expansion," *Journal of Urban Economics* 67, 90–102.  2010.  (with Henry Chen, Anna Kovner, and Josh Lerner.)

"Gender Effects in Venture Capital." November 2015. Revise and resubmit at *Management Science*. (with Vladimir Mukharlyamov, Emily Weisburst, and Yuhai Xuan.)

"The Cost of Friendship," *Journal of Financial Economics* 119, 626–644. March 2016. (with Vladimir Mukharlyamov and Yuhai Xuan.)

"What Do Private Equity Firms Say They Do?" *Journal of Financial Economics* 121, 449–476.  September 2016. (with Steven N. Kaplan and Vladimir Mukharlyamov.)


**Other Articles**

"Venture Capital and the Creation of Public Companies: Do Venture Capitalists Really Bring More than Money?"  *Journal of Private Equity* 1, 15-32.  Fall 1997.  (with Josh Lerner.)

 "Risk and Reward in Private Equity Investments: The Challenge of Performance Assessment," *Journal of Private Equity* 1, 5-12.  Winter 1997.  (with Josh Lerner.)

"Resource Allocation, Incentives, and Control: The Importance of Venture Capital in Financing Entrepreneurial Firms," *Entrepreneurship, SMEs, and the Macroeconomy* (Cambridge University Press, Cambridge), 206-238.  February 1997.

"Venture Capital," *The Handbook of Technology Management* (Richard Dorf, Editor-in-Chief). January 1997.  (with Josh Lerner.)

 "The Determinants of Corporate Venture Capital Success: Organizational Structure, Incentives, and Complementarities," NBER Conference Volume on Concentrated Corporate Ownership, 17-54.  September 1998.

"Capital Formation and Investment in Venture Markets: An Assessment of Market Imperfections," *The Economic Evaluation of Technological Change* (Richard Spivack, Editor).  June 1998.

"Corporations and the Financing of Innovation: The Corporate Venturing Experience," *The Atlanta Federal Reserve Bank Conference Volume*, 1-17.  2002.

"Venture Capital and Private Equity," *The Handbook of Corporate Finance* (Espen Eckbo, Editor) (North-Holland Press, New York).  2002.

"Short-Term America Revisited? Boom and Bust in the Venture Capital Industry and the Impact on Innovation," *Innovation Policy and the Economy* 3, 1-28.  March 2002.  (with Josh Lerner.)

"Venture Capital," Chap. D5 of *The Handbook of Modern Finance* (Dennis Logue, Editor). 2007.  (with Josh Lerner.)

"Equity Financing," *Handbook of Entrepreneurship Research: An Interdisciplinary Survey and introduction* (Zoltan Acs and David B. Audretsch, Editor). 2010. (with Josh Lerner.)

"The Role of Venture Capitalists in the Acquisition of Private Companies." In *Research Handbook on International Banking and Governance*, edited by James Barth, Chen Lin, and Clas Wihlborg.  Cheltenham, UK: Edward Elgar Publishing, 2012. (with Yuhai Xuan.)

41

Appendix A

**Working Papers**

"More than Money: Venture Capitalists on Boards." March 2015. (with Natee Amornsiripanitch and
        Yuhai Xuan.)

"To Err is Human, To Forgive is a Mistake: Evidence from Venture Capital Hiring," December 2013
        (with Vladimir Mukharlyamov and Yuhai Xuan.)

"Bridge Building in Venture Capital: Evidence from Acquisitions of Venture Capital-backed
        Companies," December 2011. Revise and resubmit at *Review of Financial Studies* (with Yuhai
        Xuan.)

"Reputation and Contractual Flexibility: Evidence from Venture Capital Distribution Pricing Policies,"
        August 2011. (with Timothy Dore and Andrew Metrick.)

"Why Experienced Venture Capitalists Leave Money on the Table: Evidence from Initial Public
        Offerings," July 2009. (with Alon Brav and Tim Dore.)

"Institutions, Capital Constraints and Entrepreneurial Firm Dynamics: Evidence from Europe,"
        November 2006. (with Mihir Desai and Josh Lerner.)

"Skill vs. Luck in Entrepreneurship and Venture Capital: Evidence from Serial Entrepreneurs," December
        2006. (with Anna Kovner, Josh Lerner, and David Scharfstein.)

"The Role of Venture Capitalists in the Acquisition of Private Companies," October 2005. (with Yuhai
        Xian.)

"Incentives vs. Control: An Analysis of U.S. Dual-class Companies," April 2004. (with Andrew Metrick
        and Joy Ishii.)

"Ownership and Control in Entrepreneurial Firms: An Examination of Convertible Securities in Venture
        Capital Investment," January 2000.

"An Analysis of Executive Compensation, Ownership, and Control in Entrepreneurial Firms," May 2000.
        (with Malcolm Baker.)


**Opinion — Editorials**

"This Tax Cut Will Pay Dividends," *Wall Street Journal,* August 13, 2002. (with Andrew Metrick and
        Jeremy Siegel.)


**Projects in Process**

- "The Evolution of Ownership and Control in Entrepreneurial Firms." (with Malcolm Baker.)
- "Dual Class IPOs." (with Malcolm Baker.)
- "Pre-public Financing in Entrepreneurial Ventures."
- "Institutional Ownership and Corporate Governance." (with Andrew Metrick and Joy Ishii.)
- "The Dynamics of Global Entrepreneurship." (with Mihir Desai and Josh Lerner.)
- "The Determinants of Venture Capital Acquisitions." (with Yuhai Xuan.)
- "The Determinants of Entrepreneurial Success." (with Anna Kovner, Josh Lerner, and David
        Scharfstein.)
- "Risk and Return in Private Equity." (with Leslie Jeng, Josh Lerner, and Andrew Metrick.)
- "Corporate Governance through Time." (with Martijn Cremers, Allen Ferrell, and Andrew Metrick.)


## COURSE MATERIALS

**Cases**

- "Abraaj Capital and Acibadem Healthcare Invesetment (A)." Harvard Business School Case 214-021.
- "Abraaj Capital and Acibadem Healthcare Invesetment (B)." Harvard Business School Case 214-022.
- "Advantage Partners: Dia Kanri (A)." Harvard Business School Case 214-016.
- "Advantage Partners: Dia Kanri (B)." Harvard Business School Case 214-017.
- "The Advent Israel Venture Capital Program." Harvard Business School Case 298–072.

- "ALWAYSi." Harvard Business School Case 201–075.
- "APV Technology Partners II, L.P." Harvard Business School Case 298–048.
- "Ardian: The Sale of Diana." Harvard Business School Case 215-033.
- "Bain Capital: Outback Steakhouse." Harvard Business School Case 212-087.
- "Bang Networks, Inc." Harvard Business School Case 201–074.
- "BioTransplant, Inc.: Initial Public Offering, January 1996." Harvard Business School Case 297–095.
- "Cachet Technologies." Harvard Business School Case 200–031.
- "Cambridge Technology Partners: 1991 Start Up." Harvard Business School Case 298–044.
- "Cambridge Technology Partners: Corporate Venturing (August 1996)." Harvard Business School Case 297–033.
- "Car Wash Partners, Inc." Harvard Business School Case 299–034.
- "Charles River Velocity." Harvard Business School Case 201–092.
- "Charter Communication Bankruptcy." Harvard Business School Case 211-035.
- "Dell Ventures." Harvard Business School Case 200–062.
- "Digital Everywhere, Inc." Harvard Business School Case 298–099.
- "edocs, Inc. (A)." Harvard Business School Case 200–015.
- "edocs, Inc. (B-1): Kevin Laracey." Harvard Business School Case 200–020.
- "edocs, Inc. (B-2): Jonathon Guerster." Harvard Business School Case 200–021.
- "Efficient Market Services: August 1993 (A)." Harvard Business School Case 298–009.
- "Efficient Market Services: August 1993 (B1), EMS Management." Harvard Business School Case 298–010.
- "Efficient Market Services: August 1993 (B2), Comdisco Ventures." Harvard Business School Case 298–011.
- "Elliot Lebowitz." Harvard Business School Case 297–094.
- "Endeca: New Growth Opportunities." Harvard Business School Case 206–041.
- "First Mark Capital." Harvard Business School Case 212-041.
- "Fitzpatrick Hotel Group (A)." Harvard Business School Case 298–002.
- "Fitzpatrick Hotel Group (B1): Niall Carroll." Harvard Business School Case 298–003.
- "Fitzpatrick Hotel Group (B2): Paddy Fitzpatrick." Harvard Business School Case 298–004.
- "Founders Fund." Harvard Business School Case 211-040.
- "Genset Initial Public Offering (A)." Harvard Business School Case 297–096.
- "Genset Initial Public Offering (B)." Harvard Business School Case 297–097.
- "Genset: 1989." Harvard Business School Case 298–070.
- "Global Digital Utilities Corp." Harvard Business School Case 297–065.
- "Globant: Going Public." Harvard Business School Case 215-021.
- "Harrah's Entertainment LBO." Harvard Business School Case 13-054.
- "HgCapital and the Visma Transaction: (A)." Harvard Business School Case 214-018.
- "HgCapital and the Visma Transaction: (B)." Harvard Business School Case 214-019.
- "HgCapital and the Visma Transaction: (C)." Harvard Business School Case 214-020.
- "Honest Tea." Harvard Business School Case 201–076.
- "Hudson Manufacturing." Harvard Business School Case 203–064.
- "Knightsbridge Advisers, Inc." Harvard Business School Case 296–054.
- "Knoll Furniture: Going Public." Harvard Business School Case 202–114.
- "MSE, Inc. Privatization: August 1997." Harvard Business School Case 298–135.
- "MSE, Inc. Privatization: August 1997 (Abridged)." Harvard Business School Case 298–136.
- "New Oriental." Harvard Business School Case.
- "New York Bagel: Hungary, April 1994." Harvard Business School Case 297–078.
- "NSK Software Technologies Ltd." Harvard Business School Case 298–071.
- "Ocular." Harvard Business School Case 202–118.
- "Pet Doctors: 1999." Harvard Business School Case 200–016.

- "The Prague Post." Harvard Business School Case 299–033.
- "Private Equity Finance Vignettes: 2016." Harvard Business School Case 216-005.
- "Private Equity Vignettes: 2014." Harvard Business School Case 213-026.
- "Sarvega." Harvard Business School Case 204–137.
- "Shenzhen Capital Group: A Pioneer in China's VC Industry" Harvard Business School Case 211-029.
- "Sky Air, Inc." Harvard Business School Case 297–110.
- "Torrent Systems." Harvard Business School Case 298–084.
- "Tutor Time (A)." Harvard Business School Case 297–064.
- "Tutor Time (B)." Harvard Business School Case 297–074.
- "United Capital Partners (A)." Harvard Business School Case 213-044.
- "United Capital Partners (B)." Harvard Business School Case 213-045.
- "Venture Capital in Ireland: Getting Their ACT Together." Harvard Business School Case 298–001.
- "Vueling Airlines." Havard Business School Case.
- "Xedia and Silicon Valley Bank (A)." Harvard Business School Case 298–119.
- "Xedia and Silicon Valley Bank (B1): The Bank's Perspective." Harvard Business School Case 298–120.
- "Xedia and Silicon Valley Bank (B2): The Company's Perspective." Harvard Business School Case 298–121.
- "Xedia and Silicon Valley Bank (C): The Final Agreement." Harvard Business School Case 298–122.
- "ZEFER: November 1998." Harvard Business School Case 299–032.

