# EXHIBIT 2

```
 1          UNITED STATES DISTRICT COURT
 2          CENTRAL DISTRICT OF CALIFORNIA
 3                   -   -   -
 4   MATTHEW J. ANGLEY,    :
     Individually and on  :
 5   Behalf of All Others :
     Similarly Situated,  :
 6            Plaintiff,  :
                          :
 7        vs.             :
                          :
 8   UTI WORLDWIDE, INC., :
     et al.,              :
 9            Defendants.:  2:14-cv-02066-CBM-E
10                   -   -   -
11        Wednesday, January 31, 2018
12                   -   -   -
13        Video-recorded deposition of CYNTHIA L.
14   JONES, taken pursuant to notice, held at the
15   Law Offices of Cravath, Swaine & Moore LLP,
16   Worldwide Plaza, 825 Eighth Avenue, New York,
17   New York, 10019, commencing at 9:59 a.m., on
18   the above date, before Jennifer P. Miller,
19   RPR, CCR, CRR #30X100234100 and Notary Public.
20
21
22
23
24
25   Job No. 136932
```

1    A P P E A R A N C E S:

2    FEDERMAN & SHERWOOD

3    WILLIAM FEDERMAN, ESQUIRE

4    10205 N. Pennsylvania Avenue

5    Oklahoma City, OK 73120

6     Counsel for Plaintiff

7

8

9

10   CRAVATH, SWAINE & MOORE

11   MARGARITA BOTERO, ESQUIRE

12   ISAAC CHAPUT, ESQUIRE

13   Worldwide Plaza

14   825 Eighth Avenue

15   New York, NY 10019

16    Counsel for Defendants

17

18

19

20   ALSO PRESENT:  Kevin Marth, Videographer

21                 Robin Hester, Paralegal

22

23

24

25

1          THE VIDEOGRAPHER:   Good morning.

2     This marks the start of media label

3     number one of the video-recorded

4     deposition of Cynthia L. Jones in the

5     matter of Matthew J. Angley, Individually

6     and on Behalf of All Others Similarly

7     Situated, versus UTi Worldwide, Inc. et

8     al. in the United States District Courts

9     for the Central District of California,

10    Western Division.

11         The deposition today is being held

12    in the offices of Cravath, Swaine & Moore

13    in New York, New York on January 31st

14    2018 at approximately 9:59 a.m.  My name

15    is Kevin Marth.  I'm the Legal Video

16    Specialist from TSG Reporting, Inc.,

17    headquartered at 747 Third Avenue in New

18    York, New York.  Our Court Reporter today

19    is Jennifer Billstein-Miller, also in

20    association with TSG Reporting.  At this

21    time would counsel please identify

22    themselves for the record.

23         MR. CHAPUT:  Isaac Chaput with

24    Cravath, Swaine & Moore, LLP on behalf of

25    Defendants.

Page 4

1           MS. BOTERO:  Margarita Botero with

2      Cravath, Swaine & Moore on behalf of

3      Defendants.

4           MR. FEDERMAN:  William B. Federman,

5      Federman & Sherwood, on behalf of the

6      Plaintiff.

7           THE VIDEOGRAPHER:  At this time

8      would the Court Reporter please swear in

9      the witness so we may proceed.

10               -   -   -

11           CYNTHIA L. JONES, after

12        having been first duly sworn, was

13        examined and testified as follows:

14               -   -   -

15          E X A M I N A T I O N

16               -   -   -

17  BY MR. CHAPUT:

18      Q.   Good morning, Ms. Jones.

19      A.   Good morning.

20      Q.   Would you please state your full

21  name for the record.

22      A.   Cynthia L. Jones.

23      Q.   Do you go by any other names?

24      A.   Yes, my legal name is recently

25  changed -- has recently changed because of

Page 5

1    marriage.  My last name is Melillo,

2    M-E-L-I-L-L-O.

3         Q.   Would you please state your business

4    address for the record.

5         A.   Sure, it's 5 Penn Plaza, New York,

6    New York, 10002.

7         Q.   Have you ever been deposed as an

8    expert before?

9         A.   Yes.

10        Q.   On how many occasions?

11        A.   Three.

12        Q.   And have you been deposed as an

13   expert in any cases other than those that are

14   listed in your expert report in this case?

15        A.   No.

16        Q.   You understand that you're under

17   oath and that your testimony today is being

18   videotaped?

19        A.   Yes.

20        Q.   If you don't understand any

21   questions or need me to repeat anything,

22   please let me know, otherwise I'll assume that

23   you understood my question; is that fair?

24        A.   Yes.

25        Q.   Please make sure to give all of your

1      A.   You're characterizing it as the

2  event study.  Whereas, there was also an

3  analysis of events separate and apart from the

4  analysis that's set forth beginning in

5  paragraph 65.

6      Q.   Are you referring to the examples of

7  statistically significant abnormal return days

8  that you explain in paragraph 80?

9      A.   Yes.

10      Q.   But apart from those examples, the

11  methodology you performed for your primary

12  event study is the one that starts in

13  paragraph 65, correct?

14      A.   You're characterizing it as the

15  primary event study.  Other than using the

16  word "the primary event study," I agree with

17  that statement.

18      Q.   And you state that the premise

19  behind this analysis is set forth in the

20  Ferrillo article in the St. John's Law Review;

21  is that right?

22      A.   Yes, yes.

23      Q.   Is the premise behind this analysis

24  set forth in any economic publications that

25  you're aware of?

1      A.   Not that I can cite to, but it is

2  certainly often described in financial and

3  economic literature.

4      Q.   And the Ferrillo authors state that,

5  while this test addresses the question of

6  whether the stock responds to news, it does

7  not answer the question about whether the

8  response is of the correct magnitude.

9  Therefore, this step is a threshold step, not

10 a sufficient condition, to show that a stock

11 traded in an efficient market.

12           Do you recall having read that?

13     A.   Yes.

14     Q.   What do you think that means?

15     A.   Can I have a copy of the article?

16          MR. CHAPUT:  Absolutely.

17                 -  -  -

18          (Whereupon, Exhibit 102 was

19      marked for identification.)

20                 -  -  -

21     THE WITNESS:  Can you just point me

22      to the page?

23 BY MR. CHAPUT:

24     Q.   Absolutely.  That quote is on Page

25 122.