**Teaching Notes**
- "Advent Israel Venture Capital Program TN." Harvard Business School Teaching Note 299–054.
- "APV Technology Partners II, L.P. TN." Harvard Business School Teaching Note 299–053.
- "Beta Golf." Harvard Business School Teaching Note 202–062.
- "BioTransplant Inc.: Initial Public Offering, January 1996 TN." Harvard Business School Teaching Note 299–055.
- "Cachet Technologies." Harvard Business School Teaching Note 202–068.
- "Cambridge Technology Partners —1991 Start Up TN." Harvard Business School Teaching Note 299–057.
- "Cambridge Technology Partners: Corporate Venturing (August 1996) TN." Harvard Business School Teaching Note 299–056.
- "Carlton Polish Co." Harvard Business School Teaching Note 202–076.
- "Car Wash Partners, Inc. TN." Harvard Business School Teaching Note 299–058.
- "Contracting and Control in Venture Capital." Harvard Business School Note 298–067.
- "Dell Ventures." Harvard Business School Teaching Note 202–072.
- "Digital Everywhere, Inc. TN." Harvard Business School Teaching Note 299–059.
- "edocs, Inc. Series." Harvard Business School Teaching Note 202–064.
- "Elliot Lebowitz TN." Harvard Business School Teaching Note 299–060.
- "Emergence of Silicon Wadi." Harvard Business School Note 204–156.
- "Fenchel Lampshade Company." Harvard Business School Teaching Note 202–063.
- "Efficient Market Services: August 1993 Series TN." Harvard Business School Teaching Note 299–061.
- "Fitzpatrick Hotel Group Series TN." Harvard Business School Teaching Note 299–062.
- "Genset: 1989 TN." Harvard Business School Teaching Note 299–063.
- "Genset Initial Public Offering (A) & (B) TN." Harvard Business School Teaching Note 299–064.
- "Global Digital Utilities Corporation TN." Harvard Business School Teaching Note 299–065.
- "HIMSCORP, Inc." Harvard Business School Teaching Note 202–073.
- "Honest Tea." Harvard Business School Teaching Note 202–069.

- "Introduction to Entrepreneurial Finance." Harvard Business School Note 298–061.
- "Introduction to Private Equity Finance." Harvard Business School Note 213-026.
- "Knightsbridge Advisers, Inc. TN." Harvard Business School Teaching Note 299–066.
- "Knot, The." Harvard Business School Teaching Note 202–070.
- "MSE, Inc. Privatization: August 1997 & MSE, Inc. Privatization: August 1997 (Abridged) TN." Harvard Business School Teaching Note 299–067.
- "Nantucket Nectars." Harvard Business School Teaching Note 202–074.
- "New York Bagel: Hungary, April 1994 TN." Harvard Business School Teaching Note 299–068.
- "A Note on Angel Financing." Harvard Business School Note 298–083.
- "A Note on LBO Capital Structure." Harvard Business School Note 213-091.
- "A Note on Franchising." Harvard Business School Note 297–108.
- "A Note on Government Sources of Financing for Small Businesses." Harvard Business School Note 298–015.
- "Note on Strategic Alliances, A." Harvard Business School Note 298–047.
- "A Note on the Internet." Harvard Business School Note 297–109.
- "A Note on Private Equity Exits." Harvard Business School Note 213-112.
- "A Note on the Venture Capital Industry." Harvard Business School Note 295–065.
- "A Note on Valuation in Entrepreneurial Ventures." Harvard Business School Note 298–082.
- "A Note on Valuation in Private Equity." Harvard Business School Note 213-034.
- "NSK Software Technologies Ltd. TN." Harvard Business School Teaching Note 299–069.
- "Parenting Magazine TN." Harvard Business School Teaching Note 202–065.
- "Penelope's Personal Pocket Phones TN." Harvard Business School Teaching Note 299–070.
- "Prague Post, The TN." Harvard Business School Teaching Note 299–071.
- "Private Equity Valuation in Emerging Markets." Harvard Business School Note 213-043.
- "Record Masters." Harvard Business School Teaching Note 202–075.
- "Penelope's Personal Pocket Phones." Harvard Business School Case 299–004.
- "Sky Air, Inc. TN." Harvard Business School Teaching Note 299–072.
- "Torrent Systems TN." Harvard Business School Teaching Note 299–073.
- "Tutor Time (A) TN." Harvard Business School Teaching Note 299–074.
- "Tutor Time (B) TN." Harvard Business School Teaching Note 299–078.
- "Venture Capital in Ireland: Getting Their ACT Together TN." Harvard Business School Teaching Note 299–075.
- "Xedia and Silicon Valley Bank Series TN." Harvard Business School Teaching Note 299–076.
- "ZEFER: November 1998 TN." Harvard Business School Teaching Note 299–077.

## SEMINARS AND CONFERENCE PRESENTATIONS — Academic

American Economic Association: Annual Meeting, January 1995, "Optimal Investment, Monitoring, and the Staging of Venture Capital."

American Finance Association:  Annual Meeting, January 1995, "An Analysis of Compensation in the U.S. Venture Capital Partnership."

American Finance Association: Annual Meeting, January 1996, "Myth or Reality? The Long-Run Underperformance of Initial Public Offerings: Evidence from Venture and Nonventure-backed Companies."

American Finance Association: Annual Meeting, January 1999, "What Drives Venture Capital Fundraising."

American Finance Association: Annual Meeting, January 2000, "An Analysis of Executive Compensation, Ownership, and Control in Entrepreneurial Firms."

American Finance Association:  Annual Meeting, January 2004, "Incentives vs. Control: An Analysis of U.S. Dual-class companies."

American Finance Association:  Annual Meeting, January 2015, "Cost of Friendship."

**Appendix A**

American Finance Association: Annual Meeting, January 2015, "What Do Private Equity Firms (Say) They Do?"

American Law and Economics Association: Annual Meeting, May 1996, "The Use of Covenants: An Empirical Analysis of Venture Partnership Agreements."

Association of Financial Economists: Annual Meeting, January 2001, "The Determinants of Board Structure and Function in Entrepreneurial Firms."

Association of Financial Economists: Annual Meeting, January 2006, "Skill vs. Luck: An Analysis of Serial Entrepreneurs."

Arizona State University School of Business: Finance Seminar, December 1995, "Venture Capital Distributions: Short-Run and Long-Run Reactions."

Boston University: Finance Seminar, December 1996, "Myth or Reality? The Long-Run Underperformance of Initial Public Offerings: Evidence from Venture and Nonventure-backed Companies."

Brandeis University: Entrepreneurship Conference, April 2014, "The Next Big Question in Entrepreneurship Research."

Brookings Institute: Microeconomic Conference, June 1998, "What Drives Venture Fundraising?"

Business and Economic History: Annual Meeting, March 1994, "The Rise and Fall of Venture Capital."

Center for Research on Security Prices: Biannual Meeting, March 1995, "Myth or Reality? The Long-Run Underperformance of Initial Public Offerings: Evidence from Venture and Nonventure-backed Companies."

Center for Research on Security Prices: Biannual Meeting, November 1994, "Venture Capital Distributions: Short-Run and Long-Run Reactions."

Center for Economic and Policy Research: European Finance Conference on Financing Innovation, November 1998, "What Drives Venture Capital Fundraising?"

Columbia Law School: Law and Economics Seminar, November 1995, "An Analysis of Compensation in the U.S. Venture Capital Partnership."

Columbia Law School: Law and Economics Seminar, November 1995, "The Use of Covenants: An Empirical Analysis of Venture Partnership Agreements."

Columbia Law School: Financing Innovation Conference, December 1997, "An Analysis of Covenants in Venture Capital Investments."

Columbia University School of Business: Finance Seminar, January 1993, "Grandstanding in the Venture Capital Industry."

Copenhagen Business School: Finance Seminar, May 1999, "An Analysis of Executive Compensation, Ownership, and Control in Closely Held Firms."

Cornell Business School: Finance Seminar, October 2001, "Corporate Governance and Equity Prices."

Federal Reserve Bank of Chicago: January 1994, "Optimal Investment, Monitoring, and the Staging of Venture Capital."

Duke University Fuqua Business School: Finance Seminar, January 1993, "Grandstanding in the Venture Capital Industry."

Georgetown Law School: April 2003, "Corporate Governance and Equity Prices."

Harvard Business School: Business History Seminar, December 2000, "The History of Silicon Valley."

Harvard Business School: Entrepreneurship Conference, December 2000, "The Really Long-run Performance of Initial Public Offerings."

Harvard Business School: Financial Decision and Control Workshop, July 1994, "Optimal Investment, Monitoring, and the Staging of Venture Capital."

Harvard Business School: Financial Decision and Control Workshop, July 1996, "Myth or Reality? The Long-Run Underperformance of Initial Public Offerings: Evidence from Venture and Nonventure-backed Companies."

Harvard Business School: Financial Decision and Control Workshop, July 1997, "Reputation and Conflict of Interest in the Issuance of Public Securities: Evidence from Venture Capital."

Harvard Business School: Financial Decision and Control Workshop, July 1998, "How are Large

**Appendix A**

Institutions Different From Other Investors? Why Do These Differences Matter for Equity Prices and Returns?"

Harvard Business School: Finance Seminar, February 1994, "An Analysis of Compensation in the U.S. Venture Capital Partnership."

Harvard Business School: Finance Seminar, January 1993, "Grandstanding in the Venture Capital Industry."

Harvard Business School: Finance Seminar, October 1996, "Venture Capital Distributions: Short-Run and Long-Run Reactions."

Harvard Business School: Finance Seminar, May 1999, "An Analysis of CEO Compensation, Ownership, and Control in Closely Held Firms."

Harvard Business School: Finance Seminar, October 2011, "The Cost of Friendship."

Harvard Business School: Organizations and Markets Seminar, May 1999, "An Analysis of CEO Compensation, Ownership, and Control in Closely Held Firms."

Harvard Business School: Finance Seminar, November 2000, "The Venture Capital Revolution."

Harvard Business School:  Finance Seminar, March 2006, "Skill vs. Luck: An Analysis of Serial Entrepreneurs."

Harvard Business School: Finance Seminar, December 2008, "Bridge Building in Venture Capital: Evidence from Acquisitions."

Harvard Business School: Finance Seminar, December 2014, "More than Money: Venture Capitalists on Boards."

Harvard Business School: Finance Seminar, February 2015, "What do Private Equity Firms (Say) They Do?"

Harvard Business School: Organizational Behavior Seminar, February 2012, "The Role of Social Ties in Venture Capital."

Harvard University Department of Economics: Workshop, December 1992, "Optimal Investment, Monitoring, and the Staging of Venture Capital."

Harvard University Department of Economics: Organizations Workshop, December 1996, "Reputation and Conflict of Interest in the Issuance of Public Securities: Evidence from Venture Capital."

Harvard University Department of Economics: Organizations Workshop, December 2002, "Entrepreneurial Spawning."

Harvard University Department of Economics: Organizations Workshop, December 1998, "Are the Hundred-Million-Dollar Managers Just Like Everyone Else? An Analysis of the Stock Ownership of Large Institutions."

Harvard University Department of Economics: Organizations Workshop, September 2003, "Entrepreneurial Spawning: Corporations and the Genesis of New Ventures, 1986–1999."

Hebrew University School of Business: Finance Seminar, March 1994, "An Analysis of Compensation in the U.S. Venture Capital Partnership."

Hebrew University School of Business: Finance Seminar, March 1995, "Venture Capital Distributions: Short-Run and Long-Run Reactions."

Hebrew University School of Business: Distinguished Lecture: December 2014, "What Do Private Equity Firms (Say) They Do?"

London School of Economics: Venture Capital Conference, October 1998, "How You Get There Matters: The Path Dependency of Executive Compensation in Closely Held Firms."

Massachusetts Institute of Technology: Organizations Workshop, March 1996, "The Use of Covenants: An Empirical Analysis of Venture Partnership Agreements."

Massachusetts Institute of Technology and Harvard University: Public Finance Workshop, March 1998, "What Drives Venture Fundraising?"

National Bureau of Economic Research: Corporate Finance Group, April 1994, "Optimal Investment, Monitoring, and the Staging of Venture Capital."