1    A.   Oh, sure, yes.  So I believe what

2    they're saying here is it is one way to

3    demonstrate that the market is informationally

4    efficient; that it responds to new

5    information.

6              It doesn't, however, answer the

7    question of whether or not a stock may have

8    overreacted, so to speak, or underreacted to

9    certain information.  So that's more of a --

10   the context of value rather than does the

11   stock respond to information.  Is it

12   informationally efficient, which is the

13   premise behind the semi-strong form of the

14   efficient market hypothesis.

15   Q.   So when it says this test is a

16   threshold step, not a sufficient condition, to

17   show that a stock traded in an efficient

18   market, it's your opinion that that means that

19   this test does show that the stock traded in

20   an efficient market?

21   A.   It shows the stock is

22   informationally efficient, it responds to new

23   information, yes.

24   Q.   Is informational efficiency the same

25   as market efficiency?

1       A.    So market efficiency in terms of a

2   legal context like in a securities litigation

3   is -- has different aspects to it.  There are

4   different indicators of it.

5                   Price response to information

6   is informational efficiency or shows

7   informational efficiency.  So it is a

8   component of what courts typically look at in

9   assessing overall market efficiency.

10      Q.    So this test is a component that

11  help -- that helps show potentially market

12  efficiency, but it doesn't prove market

13  efficiency in and of itself?

14      A.    I would agree with that.

15      Q.    In your report, you state that in

16  markets that are semi-strong efficient

17  securities prices reflect all publicly

18  available information; do you recall that?

19                  It's paragraph 18 if you'd like

20  to look.

21      A.    Thank you.

22                  I would agree with that.

23      Q.    Conceptually, that means that any

24  time a new piece of firm-specific information

25  enters the market, the stock price will react

Page 42

1    to it; is that correct?

2         A.   No.

3         Q.   Why not?

4         A.   More often than not, when

5    information enters the market about a company,

6    it is consistent with what the investment

7    community expects, and therefore, it doesn't

8    change the stock price.

9         Q.   So information that is consistent

10   with the investment community's expectations

11   does not impact the stock price?

12        A.   Generally.

13        Q.   So, when you say that security

14   prices reflect all publicly available

15   information, what do you mean if it's not that

16   the stock price react to new firm-specific

17   information?

18        A.   There can be an equilibrium with

19   regard to the price, which reflects -- it's a

20   mosaic, so it reflects all of the information

21   that's in the market about a security.

22                  Generally, when that

23   equilibrium is disrupted by something that is

24   new, unexpected, whether it be positive or

25   negative, is when you see some kind of change

Page 43

1   in the price.  And certainly, all security

2   prices have some random fluctuation associated

3   with them, so that's not what I'm referring

4   to.

5        Q.   So, if stock prices don't react to

6   all publicly available information, what

7   publicly available information do they react

8   to?

9        A.   I think I just explained that when

10  new information enters the market that

11  disrupts the equilibrium because it is

12  unexpected, whether it be positive or

13  negative, the stock price would react possibly

14  to that type of information.

15       Q.   And how do you determine whether a

16  piece of information is consistent with

17  expectations as opposed to disruptive of the

18  equilibrium you've described?

19       A.   Can you be more specific?

20                In other words, how do I

21  determine when and for what purpose?

22       Q.   Well, let's say that a piece of

23  information comes out and there's a change in

24  the stock price, whether they're positive or

25  negative.  Do you have a way of determining

Page 44

1    whether that change in the stock price is

2    actually the result of the piece of

3    information; that is, the piece the

4    information was disruptive, versus that change

5    in the stock price was random?

6        A.   One of the ways to make that

7    determination is to review the contemporaneous

8    commentary news articles, analyst reports.

9        Q.   Would you find evidence of market

10   efficiency if the stock price only reacted to

11   new information 11 percent of the time?

12       A.   Say that again?

13       Q.   Would you find evidence of market

14   efficiency if the stock price for a particular

15   company reacted to new information only

16   11 percent of the time?

17       A.   I think it's too general.  I think

18   that I would have to study, you know, over

19   what period of time, what type of information

20   is coming out.  There are a host of factors

21   that would go into an opinion as to whether or

22   not that may be indicative of an efficient

23   market.

24       Q.   So you would have to determine

25   whether or not the news was material; is that

1   fair?

2       A.   Not necessarily.  So it would depend

3   on what -- what type of news it is.  It would

4   depend on whether it was entirely unexpected

5   information.  It would depend on a host of

6   things that I can't answer generally is a

7   number indicative of market efficiency or is a

8   percent indicative of market efficiency.

9               So, you know, in this case,

10  there are two samples.  And statistical

11  sampling is very common in economics.  And so

12  there are two samples; there's a sample of

13  days when news enters the market, there's a

14  sample of days when there's no news.

15              And the methodology is to

16  compare the likelihood of a statistically

17  significant price change in the sample with

18  news versus no news.  And you make that

19  statistical comparison and you test the

20  difference.  So, in isolation, you wouldn't

21  form a conclusion about a certain percentage

22  of days being -- you know, resulting in a

23  price change.

24      Q.   So we were discussing just a minute

25  ago the fact that markets don't necessarily

1          MR. FEDERMAN:  We've been going

2     about an hour or so.  If you guys want to

3     take a break at any convenient point, let

4     me know.

5          MR. CHAPUT:  Now is a fine time for

6     me to take a break.

7          MR. FEDERMAN:  Okay.  Great.

8          MR. CHAPUT:  We can go off the

9     record.

10          THE VIDEOGRAPHER:  This marks the

11     end of tape number one.  We're going off

12     the record at 11:05 a.m.

13               -   -   -

14               (Whereupon, a short recess

15       was taken.)

16               -   -   -

17          THE VIDEOGRAPHER:  This is the start

18     of tape number two.  We're back on the

19     record at 11:13.

20   BY MR. CHAPUT:

21     Q.   In performing your event study in

22   this case, you identified 36 news days; is

23   that right?

24     A.   Yes.

25     Q.   And then you found that UTi's stock

1    price responded to your identified news on

2    four days and did not respond on the remaining

3    32 days; is that right?

4          A.   Yes.

5          Q.   Did you evaluate the direction of

6    the price reaction on those four days?

7          A.   No.

8          Q.   If on each of the four days that

9    there was a price reaction, if the stock price

10   moved in a direction that was opposite to what

11   the news would suggest, would your test still

12   find that the market was efficient?