National Bureau of Economic Research: Summer Institute, July 1994, "An Analysis of Compensation in the U.S. Venture Partnership Agreement."

National Bureau of Economic Research: Summer Institute, July 1995, "Myth or Reality? The Long-Run Underperformance of Initial Public Offerings: Evidence from Venture and Nonventure-backed Companies."

National Bureau of Economic Research: Summer Institute, July 1996, "Venture Capital Distributions: Short-Run and Long-Run Reactions."

National Bureau of Economic Research: Finance Series, December 1997, "Are the Hundred-Million-Dollar Managers Just Like Everyone Else? An Analysis of the Stock Ownership of Large Institutions."

National Bureau of Economic Research: Finance Series, November 1998, "How You Get There Matters: The Path Dependency of Executive Compensation in Closely-Held Firms."

National Bureau of Economic Research: Summer Institute, July 2001, "Corporate Governance and Equity Prices."

New York Federal Reserve Bank: May 2000, "The Determinants of Board Structure and Function in Entrepreneurial Firms."

New York University, Stern School of Business: Finance Seminar, January 1993, "Grandstanding in the Venture Capital Industry."

New York University, Stern School of Business: Finance Seminar, February 1999, "How You Get There Matters: The Path Dependency of Executive Compensation in Closely-Held Firms."

New York University, Stern School of Business: Finance Seminar, October 2006, "Skill vs. Luck: An Analysis of Serial Entrepreneurs."

Northwestern University, Kellogg Business School: Finance Seminar, January 1993, "Grandstanding in the Venture Capital Industry."

Northwestern University, Kellogg Business School: Finance Seminar, October 1997, "Money Chasing Deals? The Impact of Fund Inflows on Private Equity Valuations."

Norwegian School of Management: Finance Seminar, May 1999, "An Analysis of Executive Compensation, Ownership, and Control in Closely Held Firms."

Ohio State University: Finance Seminar, October 1998, "How You Get There Matters: The Path Dependency of Corporate Governance in Closely Held Firms."

Oxford University:  Graduate Student Seminar, May 1989.

Oxford University: Finance Seminar, May 1999, "An Analysis of Executive Compensation, Ownership, and Control in Closely Held Firms."

Queens University (Kingston, Ontario) School of Business: Finance Seminar, November 1996, "Myth or Reality? The Long-Run Underperformance of Initial Public Offerings: Evidence from Venture and Nonventure-backed Companies."

Rutgers University: Finance Seminar, October 1997, "Money Chasing Deals? The Impact of Fund Inflows on Private Equity Valuations."

Stanford University Graduate School of Business: Strategy Workshop, January 1993, "Grandstanding in the Venture Capital Industry."

Stanford University Graduate School of Business: Center for Economic and Political Research, March 1997, "The Valuation of Private Equity Investments."

Stanford University: Finance Seminar, October 2012, "The Cost of Friendship."

Stockholm Business School: September 2003, "Entrepreneurial Spawning: Corporations and the Genesis of New Ventures, 1986–1999."

Tel Aviv University School of Business: Finance Seminar, March 1994, "An Analysis of Compensation in the U.S. Venture Capital Partnership."

Tel Aviv University School of Business: Finance Seminar, March 1995, "Venture Capital Distributions: Short-Run and Long-Run Reactions."

Tel Aviv University School of Business: Finance Seminar, December 2014, "What Do Private Equity Firms (Say) They Do?"

University of Arizona School of Business: Finance Seminar, December 1995, "Venture Capital Distributions: Short-Run and Long-Run Reactions."

**SPEECHES AND CONFERENCE PRESENTATIONS — Practitioner**

Advanced Technology Program, National Institute for Standards and Technology and NBER Conference on Financing Innovation, June 1998.

Amsterdam Institute of Finance, October 1994, "Venture Capital and the Finance of Emerging Companies."

American Friends of the Technion, October 1998, "The Development of High Technology and Venture Capital in Israel."

AT&T Small Business Conference, April 1994, "Venture Capital: The Road Ahead."

Center for Economic Policy Research, Venture Capital Conference, March 1997, "The Pricing of Private Equity Investments: A Window on the Returns of Tomorrow."

Deloitte and Touche, May 2003, "Entrepreneurial Leadership."

Ernst and Young Silicon Valley Venture Capital Conference, 2002, "The Future of Venture Capital."

Ernst and Young Buyout Roundtable, 2002, "Corporate Governance and Private Equity."

Greenwich Roundtable, 2015, "Skill in Private Equity."

Harvard Business School Venture Capital Conference, December 1995, "Myth or Reality? The Long-Run Underperformance of Initial Public Offerings: Evidence from Venture and Nonventure-backed Companies" and "Venture Capital Distributions: Short-run and Long-run Reactions."

Harvard Business School Alumni Series, May 2000 and May 2003, "The Future of Private Equity."

Harvard Business School European Conference, June 2003, "European Private Equity."

Harvard Business School Global Alumni Conference, June 1998, "Consolidation Buy-outs."

Harvard Business School Global Alumni Conference, May 2001, "Venture Capital 2001: Boom or Bust?"

Harvard Business School Centennial Celebration, February 2010, "Private Equity at the Crossroads."

Harvard Business School Global Alumni Venture Capital Conference, May 2012, "New Venture Capital Models"

Harvard Business School Global Alumni Venture Capital Conference, October 2014, "Lessons from the Trenches."

Hambrecht and Quist, Post-Venture Forum, March 1999, "Venture and Post-Venture Opportunities: Insights from Research."

Institutional Limited Partner's Association, September 1997, "Risk and Return in Private Equity."

Institutional Limited Partner's Association, April 2002, "New Tools for Assessing Private Equity Valuation and Asset Allocation."

International Business Forum, June 1999, "Venture Capitalists and the Public Markets."

Investors' Press Alpha Roundtable, October 1996, "The Future of Private Equity."

Israel Business Forum, March 1994.

Israeli Venture Capital and High Technology Conference, 2002, "The Future of Venture Capital and Its Implication for Israel."

Japanese Private Equity Forum, July 1997, "Corporations and Venture Capital: Old and New Challenges."

Latin American Chamber of Commerce, February 1995, "Capital for Entrepreneurial Companies: A Look Ahead."

Massachusetts Public Pension Fund Investment Forum, October 1998, "Venture Capital: Investing in Start-up and Newly Public Firms."

National Venture Capital Association, March 2003, "The Future of Venture Capital."

Nova Pharmaceuticals, September 2009, "Venture Capital after the Downturn."

OPAL Institutional Investors Conference, December 2000, "The Future of Private Equity."

Rocky Mountain Venture Capital Association, March 2003, "Venture Capital: Challenges and Opportunities."

Russell Capital Private Equity Conference, March 1997, "The Pricing of Private Equity Investments: A Window on the Returns of Tomorrow."

University of California at Berkeley, Haas School of Business: Finance Seminar, April 1993,
"Grandstanding in the Venture Capital Industry."

University of California at Los Angeles: Finance Seminar, May 1997, "The Valuation of Private Equity
Investments."

University of California at Los Angeles: Behavioral Finance Conference, April 1998, "Are the Hundred-
Million-Dollar Managers Just Like Everyone Else?  An Analysis of the Stock Ownership of
Large Institutions."

University of Chicago Graduate School of Business: Finance Seminar, January 1993, "Grandstanding in
the Venture Capital Industry."

University of Chicago Graduate School of Business: Information and Uncertainty Seminar, April 1995,
"Venture Capital Distributions: Short-Run and Long-Run  Reactions."

University of Chicago Graduate School of Business: Finance Seminar, May 2006, "Skill vs. Luck: An
Analysis of Serial Entrepreneurs."

University of Chicago Economics Department: Economic and Legal Organization Workshop, February
1994, "The Use of Covenants: An Empirical Analysis of Venture Partnership Agreements."

University of Chicago Economics Department: Economic and Legal Organization Workshop, October
1997, "Reputation and Conflict of Interest in the Issuance of Public Securities: Evidence from
Venture Capital."

University of Georgia School of Business: Finance Seminar, "Myth or Reality? The Long-Run
Underperformance of Initial Public Offerings: Evidence from Venture and  Nonventure-backed
Companies."

University of Illinois School of Business: Finance Seminar, October 1994, "Optimal Investment,
Monitoring, and the Staging of Venture Capital."

University of Michigan School of Business: Finance Seminar, November 1995, "Venture Capital
Distributions: Short-Run and Long-Run  Reactions."

University of North Carolina School of Business: Finance Seminar, November 1995, "Venture Capital
Distributions: Short-Run and Long-Run  Reactions."

University of Pennsylvania Wharton School: Finance Workshop, March 1998, "Money Chasing Deals? The
Impact of Venture Inflows of Private Equity Prices."

University of Rochester Simon School of Business:  Finance Seminar, December 1996, "Myth or Reality?
The Long-Run Underperformance of Initial Public Offerings: Evidence from Venture and
Nonventure-backed Companies."

University of Rochester Simon School of Business: Organizations Seminar, February 1993,
"Grandstanding in the Venture Capital Industry."

Virginia Tech University School of Business: Finance Seminar, October 1995, "Myth or Reality? The
Long-Run Underperformance of Initial Public Offerings: Evidence from Venture and  Nonventure-
backed Companies."

World Bank: Finance Seminar, May 1999, "An Analysis of CEO Compensation, Ownership, and Control
in Closely Held Firms."

Western Finance Association: Annual Meeting, June 1994, "Optimal Investment, Monitoring, and the
Staging of Venture Capital."

Western Finance Association: Annual Meeting, June 1995, "The Long-run Underperformance of
Seasoned Equity Offerings Revisited."

Western Finance Association: Annual Meeting, June 1996, "The Use of Covenants: An Empirical
Analysis of Venture Partnership Agreements."

Western Finance Association: Annual Meeting, June 1997, "Reputation and Conflict of Interest in the
Issuance of Public Securities:  Evidence from Venture Capital."

Western Finance Association: Annual Meeting, June 1998, "How are Large Institutions Different from
Other Investors? Why These Differences Matter for Equity Prices and Returns?"

Yale University, School of Management: Finance Seminar, January 1993, "Grandstanding in the Venture
Capital Industry."

**Appendix A**

Russell Capital Private Equity Conference, November 1998, "Advent Israel Venture Capital Program."
Salomon Smith Barney Private Equity Conference, March 2000, "The Future of Private Equity."
Salomon Smith Barney Consulting Group, March 2001, "Risk and Return in Private Equity."
Samsung Venture Capital Group, October 1997, "Corporations and Venture Capital: Old and New
    Challenges."
Seeking Alpha, March 2015, "What's Hot in Venture Capital Fundraising?"
Silicon Valley Bank, May 2003, "Venture Capital: Challenges and Opportunity."
SuperReturn Conference US, May 2009, "Insights from Private Equity Academic Research at the Harvard
    Business School."
SuperReturn Conference Europe, February 20011, "Insights from Private Equity Academic Research at
    the Harvard Business School."
SuperReturn Conference US, May 2013, "The Future of Private Equity."
University of Chicago Business Forum, May 1995, "The Next Ten Years in Venture Capital." (Organized
    and moderated panel.)
Venture Economics Venture Forum, November 1994, "The Venture Cycle." (Keynote Address.)
Venture Economics Venture Forum, November 1994, Panelist for IPO performance issues.
Venture Economics Venture Forum, November 1996, Plenary session speaker on venture capital returns.
VentureOne / Ernst and Young Venture Capital Conference, July 2002, "The Future of Venture Capital."
VentureOne / Ernst and Young Venture Capital Conference, July 2003, "The Future of European Venture
    Capital."
Young Presidents' Organization Conference, November 1998, "Entrepreneurial Opportunities in Crisis
    Situations."
Young Presidents' Organization Conference, January 2003, "The Future of Venture Capital."
Young Presidents' Organization Conference, January 2010, "New Models in Venture Capital."
Young Presidents' Organization Conference, January 2013, "Private Equity Trends."
In addition, made presentations of research findings for several institutional investors and investment
    managers who contributed data for the project on interactions between venture organizations and
    institutional investors.