13         A.   The test is not limited to just

14   looking at the number of news days -- I'm

15   sorry, the number of statistically significant

16   price reactions on news days.  It is in

17   comparing two samples of data.  So I just

18   wanted to correct -- correct that, that is not

19   an entire analysis.  So I wouldn't draw any

20   conclusion.

21         Q.   But if on each of those four days

22   with a statistically significant price

23   reaction the stock price moved in a direction

24   that was opposite to what the news would

25   suggest, would your test still find that the

1    market was efficient?

2            MR. FEDERMAN:  Object to the form of

3        the question.

4            THE WITNESS:  Just to clarify, you

5        said what the news would suggest.  So,

6        hypothetically, there is some information

7        that hits the market and, you know, three

8        analysts say, oh, my gosh, this is

9        terrible for the stock, we can't believe

10        this, you know, negative news, came out

11        of nowhere, we're shocked, and the price

12        goes up by 20 percent, I would think that

13        was odd.

14    BY MR. CHAPUT:

15        Q.   But you did not evaluate in this

16    case whether the stock price on those four

17    statistically significant price reaction days

18    responded in the direction that you would

19    expect based on the announcement that was

20    made?

21        A.   Two of the four are mentioned later

22    in my report as events that I specifically

23    looked at.  So, in that context, yes, I did.

24        Q.   And did you look at the other two of

25    the four events in a similar analysis?

1        A.   Generally.  I didn't perform a

2   separate analysis.  But generally, I'm

3   familiar with the nature of the news and the

4   direction of the price change.

5        Q.   And was the direction of the price

6   change for those two that aren't specifically

7   looked at in your report consistent with the

8   nature of the news?

9        A.   I don't recall.

10        Q.   How important is it for an event

11   study to use an objective and replicable

12   methodology?

13        A.   Certainly, the methodology is

14   standard.  However, the application of any

15   event study is subject to the different facts

16   and circumstances presented and the problem,

17   so to speak, that you are asked to solve or

18   analyze.

19             So, in terms of, you know, core

20   event study methodology, it would be important

21   to stick to the standard.  In terms of the

22   application, the application really is

23   accustomed, you know, to whatever facts and

24   circumstances are presented to you.

25        Q.   How important is it for the

1    application of an event study that's tailored

2    to the facts and circumstances to use an

3    objective and replicable methodology?

4         A.   It would be consistent with my

5    practice to set forth an objective standard or

6    an objective set of criteria in applying an

7    event study methodology.

8         Q.   And is the purpose of using that

9    objective set of criteria to ensure that the

10   methodology is unbiased?

11        A.   I'm not sure necessarily that

12   setting forth an objective criteria guarantees

13   that the application is unbiased.

14        Q.   Does -- go ahead.

15        A.   If I might elaborate on that?

16             An example would be, let's say,

17   I'm looking at a short time frame and I know

18   ahead of time that during this period there

19   are, you know, two alleged corrective

20   disclosures related to earnings announcements

21   and my objective selection criteria is to just

22   isolate earnings announcements, that is a

23   replicable objective criteria for selecting

24   events of interest.  However, I'm not sure,

25   because I know ahead of time, that those are

1  corrective -- alleged corrective disclosures

2  and there's a large price reaction, I'm not

3  sure that doesn't bias my results.

4              Does that make sense?

5      Q.   It does.  So what kinds of

6  safeguards can you use to ensure then that the

7  methodology is unbiased?

8      A.   Again, there are many ways to

9  implement an event study, so there are many

10  ways that you can design a model and a

11  procedure to select your events of interest.

12              What I have done here is to

13  include the Bloomberg news that mentions or is

14  about UTi and the analyst reports that were

15  issued during the perspective class period by

16  analysts that were following the company at

17  the time.

18      Q.   How did you determine what

19  constituted a news versus no news day?

20      A.   Well, a no news day did not have

21  either a Bloomberg news article or an analyst

22  report published.

23      Q.   I think you told me earlier, though,

24  that there were results from your Bloomberg

25  search that you excluded from your event

Page 56

1    chronology?

2         A.   Yes, there were.

3              So UTi was acquired by a

4    company called DSV, and one of the attributes

5    that is not so enduring of Bloomberg news is

6    when you search the archived news for UTi, it

7    also includes all news about DSV.  So those

8    are the articles that I excluded.

9         Q.   Were there any other articles that

10   mentioned UTi that were in that search that

11   you also excluded?

12        A.   Not -- there were no other articles

13   unless they mentioned price only.

14              So it's -- it's one of the --

15   you know, it's one of the types of news

16   articles that the St. John's Law Review

17   articles suggests removing.  So if, for

18   example, if Bloomberg publishes or, you know,

19   sends out a release that says UTi stock is up,

20   you know, half a percent today to $15 a share,

21   that's not news.

22        Q.   How did you identify those items

23   that mentioned UTi's stock price alone?

24        A.   I reviewed the article.  I reviewed

25   the release.

1    Q.    So, if there was any commentary no

2    matter how trivial, did you include the

3    article as news?

4    A.    Describe what you mean by anything

5    trivial?

6    Q.    Sorry, maybe you didn't hear me.

7              If there was any commentary no

8    matter how trivial, did you include the

9    article as news?

10    A.    Can you give me an example, because

11    I'm just not sure what you may consider

12    trivial is what I would consider trivial?

13    Q.    How much additional information had

14    to be included in the article beyond the stock

15    price for you to include it in your

16    chronology?

17    A.    If it only commented on the stock

18    price, no other information, it was not

19    included.

20    Q.    If it commented on the stock price

21    and also mentioned UTi's expected performance,

22    would it be included?

23    A.    Hypothetically?

24    Q.    Uh-hum.

25    A.    Expected performance by some

1    industry participant or guidance from

2    management or -- it would be included.

3         Q.   Did you perform any analysis to

4    determine whether the news that you identified

5    was in fact news as opposed to a further

6    report of something that had previously been

7    reported?

8              MR. FEDERMAN:  Object to the form of

9         the question.

10             THE WITNESS:  I reviewed each of the

11        news articles.  I did not cherry-pick or

12        select out news that I thought was of the

13        type that would necessarily change the

14        price.  So, if it was confirmatory news,

15        I included it as news.

16             Had I selected news that I thought

17        was of enough import that it would have

18        moved to the price, I would bias my

19        sample.