## TEACHING

### University of Chicago
Developed and taught course "Entrepreneurial Finance and Management," a second-year MBA elective,
    1993–1995.

### Harvard Business School
Taught "First-Year Finance," in Required Curriculum, 1995–1997.
Taught "Entrepreneurial Finance," in Elective Curriculum, 1997–2003.
Taught "The Entrepreneurial Manager," in Required Curriculum, 2003–2008.
Taught "Venture Capital and Private Equity," in Elective Curriculum, 2009–2012.
Co-developed and taught, "Private Equity Finance," in Elective Curriculum, 2012-2015.
Developed and taught, "Private Equity Field," in Elective Curriculum, 2013.
Course Head for "The Entrepreneurial Manager" in Required Curriculum 2005–2008.
Co-developed and co-taught Ph.D. course "Empirical Topics in Corporate Finance," 1999–2015. (with
    Josh Lerner.)
Co-developed and partially taught three-day executive courses on venture capital and private equity:
    "Conflict and Evolution in Private Equity" (1996), "Corporate Venture Capital: The Third Wave"
    (1997), "The Internationalization of Private Equity" (1998), "Structuring Effective Private Equity
    Organizations" (1999, 2000), "Optimizing Corporate Investments" (2000), "Doing Private Equity
    Deals" (2001, 2003), "Private Equity in a Downturn" (2002), "Private Equity Deals" (2004),

"Private Equity and Corporate Governance" (2005), "Venture Capital and Private Equity" (2006), "Internationalization of Private Equity" (2007), "Private Equity and Venture Capital" (2008), and "Private Equity after the Downturn" (2009), "Venture Capital and Private Equity" (2010-2011). "Private Equity and Venture Capital: After the Financial Crisis" (2012), Private Equity and Venture Capital: The Future" (2013). "Private Equity and Venture Capital: At the Crossroads" (2014). "Private Equity and Venture Capital: Changing Market Power." (2015) (all with Josh Lerner.)

Co-developed and taught "Economics of Markets," in Elective Curriculum, 1997.

Partially taught in a variety of programs including:

General Management Program / START, August 1996.
HBS / CIEBA Pension Workshop, April 1996.
YPO Conference, February 1997, February 2003, February 2006, February 2008.
Strategic Finance for Small Business, February 1998, March 1999, March 2000.
Entrepreneur's Toolkit, June 1997, June 1998, June 1999.

## PROFESSIONAL SERVICE AND EXPERIENCE

| | | |
|---|---|---|
| 1985–1986 | BAYER CHEMICAL CO. | LEVERKUSEN, GERMANY |
| | Researcher. Performed biochemical analysis on locust flight muscle metabolism. | |

1997–present    Associate Editor for *Small Business Economics*.

1997–present    Associate Editor for *Journal of Private Equity*.

1997–present    Associate Editor for *Journal of Finance*.

1997–present    Western Finance Association Meetings Program Committee.

1998    Program Committee, *Journal of Financial Economics* conference on research methodologies in finance.

2006–present    Associate Editor for *Journal of Economic Literature*.

2010–present    Associate Editor for *Journal of Economics and Management Strategy*.

Referee for the *Journal of Financial Economics*, *Journal of Finance*, *Journal of Political Economy*, *Quarterly Journal of Economics*, *Rand Journal of Economics*, *Review of Financial Studies*, *American Economic Review*, *Journal of Public Economics*, *Journal of Corporate Finance*, *Journal of Small Business Management*, *Economic Letter*, *Small Business Economics*, *Journal of Business Venturing*, *Journal of Small Business Finance*, *Journal of Business*, *Journal of Law*, *Economics*, *and Organizations*, and *Journal of Law and Economics*.

Reviewer for reports and proposals for the National Science Foundation.

Reviewer for reports and proposals for the Securities and Exchange Commission.

## COMMUNITY SERVICE

Board Member, Beth Israel Deaconess Hospital, (2014-2015).
Board member, Friends of Harvard Track, (2014-2015).

**Appendix A**

Board Member, USA Triathlon Foundation, (2015)
Beth Israel Deaconess Wellness Center Advisory Board (2013-2015)
Vice President, Treasurer, and Executive Board Member, Harvard Hillel (1995–2010).
Board Member, Camp Yavneh (2007–2010).
Ivy League Eikeden Committee (1997–2010)
Young Israel of Brookline, Internet Advisory Board (2000–2001).
Technion Institute of Management: Boston Advisory Board (2000).
Board Member, Anshe Shalom B'nei Israel Congregation (1993–1995).

## CONSULTING PROJECTS

Apax Venture Partners, 2003.
Battery Venture Partners, 2001.
Bessemer Venture Partners, 1998.
Deloitte and Touche, 2003.
Department of Energy, Idaho Falls National Laboratory, 1994–1995.
Department of Energy, Savannah River National Laboratory, 1995–1997.
Department of Energy, Butte, Montana National Laboratory, 1997–1998.
E.M. Warburg, Pincus, 1997.
Ernst and Young, 2002.
GTCR Golder Rauner, 1999.
Jerusalem Venture Partners, 2001.
Montana Science and Engineering, Inc., 1997.
Patricoff & Co., 1995.
Phillip's Petroleum, 1998, 2000, 2001, 2002.
PriceWaterhouse Coopers, 2001.
RogersCasey Investment Advisors, 1994.
Salomon Smith Barney, 1999–2003.
TA Associates, 2015.
Thermo Electron Corporation, 1994–1997.
VentureOne, 1995.

## BOARDS OF DIRECTORS AND ADVISORY BOARDS

Evergreen Partners, 2005–2015.
Gemini Venture Capital, 2003–2015.
Highland Capital Consumer Fund, 2007–2017.
Khosla Ventures, 2009-2017.
Knightsbridge Investment Advisers, 1995–2012.
Mercanteo, 1999.
New Capital Partners, 2000–2001.
Onpoint Technology Ventures, 2003–2015.
OnTheFrontier.com, 2000–2001.
Spur Capital Partners, 2002–2017.
Triple Point Capital, 2003.
ZEFER, 1998.

## GRANTS AND AWARDS

National Science Foundation Grant, 1994–1997, "Financing New Business Formation."

**Appendix A**

National Science Foundation Grant, 2002–2005, "Corporate Governance and Firm Performance."

National Institute of Standards and Technology, Advanced Technology Program, 1996–1997, "Venture Capital and the Financing of Emerging Technologies."

Newcomen Business History Paper Prize, 1994.

American Association of Individual Investors Award for Best Paper on Investments, at the Western Finance Association Meeting, 1998.

Journal of Financial Economics, Fama-DFA Price, Second Prize, 2008.

Journal of Finance, Smith Breeden Distinguished Paper Prize, 1998.

Rodney White Center for Financial Research, Best Paper Prize, 2002.

MBA Class of 1961 Fellow, 1997–1998.


## <u>ATHLETICS</u>

Alternate on the 1988 Olympic team in the marathon. Finished fourth in the Olympic trials. Qualified for 1984, 1988, 1992 Olympic marathon trials. Cross-Country All-American. Academic All-American. Set World Junior Record in the marathon (1983). Bronze medalist in 1985 World University Games in Japan (marathon). Qualified for two US cross-country teams and competed in the World Championships. Set Harvard Records in the 5,000 and 10,000 meters. Triathlon Age Group All-American 2007, 2009, 2010, 2013, 2014. Ranked second in the world by World Triathlon Corporation in Age Group at the Ironman 70.3 distance in 2014. Competed in ITU Age Group World Championships (2007, 2015). Competed in Ironman 70.3 World Championship (2007). Competed in Ironman World Championships in Kailua Kona (2009, 2010).

# Paul A. Gompers
# Expert Depositions and Testimony for Prior Five Years

Deposition of Paul A. Gompers in <u>Rick L. Stratford v. Peterson Capital I, LLC, et al.</u> and <u>Peterson Capital I, LLC, et al. v. Rick L. Stratford</u>, Third Judicial District Court of Salt Lake County, State of Utah, Case No. 120900633 (April 10, 2013).

Deposition of Paul A. Gompers in <u>Mark Smilovits, Individually and on Behalf of All Other Persons Similarly Situated v. First Solar, Inc., et al.</u>, United States District Court for the District of Arizona, Case No. CV 12-00555-PHX-DGC (June 11, 2013).

Deposition of Paul A. Gompers in <u>Hollywood Media Corp., f/k/a Hollywood.com, Inc., National Amusements, Inc. and Movietickets.com, Inc. v. AMC Entertainment, Inc.,</u> Circuit Court of the 15th Judicial Circuit in and for Palm Beach County, Florida, Case No. 50 2011 CA 016684XXXX Division A1 (July 10, 2013).

Deposition of Paul A. Gompers in <u>In Re Pfizer Inc. Securities Litigation</u>, on behalf of Pfizer Inc., Henry A. McKinnell, John L. LaMattina, Karen L. Katen, Joseph M. Feczko, and Gail Cawkwell, United States District Court for the Southern District of New York, Case No. 04 Civ. 9866 (August 7, 2013).

Deposition of Paul A. Gompers in <u>IBEW Local 90 Pension Fund v. Deutsche Bank AG, et al.</u>, on behalf of Deutsche Bank AG, United States District Court for the Southern District of New York, Case No. 1:11-cv-04209-KBF (September 18, 2013).

Deposition of Paul A. Gompers in <u>Kenneth J. Novack, as Representative of the Former Shareholders of Retail Convergence, Inc. v. GSI Commerce, Inc., et al.</u>, Commonwealth of Massachusetts Superior Court Department of the Trial Court, Civil Action No. SUCV2011-2086-BLS2 (September 25, 2013).

Testimony of Paul A. Gompers in <u>IBEW Local 90 Pension Fund v. Deutsche Bank AG, et al.</u>, on behalf of Deutsche Bank AG, United States District Court for the Southern District of New York, Case No. 1:11-cv-04209-KBF (October 4, 2013).

Deposition of Paul A. Gompers in <u>Hollywood Media Corp., f/k/a Hollywood.com, Inc., National Amusements, Inc. and Movietickets.com, Inc. v. AMC Entertainment, Inc.,</u> Circuit Court of the 15th Judicial Circuit in and for Palm Beach County, Florida, Case No. 50 2011 CA 016684XXXX Division A1 (October 14, 2013).

Testimony of Paul A. Gompers in <u>United States of America v. Mathew Martoma</u>, on behalf of Mathew Martoma, United States District Court for the Southern District of New York, Case No. 1:12-cr-00973-PGG (January 29, 2014).

Deposition of Paul A. Gompers in <u>Kirk Dahl, et al. v. Bain Capital Partners, LLC, et al.</u>, United States District Court for the District of Massachusetts, Case No. 1:07-cv-12388-EFH (February 28, 2014).

Arbitration Testimony of Paul A. Gompers in <u>Diana Peterson v. Jordan Clements</u>, on behalf of Diana Peterson, American Arbitration Association, Arbitration No. 77 148 Y 00251 13 (March 6, 2014).

Deposition of Paul A. Gompers in <u>Anwar, et al. v. Fairfield Greenwich Limited, et al.</u>, on behalf of Citco, United States District Court for the Southern District of New York, Master File No. 09-cv-118

# Paul A. Gompers
# Expert Depositions and Testimony for Prior Five Years

(VM) (March 31, 2014).

Testimony of Paul A. Gompers in <u>Kenneth J. Novack, as Representative of the Former Shareholders of Retail Convergence, Inc. v. GSI Commerce, Inc., et al.</u>, Commonwealth of Massachusetts Superior Court Department of the Trial Court, Civil Action No. SUCV2011-2086-BLS2 (April 24, 2014).