20   BY MR. CHAPUT:

21        Q.   And you said that you performed a

22   search in Bloomberg; is that right?

23        A.   Yes.

24        Q.   Why did you use Bloomberg as your

25   source for public press?

1      A.    Because I have access to it on my

2    desktop.

3      Q.    Do you have access to any other news

4    sources?

5      A.    Not without paying a fee.

6      Q.    And you indicate that you included

7    all analyst reports as archived by Thomson

8    Reuters; is that right?

9      A.    Yes.

10      Q.    So everything that's listed in your

11    Exhibit Eight, which is your list of analyst

12    reports, was categorized as news; is that

13    right?

14      A.    Not necessarily.

15      Q.    Why not?

16      A.    So there are oftentimes reports that

17    are archived by Thomson Reuters that are not

18    analyst reports as you and I would consider an

19    analyst reports.

20            There are some investor

21    services that from time to time will publish

22    what I would like to call maybe an

23    informational report, which basically

24    reiterates, you know, what the company's

25    earnings were, et cetera, without providing

1    independent professional analysis and

2    investment recommendations.

3         Q.   And did you exclude those

4    informational reports, as you termed them,

5    from your event study in this case?

6         A.   If there were any in this case, I

7    likely excluded those.

8         Q.   And would you have identified the

9    reports that you excluded?

10        A.   No.

11        Q.   Would you have listed them on your

12   Exhibit Eight, which is your list of analyst

13   reports?

14        A.   Can I look at Exhibit Eight?

15        Q.   Yeah, absolutely, of course.

16             MR. FEDERMAN:  By Exhibit A, you

17        mean Defendant's 101?

18             MR. CHAPUT:  No.  I mean Exhibit

19        Number Eight to Ms. Jones' expert report.

20             MR. FEDERMAN:  Okay.

21             MR. CHAPUT:  Which is Exhibit 101 in

22        the case.

23             MR. FEDERMAN:  I just wanted to be

24        able to make sure everybody is on the

25        same page when we read the transcript at

1      trial.

2   BY MR. CHAPUT:

3      Q.   Understood.  And this is part of

4   docket 103-1 and it starts on Page ID2564.

5      A.   So Exhibit Eight lists exactly as we

6   received it, the reports that Thomson Reuters

7   has archived.

8           Not each of these reports

9   appears in the event chronology.  For example,

10  on April 6th there appears to have been a

11  report by Wright Investors' Service.  And I'm

12  very familiar with the type of report that

13  that it is, and it's not what I would refer to

14  as an analyst report.

15     Q.   Is SADIF, S-A-D-I-F, Analytics a

16  company that you would consider that produces

17  analyst reports?

18     A.   It's not one of the companies that

19  was actively following UTi during this time

20  period.  It's more of an informational report

21  rather than an analyst report or, you know, an

22  analyst research report.

23     Q.   What is your methodology for

24  determining whether a particular analyst

25  report that's listed in this Exhibit Eight is

Page 62

1   an informational report as opposed to an

2   analyst report using your terminology?

3        A.   So, as a normal part of what I do, I

4   review analyst reports all the time.  I'm very

5   familiar with them.  I'm familiar with the

6   firms that I just mentioned.

7                  I know what their reports are

8   like.  I know the research that goes into

9   them.  I know that -- these analysts are not

10  the ones that are participating in the

11  company's earnings calls and asking questions

12  and providing responsive analyses to different

13  events happening at the company.

14                  So, based on my experience and

15  my review of millions of analyst reports, I

16  have, you know, selected the analyst reports

17  for the analysts that were following the

18  company actively participating and making

19  investment recommendations.

20       Q.   And does CFRA Research fall into

21  that same group as SADIF and Wright

22  Investors'?

23       A.   Yes.  I believe that's a

24  subscription-only research outfit.

25       Q.   Subscription-only research outfit

1  meaning what?

2      A.    So there are some firms that are not

3  your typical brokerage firm or investment

4  banking firm that just produce research for

5  certain subscribers to their database.

6      Q.    It's your opinion that research

7  performed by subscription-only research

8  outfits is not news for purposes of your event

9  study?

10     A.    I wouldn't necessarily say all.  But

11  my criteria here was to focus on the analyst

12  reports that were published by companies

13  actively following the company during this

14  time period and publishing reports including

15  earnings estimates and investment

16  recommendations.

17               I don't want to make a general

18  statement.

19     Q.    So you may have included some

20  reports by, for example, SADIF, but not

21  others?

22     A.    Here?

23     Q.    Yes.

24     A.    I'm not sure.  I'm not certain.

25     Q.    Okay.  Well, if you turn to the

Page 64

1    second page of Exhibit Number Eight to your

2    report, on the fourth line down, there's a

3    report by SADIF Analytics.  The subtitle is,

4    is UTi Worldwide, Inc. a good long-term

5    investment; do you see that?

6        A.   Yes.

7        Q.   And if you turn to Page 12 of your

8    report.  This is Page 3.  Do you see that

9    SADIF report listed in Exhibit 12?

10       A.   No.

11       Q.   And if you go back your Exhibit

12   Eight.  About halfway down the page on

13   September 10th 2013 --

14       A.   Yes.

15       Q.   -- there is a SADIF Analytics

16   report, is UTi Worldwide, Inc. a good

17   long-term investment; do you see that?

18       A.   On what date?

19       Q.   September 10th.

20       A.   Yes.

21       Q.   And if you go to Page 5 of your

22   Exhibit 12, do you see that SADIF report?

23       A.   No.

24       Q.   And you testified earlier that

25   Exhibit Number Eight to your report is all of

Page 65

1   the analyst reports that were listed by

2   Thomson Reuters; is that right?

3       A.   Yes, that's the list that we

4   received from Thomson Reuters.

5       Q.   Are you aware that there are 12

6   analysts reports on Thomson Reuters that are

7   not included in Exhibit Eight?

8       A.   There may be.

9       Q.   Why may there be?

10      A.   For reasons we just discussed.

11      Q.   That you would have excluded them?

12      A.   There may be items listed on the

13  Thomson Reuters list that are not analysts

14  reports by analysts that were actively

15  following the company during this time period.

16      Q.   Why would you exclude some reports

17  by analysts that were not actively following

18  the company, but not exclude others?