Deposition of Paul A. Gompers in <u>Justin M. Scott v. Putnam, LLC d/b/a Putnam Investments, et al.</u>, on behalf of Putnam and Marsh & McLennan, United States District Court for the District of Massachusetts, Case No. 1:11-cv-11082-RWZ (May 6, 2014).

Deposition of Paul A. Gompers in <u>HealthCare Royalty Partners, L.P., v. Shionogi, Inc.</u>, on behalf of HealthCare Royalty Partners, L.P., Supreme Court of the State of New York, County of New York, Case No. 650424/2012 (July 9, 2014).

Deposition of Paul A. Gompers in <u>Amazon.com, Inc. & Subsidiaries v. Commission of Internal Revenue</u>, on behalf of Commission of Internal Revenue, United States Tax Court, Tax Court Docket No. 31197-12 (August 20, 2014).

Testimony of Paul A. Gompers in <u>In Re Groupon Inc. Securities Litigation</u>, on behalf of Groupon, Inc., United States District Court for the Northern District of Illinois, Case No. 12-cv-2450 (September 11, 2014).

Deposition of Paul A. Gompers in <u>In Re Marriage of Martha Ehmann Conte and Jean-Pierre L. Conte</u>, on behalf of Martha Ehmann Conte, Superior Court of the State of California, City and County of San Francisco, Case No. FDI-10-773039 (October 30, 2014).

Deposition of Paul A. Gompers in <u>City of Austin Police Retirement System, Individually and on Behalf of All Others Similarly Situated v. Kinross Gold Corporation, et al.</u>, on behalf of Kinross Gold Corporation, United States District Court for the Southern District of New York, Case No. 1:12-cv-01203-VEC (November 11, 2014).

Testimony of Paul A. Gompers in <u>In Re Marriage of Martha Ehmann Conte and Jean-Pierre L. Conte</u>, on behalf of Martha Ehmann Conte, Superior Court of the State of California, City and County of San Francisco, Case No. FDI-10-773039 (December 15, 2014).

Testimony of Paul A. Gompers in <u>Amazon.com, Inc. & Subsidiaries v. Commission of Internal Revenue</u>, on behalf of Commission of Internal Revenue, United States Tax Court, Tax Court Docket No. 31197-12 (December 16, 2014).

Deposition of Paul A. Gompers in <u>In Re Dole Food Co, Inc., Stockholder Litigation and In Re Appraisal of Dole Food Company, Inc.</u>, Court of Chancery of the State of Delaware, Case Nos. 8703-VCL and 9079-VCL (December 19, 2014).

Deposition of Paul A. Gompers in <u>Dr. David Beach and Christopher Kelly, et al. v. Citigroup Alternative Investments LLC and Citigroup Inc.</u>, on behalf of Citigroup Alternative Investments, United States District Court for the Southern District of New York, Case No. 12-cv-7717(GHV) (January 22, 2015).

Deposition of Paul A. Gompers in <u>Ellen Pao v. Kleiner Perkins Caufield & Byers LLC, et al.</u>, on behalf of

# Paul A. Gompers
# Expert Depositions and Testimony for Prior Five Years

Kleiner Perkins Caufield & Byers LLC, Superior Court of the State of California, City and County of San Francisco, Case No. CGC-12-520719 (February 9, 2015).

Testimony of Paul A. Gompers in In Re Dole Food Co., Inc., Stockholder Litigation and In Re Appraisal of Dole Food Company, Inc., Court of Chancery of the State of Delaware, Case Nos. 8703-VCL and 9079-VCL (March 2, 2015).

Testimony of Paul A. Gompers in Ellen Pao v. Kleiner Perkins Caufield & Byers LLC, et al., on behalf of Kleiner Perkins Caufield & Byers LLC, Superior Court of the State of California, City and County of San Francisco, Case No. CGC-12-520719 (March 19, 2015).

Deposition of Paul A. Gompers in Carpenters Pension Trust Fund of St. Louis, et al. v. Barclays PLC, et al., on behalf of Barclays PLC, United States District Court for the Southern District of New York, Case No. 1:12-cv-5329-SAS (March 25, 2015).

Deposition of Paul A. Gompers in In Re Goldman Sachs Group, Inc. Securities Litigation, on behalf of The Goldman Sachs Group, Inc., United States District Court for the Southern District of New York, Case No. 1:10-cv-03461-PAC (April 30, 2015).

Deposition of Paul A. Gompers in In Re MiMedx Group, Inc. Securities Litigation, on behalf of MiMedx Group, Inc., United States District Court for the Northern District of Georgia, Atlanta Division, Civil Action No. 1:13-cv-03074-TWT (June 3, 2015).

Deposition of Paul A. Gompers in Carpenters Pension Trust Fund of St. Louis, et al. v. Barclays PLC, et al., on behalf of Barclays PLC, United States District Court for the Southern District of New York, Case No. 1:12-cv-5329-SAS (June 18, 2015).

Testimony of Paul A. Gompers in Carpenters Pension Trust Fund of St. Louis, et al. v. Barclays PLC, et al., on behalf of Barclays PLC, United States District Court for the Southern District of New York, Case No. 1:12-cv-5329-SAS (July 15, 2015).

Deposition of Paul A. Gompers in In Re Goldman Sachs Group, Inc. Securities Litigation, on behalf of The Goldman Sachs Group, Inc., United States District Court for the Southern District of New York, Case No. 1:10-cv-03461-PAC (September 9, 2015).

Deposition of Paul A. Gompers in In Re Marriage of Martha Ehmann Conte and Jean-Pierre L. Conte, on behalf of Martha Ehmann Conte, Superior Court of the State of California, City and County of San Francisco, Case No. FDI-10-773039 (September 25, 2015).

Deposition of Paul A. Gompers in In Re Intercept Pharmaceuticals, Inc. Securities Litigation, on behalf of Intercept Pharmaceuticals, Inc., United States District Court for the Southern District of New York, Civil Action No. 1:14-cv-01123-NRB (October 2, 2015).

Deposition of Paul A. Gompers in In Re NII Holdings, Inc. Securities Litigation, on behalf of NII Holdings, Inc., United States District Court for the Eastern District of Virginia, Alexandria Division, Case No. 1:14-cv-00227-LMB-JFA (October 23, 2015).

Deposition of Paul A. Gompers in David M. Loritz, et al. v. Exide Technologies, et al., on behalf of the individual defendants, United States District Court for the Central District of California, Master File

# Paul A. Gompers
# Expert Depositions and Testimony for Prior Five Years

No. 2:13-cv-02607-SVW-E (November 3, 2015).

Deposition of Paul A. Gompers in Första AP-Fonden and Danske Invest Management A/S, Individually and on Behalf of All Others Similarly Situated v. St. Jude Medical, Inc., et al., on behalf of St. Jude Medical, Inc., United States District Court for the District of Minnesota, Civil No. 12-3070 (JNE/HB) (November 6, 2015).

Deposition of Paul A. Gompers in In Re Petrobras Securities Litigation, on behalf of the individual defendants, United States District Court for the Southern District of New York, Case No. 14-cv-9662 (November 11, 2015).

Testimony of Paul A. Gompers in Andrew Segal, M.D. v. Genitrix, LLC, H. Fisk Johnson, III and Stephen Rose, on behalf of the individual defendants, Commonwealth of Massachusetts Superior Court Department, Civil Action No. 09-776-G (November 18, 2015).

Deposition of Paul A. Gompers in In Re Montage Technology Group Limited Securities Litigation, on behalf of Montage Technology Group Limited, United States District Court for the Northern District of California, Case No. 3:14-cv-00722-SI (January 20, 2016).

Deposition of Paul A. Gompers in In Re Symbol Technologies, Inc. Securities Litigation, on behalf of Symbol Technologies, Inc. and the individual defendants, United States District Court for the Eastern District of New York, Civil Action No. 05-CV-3923-DRH (January 27, 2016).

Deposition of Paul A. Gompers in In Re Amgen, Inc. Securities Litigation, on behalf of Amgen, Inc., United States District Court for the Central District of California, Western Division, Case No. CV 07-2536 PSG (PLAx) (February 25, 2016).

Deposition of Paul A. Gompers in In Re Comverge, Inc. Shareholders Litigation, on behalf of the Comverge directors, Court of Chancery of the State of Delaware, Consolidated C.A. No. 7368-VCP (March 24, 2016).

Deposition of Paul A. Gompers in Musashi, L.L.C. and W.R. Huff Asset Management Co., L.L.C. v. Virgin Media Inc., on behalf of Musashi, L.L.C. and W.R. Huff Asset Management Co., L.L.C., Superior Court of New Jersey, Law Division: Morris County, Civil Action No. MRS-L-734-13 (June 1, 2016).

Deposition of Paul A. Gompers in Spin Master Ltd. v. Bureau Veritas Consumer Products Services, Inc. and Eurofins Product safety Labs, Inc., on behalf of Bureau Veritas Consumer Products Services, Inc., United States District Court for the Western District of New York, Civil Action No. 08 CV 0923 (August 8, 2016).

Arbitration Testimony of Paul A. Gompers in Todd M. Rainville v. Symmetric Capital, LLC, et al., on behalf of Symmetric Capital, LLC, et al., American Arbitration Association, Arbitration No. 01-15-003-8498 (August 2016).

Deposition of Paul A. Gompers in Alan Willis, Individually and on Behalf of All Others Similarly Situated v. Big Lots, Inc., et al., on behalf of Big Lots, Inc. and the individual defendants, United States District Court for the Southern District of Ohio, Eastern Division, Case No. 2:12-cv-00604-MHW-NMK (August 25, 2016).

**Appendix B**

# Paul A. Gompers
# Expert Depositions and Testimony for Prior Five Years

Arbitration Testimony of Paul A. Gompers in Michael Christopher v. ArcLight Capital Holdings, LLC, et al., on behalf of Michael Christopher, Judicial Arbitration and Mediation Services, Arbitration No. 1400015869 (October 6, 2016).

Deposition of Paul A. Gompers in ITW Global Investments Inc. v. American Industrial Partners Capital Fund IV, L.P., et al., on behalf of ITW Global Investments Inc., Superior Court of the State of Delaware in and for New Castle County, C.A. No. N14C-10-236 (JRJ) (November 3, 2016).

Deposition of Paul A. Gompers in Keith Thomas, Richard Hayes, Herb Smith, and Oklahoma Police Pension & Retirement System v. Magnachip Semiconductor Corp., Sang Park, Tae Young Hwang, Margaret Sakai, R. Douglas Norby, Ilbok Lee, Nader Tavakoli, Randal Klein, Michel Elkins, Avenue Capital Management II, L.P., Barclays Capital Inc., Deutsche Bank Securities Inc., Citigroup Global Markets Inc., UBS Securities LLC, and Needham and Company, LLC, on behalf of Avenue Capital Management II, L.P., United States District Court for the Northern District of California, Case No. 3:14-cv-01160-JST (November 16, 2016).

Deposition of Paul A. Gompers in Dr. Joseph F. Kasper v. AAC Holdings, Inc. et al., on behalf of AAC Holdings, Inc. and the individual defendants, United States District Court for the Middle District of Tennessee, Case No. 3:15-cv-00923 (January 23, 2017).

Deposition of Paul A. Gompers in In re Facebook, Inc., IPO Securities and Derivative Litigation, on behalf of Facebook, Inc. and its officers and directors named in the suit, United States District Court for the Southern District of New York, MDL No. 12-2389 (March 28, 2017).

Deposition of Paul A. Gompers in Louisiana Municipal Police Employees' Retirement System, et al. v. Green Mountain Coffee Roasters, Inc. et al., on behalf of Green Mountain Coffee Roasters, Inc., United States District Court for the District of Vermont, Civil Action No. 2011-CV-00289 (August 3, 2017).