19      A.   Can you show me an example of where

20  I didn't exclude others?  I didn't think that

21  was the case.

22          MR. FEDERMAN:  Do you mean to say

23      exclude as opposed to include because I'm

24      not following you?

25

Page 66

BY MR. CHAPUT:

    Q.   Sure.  I will rephrase the question.

            Why would you exclude from your Exhibit Eight some analysts reports by analysts that were not actively following the company, but include some analysts reports by analysts that were not actively following the company?

      MR. FEDERMAN:  I'll object to the question.

      THE WITNESS:  I don't know that that's the case.

BY MR. CHAPUT:

    Q.   Would global data reports fall into the category of reports by analysts that were not actively following the company?

    A.   Can you show me a global data report?

    Q.   Would Market Line reports fall into the category of reports by analysts that were not actively following the company?

    A.   I believe so.

    Q.   And we talked before about the fact that you used Bloomberg to find your news, not including report analyst reports?

Page 67

1        A.    Correct.

2        Q.    Is it your usual approach to use

3    only Bloomberg to identify news?

4        A.    There's no usual approach per se.

5    So each time you perform an event study, the

6    application is different essentially guided by

7    the facts and circumstances.

8                So, for example, in this case,

9    it's my understanding that the investor

10    relations file has not been produced at this

11    time.  I would guess that when that file was

12    actually produced we may have a whole

13    compendium of news articles and analyst

14    reports that the company collected.

15                So, in lieu of that additional

16    information, including the Bloomberg news, is

17    an objective way to identify news days.

18        Q.    Did you assume that Bloomberg would

19    include all available news during the relevant

20    period?

21        A.    I don't know if I made that

22    assumption.

23                What I will say is that it

24    would not surprise me if at this point in time

25    there may have been news items that were not

Page 68

1    archived by Bloomberg.  However, obtaining all

2    of the Bloomberg news during time period is an

3    objective way to identify news days.

4                   If I might add to that answer,

5    as I mentioned previously, there are instances

6    when you may limit your news days or so-called

7    news days to just earnings announcement days.

8    That doesn't mean that on any other day other

9    than an earnings announcement day there

10   weren't news items.  But that would be an

11   objective selection criteria as well if you

12   had, you know, enough earnings announcement

13   days that you could, you know, feel like you

14   had a robust sample.

15        Q.   And is it your opinion that

16   Bloomberg provided a robust sample --

17        A.   Yes.

18        Q.   -- in this case?

19                   Have you supplemented Bloomberg

20   with other databases in other expert reports?

21                   MR. FEDERMAN:  In this case or other

22        cases?

23   BY MR. CHAPUT:

24        Q.   Have you supplemented Bloomberg with

25   other databases and expert reports in other

1    cases?

2         A.    I can think of, you know, not

3    specifically, but certainly, there are other

4    news archive sources that I have used.

5         Q.    And why did you not supplement

6    Bloomberg with one of those, one or more of

7    those, other news sources in this case?

8         A.    It wasn't necessary.  I had robust

9    sample of news day.

10        Q.    Would a more comprehensive search

11   have made your sample more robust?

12             MR. FEDERMAN:  Object to the form of

13        the question.

14             THE WITNESS:  Hypothetically, it

15        could have.  I don't know that for a

16        fact.

17   BY MR. CHAPUT:

18        Q.    Hypothetically, if you had

19   supplemented Bloomberg and Bloomberg did not

20   cover all news, your classification of news

21   versus new days -- sorry.  I'll start over.

22             Hypothetically, if you had

23   supplemented Bloomberg and Bloomberg did not

24   cover all news, your classification of news

25   versus no news days could change in this case;

1    appears that this analysis in paragraph 58 was

2    performed in the context of determining market

3    efficiency; is that correct?

4        A.   Yes.

5        Q.   And can you explain to me what

6    analysis you're describing in paragraph 58.

7        A.   It is a selection of dates for

8    analyses in terms of the -- whether there was

9    significant abnormal returns on dates that

10   were either alleged to have contained a

11   misrepresentations or there were partially

12   curative disclosures.

13       Q.   And you told me before that the

14   statistical significance of excess returns on

15   alleged misrepresentation days is not relevant

16   to a determination of market efficiency; is

17   that right?

18       A.   Not in a vacuum.

19       Q.   Why did you not perform the same

20   examination regarding alleged misstatement

21   days in the case of UTi?

22       A.   As I mentioned, each situation

23   presents a unique set of facts and

24   circumstances, and I determined that it was

25   less subjective to include all news days in my

Page 74

1    analysis of abnormal returns on news days

2    versus non-news days in this case.

3                So event studies are not one

4    size fits all.  And you've got to adopt your

5    application criteria to, you know, a certain

6    time period that you are constrained by, and

7    the facts and circumstances, the available

8    data.  There are a number of factors that you

9    would look at in developing a model that

10   assists you in answering the questions that

11   you're seeking answers for.

12       Q.   But you could have performed a

13   similar analysis in this case in addition to

14   your news versus no news event study, correct?

15       A.   You could have performed event

16   studies in a number of different ways, but,

17   you know, doesn't mean that, you know, one is

18   more or less relevant.

19                I am very happy with the event

20   study that I performed here.  There's an

21   objective criteria for including -- or

22   identifying news days, and the statistics from

23   that analysis show that the market model that

24   I developed is robust, it's a reliable

25   predictor of the returns, expected returns for

1    Because, as you know, these are not just

2    misrepresentation days that were tested here,

3    so -- and as I've explained, you wouldn't

4    expect necessarily to see any abnormal price

5    return on a misrepresentation -- alleged

6    misrepresentation day if the misrepresentation

7    was just a continuation of what the company

8    said previously.  So, for two reasons, I can't

9    agree with you.

10        Q.   How do you define stock returns?

11             MR. FEDERMAN:  How do you define

12        stock returns?

13             MR. CHAPUT:  Correct.

14             MR. FEDERMAN:  I object to the

15        question.

16             THE WITNESS:  How do I define a

17        daily stock price return?

18    BY MR. CHAPUT:

19        Q.   In paragraph 62 of your report, you

20    say that you used daily price returns.  What

21    is the definition of daily price returns?

22        A.   Thank you.  The percentage change in

23    the price from close to close.

24        Q.   When you're using an event study

25    model, would you need to use returns that

1    include dividends?