Deposition of Paul A. Gompers in Ohio Public Employees Retirement System, On Behalf of Itself and All Others Similarly Situated v. Federal Home Loan Mortgage Corporation a/k/a Freddie Mac, et al., on behalf of Federal Home Loan Mortgage Corporation, United States District Court for the Northern District of Ohio, Eastern Division, Civil Action No. 4:08-CV-00160 (September 15, 2017).

Deposition of Paul A. Gompers in Hudson Bay Master Fund Ltd. v. Patriot National, Inc. and Steven M. Mariano and CVI Investments, Inc. v. Patriot National, Inc., on behalf of Patriot National, Inc. and Steven M. Mariano, United States District Court for the Southern District of New York, Case Nos. 16-cv-2767 (GBD) (RLE) and 16-cv-2787 (GBD) (RLE) (October 4, 2017).

Testimony of Paul A. Gompers in Musashi, L.L.C. and W.R. Huff Asset Management Co., L.L.C. v. Virgin Media Inc., on behalf of Musashi, L.L.C. and W.R. Huff Asset Management Co., L.L.C., Superior Court of New Jersey, Law Division: Morris County, Civil Action No. MRS-L-734-13 (October 18, 2017).

Deposition of Paul A. Gompers in Winson Tang v. Lindsay Rosenwald, Michael Weiss, Opus Point Partners, LLC, Mustang Bio, Inc. (aka Mustang Therapeutics, Inc.), City of Hope, and Fortress Biotech, Inc. (f/k/a Coronado Biosciences, Inc.), on behalf of Opus Point Partners, LLC, Mustang

# Paul A. Gompers
# Expert Depositions and Testimony for Prior Five Years

Therapeutics, Inc., Fortress Biotech, Inc., Lindsay Rosenwald, and Michael Weiss, Superior Court of the State of California, County of Los Angeles, Case No. BC 607346 (October 23, 2017).

Deposition of Paul A. Gompers in EWC Holdings, Inc. v. Princeton Ventures II, LLC and Brazos/EWC, LLC, on behalf of EWC Holdings, Inc., Court of Chancery of the State of Delaware, C.A. No. 12519-VCL (November 7, 2017).

Deposition of Paul A. Gompers in Securities and Exchange Commission v. AVEO Pharmaceuticals, Inc., Tuan Ha-Ngoc, David Johnston, and William Slichenmeyer, on behalf of the individual defendants, United States District Court for the District of Massachusetts, Case No. 1:16-cv-10607-NMG (December 13, 2017).

Deposition of Paul A. Gompers in Ralph S. Janvey, In His Capacity as Court-Appointed Receiver for the Stanford Receivership Estate, and the Official Stanford Investors Committee v. Proskauer Rose, LLP, Chadbourne & Parke, LLP, and Thomas V. Sjoblom, on behalf of Proskauer Rose, LLP and Thomas V. Sjoblom, United States District Court for the Northern District of Texas, Dallas Division, Civil Action No. 3:13-cv-00477-N (January 22, 2018).

Arbitration Testimony of Paul A. Gompers in Credit Agricole Corporate and Investment Bank (f/k/a Calyon Bank New York Branch), et al. v. Black Diamond Capital Management LLC, et al., on behalf of Black Diamond Capital Management LLC, BDC Finance LLC, and Black Diamond CLO 2006-1, American Arbitration Association, Arbitration No. 01-17-0007-1196 (February 6, 2018).

**Appendix C**

## Documents Relied Upon

### Academic Articles

- Chhaochharia, V. and Y. Grinstein (2007), "Corporate Governance and Firm Value: The Impact of the 2002 Governance Rules," *The Journal of Finance*, 62(4), pp. 1789–1825.
- Chordia, T., R. Roll, and A. Subrahmanyam (2008), "Liquidity and Market Efficiency," *Journal of Financial Economics*, 87(2), pp. 249–268.
- Cohen, R., P. Gompers, and T. Vuolteenaho (2002), "Who Underreacts to Cash-Flow News? Evidence From Trading Between Individuals and Institutions," *Journal of Financial Economics*, 66, pp. 409–462.
- D'Avolio, G. (2002), "The Market for Borrowing Stock," *Journal of Financial Economics*, 66, pp. 271–306.
- De Long, J., A. Shleifer, L. Summers, and R. Waldmann (1990), "Noise Trader Risk in Financial Markets," *Journal of Political Economy*, 98(4), pp. 703–738.
- Dellavigna, S., and J. Pollet, (2009), "Investor Inattention and Friday Earnings Announcements," *The Journal of Finance*, 64(2), pp. 709–749.
- Fama, E. (1970), "Efficient Capital Markets: A Review of Theory and Empirical Work," *The Journal of Finance*, 25(2), pp. 383–417.
- Fama, E. (1991), "Efficient Capital Markets: II," *The Journal of Finance*, 46(5), pp. 1575–1617.
- Fama, E., L. Fisher, M. Jensen, and R. Roll (1969), "The Adjustment of Stock Prices to New Information," *International Economic Review*, 10(1), pp. 1–21.
- Fuller, K., J. Netter, and M. Stegemoller (2002), "What Do Returns to Acquiring Firms Tell Us? Evidence From Firms That Make Many Acquisitions," *The Journal of Finance*, 57(4), pp. 1763–1793.
- Hirshleifer, D., S. Lim, and S. Teoh (2009), "Driven to Distraction: Extraneous Events and Underreaction to Earnings News," *The Journal of Finance*, 64(5), pp. 2289–2325.
- Hong, H. and J. Stein (2007), "Disagreement and the Stock Market," *The Journal of Economic Perspectives*, 21(2), pp. 109–128.
- Huberman, G. and T. Regev (2001), "Contagious Speculation and a Cure for Cancer: A Nonevent that Made Stock Prices Soar," *The Journal of Finance*, 56(1), pp. 387–396.
- Jegadeesh, N., and S. Titman (1993), "Returns to Buying Winners and Selling Losers: Implications for Stock Market Efficiency," *The Journal of Finance*, 48(1), pp. 65–91.
- Lakonishok, J., A. Shleifer, and R. Vishny (1994), "Contrarian Investment, Extrapolation, and Risk," *The Journal of Finance*, 49(5), pp. 1541–1578.
- Lamont, O. and R. Thaler (2003), "Anomalies: The Law of One Price in Financial Markets," *The Journal of Economic Perspectives*, 17(4), pp. 191–202.
- MacKinlay, A. (1997), "Event Studies in Economics and Finance," *Journal of Economic Literature*, 35(1), pp. 13–39.
- Mitchell, M. and T. Pulvino, (2012), "Arbitrage Crashes and the Speed of Capital," *Journal of Financial Economics*, 104(3), pp. 469–490.
- Mitchell, M., T. Pulvino, and E. Stafford (2002), "Limited Arbitrage in Equity Markets," *The Journal of Finance*, 57(2), pp. 551–584.
- Moeller, S., F. Schlingemann, and R. Stulz (2005), "Wealth Destruction on a Massive Scale? A Study of Acquiring-Firm Returns in the Recent Merger Wave," *The Journal of Finance*, 60(2), pp. 757–782.

- Saffi, P. and K. Sigurdsson (2011), "Price Efficiency and Short Selling," *Review of Financial Studies*, 24(3), pp. 821–852.
- Shleifer, A. and R. Vishny (1997), "The Limits of Arbitrage," *The Journal of Finance*, 52(1), pp. 35–55.
- Tetlock, P. (2011), "All the News That's Fit to Reprint: Do Investors React to Stale Information?," *The Review of Financial Studies*, 24(5), pp. 1481–1512.

**Analyst Reports**

- Baird Equity Research, "UTI Worldwide Inc. (UTIW) Recap a Seemingly Expensive Solution to a Short-Term Liquidity Need." February 27, 2014.
- BB&T Capital Markets, "UTIW: Q4'14 Impacted by Higher Costs and Margin Pressure; Breaches Covenants."  February 26, 2014.
- RBC Capital, "UTi Worldwide Inc. A wild day, we view risk/reward as favorable." February 27, 2014.

**Conference Calls**

- UTi Worldwide, Inc. Conference Call on February 26, 2014.
- UTi Worldwide, Inc. Conference Call on September 6, 2013.

**Books**

- Bodie, Z., A. Kane, and A. Marcus (2013), *Investments*, New York: McGraw-Hill Irwin, Tenth Edition.
- Campbell, J., A. Lo, A. MacKinlay (1997), *The Econometrics of Financial Markets*, New Jersey: Princeton University Press.

**Depositions**

- Deposition of Cynthia L. Jones, CFA, dated January 31, 2018.
- Deposition of Richard Glen Rodick, Jr., dated January 23, 2015.

**Expert Reports**

- Declaration and Expert Report of Cynthia L. Jones, CFA *In re UTi Worldwide, Inc. Securities Litigation*, filed January 2, 2018.
- Declaration of Cynthia L. Jones, CFA *In re China Media Express Holdings, Inc. Shareholder Litigation*, filed on August 15, 2013.
- Report of Cynthia L. Jones, CFA *In re Jiangbo Pharmaceuticals, Inc. Securities Litigation*, filed on September 26, 2014.

**Legal Documents**

-  *Cutler v. Kirchner*, 696 Fed. App'x 809 (9th Cir. 2017).

**Appendix C**

- Third Amended Class Action Complaint in *Michael J. Angley, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. UTi Worldwide, Inc., et al., Defendants*, filed December 29, 2017.

**Press Releases**

- "UTi Worldwide Announces Mike Valentine New Americas Region Sales Vice President," *PRWeb*, July 29, 2013, http://www.prweb.com/releases/2013/7/prweb10972329.htm.
- "UTi Worldwide Expands Multi-Client Warehousing in Chicago Area," *PRWeb*, September 26, 2013, http://www.prweb.com/releases/2013/9/prweb11164172.htm.
- "UTi Worldwide Names Bruce Hulings New Global Lead for Projects, Mining and Energy," *PRWeb*, July 24, 2013, http://www.prweb.com/releases/2013/7/prweb10961973.htm.
- "UTi Worldwide Opens New Expanded London Facility," *PRWeb*, August 12, 2013, http://www.prweb.com/releases/2013/8/prweb11018804.htm.
- Miller, T., "UTi/Starbucks Leases Major Distribution Facility in Sparks, Nevada," *Miller Industrial Properties,* July 15, 2013, http://www.millerindustrialblog.com/utistarbucks-leases-major-distribution-facility-in-sparks-nevada/.

**Data Sources**

- *Bloomberg*
- *S&P Capital IQ*
- *Dow Jones Factiva*
- *Thomson Reuters*

**SEC Filings**

- UTi Worldwide, Inc. Form 10-Q for Q3 FY2008 filed December 10, 2007.
- UTi Worldwide, Inc. Form 10-K for FY2008 filed April 14, 2008.
- UTi Worldwide, Inc. Form 10-Q for Q1 FY2009 filed June 9, 2008.
- UTi Worldwide, Inc. Form 10-Q for Q2 FY2009 filed September 9, 2008.
- UTi Worldwide, Inc. Form 8-K filed February 25, 2014.
- UTi Worldwide, Inc. Form 10-K for FY2013 filed April 1, 2013.

**Other**

- *Cammer v. Bloom*, 711 F. Supp. 1264, 1287 (D.N.J. 1989).
- Tabak, D., "Use and Misuse of Event Studies to Examine Market Efficiency, *Nera Economic Consulting*, April 30, 2010, Retrieved from http://www.nera.com/content/dam/nera/publications/archive2/PUB_Use_Misuse_of_Event_Studies_0410_final.pdf.
- Revised Exhibit 13, filed on January 30, 2018.