2         A.    Not if you are trying to ascertain

3    the change in the price of the stock.

4              So one might include dividends

5    or interest in common in the case of a

6    fixed-income security if you are assessing a

7    performance of your portfolio and you want to

8    obtain a total return for that particular

9    investment.

10        Q.    Would excluding dividends from the

11   daily price return of a stock misstate the

12   value of the stock?

13        MR. FEDERMAN:  Object to the form of

14        the question.

15        THE WITNESS:  No.

16   BY MR. CHAPUT:

17        Q.    Would ignoring dividends from --

18   would ignoring dividends in calculating an

19   index misstate the value of the index?

20        A.    It depends what you're trying to

21   represent in the index.  So some indices are

22   price only and some indices are total return

23   index.  So it depends.

24        Q.    In your report, you talk about the

25   Cammer factors and Krogman factors; is that

Page 82

1           MR. CHAPUT:  Page 43.

2           MR. FEDERMAN:  Forty-three.

3           MR. CHAPUT:  Footnote 58.

4           THE WITNESS:  Oh, yeah, uh-hum.

5     BY MR. CHAPUT:

6           Q.   And this chapter of a book explains

7     the methodology that you believe is

8     appropriate for calculating damages on a

9     class-wide basis in this class action; is that

10    right?

11          A.   It's a general -- it's a general

12    description of a generally accepted

13    methodology.

14          Q.   And does the cited chapter summarize

15    the methodology that you believe is the

16    appropriate way to calculate damages on a

17    class-wide basis in this action?

18          A.   I think that I set forth in my

19    report the methodology, which would be the

20    application of an event study analysis to

21    identify alleged inflation per share for each

22    date during the proposed class period that a

23    perspective investor may have purchased the

24    stock.

25          Q.   And this Crew chapter also explains

Page 83

1    how to use an event study to do a similar

2    analysis; is that right?

3         A.   Yes, they -- generally, yes.

4         Q.   And in your opinion, the out of

5    pocket loss calculation using an event study

6    is the most appropriate methodology to use to

7    calculate damages on a class-wide basis in

8    this case; is that right?

9         A.   I think it depends on the ultimate

10   finding of liability.  But, given the

11   allegations here, I believe that this is a

12   reliable methodology for ascribing damages in

13   this case.

14        Q.   And what experience did you draw on

15   to form that opinion?

16        A.   I have calculated potential investor

17   damages in hundreds of litigations such as

18   this one.  I am also frequently retained by

19   the SEC to develop plans of allocation in

20   their disgorgement proceedings, and it's a

21   methodology that I also employ there.

22        Q.   And you described this methodology

23   as being generally accepted and widely used;

24   is that correct?

25        A.   Yes.

Page 84

1      Q.    And what's the basis for that

2    opinion?

3      A.    The methodology has been adopted and

4    implemented in developing and administering

5    plans of allocation and settlement proceeds in

6    most, if not all, of the securities class

7    actions that have been resolved in my

8    experience over the last 25 years.

9      Q.    So this methodology that you set

10   forth is consistent with methodologies you've

11   used in developing and administering plans of

12   allocation and settlement proceeds in class

13   actions?

14     A.    Yes.  It's also been the basis for

15   preliminary damages analyses that have been

16   used in a mediation context to help resolve

17   the issue of damages in cases where they've

18   gone to mediation, both sides have presented

19   findings with regard to damages, and a

20   settlement was negotiated.

21     Q.    Have you been involved in any cases

22   in which this methodology was ultimately used

23   to determine damages after a finding of

24   liability at trial?

25     A.    I have never testified at trial.

Page 85

1      Q.   Are you aware of any cases in which

2  this methodology was ultimately used to

3  determine damages after a finding of liability

4  at trial?

5      A.   I don't believe so.  I don't know

6  anything specific.

7      Q.   With respect to the ability to

8  calculate class-wide damages, you say that you

9  determine the amount of artificial inflation

10  using the event study methodology; is that

11  right?

12      A.   Yes.

13      Q.   And you say that you will have to

14  isolate that portion of the price impact that

15  was attributed to certain corrective

16  disclosures; is that right

17      A.   That is correct.

18      Q.   And you say that the amount of

19  artificial inflation in the price of the stock

20  can be determined on a daily basis using the

21  historical pricing data; is that right?

22      A.   That's right.

23      Q.   And then you indicate that once you

24  determine the amount of artificial inflation

25  you will to apply to it to class members

Page 86

1    actual purchase and sale activity, and

2    individual losses can be calculated using a

3    single common formula consistent with

4    Plaintiff's theory of liability, correct?

5         A.   Correct.

6         Q.   Have you done any of that work?

7         A.   No.

8         Q.   How can you be sure that the

9    out-of-pocket methodology that you describe to

10   calculate damages will be useful or even

11   workable if you have not attempted to

12   implement that methodology?

13             MR. FEDERMAN:  Object to the form of

14        the question.  Mischaracterizes the

15        testimony.

16             THE WITNESS:  The facts and

17        circumstances here and the stock price

18        behavior here following the alleged

19        corrective disclosures is consistent with

20        facts and circumstances that have been

21        used, you know, in other cases where this

22        methodology was applied.

23   BY MR. CHAPUT:

24        Q.   But you aren't aware of any cases in

25   which this methodology was applied to

1    calculate damages after a finding of

2    liability, correct?

3         A.   I can't -- well, in the SEC matters

4    in which I've been a consultant, there is

5    necessarily a finding of liability before I am

6    brought in to develop a damages model to

7    allocate the disgorgement proceeds.  So, you

8    know, in those circumstances, yes, I am aware

9    and, yes, this methodology has been used.

10        Q.   When you describe how you plan to

11   calculate damages, you indicate that you will

12   also use company-specific information that is

13   relevant to the allegations in this case; is

14   that right?

15        A.   I have not yet been asked to do

16   that, so I have no plan per se.

17        Q.   When you describe how you could

18   calculate damages, you indicate that you will

19   also use company-specific information that is

20   relevant to the allegations in this case; is

21   that right?

22        A.   That would potentially inform my

23   analysis, yes.

24        Q.   And what does that mean?

25        A.   So, as I described, the event study

1    is, you know, based on publicly available data

2    and information that enters the market about

3    the common stock here.  I would imagine that

4    once discovery has been completed, there may

5    be other companies' specific information that

6    might inform the methodology in terms of

7    parsing out that portion of the price decline

8    related to Plaintiff's allegations as opposed

9    to what I will term "confounding information"

10   that's unrelated to the allegations here.