# UTi Worldwide Inc.
## List of Thomson Reuters Analyst Reports released on Ms. Jones' "No-News Days" [1]

| Contributor | Report Date [2] | Trading Date [3] |
|---|---|---|
| **Included in Exhibit 8 but not in Exhibit 12 of the Jones Declaration** | | |
| CFRA Research | 4/3/2013 | 4/3/2013 |
| Wright Investors Service | 4/6/2013 | 4/8/2013 |
| SADIF Analytics | 6/11/2013 | 6/11/2013 |
| CFRA Research | 6/20/2013 | 6/20/2013 |
| Wright Investors Service | 8/16/2013 | 8/16/2013 |
| SADIF Analytics [4] | 9/10/2013 | 9/10/2013 |
| CFRA Research [4] | 9/17/2013 | 9/17/2013 |
| Wright Investors Service | 10/4/2013 | 10/4/2013 |
| CFRA Research | 12/13/2013 | 12/13/2013 |
| SADIF Analytics | 12/16/2013 | 12/16/2013 |
| SADIF Analytics | 1/7/2014 | 1/7/2014 |
| CFRA Research | 2/6/2014 | 2/6/2014 |
| Wright Investors Service | 2/9/2014 | 2/10/2014 |
| CFRA Research | 2/10/2014 | 2/10/2014 |
| **Excluded from Exhibit 8 and Exhibit 12 of the Jones Declaration** | | |
| GlobalData | 4/15/2013 | 4/15/2013 |
| MarketLine (A Datamonitor Company) - Company Research | 5/10/2013 | 5/10/2013 |
| MarketLine (A Datamonitor Company) - Company Research | 6/18/2013 | 6/18/2013 |
| MarketLine (A Datamonitor Company) - Company Research | 8/7/2013 | 8/7/2013 |
| MarketLine (A Datamonitor Company) - Company Research | 9/30/2013 | 9/30/2013 |
| MarketLine (A Datamonitor Company) - Company Research | 10/31/2013 | 10/31/2013 |
| GlobalData | 11/27/2013 | 11/27/2013 |
| MarketLine (A Datamonitor Company) - Company Research | 11/29/2013 | 11/29/2013 |
| GlobalData | 12/19/2013 | 12/19/2013 |
| MarketLine (A Datamonitor Company) - Company Research | 1/8/2014 | 1/8/2014 |
| GlobalData | 1/15/2014 | 1/15/2014 |
| MarketLine (A Datamonitor Company) - Company Research | 2/17/2014 | 2/18/2014 |

Source:  Expert Report of Cynthia L. Jones in re UTi Worldwide, Inc. Securities Litigation, filed on January 2, 2018; Revised Exhibit 13, filed on January 30, 2018; Thomson Reuters

Notes:

[1] List of analyst reports archived by Thomson Reuters found on days categorized as "no-news days" in Exhibit 13 of the Jones Declaration.

[2] Date Thomson Reuters ascribes to a specific report.

[3] This is the next trading day if the "Report Date" falls on a weekend or holiday.

[4] Ms. Jones recategorized this day as a "no-news day" in the revised Exhibit 13.

## UTi Worldwide Inc.

## Comparison of Excess Returns in the Jones Declaration Against Dividend Adjusted Excess Returns

| Date | Price | Jones Declaration Excess Return [1] | Statistical Significance [2] | Dividend Adjusted Excess Return [3] | Statistical Significance [2] |
|------|-------|-------------------------------------|------------------------------|-------------------------------------|------------------------------|
| 3/28/13 | 14.48 | -2.08% | | -2.07% | |
| 4/1/13 | 14.20 | -0.22% | | -0.21% | |
| 4/2/13 | 14.04 | -0.67% | | -0.66% | |
| 4/3/13 | 14.52 | 4.48% | * | 4.50% | * |
| 4/4/13 | 14.56 | -0.27% | | -0.26% | |
| 4/5/13 | 14.39 | -1.70% | | -1.68% | |
| 4/8/13 | 14.17 | -2.11% | | -2.10% | |
| 4/9/13 | 14.18 | -0.03% | | -0.03% | |
| 4/10/13 | 14.55 | 0.90% | | 0.90% | |
| 4/11/13 | 14.68 | 1.00% | | 1.00% | |
| 4/12/13 | 14.49 | -0.50% | | -0.49% | |
| 4/15/13 | 14.05 | 0.20% | | 0.22% | |
| 4/16/13 | 14.17 | -0.66% | | -0.66% | |
| 4/17/13 | 14.11 | 1.42% | | 1.44% | |
| 4/18/13 | 14.11 | 0.61% | | 0.63% | |
| 4/19/13 | 13.94 | -1.93% | | -1.93% | |
| 4/22/13 | 13.86 | -1.08% | | -1.08% | |
| 4/23/13 | 14.02 | 0.81% | | 0.81% | |
| 4/24/13 | 14.10 | 0.65% | | 0.66% | |
| 4/25/13 | 14.54 | 3.00% | * | 3.01% | * |
| 4/26/13 | 14.60 | 0.51% | | 0.52% | |
| 4/29/13 | 14.51 | -1.09% | | -1.09% | |
| 4/30/13 | 14.69 | 0.76% | | 0.76% | |
| 5/1/13 | 14.19 | -1.40% | | -1.39% | |
| 5/2/13 | 14.94 | 3.26% | * | 3.26% | * |
| 5/3/13 | 15.38 | 1.32% | | 1.32% | |
| 5/6/13 | 15.66 | 0.52% | | 0.50% | |
| 5/7/13 | 16.09 | 1.62% | | 1.63% | |
| 5/8/13 | 16.12 | 1.28% | | 1.25% | |
| 5/9/13 | 15.64 | -1.62% | | -1.62% | |
| 5/10/13 | 15.64 | -0.60% | | -0.60% | |
| 5/13/13 | 15.56 | 0.26% | | 0.26% | |
| 5/14/13 | 15.80 | 0.41% | | 0.41% | |
| 5/15/13 | 15.96 | -0.20% | | -0.19% | |
| 5/16/13 | 15.98 | 0.21% | | 0.21% | |
| 5/17/13 | 16.06 | -0.06% | | -0.06% | |
| 5/20/13 | 16.16 | 0.02% | | 0.02% | |
| 5/21/13 | 16.25 | -0.22% | | -0.22% | |
| 5/22/13 | 15.75 | -1.89% | | -1.88% | |
| 5/23/13 | 15.79 | -0.49% | | -0.49% | |
| 5/24/13 | 15.62 | -0.41% | | -0.41% | |
| 5/28/13 | 15.89 | 1.05% | | 1.05% | |
| 5/29/13 | 15.57 | -1.01% | | -1.00% | |
| 5/30/13 | 15.72 | 0.85% | | 0.75% | |
| 5/31/13 | 15.84 | 1.50% | | 1.50% | |
| 6/3/13 | 15.71 | -0.90% | | -0.90% | |
| 6/4/13 | 15.33 | -1.51% | | -1.50% | |
| 6/5/13 | 15.00 | -0.51% | | -0.59% | |
| 6/6/13 | 15.21 | 0.73% | | 0.73% | |
| 6/7/13 | 15.41 | -0.62% | | -0.62% | |
| 6/10/13 | 15.31 | -0.63% | | -0.62% | |
| 6/11/13 | 15.13 | -0.10% | | -0.09% | |
| 6/12/13 | 15.08 | 0.56% | | 0.57% | |
| 6/13/13 | 15.68 | 2.27% | | 2.26% | |
| 6/14/13 | 15.53 | -0.26% | | -0.24% | |
| 6/17/13 | 15.37 | -1.21% | | -1.21% | |
| 6/18/13 | 15.75 | 1.54% | | 1.54% | |

**Exhibit 2**

| Date | Price | Jones Declaration Excess Return [1] | Statistical Significance [2] | Dividend Adjusted Excess Return [3] | Statistical Significance [2] |
|---|---|---|---|---|---|
| 6/19/13 | 15.42 | -1.21% | | -1.20% | |
| 6/20/13 | 15.17 | 0.54% | | 0.56% | |
| 6/21/13 | 15.27 | 1.07% | | 1.07% | |
| 6/24/13 | 15.26 | 1.47% | | 1.48% | |
| 6/25/13 | 15.54 | 0.89% | | 0.89% | |
| 6/26/13 | 15.91 | 1.85% | | 2.22% | |
| 6/27/13 | 16.15 | 0.19% | | 0.18% | |
| 6/28/13 | 16.47 | 1.29% | | 1.30% | |
| 7/1/13 | 16.18 | -3.30% | * | -3.30% | * |
| 7/2/13 | 15.90 | -0.83% | | -0.82% | |
| 7/3/13 | 15.82 | -0.31% | | -0.30% | |
| 7/5/13 | 16.27 | 1.69% | | 1.69% | |
| 7/8/13 | 16.08 | -1.54% | | -1.53% | |
| 7/9/13 | 16.46 | 1.39% | | 1.39% | |
| 7/10/13 | 16.50 | 0.24% | | 0.24% | |
| 7/11/13 | 16.72 | 0.02% | | 0.02% | |
| 7/12/13 | 16.26 | -1.71% | | -1.71% | |
| 7/15/13 | 16.59 | 0.90% | | 0.90% | |
| 7/16/13 | 16.51 | 0.03% | | 0.04% | |
| 7/17/13 | 16.61 | 0.59% | | 0.59% | |
| 7/18/13 | 16.94 | 0.55% | | 0.56% | |
| 7/19/13 | 16.72 | -0.87% | | -0.86% | |
| 7/22/13 | 16.74 | 0.13% | | 0.13% | |
| 7/23/13 | 16.50 | 0.13% | | 0.14% | |
| 7/24/13 | 16.30 | -0.74% | | -0.73% | |
| 7/25/13 | 16.40 | 0.07% | | 0.07% | |
| 7/26/13 | 16.46 | -0.34% | | -0.34% | |
| 7/29/13 | 16.25 | -0.15% | | -0.14% | |
| 7/30/13 | 16.34 | 0.86% | | 0.86% | |
| 7/31/13 | 16.50 | 0.69% | | 0.67% | |
| 8/1/13 | 17.29 | 2.19% | | 2.19% | |
| 8/2/13 | 17.05 | -0.74% | | -0.74% | |
| 8/5/13 | 17.10 | 0.65% | | 0.63% | |
| 8/6/13 | 16.72 | -1.23% | | -1.22% | |
| 8/7/13 | 16.42 | -0.34% | | -0.33% | |
| 8/8/13 | 16.42 | -0.50% | | -0.50% | |
| 8/9/13 | 16.27 | -0.51% | | -0.50% | |
| 8/12/13 | 16.54 | 1.57% | | 1.57% | |
| 8/13/13 | 16.53 | 0.76% | | 0.76% | |
| 8/14/13 | 16.35 | -0.53% | | -0.53% | |
| 8/15/13 | 16.15 | 0.07% | | 0.09% | |
| 8/16/13 | 16.23 | 0.87% | | 0.87% | |
| 8/19/13 | 16.08 | -0.24% | | -0.23% | |
| 8/20/13 | 16.52 | 1.31% | | 1.31% | |
| 8/21/13 | 16.62 | 0.96% | | 0.97% | |
| 8/22/13 | 17.01 | 0.66% | | 0.67% | |
| 8/23/13 | 17.23 | 1.25% | | 1.26% | |
| 8/26/13 | 17.36 | 0.12% | | 0.12% | |
| 8/27/13 | 16.84 | -0.84% | | -0.82% | |
| 8/28/13 | 16.86 | 0.53% | | 0.53% | |
| 8/29/13 | 16.92 | -0.02% | | -0.02% | |
| 8/30/13 | 16.51 | -1.11% | | -1.10% | |
| 9/3/13 | 16.67 | 0.13% | | 0.14% | |
| 9/4/13 | 17.11 | 2.39% | | 2.30% | |
| 9/5/13 | 17.05 | -0.90% | | -0.90% | |
| 9/6/13 | 16.04 | -5.90% | * | -5.90% | * |
| 9/9/13 | 15.27 | -6.15% | * | -6.15% | * |
| 9/10/13 | 15.20 | -2.11% | | -2.11% | |
| 9/11/13 | 15.16 | -0.50% | | -0.49% | |
| 9/12/13 | 14.96 | -0.42% | | -0.41% | |
| 9/13/13 | 14.74 | -1.38% | | -1.38% | |
| 9/16/13 | 15.00 | 1.18% | | 1.19% | |
| 9/17/13 | 15.10 | 0.47% | | 0.47% | |
| 9/18/13 | 15.25 | -0.02% | | -0.02% | |