11        Q.   And how is the event study used to

12   sort out the confounding information from the

13   corrective disclosure?

14        A.   The event study may not be used to

15   necessarily parse out that portion of

16   information.  So there are other methodologies

17   that may be implied including, for example,

18   looking at changes in earnings expectations or

19   the consensus earnings estimates of the

20   analysts following the company before and

21   after the corrective disclosure.

22        Q.   But you don't describe any of those

23   potential analyses in your report, correct?

24        A.   I describe the standard methodology

25   for calculating out-of-pocket damages here,

Page 89

1   which is to first and foremost start with an

2   event study that isolates companies'

3   perspective price movements from those price

4   movements that might be caused by market or

5   industry factors that would be unrelated and

6   certainly unrecoverable as damages.

7        Q.   But you don't describe any

8   methodology for sorting out confounding

9   information from that company-specific

10  information that is accounted for in the event

11  study?

12       A.   Right, not in detail.

13       Q.   Not in detail, or not at all?

14       A.   So I believe the sentence is the

15  level of inflation in the price of UTi common

16  stock can be calculated using the results of

17  an event study along with company-specific

18  information that is relevant to the

19  allegations in the instant case.

20            So it's not just the event

21  study, but there would be an additional part

22  of the analysis that would look at

23  company-specific information that's relevant

24  to the allegation.  So, in the broader

25  context, yes, that's described here.

1              The event study is not the

2     penultimate methodology for coming up with the

3     per share damages.  If it's found that there

4     are confounding events, there are ways to

5     isolate the portion that's related to the

6     allegations.

7              MR. CHAPUT:  We've been going for

8         another hour.  Would you like to take a

9         break?

10             THE WITNESS:  Sure.

11             MR. FEDERMAN:  Take a break.  All

12        right?

13             MR. CHAPUT:  We can go off the

14        record.

15             THE VIDEOGRAPHER:  This marks the

16        end of tape number two.  We're going off

17        the record at 12:19 p.m.

18                  -   -   -

19                  (Whereupon, a short recess

20          was taken.)

21                  -   -   -

22             THE VIDEOGRAPHER:  This marks the

23        start of tape number three.  We're back

24        on the record at 12:32 p.m.

25                  -   -   -

1              (Whereupon, Exhibit 105 was

2         marked for identification.)

3                   -   -   -

4    BY MR. CHAPUT:

5         Q.   Ms. Jones, you've been handed what

6    we've marked as Exhibit 105, which is a Form

7    8-K for UTi Worldwide, Inc.  The date of

8    report is February 25th 2014.

9                   Have you seen this document

10   before?

11        A.   I have.

12        Q.   Did you review this document in

13   reaching your conclusions in your report?

14        A.   Just to the extent that it contained

15   information that entered the market, yes.

16        Q.   And did you consider this document

17   in determining whether class-wide damages are

18   subject to a common methodology in this case?

19        A.   Not specifically.

20        Q.   If you would turn with me to Page 3.

21   There are page numbers both at the top and the

22   bottom.  I'm referring to the number on the

23   bottom.

24        A.   Okay.

25        Q.   And the first sentence under

1    overview reads, in fiscal year 2014, we

2    experienced the effects of a lackluster global

3    economy along with difficult operating

4    conditions as reflected in our preliminary

5    results described below; do you see that?

6         A.   Yes.

7         Q.   We were talking before about

8    information that might be relevant to

9    investors.  Do you think this information

10   would be relevant to investors?

11        A.   Yes.

12        Q.   Do you think that this information

13   would be considered confounding information

14   just like we were talking just before our last

15   break?

16        A.   Confounding in what way, confounding

17   to -- to what other information?

18        Q.   Confounding in the context of

19   calculating damages in this case.

20        A.   I'm not sure I would necessarily

21   characterize it as confounding, but I

22   certainly think that it's a piece of

23   information that one would want to consider in

24   developing a damages methodology or a

25   damages -- quantifying damages.

Page 93

1      Q.    And why would you not characterize

2   it as confounding?

3      A.    Because it's not new at the time

4   that the other corrective disclosures were

5   made.  It's not something that suddenly

6   happened.

7               So, as it says here, throughout

8   the entire year, we've experienced the effects

9   of a lackluster global economy.  It does not

10  say we just discovered at this very moment

11  that we've been subject to a lackluster global

12  economy.

13     Q.    If you turn to Page 5, the second

14  full paragraph, the first sentence reads,

15  revenues and net revenues for the fourth

16  quarter and fiscal year 2014 reflect a

17  lackluster global economy and difficult

18  operating conditions.

19               Is that a piece of information

20  that would be relevant to investors?

21     A.    Certainly.

22     Q.    Is that a piece of information that

23  could be confounding information when

24  calculating damages in this case?

25     A.    Not necessarily.

1     Q.    Why not?

2     A.    Hypothetically, the analysts would

3  have taken those conditions into account in

4  forming their earnings estimates for this

5  company in the fourth quarter.

6     Q.    Have you determined that analysts

7  did take those conditions into account in

8  forming their earnings estimates for UTi in

9  the fourth quarter of fiscal year 2014?

10    A.    I have not yet done any such damages

11 analysis.

12    Q.    If you look at the following page,

13 under the heading matters impacting first

14 fiscal quarter 2015; do you see that?

15    A.    Yes.

16    Q.    And the second sentence reads, in

17 addition to normal seasonality issues, we

18 believe our operating results for the first

19 fiscal quarter of 2015 will be negatively

20 impacted by the continued effect of a number

21 of factors that affected our fiscal 2014

22 results, including pricing pressures,

23 severance costs associated with our ongoing

24 business transformation initiative, increase

25 in receivables, amortization associated with

1    our 1View system, which began in

2    September 2013, and our higher than

3    historically normalized tax rate.

4                 Do you see that?

5         A.   Yes.

6         Q.   Would that information be considered

7    relevant to investors?

8         A.   Yes.

9         Q.   And could that be confounding

10   information in calculating damages in this

11   case?

12        A.   To the extent, hypothetically, that

13   it's new or different information that is

14   revealed at the same time that the alleged

15   corrective disclosures are made.