**Exhibit 2**

| Date | Price | Jones Declaration Excess Return [1] | Statistical Significance [2] | Dividend Adjusted Excess Return [3] | Statistical Significance [2] |
|---|---|---|---|---|---|
| 9/19/13 | 15.04 | -1.71% | | -1.70% | |
| 9/20/13 | 15.10 | 0.40% | | 0.41% | |
| 9/23/13 | 15.19 | 1.06% | | 1.06% | |
| 9/24/13 | 15.36 | 0.76% | | 0.77% | |
| 9/25/13 | 15.13 | -0.87% | | -0.86% | |
| 9/26/13 | 15.27 | 0.52% | | 0.51% | |
| 9/27/13 | 15.15 | -0.10% | | -0.09% | |
| 9/30/13 | 15.11 | 0.08% | | 0.09% | |
| 10/1/13 | 15.04 | -1.66% | | -1.67% | |
| 10/2/13 | 15.05 | 0.76% | | 0.77% | |
| 10/3/13 | 14.82 | -0.05% | | -0.04% | |
| 10/4/13 | 14.94 | 0.44% | | 0.44% | |
| 10/7/13 | 14.90 | 0.84% | | 0.86% | |
| 10/8/13 | 14.68 | 0.42% | | 0.44% | |
| 10/9/13 | 14.63 | -0.08% | | -0.07% | |
| 10/10/13 | 14.88 | 0.00% | | -0.01% | |
| 10/11/13 | 14.95 | -1.09% | | -1.09% | |
| 10/14/13 | 14.96 | -0.22% | | -0.22% | |
| 10/15/13 | 14.86 | -0.03% | | -0.02% | |
| 10/16/13 | 15.02 | 0.00% | | 0.00% | |
| 10/17/13 | 14.90 | -1.92% | | -1.91% | |
| 10/18/13 | 15.14 | 0.52% | | 0.52% | |
| 10/21/13 | 15.14 | 0.08% | | 0.08% | |
| 10/22/13 | 15.10 | -0.31% | | -0.30% | |
| 10/23/13 | 15.06 | 0.19% | | 0.20% | |
| 10/24/13 | 15.53 | 2.26% | | 2.27% | |
| 10/25/13 | 15.63 | 1.35% | | 1.36% | |
| 10/28/13 | 15.78 | 0.83% | | 0.84% | |
| 10/29/13 | 16.10 | 1.79% | | 1.80% | |
| 10/30/13 | 15.73 | -1.61% | | -1.60% | |
| 10/31/13 | 15.20 | -2.02% | | -2.01% | |
| 11/1/13 | 15.18 | -0.35% | | -0.34% | |
| 11/4/13 | 15.79 | 3.08% | * | 3.08% | * |
| 11/5/13 | 15.57 | -0.07% | | -0.07% | |
| 11/6/13 | 15.43 | 0.26% | | 0.24% | |
| 11/7/13 | 15.05 | -0.81% | | -0.79% | |
| 11/8/13 | 15.33 | 0.55% | | 0.55% | |
| 11/11/13 | 15.38 | -0.04% | | -0.03% | |
| 11/12/13 | 15.42 | -0.20% | | -0.19% | |
| 11/13/13 | 15.30 | -1.27% | | -1.29% | |
| 11/14/13 | 15.25 | -0.17% | | -0.17% | |
| 11/15/13 | 15.26 | -0.71% | | -0.71% | |
| 11/18/13 | 15.52 | 2.20% | | 2.21% | |
| 11/19/13 | 15.50 | 0.84% | | 0.84% | |
| 11/20/13 | 15.25 | -1.07% | | -1.06% | |
| 11/21/13 | 15.64 | 1.36% | | 1.36% | |
| 11/22/13 | 15.67 | -0.28% | | -0.28% | |
| 11/25/13 | 15.66 | -0.86% | | -0.85% | |
| 11/26/13 | 15.82 | 0.61% | | 0.60% | |
| 11/27/13 | 15.86 | -0.53% | | -0.62% | |
| 11/29/13 | 15.81 | -0.37% | | -0.36% | |
| 12/2/13 | 15.63 | -0.62% | | -0.61% | |
| 12/3/13 | 15.54 | 0.28% | | 0.29% | |
| 12/4/13 | 15.56 | 0.25% | | 0.25% | |
| 12/5/13 | 16.52 | 5.91% | * | 5.92% | * |
| 12/6/13 | 16.89 | 1.85% | | 1.85% | |
| 12/9/13 | 16.75 | -0.77% | | -0.76% | |
| 12/10/13 | 16.45 | -0.87% | | -0.86% | |
| 12/11/13 | 16.14 | -1.06% | | -1.09% | |
| 12/12/13 | 16.14 | 0.02% | | 0.03% | |
| 12/13/13 | 16.24 | 0.17% | | 0.11% | |
| 12/16/13 | 16.46 | 0.68% | | 0.68% | |
| 12/17/13 | 16.63 | 1.39% | | 1.40% | |
| 12/18/13 | 16.87 | 0.66% | | 0.66% | |

**Exhibit 2**

| Date | Price | Jones Declaration Excess Return [1] | Statistical Significance [2] | Dividend Adjusted Excess Return [3] | Statistical Significance [2] |
|---|---|---|---|---|---|
| 12/19/13 | 16.80 | -0.18% | | -0.17% | |
| 12/20/13 | 17.22 | 1.15% | | 1.15% | |
| 12/23/13 | 17.38 | 0.22% | | 0.22% | |
| 12/24/13 | 17.49 | 0.44% | | 0.43% | |
| 12/26/13 | 17.54 | -0.32% | | -0.31% | |
| 12/27/13 | 17.61 | 0.89% | | 0.89% | |
| 12/30/13 | 17.52 | -0.32% | | -0.32% | |
| 12/31/13 | 17.56 | -0.26% | | -0.26% | |
| 1/2/14 | 17.41 | 0.17% | | 0.17% | |
| 1/3/14 | 17.30 | -1.62% | | -1.61% | |
| 1/6/14 | 17.21 | 0.54% | | 0.55% | |
| 1/7/14 | 17.44 | 0.49% | | 0.49% | |
| 1/8/14 | 17.13 | -2.01% | | -2.00% | |
| 1/9/14 | 17.17 | -0.49% | | -0.48% | |
| 1/10/14 | 17.39 | 0.07% | | 0.08% | |
| 1/13/14 | 17.12 | -0.22% | | -0.20% | |
| 1/14/14 | 17.33 | 0.44% | | 0.43% | |
| 1/15/14 | 17.33 | -0.84% | | -0.84% | |
| 1/16/14 | 17.27 | -0.46% | | -0.45% | |
| 1/17/14 | 17.20 | 0.13% | | 0.14% | |
| 1/21/14 | 17.38 | -0.06% | | -0.06% | |
| 1/22/14 | 17.57 | 0.02% | | 0.03% | |
| 1/23/14 | 17.24 | -0.79% | | -0.78% | |
| 1/24/14 | 16.40 | -1.50% | | -1.48% | |
| 1/27/14 | 16.28 | 0.91% | | 0.92% | |
| 1/28/14 | 16.07 | -2.58% | | -2.58% | |
| 1/29/14 | 15.69 | -1.84% | | -1.82% | |
| 1/30/14 | 15.97 | 0.43% | | 0.42% | |
| 1/31/14 | 15.66 | -1.22% | | -1.21% | |
| 2/3/14 | 15.11 | -1.40% | | -1.37% | |
| 2/4/14 | 15.15 | -0.46% | | -0.46% | |
| 2/5/14 | 15.03 | 0.53% | | 0.52% | |
| 2/6/14 | 15.21 | 0.29% | | 0.28% | |
| 2/7/14 | 15.41 | 0.39% | | 0.38% | |
| 2/10/14 | 15.30 | -0.56% | | -0.56% | |
| 2/11/14 | 15.81 | 2.65% | * | 2.63% | |
| 2/12/14 | 15.63 | -0.89% | | -0.88% | |
| 2/13/14 | 15.58 | -0.97% | | -0.97% | |
| 2/14/14 | 15.74 | 0.68% | | 0.68% | |
| 2/18/14 | 15.68 | -0.02% | | -0.02% | |
| 2/19/14 | 15.28 | -1.72% | | -1.71% | |
| 2/20/14 | 15.42 | -0.52% | | -0.51% | |
| 2/21/14 | 15.40 | -0.60% | | -0.59% | |
| 2/24/14 | 15.49 | 0.16% | | 0.16% | |
| 2/25/14 | 15.26 | -0.64% | | -0.63% | |
| **Total** | | **230** | | **230** | |
| **Total Number of Significant Days** | | **9** | | **8** | |

Source: *Bloomberg*; Expert Report of Cynthia L. Jones in re UTi Worldwide, Inc. Securities Litigation, filed on January 2, 2018

Notes:

[1]   Ms. Jones' event study model includes the NASDAQ Composite Index (market index) and the NASDAQ Transportation Index (industry index).  Her model is estimated over a 1 year control period prior to the Putative Class Period.  Ms. Jones did not adjust her market, industry, and stock returns for dividends.

[2]   A "*" indicates statistical significance at a 95% confidence level.

[3]   Dividend adjustments for UTi Worldwide and the NASDAQ Transportation Index are made using periodic dividend data provided by Bloomberg.  Dividend adjustments for the NASDAQ Composite Index are made by using the Total Returns NASDAQ Composite Index.

**Exhibit 3**

# UTi Worldwide Inc.

## Cash Flow from Operations by Quarter [1]
## Fiscal Year 2001 –  Fiscal Year 2014

| Fiscal Year | Q1 | Q2 | Q3 | Q4 |
|---|---|---|---|---|
| 2001 | 7.95 | 0.01 | 11.44 | 13.25 |
| 2002 | 7.06 | 11.46 | 11.10 | 13.46 |
| 2003 | 8.95 | 6.29 | 10.43 | 23.94 |
| 2004 | 0.11 | 13.72 | 22.78 | 29.25 |
| 2005 | -4.90 | 29.16 | -9.00 | 46.62 |
| 2006 | -3.30 | 25.84 | -22.60 | 104.41 |
| 2007 | -59.20 | 66.75 | 16.54 | 104.14 |
| 2008 [2] | -36.40 | 60.12 | 13.74 | 69.26 |
| 2009 [2] | -21.90 | 35.66 | 59.08 | 77.65 |
| 2010 | 14.83 | 51.48 | -14.70 | 68.33 |
| 2011 | -28.50 | -20.00 | 60.26 | 61.16 |
| 2012 | -43.60 | 37.64 | 27.67 | 96.26 |
| 2013 | -10.20 | -4.10 | -43.10 | 98.25 |
| 2014 | -52.60 | 5.90 | -22.20 | -29.20 |

Source:  *Capital IQ;* SEC Form 10-K filed by UTi Worldwide Inc. for FY2008; SEC Forms 10-Q filed by UTi Worldwide Inc. for Q3 FY2008, Q1 FY2009, and Q2 FY2009

Notes:

[1]  All values in millions of US dollars.  Unless otherwise noted, all values are sourced from Capital IQ.

[2]  Values for Q4 FY2008 and Q2 FY2009 are calculated using data from SEC filings.  Data for these quarters are unavailable on Capital IQ.