16        Q.   And is it your understanding that

17   the alleged corrective disclosures were made

18   on February 25th of 2014?

19        A.   I thought it was the 26th, but I

20   could be wrong.  I believe this was filed on

21   the morning of the 26th.  I could be mistaken,

22   but that's my recollection.

23        Q.   Certainly.  If this was filed on the

24   morning of the 26th at the same time as the

25   alleged corrective disclosures were made, then

Page 96

1    would that mean that this information on Page

2    6 would be confounding information in

3    calculating damages in this case?

4        A.   Not necessarily.

5        Q.   Why not?

6        A.   If --

7            MR. FEDERMAN:  Object to the form of

8        the question.  She said she hasn't done a

9        damages analysis; you realize that,

10       right?

11           THE WITNESS:  It depends whether

12       this information is inconsistent with

13       expectations that are already priced into

14       the stock.

15   BY MR. CHAPUT:

16       Q.   Further down in that same paragraph,

17   there's a sentence, our results will also

18   likely be negatively impacted by the South

19   African Rand to U.S. dollar exchange rate; do

20   you see that?

21       A.   Yes.

22       Q.   And do you think that piece of

23   relevant -- excuse me, do you think that this

24   piece of information is relevant information?

25       A.   It's relevant.

1      Q.   And is it potentially confounding

2   information in calculating damages in this

3   case?

4               MR. FEDERMAN:  Object to the form of

5          the question.

6               We're not going to continue going

7          down this road unless this is the one

8          deposition you're going to take of the

9          witness and you're waiving taking a

10         second deposition after she provides an

11         analysis and report on damages.  You're

12         not getting two cracks at one witness on

13         the same subject matter.

14              MR. CHAPUT:  The witness has

15         provided an opinion regarding whether it

16         would be possible to calculate damages on

17         a class-wide basis in this case.  And my

18         question asks whether this piece of

19         information is potentially confounding

20         information, which she has already stated

21         could be relevant to the calculation of

22         damages on a class-wide basis.

23              MR. FEDERMAN:  You're not asking

24         about the methodology, though.  That's

25         what you're missing.  To restrict it that

Page 98

1    way, that's different.

2         You're being -- you're not as broad

3    in your questioning as I think you intend

4    to be.  If you're questioning her about

5    her methodology, that's one thing.

6    That's what she opined to.

7         But if you're going to start getting

8    involved in what are the components of

9    the damages analysis that she's not

10   performed that she's not appearing to

11   testify on today, that's something else.

12   That's the distinction I'm making for

13   you.  It's your deposition, your

14   opportunity.

15   BY MR. CHAPUT:

16        Q.   We can move on for now.

17             In your opinion in this case,

18   do you think the excess return on

19   February 26th 2014 should be the inflation for

20   all class members throughout the entire

21   period?

22        A.   I haven't studied that.

23        Q.   According to the methodology that

24   you describe in your report, would the excess

25   return on February 26th 2014 be the inflation

Page 99

1    for all class members throughout the entire

2    class period?

3          A.    I haven't studied that.

4          Q.    To be clear, I'm not asking whether

5    you studied it.

6                I'm asking whether if you were

7    to apply the methodology that you describe in

8    your report, the excess return on

9    February 26th 2014 would be the inflation for

10   all class members throughout the entire class

11   period?

12         A.    The excess return on February 26th

13   2014 may give rise to a calculation of damages

14   on a class-wide basis.

15               However, without having studied

16   it, I wouldn't want to limit my answer to the

17   excess returns on that particular date only,

18   nor would I want to indicate the quantum of

19   the excess return on that date that may be

20   related to a finding of liability.

21         Q.    Is it your opinion that under this

22   methodology you describe the artificial

23   inflation would be constant throughout the

24   class period?

25         A.    Not necessarily.

1    Q.   So it's possible that the inflation

2    could change over the class period?

3    A.   The damages necessarily flow from

4    liability, so the damage model would have to

5    be structured in lockstep with liability.

6    Q.   Does the methodology you describe in

7    your opinion explain how you could calculate

8    artificial inflation that changed over the

9    course of the class period?

10    A.   Not specifically.  However, it does

11    say along with company-specific information

12    that is relevant to the allegations in the

13    instance case.

14            It does not elaborate and say

15    this potentially includes, you know, changing

16    inflation throughout the class period

17    depending upon, you know, what the trier of

18    fact finds as the liability.

19    Q.   Does your opinion explain

20    methodologies that might be used to determine

21    artificial inflation that changes throughout

22    the class period?

23    A.   It explains the standard

24    methodology.  It doesn't detail the

25    application of that methodology to a number of

1   different potential scenarios on liability.

2        Q.   Does the standard event study

3   methodology you describe -- let me rephrase.

4             Can the standard event study

5   methodology you describe on its own determine

6   artificial inflation that changes throughout

7   the class period?

8        A.   What do you mean "on its own"?

9        Q.   If you were to apply the event study

10  methodology without additional further

11  analysis, could you determine artificial

12  inflation that changes throughout the class

13  period?

14       A.   Hypothetically, if we were dealing

15  with a securities case where it was alleged

16  that there were -- or it was found that there

17  were numerous partially curative disclosures

18  throughout the class period, then the event

19  study methodology could be used to quantify

20  damages in that case where the inflation may

21  change throughout the -- the class period.

22       Q.   Is it your understanding that there

23  are numerous partially curative disclosures in

24  this case?

25       A.   I haven't studied that.  I haven't

1    performed a damage analysis here.

2         Q.   Based on your review of the

3    complaint, is it your understanding that there

4    are numerous partially curative disclosures

5    alleged in this case?

6         A.   I don't recall.

7         Q.   Do you believe that the same

8    information that was conveyed on the alleged

9    corrective disclosure date could have been

10   conveyed on the first day of the class period?

11             MR. FEDERMAN:  Object to the form of

12        the question.  It asks the witness to

13        speculate.

14             THE WITNESS:  I have no idea.

15             MR. CHAPUT:  We can go off the

16        record.

17             MR. FEDERMAN:  Sure.

18             THE VIDEOGRAPHER:  Going off the

19        record at 12:49 p.m.

20                     -   -   -

21                  (Whereupon, a short recess

22          was taken.)

23                     -   -   -

24             THE VIDEOGRAPHER:  We are back on

25        the record at 1:00 p.m.